UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PLUMBERS LOCAL #200 PENSION FUND, <br> 2121 Fifth Avenue <br> Ronkonkoma, NY 11779 <br><br> Individually and on Behalf of All Others <br> Similarly Situated, <br><br>                         Plaintiff, <br><br>   vs. <br><br> THE WASHINGTON POST COMPANY <br> 1150 15th Street, N.W. <br> Washington, DC  20071 <br><br> DONALD E. GRAHAM <br> 8103 Glen Welby Lane <br> Marshall, VA  20115 <br><br> HAL S. JONES <br> 3725 Upton Street NW <br> Washington, DC  20016 <br><br>                         Defendants. | Civil No.: <br><br> CLASS ACTION <br><br> <u>DEMAND FOR JURY TRIAL</u> |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECURITIES LAWS**

**JURISDICTION AND VENUE**

1.      Jurisdiction is conferred by §27 of the Securities Exchange Act of 1934 ("1934 Act"). The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. §240.10b-5.

2.      Venue is proper in this District pursuant to §27 of the 1934 Act. Many of the false and misleading statements were made in or issued from this District.

3.      The Washington Post Company's ("Washington Post" or the "Company") principal executive offices are located at 1150 15th Street, N.W., Washington D.C. 20071.

4.      In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**INTRODUCTION**

5.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Washington Post between July 31, 2009 and August 13, 2010, inclusive (the "Class Period"), against Washington Post and certain of its officers and/or directors for violations of the 1934 Act. These claims are asserted against Washington Post and certain of its officers and/or directors who made materially false and misleading statements during the Class Period in press releases, analyst conference calls, and filings with the SEC.

6.      Washington Post is a diversified education and media company. The Company's Kaplan Inc. ("Kaplan") subsidiary is a for-profit educational institution that provides an extensive range of education and related services worldwide for students and professionals. Kaplan operates through four segments: Kaplan Higher Education, Kaplan Test Preparation, Kaplan International and Kaplan Ventures. Kaplan Higher Education, through Kaplan University and its Kaplan Higher Education Campuses, provides a wide array of certificate, diploma and degree programs – on

campus and online – designed to meet the needs of students seeking to advance their education and career goals.

7. During the Class Period, defendants issued materially false and misleading statements regarding the Company's business and financial results. Specifically, defendants failed to disclose that the Company had been engaging in abusive and fraudulent recruiting and financial aid lending practices, thereby increasing Washington Post's student enrollment and revenues. As a result of defendants' false statements, Washington Post's common stock traded at artificially inflated prices during the Class Period, reaching a high of $541.38 per share on April 15, 2010.

8. Then on August 13, 2010, after the market closed, the U.S. Department of Education released data on federal student-loan repayment rates at the nation's colleges and universities. The data showed that repayment rates were 54% at public colleges and 56% at private non-profit institutions, compared to just 36% at for-profit colleges. Specifically, the data showed that the repayment rates at Washington Post's Kaplan University were a mere 27%.

9. On this news, the price of Washington Post stock dropped 8.10% – or $27.83 per share – from a closing price of $343.48 on August 13, 2010 to a closing price of $315.65 per share on August 16, 2010, the following trading day, on a 422% increase in trading volume.

10. The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a) the Company failed to disclose that it had engaged in improper and deceptive recruiting and financial aid lending practices and, due to the government's scrutiny into the for-profit sector, the Company would be unable to continue these practices in the future;

(b) the Company failed to maintain proper internal controls;

(c) many of the Company's programs were in jeopardy of losing their eligibility for federal financial aid; and

(d)     as a result of the foregoing, defendants' statements regarding the Company's financial performance and expected earnings were false and misleading and lacked a reasonable basis when made.

11.     As a result of defendants' false statements and omissions, Washington Post stock traded at artificially inflated prices during the Class Period.  However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down approximately 41.7% from their Class Period high.

## PARTIES

12.     Plaintiff Plumbers Local #200 Pension Fund purchased Washington Post publicly traded securities as described in the attached certification and was damaged thereby.

13.     As set forth above, Washington Post is a Delaware Company with principal executive offices located in Washington D.C.

14.     Defendant Donald E. Graham ("Graham") has served as Chairman of the Board and Chief Executive Officer of Washington Post since 1993.

15.     Defendant Hal S. Jones ("Jones") has served as the Senior Vice President-Finance and Chief Financial Officer of Washington Post since January 2009.

16.     Defendant Graham and Jones (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Washington Post's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse

facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

17.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Washington Post. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Washington Post stock was a success, as it: (i) deceived the investing public regarding Washington Post's prospects and business; (ii) artificially inflated the prices of Washington Post stock; and (iii) caused plaintiff and other members of the Class to purchase Washington Post publicly traded securities at inflated prices and suffer economic loss when the revelations set forth herein reached the market.

## CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Washington Post publicly traded securities during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

19.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Washington Post has almost 9 million shares of stock outstanding, owned by hundreds if not thousands of persons.

20.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

  (a) whether the 1934 Act was violated by defendants;

  (b) whether defendants omitted and/or misrepresented material facts;

  (c) whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

  (d) whether defendants knew or deliberately disregarded that their statements were false and misleading;

  (e) whether the price of Washington Post publicly traded securities was artificially inflated; and

  (f) the extent of damage sustained by Class members and the appropriate measure of damages.

21. Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

22. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

23. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## BACKGROUND

24. As stated above, Washington Post is a diversified education and media company. The Company's Kaplan subsidiary is a for-profit educational institution that provides an extensive range of education and related services worldwide for students and professionals. Kaplan operates through four segments: Kaplan Higher Education, Kaplan Test Preparation, Kaplan International and Kaplan Ventures. Kaplan Higher Education, through Kaplan University and its Kaplan Higher Education

Campuses, provides a wide array of certificate, diploma and degree programs - on campus and online - designed to meet the needs of students seeking to advance their education and career goals.

25. Kaplan University specializes in online education, is accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools and holds other programmatic accreditations. Most of Kaplan University's programs are offered online, while others are offered in a traditional classroom format at ten campuses in Iowa, Nebraska and Maryland. Kaplan University also includes Concord Law School, the nation's first fully online law school. At year-end 2009, Kaplan University had approximately 60,400 students enrolled in online programs and 5,120 students enrolled in its classroom-based programs.

## DEFENDANTS' FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

26. The Class Period begins on July 31, 2009. On that date, Washington Post issued a press release reporting its financial results for the 2009 second quarter ended June 28, 2009. The Company reported net income of $11.4 million or $1.30 diluted earnings per share and revenue of $1,128.5 million for the quarter. The Company also announced that as of June 30, 2009, Kaplan Higher Education's enrollments totaled 103,300, a 31% increase compared to total enrollments of 78,700 for the same quarter in the prior year.

27. On this news, Washington Post stock closed up 7.73%, or $32.50, from a closing price of $419.10 per share on July 30, 2009, to a closing price of $451.50 per share on July 31, 2009.

28. On October 30, 2009, Washington Post issued a press release reporting its financial results for the 2009 third quarter ended September 27, 2009. The Company reported net income of $17.1 million or $1.81 diluted earnings per share and revenue of $1,148.7 million for the quarter. The Company also announced that as of September 30, 2009, Kaplan Higher Education's enrollments totaled 103,800, a 28% increase compared to total enrollments of 81,400 for the same quarter in the prior year.

29. On January 21, 2010, Washington Post issued a press release announcing that it was increasing the Company's annual dividend rate on the Company's common stock from $8.60 to $9.00 per share.

30. On February 24, 2010, Washington Post issued a press release reporting its financial results for the 2009 fourth quarter and full-year ended January 3, 2010. The Company reported net income of $82.2 million or $8.71 diluted earnings per share and revenue of $1,238.4 million for the quarter. The Company reported net income of $91.2 million or $9.78 diluted earnings per share and revenue of $4,461.6 million for the year. The Company also announced that as of December 31, 2009, Kaplan Higher Education's enrollments totaled 104,900, a 32% increase compared to the prior year's total enrollments of 79,800.

31. On April 15, 2010, Washington Post's stock reached its Class Period high of $541.38.

32. On May 7, 2010, Washington Post issued a press release reporting its financial results for the 2010 first quarter ended April 4, 2010. The Company reported net income of $45.4 million or $4.91 diluted earnings per share and revenue of $1,171.2 million for the quarter. The Company also announced that as of March 31, 2010, Kaplan Higher Education's enrollments totaled 119,293, a 25% increase compared to total enrollments of 95,589 for the same quarter in the prior year.

33. On June 10, 2010, Senator Tom Harkin, chair of the U.S. Senate's Health, Education, Labor and Pensions Committee, announced that he would be holding a series of hearings to examine federal spending at for-profit colleges. The press release provided in pertinent part:

> Senator Tom Harkin (D-IA), Chairman of the Health, Education, Labor and Pensions (HELP) Committee, today announced that he plans to hold a series of hearings to examine federal education spending at for-profit higher education institutions. The hearings will begin June 24th.
>
> "In the past two years we have made major new investments to expand federal financial aid," said Harkin. "Pell Grants and student loans now provide more than $20 billion to for-profit higher education companies every year. We need to ensure

for-profit colleges are working well to meet the needs of students and not just shareholders. We owe it to students and taxpayers to make sure these dollars are being well spent."

Between 1998 and 2008 the for-profit sector has grown from 550,000 students to 1.8 million, a 225 percent increase. Students at for-profit institutions are borrowing more, and more frequently, than their peers at non-profit schools, and according to the Department of Education, one in five students who left a for-profit college in 2007 defaulted on their loan within three years.

The Committee will examine a broad range of issues related to the growing role of the for-profit higher education sector, including the scope and rapid growth of the federal investment in for-profit higher education and the corresponding opportunities and risks for students and taxpayers. Details on the first hearing will be available in the coming weeks.

34. On June 16, 2010, the U.S. Department of Education announced that it was proposing new tougher regulations on the industry designed to protect college students and taxpayers from abusive or fraudulent practices.

35. On June 24, 2010, the Senate held the first of its hearings entitled "Emerging Risk? An Overview of the Federal Investment in For-Profit Education."

36. By the end of June 2010, Washington Post's stock was trading at $410.48, down 24% from its Class Period peak of $541.38 on April 15, 2010.

37. On August 3, 2010, news began to leak into the market concerning the findings from an undercover operation conducted by the U.S. Government Accountability Office ("GAO") on recruiting techniques used in the for-profit higher education industry.

38. For example, on August 3, 2010, *The New York Times* published an article entitled "For-Profit Colleges Mislead Students, Report Finds," stating in pertinent part, as follows:

Undercover investigators posing as students interested in enrolling at 15 for-profit colleges found that recruiters at four of the colleges encouraged prospective students to lie on their financial aid applications — and all 15 misled potential students about their programs' cost, quality and duration, or the average salary of graduates, according to a federal report.

The report and its accompanying video are to be released publicly Wednesday by the Government Accountability Office, the auditing arm of Congress, at an oversight

hearing on for-profit colleges by the Senate Committee on Health, Education Labor and Pensions.

The report does not identify the colleges involved, but it includes both privately held and publicly traded institutions in Arizona, California, Florida, Illinois, Pennsylvania, Texas and Washington, D.C. According to the report, the colleges in question were chosen because they got nearly 90 percent of their revenues from federal aid, or they were in states that are among the top 10 recipients of Title IV money.

The fast-growing for-profit education industry, which received more than $4 billion in federal grants and $20 billion in Department of Education loans last year, has become a source of concern, with many lawmakers suggesting that too much taxpayer money is being used to generate profits for the colleges, instead of providing students with a useful high-quality education.

The report gave specific instances in which some colleges encouraged fraud. At one college in Texas, a recruiter encouraged the undercover investigator not to report $250,000 in savings, saying it was "not the government's business." At a Pennsylvania college, the financial representative told an undercover applicant who had reported a $250,000 inheritance that he should have answered "zero" when asked about money he had in savings — and then told him she would "correct" his form by reducing the reported assets to zero, a change she later confirmed by e-mail and voicemail.

At a college in California, an undercover investigator was encouraged to list three nonexistent dependents on the financial aid application.

In addition to the colleges that encouraged fraud, all the colleges made some deceptive statements. At one certificate program in Washington, for example, the admissions representative told the undercover applicant that barbers could earn $150,000 to $250,000 a year, when the vast majority earn less than $50,000 a year. And at an associate degree program in Florida, the report said, a prospective student was falsely told that the college was accredited by the same organization that accredits Harvard and the University of Florida.

According to the report, courses in massage therapy and computer-aided drafting that cost $14,000 at a California for-profit college were presented as good values, when the same courses cost $520 at a local community college.

Six colleges in four states told the undercover applicants that they could not speak with financial aid representatives or find out what grants and loans they were eligible for until they completed enrollment forms agreeing to become a student and paid a small application fee.

And one Florida college owned by a publicly traded company told an undercover applicant that she needed to take a 50-question test, and answer 18 questions correctly, to be admitted — and then had a representative sit with her and coach her through the test. A representative at that college encouraged the applicant to sign an enrollment contract, while assuring her it was not legally binding.

>But in some instances, the report said, the applicants were given accurate and helpful information, about likely salaries and not taking out more loans than they needed

39.     As news continued to come out concerning details of the government's investigation and the anticipated repercussions from the investigation on Washington Post's business and prospects, Washington Post stock continued to decline.

40.     On August 4, 2010, the GAO issued its report detailing its findings. At the request of Congress, the GAO undertook its investigation to determine if for-profit colleges engaged in fraudulent, deceptive or otherwise questionable marketing practices. The GAO's report cited many instances of abuse in the sector, finding that many of the companies in the industry – such as Washington Post – employed fraudulent and deceptive practices in their student recruitment, targeting students who used federal financial aid to pay for their schooling. The study was presented at a Senate education hearing held on August 4, 2010, as part of the ongoing government inquiry into the for-profit education sector. This was the second of the Senate's hearings on the industry, and was entitled "For Profit Schools: The Student Recruitment Experience."

41.     As a result, on August 4, 2010, Washington Post stock declined $11.60, or 2.71%, from a closing price of $428.18 on August 3, 2010, to a closing price of $416.58 on August 4, 2010.

42.     On August 6, 2010, Washington Post issued a press release announcing the Company's financial results for the 2010 second quarter ended July 4, 2010. The Company reported net income of $91.9 million or $10.00 diluted earnings per share and revenue of $1,201.8 million for the quarter. The Company also announced that for the first half of 2010, as of June 30, 2010, Kaplan Higher Education's enrollments totaled 112,221, an 18% increase compared to total enrollments of 94,703 for the same period in the prior year.

## The Truth Is Revealed

43.     On August 13, 2010, after the market closed, the U.S. Department of Education released data on student-loan repayment rates at the nation's colleges and universities. The data

showed that the repayment rates were 54% at public colleges and universities, 56% at private non-profit institutions and 36% at for-profit colleges. The data showed that the repayment rate at Washington Post's Kaplan University was just 27%.

44. In addition, the U.S. Department of Education proposed new regulations for programs to continue to be eligible to receive federal financial aid. The tests for eligibility would be based on repayment rates and debt-to-income loads. Under the proposed "gainful employment" regulations, programs would need to have a repayment rate of at least 45% to continue to be eligible for federal financial aid. The regulations if adopted will go into effect in July 2011. Based on the proposed regulations, many of Washington Post's programs are in jeopardy of losing their financial aid status.

45. On this news, the price of Washington Post's stock decreased $27.83, or 8.10%, from a closing price of $343.48 on August 13, 2010, to a closing price of $315.65 on August 16, 2010, the next trading day, on a 421% increase in trading volume.

46. The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a) the Company failed to disclose that it had engaged in improper and deceptive recruiting and financial aid lending practices and, due to the government's scrutiny into the for-profit sector, the Company would be unable to continue these practices in the future;

(b) the Company failed to maintain proper internal controls;

(c) many of the Company's programs were in jeopardy of losing their eligibility for federal financial aid; and

(d) as a result of the foregoing, defendants' statements regarding the Company's financial performance and expected earnings were false and misleading and lacked a reasonable basis when made.

47.     As a result of defendants' false statements and omissions, Washington Post publicly traded securities traded at artificially inflated prices during the Class Period.  After the above revelations seeped into the market, however, the Company's shares were hammered by massive sales, sending them down approximately 41.7% from their Class Period high.

### Additional Scienter Allegations

48.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Washington Post, their control over, and/or receipt and/or modification of Washington Post allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Washington Post, participated in the fraudulent scheme alleged herein.

### LOSS CAUSATION/ECONOMIC LOSS

49.     During the Class Period, as detailed herein, the defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Washington Post common stock and operated as a fraud or deceit on Class Period purchasers of Washington Post stock by misrepresenting the Company's business and prospects. Later, when the defendants' prior misrepresentations and fraudulent conduct became apparent to the market, through a series of partial disclosures, the price of Washington Post stock fell precipitously, as the prior artificial inflation came out of the price over time.  As a result of their purchases of Washington Post stock during the Class Period, plaintiff and other members of the

Class suffered economic loss, *i.e.*, damages, under the federal securities laws when the above-described revelations reached the market and the artificial inflation was removed.

**NO SAFE HARBOR**

50.     Washington Post's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

51.     The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Washington Post who knew that the FLS was false.  None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

**COUNT I**

**FOR VIOLATION OF §10(B) OF THE 1934 ACT AND RULE 10B-5
AGAINST ALL DEFENDANTS**

52.     Plaintiff incorporates ¶¶1-48 by reference.

53.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

54.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

      (a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Washington Post publicly traded securities during the Class Period.

55.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Washington Post common stock and sustained substantial losses when that artificial inflation was removed as a result of the disclosures described herein. Plaintiff and the Class would not have purchased Washington Post publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### FOR VIOLATION OF §20(A) OF THE 1934 ACT
### AGAINST ALL DEFENDANTS

56.     Plaintiff incorporates ¶¶1-48 by reference.

57.     The Individual Defendants acted as controlling persons of Washington Post within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, and their ownership of Washington Post publicly traded securities, the Individual Defendants had the power and authority to cause Washington Post to engage in the wrongful conduct complained of herein. Washington Post controlled the Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

- A. Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

- B. Awarding plaintiff and the members of the Class damages, including interest;

- C. Awarding plaintiff reasonable costs and attorneys' fees; and

- D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: October 28, 2010

*[signature: Roger M. Adelman]*
_____
ROGER M. ADELMAN, ESQ.

LAW OFFICE OF ROGER M. ADELMAN
ROGER M. ADELMAN (Bar No. 056358)
1100 Connecticut Avenue, NW - Suite 730
Washington, D.C. 20036
Telephone: (202) 822-0600
Facsimile: (202) 828-8528
Email: radelman@erols.com

*Local Counsel for Plaintiff*


ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID J. GEORGE
(*Motion For Admission Pro Hac Vice Pending*)
ROBERT J. ROBBINS
(*Motion For Admission Pro Hac Vice Pending*)
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: (561) 750-3000
Facsimile: (561) 750-3364
Emails: dgeorge@rgrdlaw.com
        rrobbins@rgrdlaw.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing documents was served on the Counsel of Record for all parties via process service or electronic mail in accordance with the Court's Order on this 25th day of October, 2010.

Roger M. Adelman
*Local Counsel for Plaintiff*