UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PLUMBERS LOCAL #200 PENSION FUND, ) Individually and on Behalf of All Others ) Similarly Situated, ) ) Plaintiff, ) ) vs. ) ) THE WASHINGTON POST COMPANY, ) DONALD E. GRAHAM and HAL S. JONES, ) ) Defendants. ) ) | Civil No.:1:10-cv-01835-PLF CLASS ACTION DEMAND FOR JURY TRIAL |

**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

I.      INTRODUCTION AND NATURE OF THE ACTION ..................................................1

II.     JURISDICTION AND VENUE ........................................................................................8

III.    PARTIES .............................................................................................................................8

IV.     CLASS ACTION ALLEGATIONS ................................................................................10

V.      CONFIDENTIAL SOURCES ........................................................................................11

VI.     SUBSTANTIVE ALLEGATIONS .................................................................................21

    A.      Introduction.......................................................................................................21

    B.      Washington Post's Business Model Depends on Maximizing the Amount of Financial Aid Obtained by Kaplan Students, Regardless of Their Ability to Ever Repay It.......................................................................................23

        1.      The For-Profit College Business Model Places Low-Income Students in High-Cost Schools ..................................................................23

        2.      The Vast Majority of For-Profit College Revenue Comes From Federal Student Aid ........................................................................................24

    C.      The HEA Provides Eligibility Criteria that an Institution Must Meet in Order to Participate in the Federal Student Aid Programs ...................................26

        1.      Incentive Compensation for Recruiters Is Not Permitted..........................26

        2.      Substantial Misrepresentations Are Prohibited .........................................27

        3.      Kaplan Is Required to Keep Cohort Default Rates Under 25% ...............28

        4.      Kaplan Must Comply With the 90/10 Rule ...............................................29

        5.      Kaplan Must Prepare Its Students For Gainful Employment ....................29

        6.      Kaplan Must Meet State Authorization and Accreditation Requirements ...............................................................................................30

        7.      Other "Applicable Laws" ...........................................................................31

    D.      At All Relevant Times, Kaplan Generated the Majority of Washington Post's Revenues .................................................................................................32

    E.      Washington Post's Kaplan Was All A "Numbers Game"...................................34

1.  The Company's Sales Machine Included an Army of Kaplan Admissions Advisors Stationed In Warehouse-Sized Call Centers ..........34

2.  Like A Boiler Room, Admissions Advisors Were Under Intense Pressure to Meet "Enrollment Quotas"........................................................36

3.  Admissions Advisors' Employment Status Was Directly Tied to Enrollment Numbers.................................................................................39

4.  Admissions Advisors' Compensation was Directly Tied to Enrollments....................................................................................................41

F.  In Order to Artificially Inflate the Company's Financials, Defendants Endorsed and Oversaw Unethical Recruiting Practices .........................42

1.  "Uncovering the Pain and the Fear – Creating Urgency" – Kaplan's Scripts............................................................................................51

2.  Kaplan Works the System, and Its Students, In Order to Obtain Financial Aid Awards ...................................................................................53

G.  Ability to Benefit - Kaplan Takes One Step Forward and Two Steps Back .........55

H.  Kaplan's Improper Practices Throughout the Class Period Were Orchestrated to Circumvent the Requirements of the 90/10 Rule.........................56

I.  Kaplan Skirts DOE Reviews .......................................................................58

J.  The GAO Investigates Kaplan, Prompting the Company's Education Division to Dramatically Change Its Practices.....................................................58

1.  The GAO Visit to the Pembroke Pines Campus.........................................58

2.  The Impact of GAO Report – Kaplan Scrambles to Minimize the Damage ..........................................................................................................59

K.  The Florida Attorney General Investigates Kaplan, and Reveals the Sworn Testimony of Two Former Kaplan Admissions Advisors......................................62

L.  Kaplan's Extensive Reporting Systems Provided Defendants With Knowledge of Kaplan's Predatory Business Model................................................63

VII.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD .......................................................................65

VIII.  POST CLASS PERIOD EVENTS AND DISCLOSURES............................................105

IX.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS REGARDING WASHINGTON POST'S BUSINESS CONDUCT AND ETHICS ...............................115

X.  ADDITIONAL SCIENTER ALLEGATIONS................................................................117

XI.     APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE
        MARKET DOCTRINE ....................................................................................................119

XII.    LOSS CAUSATION/ECONOMIC LOSS .................................................................120

XIII.   NO SAFE HARBOR ......................................................................................................124

XIV.    COUNT I:  FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE
        ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL
        DEFENDANTS ...............................................................................................................125

XV.     COUNT II:  FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE
        ACT AGAINST THE INDIVIDUAL DEFENDANTS .................................................128

XVI.    JURY TRIAL DEMANDED ..........................................................................................130

1.     Lead Plaintiff Iron Workers Local No. 25 Pension Fund ("Plaintiff"), individually and on behalf of a proposed class (the "Class") of all purchasers of the publicly traded common stock of The Washington Post Company ("Washington Post" or the "Company") between July 31, 2009 and August 13, 2010, inclusive (the "Class Period"), by and through its undersigned counsel, brings suit against Washington Post, Donald E. Graham ("Graham") and Hal S. Jones ("Jones") (Graham and Jones are sometimes collectively referred to as the "Individual Defendants") (Washington Post, Graham, and Jones are collectively the "Defendants").

2.     Plaintiff seeks remedies under the Securities Exchange Act of 1934 (the "Exchange Act") as a result of the fraudulent scheme undertaken by Defendants and the economic loss suffered when the true facts were revealed to the public through a series of disclosure events.  The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

## I.     INTRODUCTION AND NATURE OF THE ACTION

3.     For decades, Washington Post operated as a well-known media company, most recognizable for its newspaper publication. Times, however, have changed.  As set forth herein, the Company's very viability has become ever more reliant upon revenues generated by its education division.  Specifically, Washington Post operates Kaplan, Inc. ("Kaplan"), what the Company describes as "one of the world's largest diversified providers of educational services." Of relevance here is Kaplan Higher Education ("KHE"), the Company's for-profit, post-secondary education division whose U.S. operations include more than 70 campuses in 20 states, as well as online offerings through Kaplan University.

4.     Put simply, throughout the Class Period, Kaplan was the financial lifeline that kept the Company from drowning from the poor performance of Washington Post's newspaper.  What investors did not know, however, was that Defendants engaged in a fraudulent scheme designed to

boost Kaplan's student enrollments, financial results, and future business prospects. The result of Defendants' fraudulent scheme was to artificially inflate the price of Washington Post stock during the Class Period.

5.     Defendants' fraud involved two layers of deceit. First, Defendants oversaw Kaplan's systematic use of predatory and deceptive recruiting and financial aid practices, among other things, specifically implemented for the purpose of boosting financial results in the Company's education division. Second, and most pertinent here, Defendants misrepresented the true nature, cause, and driving force behind Washington Post's education division's financial performance and future business prospects throughout the Class Period.

6.     The market learned of the pervasive fraud occurring at Kaplan through bits and pieces of information that became public during the Class Period. Following the close of the Class Period, additional information continued to seep out. For example, on February 6, 2011, excerpts from a Kaplan recruiting script - the Company-approved formula for convincing "prospects" (*i.e.*, potential students) to enroll and pay exorbitant tuition fees funded (almost exclusively) by federal financial aid dollars - became public. On the floor the United States Senate, the curtain was pulled back ever so slightly to demonstrate the level of deceit implemented in the Company's education division during the Class Period. The following quotes are excerpts from the Company's official Kaplan recruiting script (capitalization and emphasis in original):

> IT IS ALL ABOUT UNCOVERING THEIR <u>PAIN AND FEARS</u>. ONCE THEY ARE REMINDED OF HOW BAD THINGS ARE, THIS WILL CREATE A SENSE OF URGENCY TO MAKE THIS CHANGE.
>
> *           *           *
>
> KEEP DIGGING UNTIL YOU UNCOVER THEIR PAIN, FEARS AND DREAMS. DO NOT ANSWER FOR THEM. <u>LET THEM PAINT THEIR OWN PICTURE</u>. IF YOU GET THE PROSPECT TO THINK ABOUT HOW TOUGH THEIR SITUATION IS RIGHT NOW AND IF THEY DISCUSS THE LIFE THEY <u>CAN'T</u> GIVE THEIR FAMILY BECAUSE THEY DON'T HAVE A DEGREE, YOU

WILL DRAMATICALLY INCREASE YOUR CHANCES OF GAINING A COMMITMENT FROM THE STUDENT.

IF YOU CAN STIR UP THEIR EMOTIONS, YOU WILL <u>CREATE URGENCY</u>!

*    *    *

IF YOU CAN HELP THEM UNCOVER THEIR TRUE PAIN AND FEAR. IF YOU GET THE PROSPECT TO THINK ABOUT HOW TOUGH THEIR SITUATION IS RIGHT NOW, IF YOU TALK ABOUT THE LIFE THEY CAN'T GIVE THEIR FAMILY RIGHT NOW BECAUSE THEY DON'T HAVE A DEGREE . . . YOU DRAMATICALLY INCREASE YOUR CHANCES OF ENROLLING THIS PROSPECTIVE STUDENT. GET TO THEIR EMOTIONS, AND YOU WILL CREATE THE URGENCY!

> -- Excerpts from Kaplan scripts, Senator Tom Harkin, Chairman of the Senate Committee on Health Education Labor and Pensions, Floor Statement, February 6, 2011.[1]

7.    Indeed during his February 6, 2011 speech on the floor of the U.S. Senate, Chairman Harkin specifically referred to Kaplan's internal sales script, demonstrating the Company ran Kaplan like a boiler-room sales machine, disguised as an institution of higher learning, focused on enrollment quotas and "numbers" above anything else. Discussing Washington Post's Kaplan on the U.S. Senate Floor, Harkin further stated:

> Kaplan University also encourages its recruiters to focus on pain and fear. This is a page from a manual dated July 8, 2009. With side notes about "advisor call control" and maintaining "rapport with PROSPECT," the document is similar to ITT's with questions to "uncover the pain and fear." At the bottom, in big capital, bold letters is the takeaway message for staff. "It is all about uncovering their pain and fears. Once they are reminded of how bad things are, this will create a sense of urgency to make this change." Sixteen pages of sales tactics later, the recruiter is taught to "restate back word for word, the better you restate the brighter the dream."

> Another Kaplan document says "keep digging until you uncover their pain, fears and dreams. . . ." If you get the prospect to think about how tough their situation is right now and if they discuss the life they can't give their family because they don't have a degree, you will dramatically increase your chances of gaining a commitment from the student. "Get to their emotions and you will create the urgency!" According to

---

[1] A true and correct copy of the Company's Kaplan recruiting script is attached hereto as ***Exhibit A***.

the Department of Education 30 percent of student loan borrowers at Kaplan default within three years of leaving school.

8.    Despite the fact that these and other now-documented predatory practices drove the vast majority of the Company's Class Period revenue, Defendants publicly touted Kaplan as "exceedingly student centric" where "everything is focused on helping our students." What Defendants did not disclose, however, was that Kaplan was nothing more than a telemarketing machine that relied on collections agency tactics to manipulate, deceive, and mislead tens of thousands of people to enroll at Kaplan and incur substantial amounts of student loan debt that the Company knew (and did not care) that the students would never be able to repay. Employing virtual armies of salespeople disguised as "Admissions Advisors," the Company utilized several football field-sized call centers that ran 14 hours a day, seven days a week, to maintain and increase reported enrollments in Washington Post's education division by hounding and harassing potential students into enrolling.

9.    In stark contrast to Defendants' rhetoric, the reality is that Kaplan simply does not educate its students. The vast majority of Kaplan students drop out without ever completing their education, incurring tens of thousands of dollars in federal student loan debt along the way. Indeed, Washington Post's educational division – specifically Kaplan – was a market leader (unbeknownst to investors during the Class Period) in for-profit education drop out rates, *with nearly 70% of its students leaving school after attending for a median time period of only 4.2 months*, as demonstrated in the chart below:

### Ten Highest Withdrawal Rates
### for Associates Programs
#### (Students enrolling between 8/08 and 7/09 as of 8/10)

| Institution | Total Students | % Completed | % Still Enrolled | % Withdrawn | Median Months Attended before Withdrawal |
|---|---|---|---|---|---|
| Bridgepoint | 7,931 | 1.2% | 14.4% | 84.4% | 3.7 |
| Lincoln | 6,160 | 15.5% | 14.6% | 69.9% | 4.3 |
| Kaplan | 33,324 | 12.5% | 18.4% | 69.1% | 4.2 |
| Corinthian | 44,436 | 6.9% | 26.6% | 66.5% | 4.1 |
| Apollo | 177,368 | 4.7% | 28.9% | 66.4% | 4.2 |
| Keiser | 9,041 | 12.0% | 23.0% | 65.0% | 7.1 |
| Ed. Mgmt. Corp. | 32,107 | 2.9% | 33.5% | 63.7% | 5.4 |
| Rasmussen | 7,758 | 7.8% | 29.2% | 63.0% | 5.5 |
| Career Ed. Corp. | 54,553 | 24.8% | 13.6% | 61.7% | 4.1 |
| Westwood | 2,541 | 17.0% | 25.5% | 57.6% | 4.4 |

10.     Washington Post, like any other business, is free to construct and implement any business model that it chooses. So then, the fact that it built Kaplan's for-profit education business model on a foundation of predatory enrollment and financial aid practices – identifying, exploiting and preying upon the "pains and fears" of the very students it told the market it was sworn to educate and help succeed – does not form the basis for Plaintiff's claim. To be sure and plain, Plaintiff's claims arise from Defendants' false and misleading statements regarding the true nature of its business model and the true reasons behind the Company's reported enrollments, financial results, and future business prospects - which were all touted to the market. While bragging to the market of its revenue being driven by its educational ideals, the quality of the education it provided, and the return on investment enjoyed by its students, the truth was that its revenues were being driven by nefarious, predatory, and exploitive enrollment and financial aid practices. Defendants' lies and omissions regarding Washington Post's financials and future business practices, which artificially inflated the value of its stock throughout the Class Period, are the bedrock of Plaintiff's claims. As demonstrated below, when the truth was revealed, the artificial inflation came out of Washington Post's stock and Plaintiff and the Class suffered massive losses.

11.    As mentioned above, almost all of Kaplan's revenues are generated through tuition payments. The vast majority of students rely on federal financial aid provided by Title IV ("Title IV") of the Higher Education Act of 1965, as amended (the "HEA"). Consequently, during the Class Period, the Company and Kaplan derived a vast majority of their revenue from Title IV funding. As a result of Kaplan's dependence on Title IV funding, the Company is highly regulated by federal, state and private accreditation agencies, including the Accrediting Council for Independent Colleges and Schools ("ACICS"). In order to be and remain eligible to receive Title IV funds, each Kaplan institution must comply with the standards set forth in the HEA.

12.    The HEA and the U.S. Department of Education ("DOE") impose requirements on institutions seeking to participate in Title IV student financial aid programs. For example, these regulations prohibit misleading prospective students, as well as paying incentive compensation to Admissions and Financial Aid Advisors based on meeting enrollment quotas. Institutions must also prepare their students for "gainful employment in a recognized occupation,"[2] and maintain accreditation by a recognized accrediting commission in each state in which they operate. Any institution that violates these regulations risks losing its Title IV funding eligibility. For the Company, losing Title IV eligibility would be a death knell that would decimate both Kaplan and Washington Post's financial condition.

13.    As detailed below, 22 former Company employees (including recruiters/salespeople) and students located throughout the United States confirmed that Defendants used a variety of deceptive and predatory tactics to lure prospective students into enrolling at Kaplan, and taking all available financial aid, all for the single-minded purpose of generating as much revenue (from

---

[2] To qualify for Federal aid, the law requires that most for-profit programs and certificate programs at nonprofit and public institutions prepare students for gainful employment in a recognized occupation. On June 7, 2011, the Obama Administration released final regulations regarding "gainful employment" which will be discussed in more detail below.

federal financial aid) as possible.  The strong growth reported by the Company during the Class Period was unequivocally and materially based on abusive and predatory enrollment and financial aid practices, none of which Defendants revealed to the market when discussing the Company's financial performance.  Thus, Defendants' omissions rendered Washington Post's reported financial results and statements regarding its future business prospects materially false and misleading when made.

14.    Despite Defendants' best efforts, and a lengthy and successful run of subterfuge, they could not keep their scheme under wraps forever.  Through a series of partial disclosures regarding the Company's true financial condition and future business prospects, the artificial inflation came out of the price of Washington Post common stock.  For example, on August 4, 2010 the U.S. Government Accountability Office ("GAO") issued the findings of its undercover investigation into for-profit colleges, including Kaplan.  Among other things, the GAO report detailed multiple severely abusive and manipulative practices at two Kaplan campuses.  The multiple partial disclosures at the end of the Class Period culminated in an 8.1% drop on August 16, 2010.  That drop resulted from a DOE publication on federal student-loan repayment rates at the nation's colleges and universities demonstrating that student loan repayment rates by Kaplan students were an abysmal *28%*, compared to 54% at public colleges and 56% at private non-profit institutions. This repayment rate was revealed to be one of the lowest among all major for-profit education companies.

15.    As a result of Defendants' false statements and omissions, Washington Post common stock traded at artificially inflated prices throughout the Class Period.  As the truth emerged and seeped into the market, however, the Company's shares were hammered by massive sales, sending them down approximately *41.7%, or $225.73 per share*, from their Class Period high.

## II.    JURISDICTION AND VENUE

16.    Jurisdiction is conferred by §27 of the Exchange Act.  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. §240.10b-5.

17.    Venue is proper in this District pursuant to §27 of the Exchange Act.  Many of the false and misleading statements were made in or issued from this District.

18.    Washington Post's principal executive offices are located at 1150 15th Street, N.W., Washington, D.C. 20071.

19.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.    PARTIES

20.    Plaintiff Iron Workers Local No. 25 Pension Fund purchased Washington Post common stock on the open market during the Class Period, as set forth in its certification previously filed with the Court.  On April 21, 2011, the Court appointed Iron Workers Local No. 25 Pension Fund as Lead Plaintiff in this action.

21.    Defendant Washington Post is a diversified education and media company, with principal executive offices located in Washington D.C.  As discussed above, the Company's Kaplan subsidiary is a for-profit educational institution that purports to provide an extensive range of education and related services worldwide for students and professionals.  Kaplan operates through four segments: (i) KHE; (ii) Kaplan Test Preparation; (iii) Kaplan International; and (iv) Kaplan Ventures.  KHE, through Kaplan University and its Kaplan Higher Education Campuses ("KHEC"), provides a wide array of certificate, diploma and degree programs – on campus and online – which are purportedly designed to meet the needs of students seeking to advance their education and career goals.

22.    Although Kaplan University specializes in online education, with a vast majority of its programs offered online, it also offers traditional classroom formats at 12 campuses in Iowa, Maine, Maryland and Nebraska and 5 Kaplan University Learning Centers in 4 additional states. Moreover, Kaplan University includes Concord Law School, a fully online law school. At the end of 2010, Kaplan University had approximately 58,200 students enrolled in online programs and 7,400 students enrolled in its classroom-based programs.

23.    KHEC consists of 73 schools in 19 states that provide classroom-based instruction to approximately 44,500 students (including the 5,120 students enrolled at Kaplan University's on-ground campuses).

24.    Defendant Graham has served as Chairman of the Board and Chief Executive Officer of Washington Post since 1993.

25.    Defendant Jones has served as the Senior Vice President-Finance and Chief Financial Officer of Washington Post since January 2009.

26.    Throughout the Class Period, Graham and Jones were responsible for ensuring the accuracy of Washington Post's public filings and other public statements, and they both personally attested to and certified the accuracy of Washington Post's financial statements. During the Class Period – specifically on August 4, 2009, November 9, 2009, March 2, 2010, May 11, 2010, and August 11, 2010 – Graham and Jones each signed certifications included in the Company's public filings stating:

1. I have reviewed this quarterly report on Form [10-Q or 10-K] of the Registrant;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition,

results of operations and cash flows of the Registrant as of, and for, the periods presented in this report.

## IV.    CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Washington Post common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

28.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of August 13, 2010, the last day of the Class Period, Washington Post had almost 9 million shares of stock outstanding, owned by hundreds if not thousands of shareholders.

29.     There is a well-defined community of interest in the questions of law and fact involved here. Questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members include:

(a)     whether the Exchange Act was violated by Defendants;

(b)     whether Defendants omitted and/or misrepresented material facts;

(c)     whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     whether the price of Washington Post common stock was artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

30.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

31.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests in conflict with those of the Class.

32.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## V.     CONFIDENTIAL SOURCES

33.     Plaintiff makes the allegations herein, concerning the falsity of Defendants' statements and the scienter of the Individual Defendants, based upon the investigation undertaken by Plaintiff's counsel, which included analysis of publicly available news articles and reports, public filings, securities analysts' reports and advisories about Washington Post, interviews of dozens of former employees and Kaplan students, press releases and other public statements issued by the Company, and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

34.     The allegations made herein are supported by the first-hand knowledge of 22 confidential witnesses ("CWs").  These CWs include many former Company employees who were employed during the Class Period and provided facts from various departments, as well as students who fell victim to Washington Post's systemically predatory business model for Kaplan.  As detailed below, the CWs each served in positions at Washington Post's Kaplan division or had first-hand experiences that provided them with access to the information they are alleged to possess.

35.     Confidential Witness #1 ("CW 1") was employed by the Company at KHE's Orlando, Florida office as a Director of Admissions from July 2009 until July 2010.  While at KHE, CW 1 oversaw three teams of Admissions Advisors whose primary responsibility consisted of "contacting people" who had requested information and "trying to sign them up."  CW 1 reported to Senior Director of Admissions Renee Flowers ("Flowers"), who reported to Orlando site Vice President Ed Siska ("Siska").  Siska reported to Vice President of Admissions Mike Jones ("M. Jones"), who reported to Senior Vice President Scott Kilgore ("Kilgore").  CW 1 was one of 12 Directors of Admissions at the Orlando, Florida facility.  While working at the Company, CW 1 oversaw anywhere from 40 to 55 Admission Advisors.  Among other things, CW 1 has knowledge regarding scripts for Admissions Advisors, aggressive enrollment quotas, predatory recruitment and financial aid practices, and the Company's compensation structure for Admissions Advisors.

36.     Confidential Witness #2 ("CW 2") was employed by the Company at Kaplan's Chicago, Illinois office as an Administrative Assistant for approximately 5 years until August 2010. When CW 2 first began working at the Company, CW 2 spent the majority of her/his time providing assistance to executives of Kaplan Professional.  In approximately March 2009, CW 2 began providing assistance to KHE executives.  While employed by the Company, CW 2 provided assistance to a number of Washington Post and Kaplan executives, including: Defendant Jones, Senior Vice President, General Counsel and Secretary of Washington Post Veronica Dillon, Kaplan Professional CEO and President Eric Cantor ("Cantor"), General Counsel for Kaplan Mary Jane Miller, KHE President Beth Hollenberg ("Hollenberg"), and KHE CFO Lionel Lenz ("Lenz"). Among other things, CW 2 has knowledge regarding Kaplan's weekly executive meetings and quarterly Senior Executive Meetings held in the Delhi Conference room of the Chicago, Illinois office (and offsite at up-scale resorts), internal presentations and e-mails regarding the 90/10 Rule (a requirement that no more than 90% of Kaplan's revenue could come from financial aid), Cohort

Default Rates, gainful employment and financial aid, and the Company's extensive focus on enrollment numbers.

37.    Confidential Witness #3 ("CW 3") was employed by the Company at Kaplan's Columbus, Ohio campus as an Office Manager/Assistant Controller from August 2008 until September 2009, when CW 3 left on her/his own accord because CW 3 was troubled by Kaplan's business operations. As the Assistant Controller, CW 3 oversaw the "finances and the business operations" of the Columbus campus. Specifically, CW 3's duties included approving the amount a student was supposed to pay in cash, as opposed to receiving financial aid, towards tuition, signing off on student stipends, tracking and reporting the campus' accounts receivables, and preparing and submitting Admission Advisors' enrollment commissions. For example, each quarter CW 3 prepared an Excel spreadsheet showing the enrollments and graduations of each student recruited by an Academic Advisor, and submitted the spreadsheet to payroll in Alpharetta, Georgia. While with the Company, CW 3 reported to the Columbus, Ohio campus President James Vaas ("Vaas"), who, according to CW 3, was "forced" to retire at the end of 2008 because he "didn't push the numbers." Vaas was then replaced by another Campus President, who CW 3 then reported to. Among other things, CW 3 has knowledge regarding the Company's predatory enrollment practices, including the emphasis on increasing enrollments at all costs, and the Columbus, Ohio campus' improper practices designed to circumvent the requirements of the 90/10 Rule.

38.    Confidential Witness #4 ("CW 4") began her/his employment with the Company at Kaplan Financial in Chicago, Illinois, and eventually transferred to Kaplan University in Davenport, Iowa, where she/he worked as an Admission Advisor from July 2007 to July 2010. CW 4 was terminated from the Company after being outspoken about what CW 4 viewed as unethical admissions practices at the Davenport, Iowa campus. CW 4 was one of approximately eight or nine Admissions Advisors at the Davenport, Iowa campus, and reported to Director of Admissions Jason

13

Wieleski ("Wieleski"), who reported to Campus President Mark Garland ("Garland"). Among other things, CW 4 has knowledge regarding the pressure on Admissions Advisors to meet enrollment quotas, the Company's predatory recruitment practices and unethical enrollment practices, and compensation perquisites given to Admissions Advisors.

39.    Confidential Witness #5 ("CW 5") worked as the Executive Director of Kaplan's Indianapolis, Indiana campus for approximately five months, from February 2010 until July 2010, when CW 5 resigned because the Company was "too numbers driven." As the Executive Director of the Indianapolis, Indiana campus, CW 5 was hired to "hire, train and build the campus," and oversaw 14 employees, including nine Admissions Advisors, two Financial Aid Representatives and three Academic Advisors. CW 5 reported to a Kaplan Regional Vice President. According to CW 5, there was "no doubt" that the Company's quota-driven enrollment and compensation policies created an environment and culture where Kaplan Admissions Advisors routinely lied to prospective students. Among other things, CW 5 has knowledge regarding Kaplan's scripts and the Company's use of predatory recruitment and financial aid practices.

40.    Confidential Witness #6 ("CW 6") worked for the Company as an Admissions Advisor at Bauder College, a KHE campus in Atlanta, Georgia, from December 2009 until May 2010, until CW 6 left the Company on her/his own accord after it was made clear that CW 6 would likely be terminated for "not meeting enrollment quotas." As an Admission Advisor, CW 6 was part of the high school team, which focused on enrolling high school students who would start at Bauder College during the summer following their graduation. CW 6 reported to Associate Director of Admissions Dee Vanks ("Vanks"), who reported to a Director of Admissions. The Associate Director and Director of Admissions reported to Campus President Reggie Morton ("Morton"). CW 6 has information regarding the pressure to meet enrollment quotas, the Company's predatory recruiting practices, including recruitment at a local homeless shelter, and a meeting with Campus

14

President Morton, Director Vanks, and a Financial Aid Director during which Morton told CW 6 that she/he would be fired if CW 6 did not enroll more students.

41.    Confidential Witness #7 ("CW 7") worked for the Company from February 2004 through September 2009, in Kaplan's Fort Lauderdale, Florida facility.  CW 7 worked in the Company's Admissions department from February 2004 until April 2008, first as an Admissions Advisor, and later as a Director of Admissions for the military team.  In April 2008, CW 7 was promoted to Director of Student Relations/Director of Compliance.  As Director of Compliance, CW 7 reported to Executive Director of Compliance for KHE Sue Edwards ("Edwards").  Edwards reported to Senior Vice President of Regulatory Affairs Elaine Neely ("Neely"), who reported to Executive Vice President of Compliance and General Counsel for KHE, Janie Block ("Block").  As Director of Compliance, CW 7 reviewed all student complaints, including academic and financial aid complaints.  Among other things, CW 7 has information regarding complaints made by students against the Company, weekly conference calls held to discuss student complaints, the tracking and monitoring of all calls made by Admission Advisors, and Kaplan CEO Andy Rosen's ("Rosen") knowledge of student complaints.

42.    Confidential Witness #8 ("CW 8") worked for the Company from September 2009 until December 2010, as an Admissions Advisor at KHE's Orlando, Florida facility.  CW 8 reported to Associate Director of Admissions Kristen Pugh ("Pugh"), who reported to Director of Admissions Tara Davis ("Davis").  Davis reported to Senior Director of Admissions Flowers.  According to CW 8, the internal "motto" at Kaplan was "one dial – one file," which meant "we were supposed to get on the phone and enroll students that day."  CW 8 has information regarding Kaplan's compensation structure for Admissions Advisors, the Company's predatory recruitment practices, Kaplan's scripts used to enroll students, and the impact of the August 4, 2010 GAO report on Kaplan's enrollment practices.

43.    Confidential Witness #9 ("CW 9") worked for the Company as a Director of Admissions in Kaplan's Orlando, Florida call center from July 2009 until December 2010. As Director of Admissions, CW 9 oversaw Admissions Advisors seeking to enroll students in Kaplan's Information Technology school. Among other things, CW 9 has information regarding the pressure to meet enrollment quotas, executive's knowledge of Kaplan's enrollment practices and scripts, the impact of the GAO report on Kaplan's recruitment practices and enrollment, and Kaplan's HyperQuality tracking system used to monitor Admissions Advisor's calls.

44.    Confidential Witness #10 ("CW 10") worked for the Company as the Executive Director/President of Kaplan's Columbus, Ohio campus for approximately nine months, until the end of February 2010, when CW 10 was terminated as a result of raising concerns about the enrollment process. CW 10 reported to Regional Vice President Sandy Ugol ("Ugol"), who reported to Group Vice President Dominick Fedele ("Fedele"). Ugol oversaw the North Central Region of Kaplan, which included campuses in Cincinnati, Columbus, and Cleveland, Ohio and Baltimore, Maryland. Among other things, CW 10 has information regarding the immense pressure to maintain retention rates and meet enrollment numbers at the Columbus, Ohio campus.

45.    Confidential Witness #11 ("CW 11") worked for the Company from 2005 through 2010. CW 11 began her/his employment with the Company as a Director of Education at Kaplan's San Antonio, Texas campus and was promoted in 2009 to Executive Director of the Houston, Texas campus. As Executive Director, CW 11 reported to Regional Director of Operations Mark Ferguson ("Ferguson"), who reported to Western Division Manager David Stevenson. CW 11 was responsible for the entire operation of the campus, including admissions, the education department, financial aid, and career services. CW 11 has information regarding the pressure on the Admissions Department to enroll students and weekly accountability meetings held every Friday.

46.     Confidential Witness #12 ("CW 12") worked for the Company at KHE, but was "rolled into" Kaplan in approximately the first quarter of 2010.  CW 12 began working for the Company in 2005 as an Accountant in Kaplan's Accounts Receivable Department.  In 2007, CW 12 became a Business Analyst in the Financial Planning & Analysis Department.  As a Business Analyst, CW 12 reported to Manager of Business Development Johnny Goodwin, who reported to Executive Director of Financial Planning & Analysis Candace Tenhundfeld, who reported to the Vice President/Controller Kevin Corser.  CW 12 was responsible for managing the requirements for the Company's internal "dashboard" reporting system, which was utilized to generate a snapshot of key business metrics, including drop-out rates, student starts and the percentage of revenue a school derived from financial aid.  Among other things, CW 12 has information regarding the dashboard system and reports, as well as Kaplan's key business metrics, including drop-out rates.

47.     Confidential Witness #13 ("CW 13") began working for the Company at Kaplan's Cypress Creek, Florida facility in February 2009, and then transferred to the Plantation, Florida facility in early 2009, where CW 13 remained until the end of 2010.  At the Cypress Creek facility, CW 13 reported to Director of Admissions Jordan McMullen ("McMullen"), who reported to Adam Kalish, who oversaw Admissions at the Cypress Creek facility.  While at the Plantation, Florida center, CW 13 reported to Director of Admissions Jennifer Estiverne, who reported to Chief Director of Admissions Samantha Snyder ("Snyder").  Snyder reported to a Center Director.  CW 13 has information regarding the Company's predatory recruitment practices, including the use of scripts, the compensation structure for Admissions Advisors, and the GAO investigation, which included a visit to the Pembroke Pines, Florida Kaplan facility.

48.     Confidential Witness #14 ("CW 14") worked for the Company as a Director of Admissions for Kaplan University at the Phoenix "call-center" from December 2008 until January 2010.  CW 14 reported to Vice President of Admissions M. Jones and to Senior Vice President

Kilgore. CW 14 has information regarding Admissions Advisors' compensation and employment status being tied to student enrollments, Kaplan's aggressive recruitment tactics, the negative impact on enrollments of the Company's policy to no longer accept Ability to Benefit ("ATB") students, and the impact of the GAO report on Kaplan's scripts and Admission Advisors' compensation.

49.    Confidential Witness #15 ("CW 15") was employed with the Company from March 2010 to January 2011 as a Staff Accountant in Kaplan's Alpharetta, Georgia facility. CW 15 was one of 20 Staff Accountants, and her/his primary responsibilities included revenue accounting and financial analysis for the Kaplan campuses. Specifically, CW 15 was assigned to seven Kaplan campuses, including those in Cincinnati, Ohio, Corpus Christi, Texas, El Paso, Texas, Arlington, Texas, Omaha, Nebraska, and Lubbock, Texas. CW 15 and the other Staff Accountants reported to Accounting Operations Manager Jason Edwards, who reported to Jennifer Frisky ("Frisky"). Frisky reported to Kaplan's Controller. CW 15 has information concerning the data in Kaplan's "CampusVue" revenue accounting system, including among other things, drop out rates for Kaplan students and accounting changes that were implemented after the GAO report.

50.    Confidential Witness #16 ("CW 16") worked for the Company as a Director of Finance at Kaplan's Tesst College in Baltimore, Maryland for over a year until she/he departed in March 2010. CW 16 was responsible for finance and accounting functions, including oversight of the "bursar" functions, profit and loss, and budgeting.[3] Although CW 16 was not involved directly in the administration of financial aid, she/he performed accounting tasks related to financial aid and collected on student accounts. When she/he began at Kaplan's Tesst College, CW 16 reported to Campus President Mark Millen ("Millen"). Millen was terminated in approximately mid-2009 after an internal audit resulted in "400 audit findings." Millen was temporarily replaced by Regional Vice

---

[3] A bursar is a senior professional financial administrator in a school or university.

President of Operations Ugol, until Consultant Colleen McDermott took over as Campus President. Ugol reported to Group Vice President of Operations Fedele. CW 16 has information related to Tesst College's negative internal audit and accreditation findings, that covered, among other things, incomplete registration paperwork, financial aid, and professors who did not have degrees. In fact, according to CW 16 prior to the school's accreditation audit, the campus staff were provided with an "answer sheet" as to accreditation questions. CW 16 also has information related to Tesst College's drop-out rates, concern over retention rates, and lack of concern related to student defaults on tuition payments.

51.     Confidential Witness #17 ("CW 17") initially began with the Company in June 2006 as a Financial Aid Trainer, until CW 17 moved into the role of Compliance Specialist in August 2008, and worked at Kaplan through February 2010. As a Financial Aid Trainer, she/he reported to Betsy Tellock. As a Compliance Specialist, CW 17 reported to Vice President of Compliance Edwards, who was eventually replaced by Kristi Ford ("Ford"). Edwards, and later Ford, reported to Vice President of Regulatory Affairs Neely, who reported to General Counsel Block. CW 17 believed Block reported to Kaplan CEO Rosen. CW 17's primary responsibility as a Compliance Specialist included performing audits and overseeing corrective action plans for ground campuses across the nation. According to CW 17, the Kaplan campuses were audited once per year, and twice per year if remediation of audit findings was necessary. CW 17 has information related to the internal audits of 35 Kaplan campuses, including the Excel reports generated regarding these audits, DOE scrutiny of Kaplan campuses, and Kaplan's "shifting" of financial aid between Kaplan's main and branch campuses to circumvent the 90/10 Rule.

52.     Confidential Witness #18 ("CW 18") worked for the Company as a Vice President of Communications at KHE's Fort Lauderdale, Florida facility from February 2009 through June of 2009. CW 18 was responsible for overseeing internal and external communications, as well as

community outreach functions for KHE, including Kaplan University, KHEC, Concord Law School, Kaplan Virtual Education and Colloquy. CW 18 has information related to KHE President Jeff Conlon's ("Conlon") receipt of daily enrollment reports and Conlon's emphasis on "follow[ing] the money" when it came to online education.

53.    Confidential Witness #19 ("CW 19") worked for the Company's Kaplan division in Ft. Lauderdale, Florida from December 2008 to July 2010 as a Senior Manager of Market Research. CW 19 reported to Vice President of Brand and Strategic Marketing Linda Mignone. CW 19's responsibilities included conducting market research, including surveys, pertaining to "measurement, awareness, preference, and consideration" relating to the Kaplan brand. CW 19's research was related to consolidating the Kaplan brand and creating an "intent to enroll" in KHE classes. Among other things, CW 19 has information regarding Kaplan's "segmentation studies" that focused on which prospective students were the "most attractive" from a long-term "revenue perspective," the Company's reliance on purchasing leads from low quality aggregators, as well as the Company's reliance on Kaplan for revenue.

54.    Confidential Witness #20 ("CW 20") was employed with the Company for about a year, ending in June 2009, as the Director of Financial Aid at the Company's Baltimore, Maryland Tesst College campus. CW 20 left on her/his own accord because certain practices at the campuses were "unacceptable." CW 20 worked closely with Campus President Mark Millen and the Regional Vice President Mike Mella. As such, CW 20 has information regarding the predatory recruitment of prospective students, including those with felonies who required bonding for gainful employment. CW 20 also has knowledge of issues pertaining to the academic calendar for the electrician program and lack of compliance with program accreditation in accordance with the Maryland Higher Education Commission, as well as the Company's intentional misuse of "professional judgment" in waiving a student's dependency status in order to obtain Title IV funding.

55.    Confidential Witness #21 ("CW 21") worked for the Company as a Federal Regulatory Affairs Manager at Kaplan, for three years, until November 2009, at Kaplan's Alpharetta, Georgia "headquarters." While at the Company, CW 21's responsibility included corresponding with the DOE regarding certifications, renewals, and changes in personnel and programs, and preparing and submitting the annual summary of certification for the Kaplan campuses to the DOE. CW 21 was also responsible for providing information about Kaplan for the DOE's website regarding financial aid and placement rates. While at the Company, CW 21 reported to Executive Director of Federal Regulatory Affairs Deana Echols ("Echols"), who, in turn, reported to Senior Vice President of Regulatory Affairs Neely. Neely reported to Executive Vice President of Regulatory Affairs and General Counsel Block, who, in turn, reported to Kaplan President Conlon. CW 21 has information related to the Company's policy to no longer enroll ATB students and the Company's transfer of federal funds between campuses to skirt the 90/10 Rule.

56.    Confidential Witness #22 ("CW 22") was enrolled in the online Criminal Justice Bachelor's degree program at Kaplan from 2008 until 2011. Among other things, CW 22 has information regarding Kaplan's predatory recruitment practices towards the mentally ill and misrepresentations regarding the transferability of credits.

## VI.    SUBSTANTIVE ALLEGATIONS

### A.    Introduction

57.    For-profit colleges, which are either privately-owned or owned by publicly traded companies, offer post-secondary education to a wide-variety of students. Unlike their state-operated and not-for-profit brethren, whose primary goal is to provide a quality education for their students, for-profit colleges are profit-driven, bottom-line businesses. Towards that end, these for-profit colleges charge their students significantly more to attend than not-for-profit schools (often twice as much or more), and students at for-profit schools end-up with substantially more debt upon graduation (if, indeed, they graduate at all) than students at non-profit colleges. Moreover, most for-

profit colleges rely extremely heavily on federal funds (in the form of Pell Grants, Stafford Loans and the like) – up to 90% of their gross revenues are derived in this way.

58.     As described more fully throughout this Complaint, in an attempt to cannibalize federal funds, Washington Post created a business model for Kaplan that mandates its salespeople – in order to meet quotas and not be fired – to engage in predatory and deceptive recruitment and enrollment practices, as well as misleading financial aid practices, which result in extremely low graduation rates and massive amounts of defaulted student loans. Of course, it is not these untoward business practices that create the basis for liability here, as Washington Post is free to conduct its business as it sees fit. Rather, Defendants are liable to Plaintiff and the Class for the damages caused by their failure to disclose the Company's systemically predatory for-profit education business model to the market and Washington Post shareholders, providing instead a completely different (and exceedingly misleading) picture of what drove Company revenue, and consequently misrepresenting the nature and substance of the Company's financials and future business prospects, during the Class Period. These misrepresentations and material omissions caused Washington Post common stock to trade at artificially inflated prices throughout the Class Period.

59.     Enrollment at for-profit colleges grew dramatically in the past decade. To be sure, between 1998 and 2008, enrollment at for-profit colleges expanded by approximately 236%, while enrollment at traditional institutions of higher learning rose only approximately 31% during that same period.[4]

60.     Washington Post's secret business model for Kaplan, as detailed below, was well-hidden for years, until, through a series of partial disclosures, the truth was revealed. When the truth

_____

[4] The expansion of the sector has been so extraordinary that the largest for-profit – the University of Phoenix – today enrolls more students than the entire for-profit sector enrolled in 1991.

came out, the artificial inflation was removed from the price of Washington Post common stock, and its shareholders incurred substantial damages.

**B.    Washington Post's Business Model Depends on Maximizing the Amount of Financial Aid Obtained by Kaplan Students, Regardless of Their Ability to Ever Repay It**

   **1.    The For-Profit College Business Model Places Low-Income Students in High-Cost Schools**

61.    Historically, families with greater needs generally sought lower-cost colleges to maximize the utility of available federal loans and grants, getting the most out of every dollar to reduce out-of-pocket expenses and minimize heavy debt burdens. Conversely, families with greater financial resources often sought higher-cost institutions because they could afford to pay in excess of what federal loans covered, and presumably received a better quality education. For-profit colleges have turned this traditional relationship between costs and means on its head by targeting and preying upon students with the greatest financial needs and convincing them to incur massive debt, regardless of their ability to repay the loans in the unlikely event they graduate and find employment. *See supra* at ¶9 (approximately 70% of Kaplan students drop-out after a median period of only 4.2 months).

62.    Indeed, low-income and minority students, respectively, make up 50% and 37% of students at for-profit colleges respectively, while, on average, for-profit colleges cost five and a half times the price of community colleges offering similar programs and degrees. Bachelor's degree recipients at for-profit colleges have median debt of $31,190 compared with $17,040 at private, non-profit institutions and $7,960 at public colleges. At four-year for-profit colleges, low-income students must find a way to finance, on average, almost $25,000 each year, with only a 22% chance of graduating. At Kaplan, students have a miniscule 12.5% chance of graduating. *See* ¶9. On the other hand, students at four-year private nonprofit institutions need to finance, typically, only $16,600, and graduate at rates three times higher. Moreover, private non-profit institutions, while

costing students less, actually spend three and a half times more on each student than for-profit institutions do.[5]

63.    As detailed herein, the cost of attending Kaplan was approximately $371 per credit hour. For students who were able to complete their studies, a two-year associate's degree cost approximately $35,000, while a four-year bachelor's degree cost approximately $65,000.

64.    Prospective Kaplan students typically obtain these funds by turning, usually at the direction of the Company, to the federal government. For students with financial need, the federal government helps pay for higher education through Title IV. Title IV covers the administration of the United States federal student financial aid programs, and includes Pell Grants, Stafford Loans, and other forms of federal financial aid. Title IV aid is a combination of grants and low-interest loans available in limited quantity to students enrolled at any type of college.

### 2.    The Vast Majority of For-Profit College Revenue Comes From Federal Student Aid

65.    The reason for-profit colleges recruit low-income students for a high-cost education is as simple as it is nefarious: this formula maximizes the amount of federal loans and grants the students must take on in order to be able to afford classes, and, as a result, maximizes the amount of federal loans and grant monies that the for-profit colleges are able to generate. As much as 90% of revenue generated at for-profit colleges comes from federal student aid.[6] Indeed, in 2007-08, approximately 97% of undergraduates attending for-profit 2-year colleges took out student loans, while only 13% of undergraduates attending 2-year public institutions took out student loans. Similarly, during that same time period, approximately 95% of undergraduates attending for-profit

---

[5] See "Subprime Opportunity: The Unfulfilled Promise of For-Profit Colleges and Universities," *The Education Trust* (Nov. 22, 2010), http://www.edtrust.org/dc/Subprime (last visited June 24, 2011).

[6] Twenty-four percent of 2008 graduates of for-profit colleges took out federal loans in excess of $40,000.

four-year colleges took out student loans, while only 47% of undergraduates attending public 4-year colleges took out student loans. The staggering statistical disconnect demonstrates the loan driven nature of for-profit colleges, including Washington Post's Kaplan.

66.    Though federal financial aid is intended for the benefit of the student, as a practical matter, aside from education-related expenses, student aid disbursements go directly to the student's school. Thus – as long as the school can keep enrollment rates steady or increase them – the more money a for-profit college charges per credit, the more revenue the institution will generate in guaranteed federal dollars from loans taken out by low-income and other at-risk students.

67.    Federal Pell Grants and Stafford Loans, together with aid from smaller Title IV programs, make up the lion's share of for-profit colleges' revenues.[7] While for-profit colleges enroll close to 10% of all higher education students, they currently receive approximately 24% of all Title IV funds. Indeed, between 2000 and 2009, the amount of Pell Grants, Stafford Loans, and other Title IV aid packages given to for-profit institutions grew from $4.6 billion to $26.5 billion, representing a sizeable burden for U.S. taxpayers.[8]

68.    Here, the Company's reliance on Title IV monies has only expanded in recent years. For example, in 2002, Title IV funds accounted for $160 million, or 64% of total KHE revenues, and 26% of Kaplan revenues, resulting in 36% and 74% of KHE and Kaplan's respective revenues coming from sources other than Title IV funds. By 2009, however, funds received under Title IV programs soared to approximately $1.3 billion, or approximately 83% of total KHE revenues, and

---

[7] A Pell Grant is a post-secondary educational federal grant sponsored by the DOE that does not have to be repaid. A Stafford Loan is a student loan offered to eligible students enrolled in accredited American institutions of higher education. The repayment period for a Stafford Loan typically begins upon graduation or withdrawal by the student from the institution of higher education.

[8] In 2009, for-profit colleges collected $4.4 billion of the $18.2 billion in Federal Pell Grants.

49% of Kaplan revenues. In 2010, the funds received under Title IV programs accounted for approximately $1.5 billion, or approximately 82%, of total KHE revenues, and 50% of Kaplan revenues.

> **C.    The HEA Provides Eligibility Criteria that an Institution Must Meet in Order to Participate in the Federal Student Aid Programs**

69.    In the early 1990s, Congress was concerned that certain schools were engaging in a series of unethical practices leading to the admission of unqualified students just to obtain federal financial aid. This led, ultimately, to students being unable to repay their loans – leaving the government and taxpayers holding the bag. As mentioned below, Congress and the DOE took a number of actions to address this situation.

> **1.    Incentive Compensation for Recruiters Is Not Permitted**

70.    In 1992, Congress and the DOE enacted the "incentive compensation provision" of the HEA, which prohibits schools from paying student recruiters and employees involved in financial aid "any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid." 20 U.S.C. §1094(a)(20). In 2002, the DOE clarified the "incentive compensation plan" by issuing a series of "safe harbor" regulations, 34 C.F.R. 668.14(b)(22)(ii).

71.    Most relevant here, 34 C.F.R. 668.14(b)(22)(ii)(A) provides that a school may make up to two adjustments (upward or downward) to a covered employee's annual salary or fixed hourly wage rate within any 12-month period without the adjustment being considered an incentive payment, *provided that no adjustment is based solely on the number of students recruited, admitted, enrolled, or awarded financial aid*.

72.    Additionally, 34 C.F.R. 668.14(b)(22)(ii)(D) provides that profit-sharing and bonus payments to all or substantially all of a school's full-time employees are not incentive payments based on success in securing enrollments or awarding financial aid, as long as the profit-sharing or

bonus payments are substantially the same amount or the same percentage of salary or wages, and as long as the payments are made to all or substantially all of the school's full-time professional and administrative staff, compensation paid as part of a profit-sharing or bonus plan is not considered a violation of the incentive payment prohibition.

73.    Finally, 34 C.F.R. 668.14(b)(22)(ii)(F) provides that generally, clerical pre-enrollment activities are not considered recruitment or admission activities. Accordingly, a school may make incentive payments to individuals whose responsibilities are limited to pre-enrollment activities that are clerical in nature. *However, soliciting students for interviews is a recruitment activity, not a pre-enrollment activity, and individuals may not receive incentive compensation based on their success in soliciting students for interviews.*

### 2.    Substantial Misrepresentations Are Prohibited

74.    The HEA now prohibits an institution receiving Title IV funds from "engag[ing] in substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates." 20 U.S.C. §1094(c)(3)(A). Upon a determination that an institution has made such a misrepresentation, the Office of the Secretary (the "Secretary") of the DOE may suspend or terminate the institution's Title IV eligibility status, and may also impose a civil penalty of up to $27,500 for each violation or misrepresentation. *Id.*; §1094(c)(3)(B)(i); Fed. Civ. Penalties Adjustment Act, as amended, 24 U.S.C. §2461 note.

75.    The statute itself does not define "substantial misrepresentation," but the DOE has issued regulations defining the terms "misrepresentation" and "substantial misrepresentation," and providing example categories of statements that qualify as regarding the nature of a school's education program, its financial charges, and the employability of its graduates. 34 C.F.R.§§668.71-75. A "misrepresentation" is defined as a false, erroneous, or misleading statement. 34 C.F.R. §668.71(b). A "substantial misrepresentation" is defined as "[a]ny misrepresentation on which the

person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment." *Id.*

76.     In addition, the HEA states that any "[m]isrepresentation by an institution of the nature of its educational program includes, but is not limited to, false, erroneous or misleading statements" concerning, among other things:

> The particular type(s), specific source(s), nature and extent of its accreditation;
>
> Whether a student may transfer course credits earned at the institution to any other institution; and
>
> The availability, frequency and appropriateness of its courses and programs to the employment objectives that it states its programs are designed to meet.

*See* 34 C.F.R. §668.72 (a), (b) and (f)

77.     Further, institutions are required by the HEA to provide and "accurately describe (i) the cost of attending the institution, including (ii) tuition and fees, (iii) books and supplies, (iv) estimates of typical student room and board costs or typical commuting costs, and (v) any additional cost of the program in which the student is enrolled or expresses a specific interest" to prospective and enrolled students. *See* 20 U.S.C. §1092(a)(1)(E).

### 3.      Kaplan Is Required to Keep Cohort Default Rates Under 25%

78.     To remain eligible to participate in Title IV programs, educational institutions must maintain an appropriate Cohort Default Rate ("CDR"). CDR is the percentage of a school's borrowers who enter repayment on certain federal student loans during a particular federal fiscal year (October 1 to September 30), and who default prior to the end of the next fiscal year. The "cohort" is the group of students who first enter into student loan repayment during a federal fiscal year, and the CDR for each cohort is the percentage of the cohort members who default on their student loans prior to the end of the following federal fiscal year. The CDR was initiated in the late 1980s to address the growing concern that fly-by-night trade schools were preying upon minorities

and low income populations to build their enrollments by enticing academically under-qualified students to apply for grants and guaranteed student loans that the students were unlikely to repay.

79.    Under current law, if an institution's CDR exceeds 10% for any one of the three preceding years, it must delay for 30 days the release of the first disbursement of U.S. federal student loan proceeds to first time borrowers enrolled in the first year of an undergraduate program. Institutions with three consecutive CDRs of 25% or greater or with a CDR greater than 40% in any one federal fiscal year could lose eligibility to participate in certain Title IV programs.

### 4.    Kaplan Must Comply With the 90/10 Rule

80.    Under the HEA, proprietary institutions of higher education – including Washington Post's Kaplan – must comply with the 90/10 Rule.  Specifically, a proprietary institution will be ineligible to participate in Title IV programs if, for any two consecutive fiscal years, it derives more than 90% of its revenue, as defined in the Rule, from Title IV programs.  An institution that derives more than 90% of its revenue from Title IV programs for any single fiscal year will be placed on provisional certification for two fiscal years and will be subject to possible additional sanctions by the DOE in the exercise of its broad discretion.

81.    The HEA requires Washington Post's Kaplan to demonstrate on an annual basis that at least 10% of its revenue is derived from sources other than Title IV programs, and Washington Post's Kaplan division must report the calculation as a footnote to its annual audited financial statements.  Further, Washington Post's certified public accountant is expected to test the accuracy of its 90/10 assertion as part of the audit of the institution's financial statements.  If Washington Post exceeds the 90% threshold for two consecutive institutional fiscal years, it could be subject to loss of Title IV eligibility.

### 5.    Kaplan Must Prepare Its Students For Gainful Employment

82.    The HEA further requires that programs at for-profit institutions – other than those clearly designated as "liberal arts" or not designed to lead to a degree – must prepare students for

29

"gainful employment in a recognized occupation" to be eligible for Title IV federal student aid. On June 7, 2011, the Obama administration released final regulations requiring career college programs to better prepare students for "gainful employment" or risk losing access to federal aid. Under the regulations, a program would be considered to lead to gainful employment if it meets at least one of the following three metrics: (1) at least 35% of former students are repaying their loans (defined as reducing the loan balance by at least $1); (2) the estimated annual loan payment of a typical graduate does not exceed 30% of his or her discretionary income; or (3) the estimated annual loan payment of a typical graduate does not exceed 12% of his or her total earnings.

### 6.    Kaplan Must Meet State Authorization and Accreditation Requirements

83.    In addition, state authorization and accreditation by an accrediting commission recognized by the DOE are also required for an institution to become and remain eligible to participate in Title IV programs. As such, Washington Post's Kaplan is also governed by state regulations and requirements of accrediting agencies, including ACICS, Accrediting Commission of Career Schools and Colleges, and the Higher Learning Commission of the North Central Association.

84.    For example, ACICS requires each accredited institution to maintain retention and placement standards of 60% and 65%, respectively. An institution with retention and/or placement rates lower than those standards may be subject to reporting by ACICS. Other requirements of the accrediting agencies include:

- "Advertising, recruiting, and admissions information adequately and accurately represent the programs, requirements, and services available to students."

- "An institution may not delegate without supervision these [recruiting] activities to anyone whose economic incentives are to recruit prospects through means that are unethical or subject to public criticism or to admit ill-prepared applicants."

- "Recruiting shall be ethical and compatible with the educational objectives of the institution. . . . The following minimums apply: (a) An institution shall ensure that any person or entity engaged in admissions or recruitment activities on its behalf is

communicating current and accurate information regarding courses and programs, services, tuition, terms, and operating policies."

- Schools are required "to describe themselves to prospective students fully and accurately and to follow practices that permit prospective students to make informed and considered enrollment decisions without undue pressure. The school's recruitment efforts must attract students who are qualified and likely to complete and benefit from the training provided by the school and not simply obtain enrollments. . . . Each school observes ethical practices and procedures in the recruitment of its students."

- "No misrepresentations should be made in student recruitment, including. . . b. misrepresenting job placement and employment opportunities for graduates; c. misrepresenting program costs; d. misrepresenting abilities required to complete intended program."

### 7.    Other "Applicable Laws"

85.    In addition to laws specifically mandated by the HEA, throughout the Class Period, Washington Post confirmed that it was abiding by "all applicable laws." The Federal Trade Commission has issued administrative "Guides" to "specifically address the application of [the misrepresentation prohibition under 15 U.S.C. §45] to the advertising, promotion, marketing, and sale of courses or programs of instruction offered by private vocational or distance education schools." Guides For Private Vocational and Distance Education Schools, Part 254, §254.0(b) states "[p]ractices inconsistent with these Guides may result in corrective action by the Commission."

86.    Pursuant to §254.3(a)(3) governing "Misrepresentation of extent or nature of accreditation or approval":

It is deceptive for an industry member to misrepresent, directly or indirectly, the extent or nature of any approval by a State agency or accreditation by an accrediting agency or association. For example, an industry member should not:

Misrepresent that students successfully completing a course or program of instruction can transfer the credit to an accredited institution of higher education.

87.    In addition, §254.4 specifically lays out the following:

§254.4 Misrepresentation of facilities, services, qualifications of staff, status, and employment prospects for student after training

(a) It is deceptive for an industry member to misrepresent, directly or indirectly, in advertising, promotional materials, or in any other manner, the size, location, services, facilities, or equipment of its school or the number or educational qualifications of its faculty and other personnel. For example, an industry member should not:

(2) Misrepresent, through statements or pictures, the nature or efficacy of its courses, training devices, methods, or equipment.

(3) Misrepresent the availability of employment while the student is undergoing instruction or the role of the school in providing or arranging for such employment.

*     *     *

(4) Misrepresent the availability or nature of any financial assistance available to students. If the cost of training is financed in whole or in part by loans, students should be informed that loans must be repaid whether or not they are successful in completing the program and obtaining employment.

*     *     *

(7) Misrepresent the nature and extent of any personal instruction, guidance, assistance, or other service, including placement assistance, it will provide students either during or after completion of a course.

*     *     *

(d) It is deceptive for an industry member, in promoting any course of training in its advertising, promotional materials, or in any other manner, directly or by implication, whether through the use of text, images, endorsements, or by other means, the availability of employment after graduation from a course of training, the success that the member's graduates have realized in obtaining such employment, or the salary that the member's graduates will receive in such employment.

88.    Pursuant to §254.7(b), governing "Deceptive sales practices" states:

It is deceptive for an industry member to fail to disclose to a prospective student, prior to enrollment, the total cost of the program and the school's refund policy if the student does not complete the program.

### D.    At All Relevant Times, Kaplan Generated the Majority of Washington Post's Revenues

89.    The Washington Post conducts its business operations in five segments: (1) education; (2) cable television; (3) newspaper publishing; (4) television broadcasting; and (5) magazine publishing. According to the Company's 2009 Form 10-K, throughout the relevant period,

the Company and its subsidiaries employed approximately 21,500 persons on a full-time basis. Worldwide, Kaplan employed approximately 15,000 persons on a full-time basis. Of those 21,500, Washington Post's Kaplan also employs substantial numbers of part-time employees who serve in instructional and administrative capacities. During peak seasonal periods, Kaplan's part-time workforce exceeds 19,000 employees.

90.    Throughout the Class Period, it was crystal clear to both Defendants and the market that Kaplan's financial performance was key to the overall financial health of the Company. Reeling from poor performance in its traditional newspaper business, Washington Post increasingly relied upon Kaplan, the Company's "largest business," and Defendants credited KHE specifically as "the strength of The Washington Post Company's performance."

91.    The chart below demonstrates the Company's increased dependence on its for-profit education business during the Class Period:[9]

| Time Period | WPO Revenue (in Millions) | Kaplan Revenue (in Millions) | KHE Revenue (in Millions) | Percentage of WPO Revenue Derived from Kaplan | Percentage of WPO Revenue Derived from KHE |
|---|---|---|---|---|---|
| 2Q 2009 | $1,128.5 | $649.3 | $401.8 | 57.5% | 35.6% |
| 3Q 2009 | $1,148.7 | $684.5 | $408.7 | 59.5% | 35.6% |
| 4Q 2009 | $1,238.4 | $709.3 | $420.4 | 57.3% | 33.9% |
| 1Q 2010 | $1,171.2 | $711.4 | $442.6 | 60.7% | 37.8% |
| 2Q 2010 | $1,201.8 | $747.3 | $475.1 | 62.2% | 39.5% |

92.    Thus, Washington Post's financial performance and future business prospects – as well as its stock price – were heavily dependent on Kaplan. In turn, Defendants' fraudulent scheme depended upon their ability to keep Kaplan's revenues artificially inflated. But for Kaplan's student enrollments, and the hundreds of millions of dollars in federal financial aid that those enrollments brought with them, Washington Post would have imploded. Put simply, because revenues at

---

[9] Washington Post is abbreviated as "WPO."

Washington Post's newspaper publishing, magazine publishing and television broadcasting divisions were in severe decline as their businesses struggled, Defendants were highly motivated to defraud the market and mask the true reasons behind the education division's seemingly positive financial performance.   Towards that end, its predatory business model was a closely held secret that Defendants kept from the market.

### E.    Washington Post's Kaplan Was All A "Numbers Game"

93.    To artificially boost revenues at Kaplan, Defendants oversaw and omitted any disclosure of a predatory corporate culture that transformed supposed Admissions Advisors into sales persons, potential students into "leads," and student enrollments into sales.  As detailed herein, Washington Post's Kaplan continually grew its enrollments and, consequently, its revenues, throughout the Class Period by operating football field sized call centers where Admissions Advisors were subject to quota-based recruiting that was directly determinative of Admissions Advisor's employment status and compensation.  As a result, the Company engaged in rampant fraud through aggressive and manipulative recruitment and enrollment practices – all of which were hidden from investors.

### 1.    The Company's Sales Machine Included an Army of Kaplan Admissions Advisors Stationed In Warehouse-Sized Call Centers

94.    Unlike a typical institute of higher education, which may have a small handful of admissions advisors available for phone calls, the Company's Kaplan division hyper-aggressively used a veritable army of Admissions Advisors, working out of warehouse-sized call centers, to recruit, pressure and pursue leads (*i.e.*, students), until they agreed to attend a Kaplan school and, inevitably, apply for staggering amounts of federal financial aid.

95.    For example, beginning in December 2008, Kaplan University began leasing a two-story, 124,500-square-foot building in Orlando, Florida, which was utilized as, and internally referred to as, a "call center." After its opening, the Orlando call center operated seven days a week,

14 hours a day (from 9:00 a.m. to 11 p.m. EST). It housed approximately 800 employees, the vast majority of which work on the call center's second floor, where there were two diagonal rows of cubicles – *each row spanning the length of a football field*. Internally, CW 8 recalled that the second floor was referred to as the "sales floor."

96.     More specifically, CW 8 explained that the cubicles on the "sales floor" were organized in groups of approximately 10-12 cubicles, with five or six cubicles facing one another. At the end of each section of 10-12 cubicles, within the giant rows, are two larger, secluded cubicles for the Associate Director and Director of Admissions. The part of the facility's first floor used as a call center is set up the same way. The only thing separating each group of 10-12 cubicles on the sales floor is a small walking space. The Orlando, Florida call center also includes a group meeting area reserved for team and whole site "huddles."

97.     At the Company's football field-sized call-centers, highly trained Admissions Advisors work the phones incessantly in order to meet enrollment quotas. According to CW 13, the Company trains its sales force using, among other things, the Dimensions of Professional Admissions training program, or "DPA," that focuses on utilizing sales techniques. CW 8 recalled that during CW 8's initial training program at the Orlando, Florida call center, one advisor, upon seeing the techniques being used, asked the Kaplan training personnel whether they were working at "an admissions job or a sales job?" CW 8 recalled that she/he and others were being trained for a "sales job" and "were told that we were expected to sell."

98.     According to CW 7, the Company's sole educational focus was a mere "numbers game." CW 1 confirmed that Kaplan's business model during the Class Period was based on Admission Advisors getting a certain number of enrollments. CW 3 stated the Admissions Advisors were trained to say "whatever it took to make numbers." Indeed, according to CW 11, Company

executives created a "strictly about the numbers" culture, and "didn't want to hear excuses or see the details – just the results."

### 2. Like A Boiler Room, Admissions Advisors Were Under Intense Pressure to Meet "Enrollment Quotas"

99.    Unlike a typical admissions advisor at a university – but like a salesman – Kaplan's Admissions Advisors were subject to strict enrollment quotas. According to CW 9, Kaplan's entire business "was geared toward enrollments." Indeed, according to CW 1, Admission Advisors were "*only* responsible for enrolling students." The fulfillment of enrollment goals (which were bright-line quotas) was *the* determining factor used within the Company to determine and set each Admissions Advisor's employment status and compensation. CW 8 recalled the internal motto at Kaplan was "one dial -- one file," which meant Admissions Advisors were required to "get on the phone and enroll students that day."

100.    The Company's enrollment quotas were used throughout Kaplan and hung over all Admissions Advisors' heads at Kaplan's various facilities. If quotas went unmet, Admissions Advisors were fired and replaced. For example, at the Atlanta, Georgia, facility, Admissions Advisors were required to conduct at least five interviews per day, to make 100 or more calls per day to prospective students, often calling the same person seven times in one day, and to enroll approximately five students per week. If these incredibly aggressive tactics were not used, such as serial phone calls akin to horror stories typically relegated to the world of credit collection, quotas would not be met and Kaplan would not hesitate to terminate its sales force.

101.    According to CW 1, at the Orlando, Florida facility, Admission Advisors were required to conduct seven interviews a week, make 85 calls per day, have 7.5 hours of "talk time" per week, and enroll at least one student. CW 3 recalled that at the Columbus, Ohio Campus, the campus had a quota of 98 enrollments per month. In addition CW 4 stated, Kaplan University Admissions Advisors were expected to have 15 interviews, and enroll three students per week in

Davenport, Iowa.   In fact, according to CW 4, Davenport, Iowa campus President Garland consistently told Admissions Advisors to work 16-hour days in order to achieve enrollment quotas. If Admissions Advisors missed their quotas for a specific month or term, the number by which they fell short was added to their quotas for the next month or quarter.

102.    The status of enrollment quotas was specifically and constantly discussed within the Company's Kaplan division.  For example, CW 9 recalled the Orlando, Florida facility had a "daily projections meeting" that took place "right before 2 p.m." because the enrollment numbers "had to go up the chain."  Meeting attendees included all of the Orlando Directors of Admissions, led by Senior Director of Admissions Powell.  These meetings took place "right on the sales floor."  CW 9 stated Kaplan "had a big white board in the middle of floor where all of the Advisors could see."  Each Director of Admissions had to write a daily projection for enrollments on the white board. There is no doubt that meeting enrollment quotas was absolutely critical within the Company.

103.    Further, Admissions Advisors' numbers were internally tracked on the Company's "CC Pulse" tracking system.  CW 1 recalled that CC Pulse was used to generate "a ton of internal reports."  Specifically, CC Pulse generated a "Scorecard" for each Admission Advisor that showed where a given Admission Advisor was toward meeting his/her individual minimum enrollment "goals" (*i.e.*, quotas).

104.    Moreover, Admissions Advisors were constantly singled-out by upper management for doing well, or on the other hand, publicly chastised for not meeting their required numbers. According to CW 6, at the Atlanta, Georgia facility, the Admissions department held two meetings per day that lasted about 20 minutes, where the activities of individual Admissions Advisors were pointed out to the entire facility.  According to CW 3, at the Columbus, Ohio Campus, Director of Admissions Brown had a white board in his office that detailed the enrollment goals and actual enrollments for each Admission Advisor (much like a sales board one might find in the back of a car

dealership).  CW 11, a former KHE Executive Director, stated that she/he participated in Weekly Accountability Meetings every Friday at 11:00 a.m., led by Regional Director of Operations Ferguson, where the Executive Directors were required to report on the status of enrollments, retention rates, and lead conversions.  Each of the Executive Directors would be "put on the spot" in front of all the other Directors.  CW 11 recalled that they "would go right down the line" and that it was always a "very difficult call."  Likewise, CW 14, a former Executive Director in Phoenix, Arizona, stated that Kilgore met on a weekly basis with all Directors of Admissions and Campus Executive Directors via a Kaplan-wide teleconference – every Wednesday at 9 a.m.  CW 14 and the other Directors in the Phoenix facility would go to the "Maricopa Room" to participate in the calls. During the calls, each Director had to "report the numbers," which included budget updates and "start numbers."  CW 14 recalled that it was common for Kilgore and Vice President of Admissions M. Jones to "undress" the Executive Directors for not meeting enrollment quotas.  Similarly, CW 1 stated that enrollments were stressed during Daily Management Meetings, at the Orlando, Florida facility.  If after one week into an enrollment cycle a Director of Admissions' team was not meeting enrollment quota targets, that Director of Admissions would be responsible for putting together an "action plan."  Furthermore, according to CW 3, every quarter, an Excel spreadsheet showing the enrollments and student graduations by each Admissions Advisor per quarter was submitted to corporate payroll in Alpharetta, Georgia.

105.    As if being internally tracked or frequently reprimanded by superiors was not enough pressure, Washington Post's Kaplan division added to the pressure of meeting sales goals by implementing several mechanisms on its sales floors.  The Company's education division used a variety of "motivational" tactics to create a competitive internal sales environment, where Admissions Advisors were made aware of how other advisors performed enrolling students – or making sales.  For example, at Kaplan call-centers, whenever an Admissions Advisor made an

enrollment, or met an enrollment quota or "goal," the Associate Director of Admissions would reward the Admissions Advisor with a visually conspicuous prize, such as balloon tied to the Admission Advisor's cubicle, or colored felt triangle-shaped flags that stated "I hit my goal." At the Orlando, Florida facility, Admissions Advisors were inundated with balloons, whistles, New Year's Eve blowers and clappers, which, according to CW 8 "were going off all over the place . . . every time someone made a sale." Likewise, according to CW 18, at the Fort Lauderdale, Florida call facility, a bell would ring loudly every time a student was enrolled, to inform the entire center of the sale. CW 18 recalled that when she/he first began working at Kaplan, CW 18 was excited to hear the bell. But, after continuously hearing Admissions Advisors pressuring students to enroll, towards the end of CW 18's tenure with the Company's education division, the bell made CW 18's stomach turn.

106.    The factual allegations set forth herein were provided by the independently corroborating accounts of several confidential witnesses, including CW 1, CW 4, CW 5, CW 6, CW 8, CW 9, CW 11, CW 14, and CW 18.

### 3.    Admissions Advisors' Employment Status Was Directly Tied to Enrollment Numbers

107.    It was well-known and indisputable throughout Washington Post's Kaplan that employees were fired for not making their enrollment quotes or goals.  In fact, CW 14, a former Director of Admissions in the Company's Phoenix, Arizona facility, stated Kaplan's internal policy was explicit: "it was written in the compensation plan that if you don't meet your numbers, you will be terminated."

108.    Specifically, each Admissions Advisor was subject to a 90-day review after his/her respective start date.  Throughout this 90-day window, Admissions Advisors were rewarded "production points" based on the Admissions Advisors' activities throughout the review period.  If, at the end of the 90-day review, the Admissions Advisor did not have 25 production points, she/he was ***automatically terminated***.  More specifically, during the first week an Admission Advisor was

not hitting her/his goals, the Admission Advisor received a verbal warning from her/his Director of Admissions. If the Admission Advisor did not meet the minimum goals for a second straight week, the Admission Advisor would then receive a written warning. According to CW 1, a former Director of Admissions in the Orlando, Florida facility, it was "understood" that after receipt of a written warning, "the next step was termination."

109.    According to CW 11, the internal pressure to enroll students was "very well known," and Kilgore and other Kaplan executives made "veiled threats about losing jobs" on weekly Executive Director calls. CW 10 confirmed that campus enrollments were the topics of the Monday Morning Director calls. Indeed, CW 10 recalled it was "always" meet your numbers or lose your job.

110.    In fact, CW 5 was specifically told by her/his superiors that the "goals will never be lowered – if you don't make the numbers, you will be gone." During CW 3's tenure at the Admissions Department in Columbus, Ohio, at least four of the ten Admissions Advisors were terminated for "not meeting enrollment goals."

111.    Admissions Advisors who were unable to attain enrollment quotas were often placed on a "personal improvement plan." When placed on a "personal improvement plan," they typically were given just two weeks to improve their enrollment numbers and keep their jobs.

112.    The pressure and emphasis on enrollments was not merely limited to those in Admissions, but was widespread throughout all of Kaplan. CW 10, the former President of Kaplan's Columbus, Ohio campus, recalled that she/he was under immense pressure to meet enrollment numbers, and was specifically told she/he "had to make enrollment budget or [she/he] would be let go. They didn't care who we were enrolling or how we did it – just get the numbers."

113.    The factual allegations set forth herein were provided by the independently corroborating accounts of several confidential witnesses, including CW 1, CW 3, CW 4, CW 5, CW 10, CW 11, CW 13, and CW 14.

### 4.    Admissions Advisors' Compensation was Directly Tied to Enrollments

114.    Kaplan compensated Admission Advisors on a "Gem Tier" system. Based on making quotas, an Admissions Advisor could move up the Gem Tier system, and every level offered increased compensation. The tiers were as follows (from lowest to highest): Aquamarine, Ruby, Sapphire, Emerald, and Diamond. By using the Gem Tier system, the Company's Kaplan division paid different salaries to Admission Advisors based exclusively on the number of enrollments they achieved.

115.    To be sure, the *only* factor that mattered in moving up the Gem Tier system was meeting enrollment quotas. Although, on paper, the compensation structure purported to have a number of components, including attendance, professionalism, performance, quality, enrollments and starts, in reality, the *only* way to advance and get a raise was to meet enrollment quotas. CW 8 stated it "all came down to enrollments and starts – if you hit your numbers, they liked you and your other scores would be better." If enrollments were not met, the other scores were irrelevant. The emphasis was always on enrollments – no ifs, ands, or buts about it.

116.    CW 13 confirmed that increases in compensation could only be attained by meeting enrollment quotas. For example, when CW 13 joined Kaplan in February 2008, her/his annual salary was $30,000. Within three months of employment and after attaining an enrollment quota of 30 students in three months, CW 13's salary was increased to $42,000, annually. Put simply, CW 13 received a $12,000 raise in just three months of employment based *solely* on CW 13's ability to attain the assigned enrollment quota. Likewise, CW 8 confirmed that after her/his first review,

she/he skipped three Gem Tiers because CW 8 enrolled "lots of PDLs," or personally developed leads.

117.    Not only did Admissions Advisors' salaries increase if they made enrollment quotas, but inversely, Admissions Advisors' salaries were "always at risk" if they did not meet enrollment goals.  If an Admission Advisors did not meet monthly enrollment goals commensurate with their Gem Tier, their compensation would be reduced as a direct result of the inability to meet enrollment goals.  According to CW 8, if an Admissions Advisor continued to miss enrollment quotas, the Admissions Advisor would be terminated.  CW 8 stated, "Your ass got fired if you don't meet goal."

118.    According to CW 5, "if you are a producer, you are going to make more money." CW 9 confirmed that the "whole compensation plan" was designed to put pressure on Admissions Advisors to enroll students.  According to CW 1, although the Company's Kaplan division "tried to make it appear" that it took factors other than enrollments into account in the compensation structure, that was really "just lipstick on the pig."

119.    Defendants were aware of, and endorsed Kaplan's compensation structure.  In fact, according to the Company's March 24, 2010 Proxy, during 2009 the Company's Compensation Committee met on two specific occasions to discuss "detailed questions from the Compensation Committee regarding Kaplan compensation plans."  According to the Proxy, the meetings were attended by, among others, Graham, and Rosen.

120.    The factual allegations set forth herein were provided by the independently corroborating accounts of several confidential witnesses, including CW 1, CW 5, CW 8, CW 9, CW 13, and CW 14.

### F.    In Order to Artificially Inflate the Company's Financials, Defendants Endorsed and Oversaw Unethical Recruiting Practices

121.    Due to the Company's emphasis on revenues obtained from enrollments, as well as the pressure put on executives and Admissions Advisors to maintain enrollments at Kaplan, the

Company created and essentially mandated unethical recruitment practices. According to CW 5, there is "no doubt" that the policies Washington Post's Kaplan had in place were designed to make Admissions Advisors "lie" to prospective students. Indeed, the Gem Tier salary system, according to CW 5 is set up so the Admissions Advisors are "encouraged to lie."

122. One factor that encouraged deception in recruiting was that each Admission Advisor's credit towards their enrollment quotas was given the moment a potential student completed the enrollment form; it had nothing to do with the student actually attending a single class.

123. Admissions Advisors were tasked with calling prospective students or "leads" as they were referred to internally. Kaplan purchased the majority of its leads from low quality aggregators. Indeed, it was more profitable to buy leads from low quality aggregators and enroll any student than to focus on enrolling quality students. These leads were then routed to Admissions Advisors' computer queues by Assistant Admissions Directors. After speaking with a "lead" on the phone or in person, if the potential student expressed interest in attending a Kaplan school, the student would then make a deposit. Because the vast majority of personal checks were rejected, the majority of students made deposits using credit cards. Due to the poor credit of Kaplan's potential enrollees, a universal practice was for Admissions Advisors to instruct potential students to go to Wal-Mart and obtain pre-paid cards in order to make their deposits. According to CW 1 "[w]e would even do the research for them on the phone." In other words, Admissions Advisors would tell leads where the closest Wal-Mart was located.

124. Before a student was enrolled, several forms were required, including an application form, an enrollment agreement, and financial aid forms. Prospective students' files were supposed to have copies of each student's driver's license or ID and Social Security card. As confirmed by

numerous confidential witnesses, however, at Kaplan, in order to more easily close sales, these procedures were almost never followed.

125.    According to CW 4, although all forms were supposed to be signed prior to enrollment, CW 4 was directed by her/his superior, Wieleski, to merely obtain the registration fee and to "deal with the rest" later. Moreover, CW 4 recalled that when a student eventually did sign the required enrollment forms, because the student signature was signed after the date the student paid their registration fee, Admissions Advisors were ordered by Wieleski to back-date the student's signature to make it appear that the payment of the registration fee and signing of the enrollment form occurred on the same day. CW 4 recalled that these back-dating practices occurred at least once a week. CW 3 confirmed that frequently students would start classes before "financial aid was even completed."

126.    Indeed, CW 1 stated that for the first four weeks of a given enrollment cycle, Admission Advisors focused solely on getting enrollments. On the final Friday of the enrollment cycle, Admission Advisors started getting students "cleared," meaning the Admission Advisors would re-establish contact with the prospective students they had enrolled and encourage them to login to classes as quickly as possible. The purpose of this switch in emphasis was that once a student logged into classes, he/she was considered to have officially "started." Even though students were not supposed to be enrolled until they had received final approval for their financial aid, if it was getting close to the start date of the term, Admissions Advisors were instructed to enroll students who had only received preliminary approval, resulting in students receiving less financial aid. CW 1 explained that Admissions Advisors would tell students that "classes are filling up fast, so they should login at midnight as soon as the logins were available." The result was that students would sign up for classes and be locked into attending Kaplan.

127.    Admissions Advisors were told by their superiors to tell students anything they could in order to get a student to enroll.  According to CW 14, who attended multiple speeches given by Kilgore, Kilgore "encouraged" very aggressive admission policies.  For example, the following were commonplace at Kaplan:

- Potential students were told they could earn an associate's degree in 18 to 22 months instead of two years, and a bachelor's degree in two and half years instead of four years;

- Potential students were told that they were not paying for their education, financial aid was, and that there were no out-of-pocked expenses;

- Potential students who were unable to afford the $20 registration fee to enroll were often told to donate blood plasma, or encouraged to make changes to their lifestyle, such as avoiding going out to dinner, or to the movies, to pay for the fee;

- Admissions Advisors were encouraged to enroll students mid-term just to get the enrollment, even though starting school mid-term ending up costing the student more money;

- Admissions Advisors told students that Kaplan's accreditation was the same as Ivy League schools;

- CW 8 recalled that if a potential student was still deciding whether to enroll, Admissions Advisors would tell the potential student, "let me put you on hold and check with my supervisor on the fifth floor – I gotta get approval."  The truth of the matter was that there was no fifth floor, and there was no approval process.  According to CW 8, this tactic was a repeated directive from the Associate Director of Admissions, who "told the team" to say that in the huddles;

- Although Kaplan offered multiple start dates for students to begin at Kaplan, Admissions Advisors were told to only offer students enrollment in the most immediate date.  For example, CW 5 was instructed by the Regional Vice President that "we don't want to hold their hand for two months.  That is not a good use of time"; and

- In addition, "low performing" Admissions Advisors received ongoing training on how to "close a student."  For example, if an Admissions Advisor called a prospective student that was currently at work, Admissions Advisors were trained to "keep going" on the phone until the prospective student hung up.

45

128.    Students were also misled as to whether any previous credits earned from another institution of higher education would transfer to Kaplan.  When asking about the transfer of credits, Admissions Advisors were directed to tell potential students that a student's credit audit could be requested during a student's first term enrolled at Kaplan.  In truth, if the students asked, the audits could have been performed at any time prior to enrollment.  Kaplan did not want to give students a reason to delay enrollment, even if the delay would have resulted in informing students that none of their previously earned credits would transfer to Kaplan.

129.    In those instances where potential leads still were unable to pay for their registration fees, Kaplan would pay the fee for them - in direct violation of HEA regulations and the Company's Code of Ethics.  For example, CW 13 recalls multiple instances where a student was unable to pay the $95 registration fee required to enroll, and Director of Admissions McMullen provided Admissions Advisors with an American Express card number to be used by the prospective student to cover the registration fee.  Specifically, McMullen instructed Admissions Advisors to go "outside" and use "their cell phones" to call the prospective student and provide the potential enrollee with the American Express card number for payment of the registration fee.

130.    This unethical and illegal practice of paying potential students' enrollment fees was corroborated by additional confidential witnesses.  Indeed, CW 10 recalled that in September 2009, two students signed written statements saying that Kaplan Admission Advisor John Strock ("Strock") gave the students money to cover the school's application fee.  CW 10 reported this incident to both Kaplan's legal team and Human Resources department.  Within a couple of weeks, Regional Vice President for Admissions Dave Bryant informed CW 10 that Kaplan would not punish Strock because Strock was the "number one producing Admission Advisor."  In October or November of 2009, Strock was promoted to Assistant Director of Admissions.

131.    In pursuit of federal aid dollars, Kaplan even encouraged Admissions Advisors to sign up students with backgrounds and life circumstances demonstrating that they had little chance of success, including students who worked multiple jobs, were single parents without a babysitter, did not own a computer, or who could not afford the application fee. According to CW 5, the Company's promise to prospective students that they would receive academic support was also a "bold-faced lie." Defendants encouraged Kaplan's sales force to "stretch the truth" because they knew the education Kaplan offered was "not commensurate with the cost." In fact, CW 5 recalls that at the Indianapolis, Indiana campus, there were a "bunch of students who couldn't even read or write."

132.    With respect to face-to-face interactions with potential students, Admissions Advisors were instructed not to verbally tell students the cost of tuition, but were instead instructed to show potential students the cost of their Kaplan education on a piece of paper as a way of minimizing the actual cost. Admissions Advisors were supposed to show potential students a sheet of paper that explained the costs for a particular degree, but they were not supposed to say the cost out loud.

133.    Although there are countless accounts of fraud at the Company's Kaplan division, two particular accounts warrant further detail. CW 4 recalled a potential student named Tammy who came in for an interview. CW 4 described Tammy as "filthy" and said it was clear she "wasn't making sense." Tammy was rambling about finding her dead sister and actually lay down on the floor during the interview to show CW 4 the pose in which she found her sister. Tammy had trouble coming up with the $20 application fee and she took the entrance exam three times, barely passing on her third and final attempt. Additionally, Tammy only wanted to enroll in online courses despite the fact that she did not own a computer. Although CW 4 expressed serious reservations, at Associate Director of Admission Wieleski's insistence, Tammy was enrolled at Kaplan. CW 4 recalled that Tammy dropped out of Kaplan two weeks later. According to CW 4, Wieleski's reply

47

in this disturbing situation, and in many others where it was clear potential students should not have been enrolled, was, "You gotta do what you gotta do. You gotta get those numbers." CW 6 recalled similar unethical practices, and recalled at least two occasions when Kaplan Admissions Advisors recruited students from a local homeless shelter. Indeed, CW 6 and her/his team were told by their supervising Coordinator that Admissions Advisors enrolled two homeless people, and also paid each homeless person's $50 to $100 enrollment fee.

134.   Likewise, CW 22, a former Kaplan student, was explicitly lied to by an Admissions Advisor regarding the limitations of her/his bipolar disorder, in order to secure CW 22's enrollment with Kaplan. CW 22 explained that when deciding to enroll with Kaplan, CW 22 explained to the Admissions Advisor that she/he was enrolling at Kaplan to become a probation officer, and that she/he was currently on disability and took medication multiple times a day for bipolar disorder. The Admissions Advisor told CW 22 that her/his disability and bipolar disorder would not impact her/his profession as a probation officer, and that CW 22 would be able to obtain a well-paying job as a probation officer after completing Kaplan's program. CW 22 was also assured that the credits earned at Kaplan could be transferred anywhere.

135.   After enrolling and taking classes at Kaplan, CW 22 eventually contacted the Ohio Department of Education ("Ohio DOE") and the U.S. Probation Office to inquire about becoming a probation officer. During the call with the Ohio DOE, CW 22 learned that credits earned at Kaplan could not be transferred anywhere. In addition, from speaking with the U.S. Probation Office, CW 22 learned that she/he was automatically disqualified from being a probation officer due to her/his bipolar disorder. Besides CW 22's mental health disqualification, the age limit for becoming a probation officer at the time of the application is 37, and CW 22 was already older than 37 at the time. CW 20 confirmed that Kaplan allowed students with felony charges to enroll in its heating, air conditioning, and ventilation programs and incur substantial amounts of debt, despite knowing that

their felonies would prevent the students from becoming a bonded employee capable of obtaining employment. The above examples are just a few of a multitude of the Kaplan students impacted by Kaplan's unethical recruiting activities

136.    Another deceptive practice used by Kaplan, according to CW 5, was to manipulate the add/drop periods in order to lock students into paying tuition. For example, while the "add/drop" period spanned the entire first week of the first semester a student was enrolled at Kaplan, for every semester going forward, the add/drop period was limited to a single day. As a result, Kaplan students only had one day to decide whether to leave a class, after which they were locked-in to paying for the entire course.

137.    Moreover, according to CW 7, the majority of students would "find out they could not afford the school." These students would invariably end up dropping out and defaulting on their loans. CW 7 stated that taxpayers would end up "holding the bag while [Washington Post CEO/Defendant] Don Graham makes a fortune." Kaplan was "always willing" to "push the envelope" as far as it could "as long as they were making money." Even though they "preach" they are an education company – "it is a big façade. They are all about making money."

138.    Admissions Advisors knew as they were enrolling students that they were setting the students up to fail in order to attain enrollment quotas. Courses at Kaplan cost as much as $371 per credit hour, and most students did not have the means to pay for college without extensive financial assistance. For example, according to CW 13, many students were enrolled in the online program, even though they did not own a computer that they could use to attend class and complete assignments.

139.    Once enrolled by an Admissions Advisor, it was the academic team's "job" to "keep" students in school. According to CW 5, however, "we had nine Admission Reps and three Academic Advisors," so "the focus" was clearly on enrolling students, as opposed to advising and

assisting students once they were enrolled. In fact, although Washington Post claimed that its focus was students overall future success, some Kaplan facilities offered absolutely no career planning services to graduates. For example, according to CW 13, the Cypress Creek and Plantation, Florida facilities did not offer career services to graduates. Towards the end of CW 13's employment with Kaplan, Admissions Advisors were tasked with "networking" in the community to try and build relationships with "staffing companies" and potential employers in order to be able to refer graduates to places offering potential employment opportunities. However, CW 13 was "not aware of any graduates getting jobs" after completing courses at Kaplan.

140.    Furthermore, the unethical practices within the Company's education division were encouraged by Kaplan executives. For example, CW 14 recalled that Kilgore "encouraged bad admissions practices." In fact, CW 14 stated that in either late 2009 or early 2010, Kilgore made speeches to all Kaplan Directors of Admissions that "let everyone know" that "if you can't produce the numbers, somebody else would." The first speech CW 14 recalled was called "Command Philosophy." The second speech Kilgore made was entitled "Meet the Tiger."

141.    According to CW 9, Kilgore's "job was being out in the field." He held focus groups and town hall meetings all the time with Admissions Advisors. The enrollment issues and sales practices would always come up." In fact, CW 9 estimated that Kilgore visited the Orlando, Florida facility "at least every couple of months," and held town hall meetings with "everyone from the floor – maybe 800 people." Focus groups, however, were smaller meetings consisting of approximately three to five Admissions Advisors.

142.    Moreover, according to CW 5, KHE CEO Conlon was referred to internally at Kaplan as "Mr. Numbers," and was constantly asking people about "the numbers, the number of leads and the ratio to enrollment." In fact, according to CW 18, Conlon received daily Sales Reports detailing daily enrollment activities. According to CW 18, at a meeting with Conlon, after discussing CW

18's 10-year vision for online education, she/he was specifically told by Conlon to "follow the money."

143.    Moreover, according to CW 9, Company executives were also aware of the Company's enrollment practices through a "compliance violations list," and that the Company used a HyperQuality tracking system to monitor Admissions Advisors' calls.

144.    According to CW 1, every call in the Orlando, Florida facility was recorded using a QueueMetrics call center monitoring software.  Kaplan retained a company in India to listen to and score the calls.  Not every call was "scored," but instead only a random sampling.  Directors of Admissions, including CW 1, pulled the Quality Scores for Admission Advisors from the QueueMetrics software.

145.    According to CW 8, Company executives were made aware of the Admissions practices through "intra-Company website -- KUNET."  Within KUNET, there was a "Just Ask" section that was supposed to allow Admissions Advisors to anonymously ask questions.  CW 8 recalled that there "were always questions about whether the stuff we were doing was alright."

146.    The factual allegations set forth herein were provided by the independently corroborating accounts of several confidential witnesses, including CW 1, CW 3, CW 4, CW 5, CW 6, CW 7, CW 8, CW 9, CW 10, CW 13, CW 14, CW 18, CW 19, CW 20, and CW 22.

### 1.    "Uncovering the Pain and the Fear – Creating Urgency" – Kaplan's Scripts

147.    Not only were the Company's unethical practices known throughout Kaplan, but they were memorialized in the Company's telephonic "scripts" that, as mentioned above, specifically directed Admissions Advisors to prey on potential students' "pain and fears" and to "stir up" students' emotions and "create urgency" to enroll in Kaplan.

148.    In addition to requiring Admissions Advisors to uncover "the pain and the fear," the enrollment script contained a "Rubric Attribute" that emphasized the sales nature of the calls.  It

specifically stated: "Empower the student to respond/ Advisor Call Control"; "Advisor asked positive questions to encourage prospect buy-in, while providing the prospect with the opportunity to ask questions"; "Advisor picks up on buying signals"; and "Build/Maintain Rapport w/ Prospect."

149.    Kaplan's scripts were paramount to Kaplan's enrollment process. Upon starting work with the Company's education division, Kaplan issued a binder with a laminated copy of the script to each Admissions Advisor. In fact, the first 30 days of Admissions Advisors' employment was spent memorizing Kaplan's scripts. According to CW 13, the script consisted of a 32-page PowerPoint presentation, and provided details about Kaplan, including its history and emphasized that Washington Post was the parent company of Kaplan. To that end, the script had a graph depicting how Kaplan represented more than 50% of Washington Post's total revenue.

150.    The scripts were based on an "outcome based" sales strategy designed to make the potential enrollee think about his or her inspiration for enrolling in college and the outcomes the potential enrollee sought to achieve. According to CW 13 the "whole idea" was to keep the potential enrollee on the phone by utilizing the script. The Admissions Advisors asked questions that prompted potential enrollees to consider how a college education at Kaplan might improve their income potential. CW 4 confirmed that Admissions Advisors would say things such as "look at your life now" to convince prospects that attending Kaplan was a viable way to change their lives and economic situations.

151.    Moreover, the scripts were designed to and did create a sense of urgency and panic so that students would enroll with Kaplan. According to CW 8, if students showed "any hesitation" Admissions Advisors would manipulate the prospects by using their own words against them. For example, Admissions Advisors would start sales calls with leading questions designed to pull out key facts, which could be used later in the sales process as emotional lightening rods. CW 8 stated that if a prospective student said their grandmother would be at their graduation, but later said they

could not afford the tuition deposit, CW 8 was trained (like all of the sales force in the Company's Kaplan division) to "tell them to get it from their grandma." "We were always urging them to get it done now – we preached that all day, every day."

152.    On top of manipulating students, the sales scripts used in the Company's Kaplan division contained outright lies. For example, the script stated that Concord Law School, Kaplan's online law school, was 70 years old and was accredited. The truth was that Concord Law School had only been in existence for a mere 13 years, since 1998. Moreover, although Concord Law School was accredited by the National Conference of Bar Examiners it was not accredited by the American Bar Association ("ABA") – the largest, and most reputable law school accreditation association in the country. As a result of Concord Law School's lack of ABA accreditation, graduates are not permitted to practice law, or even sit for the bar, in any state outside of California. These facts, however, were not disclosed to potential law students.

153.    The factual allegations set forth herein were provided by the independently corroborating accounts of several confidential witnesses, including CW 4, CW 8, and CW 13.

## 2.    Kaplan Works the System, and Its Students, In Order to Obtain Financial Aid Awards

154.    Admission Advisors implemented a multitude of false and misleading practices surrounding financial aid. For example, CW 8 detailed a specific example of Admission Advisors acting unethically in order to obtain financial aid on behalf of a Kaplan student.[10] Around July 3, 2010 and July 6, 2010, Associate Director of Admissions Pugh and another Admissions Advisor applied for a FAFSA pin on behalf of the student. The FAFSA is the form required to be submitted to the federal government in order to obtain federal financial aid. Included in the FAFSA is a Master

---

[10] In the interest of privacy, Plaintiff is not identifying the former Kaplan student by name. If the Court desires specific identification, Plaintiff will provide it to the Court and counsel for Defendants.

Promissory Note ("MPN") which must be signed by the student. After applying for the FAFSA pin on behalf of this student, Pugh and the other Admissions Advisor received the pin, and electronically signed the MPN on the student's behalf. According to CW 8, this blatantly fraudulent tactic was used because it was close to the enrollment deadline, and "Kristen [Pugh] needed to hit her numbers." CW 8 became aware of this situation because the student was selected for document verification, and CW 8 spoke directly with the student about the incident.

155.    On a daily basis, Kaplan also manipulated potential student's Estimated Family Contribution ("EFC"). The EFC is the amount of money that students and their family's are expected to contribute to the student's education. When calculating financial aid, this number is used to offset the amount of federal financial aid a student is entitled to receive. Kaplan wanted students with an EFC of zero, because those students - and thus Kaplan - would receive more government financial aid as a result. According to CW 8, when Kaplan saw an EFC of zero, "all they see is money signs." CW 16 confirmed that potential students were informed by Admissions personnel that they would receive "100 percent financial aid."

156.    Prior to June 2010, the Kaplan internal policy stated that Admissions Advisors could not even transfer a call to Financial Aid unless the Admissions Advisor put in the EFC number into the computer system. Admissions Advisors entered the EFC information into an Orion system used by both Financial Aid and Admissions. CW 8 recalled that it was a common practice for Admissions Advisors to enter an EFC of zero, regardless of the prospective student's actual EFC, in order for the student to "see all that money" was available to them "once they got to Financial Aid."

157.    Admissions Advisors also logged into classes on behalf of students in order to ensure the disbursement of federal financial aid dollars. CW 8 explained that in order for Kaplan to get money from the government, the student has to log in to classes within "the first seven days of the

start." So, it was common for Admissions Advisors to log in on students behalf in order to guarantee federal monies.

158.    According to CW 6, the Financial Aid department would rush prospective students and their parents through the process and would get "irritated" when students asked questions. CW 6 explained that Kaplan's policy was that the more prospective students and their parents knew about the long-term debt they were signing up for, the less likely it was they would actually enroll. In other words, the Company's financial aid department deliberately sought to minimize disclosure of the truth to prospective students in order to further boost Kaplan enrollments.

159.    The factual allegations set forth herein were provided by the independently corroborating accounts of several confidential witnesses, including CW 6, CW 8, and CW 16.

### G.    Ability to Benefit - Kaplan Takes One Step Forward and Two Steps Back

160.    Up until October 2009, Washington Post's education division permitted students who had not received a high school diploma to enroll in its Kaplan's institutions, as long as those students completed and passed an ATB test. Throughout Kaplan, these students were known as ATB students. According to CW 17, although Kaplan was theoretically giving opportunities to students without high school diplomas, in reality, Kaplan was enrolling representatives of the "at risk population" and "setting them up to fail." That is, ATB students were enrolled and incurred federal student loans in the amount of $12,000 – and often much more - but were simply not capable of completing the programs in which they enrolled. Therefore, they were instantaneously "at risk" of defaulting on their student loans. CW 17 also stated that ATB students represented a significant portion of Kaplan's drop rate because Kaplan failed to properly staff the schools to provide the requisite amount of assistance and support that Kaplan knew ATB students would require.

161.    In October 2009, Kaplan stopped admitting ATB students. According to CW 11, Kaplan became "arrogant – they wanted to be the Harvard of proprietary schools." What the

Company was not prepared for, however, and what Defendants did not disclose to investors, was that the decision to stop taking ATB students caused an immediate drop in enrollments.

162.    Despite ceasing to enroll ATB students, Kaplan did not alter its marketing. So, ATB students remained the primary target of Kaplan's marketing. For example, according to CW 11, for some time after the Company's education division no longer admitted ATB students, 30% of the potential-student leads generated were still ATB students. Regardless of the fact that Kaplan would no longer enroll 30% of its leads, the Company still expected Kaplan Admissions Advisors to have the same conversion rate of leads to enrollments and to enroll the same number of students. The change in policy of no longer enrolling ATB students, but yet still requiring Admissions Advisors to have the same conversion rates and enrollment quotas only added to the level of aggression used to recruit new students. Instead of cleaning up its act, the Company's education division had, in reality, poured fuel on the fraudulent recruiting fire burning at Kaplan. CW 14 confirmed that, despite the fact that the new policy precluded Admissions Advisors from contacting a large number of potential leads, the Company's Kaplan division made "no change" to either enrollment quotas or the Admissions Advisor compensation policies.

163.    The factual allegations set forth herein were provided by the independently corroborating accounts of several confidential witnesses, including CW 11, CW 14, and CW 17.

**H.    Kaplan's Improper Practices Throughout the Class Period Were Orchestrated to Circumvent the Requirements of the 90/10 Rule**

164.    The Company's Kaplan division routinely set up improper and undisclosed practices to circumvent the 90/10 Rule. For example, CW 3 recalled generally that in 2008 or 2009, after the state of Ohio cut funding to Kaplan's Columbus, Ohio campus, the Financial Aid Director set up cash payments for students that the Director "knew they couldn't afford." "Every student had some type of cash payment because of the 90/10 rule." According to CW 3, there was "no way" the student could afford the cash payments – "they couldn't even afford $10." As a result, the Columbus

campus had a problem with collecting accounting receivables from students. The problem reached such extremes that Kaplan Controller Neil Amari set up a conference call for every Friday at 10 a.m. for each Assistant Controller working at Ohio campuses "to ask what are you doing to collect this money."

165. In violation of regulatory standards, Kaplan had a way of skirting the 90/10 Rule and continuing to collect federal financial aid, even when campuses had already exceeded their 90% federal funds limit. For example, CW 17 stated Kaplan shifted "things between the main and branch campuses." Indeed, Kaplan had main campuses, and branch campuses. CW 17 explained that by recording and applying financial aid using different Office of Postsecondary Education Identifier ("OPEID") numbers, federal funds were applied to schools other than the schools for which they were intended. Simply stated, if a main campus had exceeded 90% funding from federal funds, the funds were "moved" to a branch of the main campus, in order to keep the main campus in line with the 90/10 Rule. CW 17 explained that she/he was specifically instructed by Financial Aid Trainer James Blackburn, to record financial aid in this manner. These practices were also confirmed by CW 21, who recalls being told multiple times by Executive Director of Federal Regulatory Affairs Echols to manipulate OPEID numbers in this manner to hide the fact that a campus has reached its 90% threshold.

166. According to CW 17, approximately one third of the 76 campuses she/he looked into had issues with exceeding the 90/10 Rule. Inevitably, by August or September of each year, there were a large number of Kaplan campuses that already had more than 90% their of funding coming from federal student aid. As a result, CW 17 explained that these campuses placed all pending federal student aid applications "in a holding pattern" until the new year began, known as a "90/10 hold."

### I.    Kaplan Skirts DOE Reviews

167.    Kaplan regularly shut down campuses that were under DOE scrutiny or at risk of adverse findings in audits by regulatory or accreditation representatives.  Kaplan would then open campuses nearby, employing the same practices.  For example, in February 2010, Kaplan shut down the Water Hill, Florida campus and opened the Pembroke Pines, Florida campus.  According to CW 17, staff and students from the Water Hill campus had been "a mess" in terms of compliance, and they were all transferred to the new Pembroke Pines campus.

168.    This practice occurred across all of the Company's Kaplan division, as Kaplan also closed schools that were under government investigation and scrutiny, and re-opened nearby campuses, in California, Michigan, and Indianapolis.  For example, Kaplan acquired Maric College and immediately closed the legacy Maric College campuses in Los Angeles, San Diego, Irwindale, and Pomona, California - which were facing DOE scrutiny - only to open new campuses nearby.  Similarly, Kaplan closed the Detroit, Michigan campus that was at risk of DOE compliance violations but immediately opened the Dearborn, Michigan campus and transferred staff and students to the new campus.  In Indianapolis, Indiana, Kaplan opened a second school for the same reason, to avoid having the first Indianapolis campus shut down by the DOE.

### J.    The GAO Investigates Kaplan, Prompting the Company's Education Division to Dramatically Change Its Practices

#### 1.    The GAO Visit to the Pembroke Pines Campus

169.    On August 3, 2010, news reached the market that the GAO conducted an investigation into for-profit schools.  Among other things, the GAO sent undercover investigators, posing as students, to Kaplan's Pembroke Pines, Florida facility, and the GAO report – along with undercover video – detailed fraudulent, deceptive, and illegal financial aid and recruiting practices as all 15 for-profit colleges that were chosen (because they received nearly 90% of their revenues from federal aid) for investigation.  According to CW 13, once the GAO released its report, there was a

58

"huge huddle" at Kaplan's Plantation, Florida center the day after the GAO "released the video" and the personnel at the center were chanting "no more goals."

170.    As a result of the events that transpired at the Pembroke Pines facility, CW 13 stated that the Plantation, Florida campus and *all other campuses in the region* were "shut down for three months." During that time, employees and Admissions Advisors were not allowed to email or speak with students or potential enrollees. According to CW 13, who worked at the Pembroke Pines facility for a period of three months after the release of the GAO report, she/he went to work "everyday with [her/his] laptop and watched cartoons." Kaplan continued to pay regular salaries to the personnel at the Plantation, Florida facility, despite the fact that they did not perform any work for a period of three months after the GAO investigation was made public.

### 2.    The Impact of GAO Report – Kaplan Scrambles to Minimize the Damage

171.    After the August 4, 2010 GAO report shined a bright light on Kaplan's predatory enrollment and deceptive financial aid practices, the Company scrambled to institute changes at Kaplan in order to attempt to minimize the damage. One of the major changes dealt with extensive revisions to Kaplan's recruiting script. Indeed, around August 12, 2010, and again approximately two weeks later, Kaplan distributed new scripts.

172.    According to CW 14, the new script grew in length to approximately 50 pages. As opposed to telling Admissions Advisors what they should say, as the previous script had done, the new scripts focused on telling Admissions Advisors what they were not permitted to say. CW 14 explained that Kaplan executives were "absolutely aware all along" of the enrollment practices in the Company's education division, as evidenced by the change in policies following release of the GAO report. Summing up the difference between the scripts, CW 14 stated, "it was like night and day after the GAO report."

173.    CW 9 confirmed that after release of the GAO report, there was a "de-emphasis on" enrollments and more of an emphasis on compliance. For example, Admissions Advisors were no longer permitted to tell prospective students that Kaplan's institutions had the same regional accreditation as Ivy League schools. The new script also forced Admissions Advisors to disclose that it was up to receiving schools as to whether Kaplan credits could transfer to another institution. In the past, Admissions Advisors assured potential students there would be no issues with transferring credits earned at Kaplan to other schools. CW 8 recalled that Admissions Advisors at the Orlando, Florida call center were "pulled off the phone for four hours" in July/August 2010 to review the new scripts, which were approximately 36 pages long. The person in charge of the training, David Klester made the Admissions Advisors go through the new script "line by line."

174.    Moreover, after the GAO report, according to CW 9, the Company's Kaplan division made a conscious effort not to pursue "certain leads." CW 9 explained that Kaplan "cut way back on the lower-level type leads." As a result of Kaplan's new-found compliance with federal regulations, Kaplan's business froze. CW 9 stated that prior to the GAO report, her/his team enrolled approximately 70 students per month in the Information Technology school. After the GAO report, enrollments dropped to a mere 7 per month.

175.    According to CW 8, after the GAO Report was released, it was not uncommon "to see 30 people walked out in a day for compliance issues," meaning that Kaplan would terminate approximately 30 Admissions Advisors in a day for not making proper disclosures to potential students. Needless to say, prior to the GAO report, these Admissions Advisors would not even have faced reprimands for such misconduct, so long as they were exceeding minimum enrollment quotas. Indeed, they may have been given raises.

176.    There were also significant changes to the compensation structure at the Company's Kaplan division following release of the GAO report. According to CW 13, the salaries paid to

Admissions Advisors became "locked-in" and no longer widely fluctuated up and down based on the attainment of enrollment quotas every quarter or every six months.

177.    Put simply, following release of the GAO report, the Company's Kaplan division recognized that its predatory business model had been exposed and froze everything. CW 14 recalled that there "were no more reviews, no more goals." Indeed, the Company even stopped terminating Admissions Advisors at the end of the 90-day review for not meeting production points, despite the fact that this was a written policy. In fact, CW 14 stated that Kaplan Admissions Advisors would get emails "every day" after the GAO report "telling us to no longer use the words 'enrollments' or 'starts,' and 'goals' were taken away.

178.    Although the Company's education division did make substantial cosmetic changes to its scripts and compensation structure, Kaplan was still up to its old tricks. For example, regarding Kaplan's Concord Law School, CW 8 asked during the new script training whether she/he was permitted to disclose to prospective students that they had to live in California to attend the law school and that the students "can't sit for the bar exam." CW 8 was specifically told by a trainer, "no . . . we don't want to tell them that."

179.    Moreover, according to CW 8, Kaplan instituted a new compensation plan on October 31, 2010. CW 8 explained that for the first performance review following the change in compensation structure, Admissions Advisors received their compensation based on "which program the Advisor scored better on." In other words, the Admissions Advisors would be given a review using metrics from both the previous and the new compensation structures. The Admissions Advisors' compensation was based on which of the two programs resulted in higher compensation.

180.    The factual allegations set forth herein were provided by the independently corroborating accounts of several confidential witnesses, including CW 8, CW 9, CW 13, and CW 14.

### K.    The Florida Attorney General Investigates Kaplan, and Reveals the Sworn Testimony of Two Former Kaplan Admissions Advisors

181.    On October 19, 2010, Florida Attorney General Bill McCullum announced commencement of an investigation into alleged deceptive trade practices at five proprietary school groups located in Florida, including Kaplan (the "AG Investigation").  In the course of the AG Investigation, two former Kaplan Admissions Advisors, Elena Bright ("Bright") and Mark Stegall ("Stegall"), sat for deposition and provided sworn testimony concerning Kaplan's unethical enrollment and financial aid practices.  True and correct copes of the Bright and Stegall deposition transcripts are attached hereto as **Exhibits B** and **C**, respectively.

182.    Bright worked for Washington Post's Kaplan from August 2009 through November 2010, as an Admissions Advisor in the Orlando, Florida call center.  While at Kaplan, Bright reported to Scott Becket.  Stegall worked for the Company from April 1, 2009 to December 3, 2009, as a Senior Admissions Officer, also in the Orlando, Florida call center.  While working at Kaplan, Stegall reported to Gordon King.  Throughout their depositions, Bright and Stegall **both** provided sworn testimony that, among other things:

- Admissions Advisors at Kaplan were under tremendous and ongoing pressure to meet enrollment goals, and if goals were not met, Admissions Advisors were fired;

- The Company's Gem-Tier compensation structure for compensating Admissions Advisors was based "solely" on enrollments.  Consequently, the **only** way to move up a level in the Gem Tier, which would result in a monetary raise, was to make certain enrollment numbers;

- Among other things, Admissions Advisors told students that Kaplan had the same accreditation as Harvard or Yale.  Admissions Advisors also provided prospective students with salary estimates of $50,000 and $100,000, which they claimed would be achieved upon receipt of a Kaplan degree, and were told to infer to students that all their credits from Kaplan would transfer to other schools; and

- Kaplan's policy regarding financial aid prohibited Admissions Advisors from transferring a potential student to the financial aid department to discuss the amount of financial aid a student would be awarded until the student had given a "commitment" to attend Kaplan.

183.    The sworn testimony attached hereto, resulting from the Florida Attorney General's investigation of Kaplan's (now well-documented) illegal and deceptive business practices, provides powerful corroborative facts that support both the accounts of the CWs detailed herein, as well as Plaintiff's allegations of fraud.

**L.    Kaplan's Extensive Reporting Systems Provided Defendants With Knowledge of Kaplan's Predatory Business Model**

184.    Records demonstrating the results of Kaplan's predatory business practices were readily available to hundreds of Company employees. According to CW 12, the Company's Kaplan division used a Pro-Clarity software for a "Dashboard" reporting system, which was accessible through Kaplan's intranet. CW 12 described the Dashboard report as providing "instant insight" into "what was going on" within the Company's Kaplan division.

185.    Each campus was assigned a campus number within the Dashboard report and CampusVue. For example, CW 12 recalled that Kaplan University was Campus 42. The KHEC campus in Cedar Falls, Iowa was Campus 36. The front page of the Dashboard report, available to Company's top executives, provided a "snapshot" of key business metrics, which included the following:

- The "Conversion Rate View" calculated the number of student leads that eventually turned into enrollments;

- The "90/10 View" showed the percentage of revenue each school derived from federal financial aid. The first view a user could access within the 90/10 view showed the ten campuses with the highest percentage of revenue derived from federal financial aid;

- The "Student Starts View" calculated taking starts net of reverse starts. Reverse starts include students that graduate, drop out and take a leave of absence; and

- The "Drop Rate Calculation View" determined the rate at which students were dropping out of Kaplan institutions.

186.    According to CW 12, once in the Dashboard, the user could "drill down into each of the numbers" to get a "detailed view of each region and then each campus." The front page provided the key business metrics "rolled up to the national level."

187.    The Dashboard was available to approximately 800 employees, ranging from the Kaplan's top executives, including Kaplan CEO and Chairman Rosen and KHE CEO Conlon, down to the Campus Director level employees.

188.    The Dashboard provided both financial and operational data for the Company's Kaplan division, including specific data discussed below for Kaplan University and KHE. Kaplan University and KHE financial and operational data was fed into the Dashboard report from the CampusVue system. The amount of data available to the viewer was determined by the employee's position within the Company. For example, Rosen and Conlon were able to see a snapshot of the Company's national operations, and according to CW 12, both Rosen and Conlon viewed the system regularly.

189.    In addition to reviewing data in the Dashboard reporting system, every Monday at 10:00 a.m., Kaplan executives met for a Weekly Executive Staff Meeting. The Weekly Executive Staff meeting was held in the "Delphi" conference room, and typically was attended by approximately 10-15 Kaplan executives, including Hollenberg, KHE CEO Conlon, CEO of Kaplan Professional Schools Jim Rosenthal, and their respective direct reports, such as Higher Education CFO Lenz and Professional CFO Michael Peyer.

190.    Kaplan executives also conducted a Quarterly Senior Executive Meeting that was held at high end hotels and/or resorts. For example, in April 2010, the Company's Kaplan division held its Senior Quarterly Senior Executive Meeting at the Four Seasons hotel in Chicago.

191.    The factual allegations set forth herein were provided by the independently corroborating accounts of several confidential witnesses, including CW 2 and CW 12.

192.    Thus, as a result of the methods by which Kaplan tracked the results of its predatory business model, through, among other things, reports, meetings, conference calls and town hall meetings, its predatory business practices, though well hidden from the market, were well known within the Company's Kaplan division, both by the rank and file employees and by the executives, including the Individual Defendants.

## VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD[11]

193.    The Class Period begins on July 31, 2009.  On that date, Washington Post issued a press release reporting its financial results for the second quarter ended June 28, 2009, which stated, in relevant part:

> The Washington Post Company (NYSE: WPO) today *reported net income of $11.4 million ($1.30 earnings per share) for its second quarter ended June 28, 2009, compared to a net loss of $2.7 million ($0.31 loss per share) for the second quarter of last year.*
>
> *       *       *
>
> *Revenue for the second quarter of 2009 was $1,128.5 million, up 2% from $1,106.2 million in the second quarter of 2008. The increase is due to revenue growth at the education and cable television divisions.* Revenues were down at the Company's newspaper publishing, magazine publishing and television broadcasting divisions.

194.    Discussing Kaplan, the press release further stated, in pertinent part:

> *Education division revenue totaled $649.3 million for the second quarter of 2009, a 13% increase over revenue of $576.5 million for the same period of 2008. Kaplan reported operating income of $58.1 million for the second quarter of 2009, up 23% from $47.4 million in the second quarter of 2008.*
>
> *For the first six months of 2009, education division revenue totaled $1,242.9 million, an 11% increase over revenue of $1,119.7 million for the same period of*

---

[11] In order to not just plead Defendants' false and misleading statements without any context, Plaintiff has attempted to provide the Court with context in this section by bolding and italicizing Defendants' statements Plaintiff contends are false and misleading, either as a result of outright misrepresentations or omissions of material fact that should have been included and were necessary to make the statements made not false and misleading.

*2008. Kaplan reported operating income of $69.3 million for the first six months of 2009, down 26% from $94.2 million for the first six months of 2008.*

195.    In addition, the press release stated KHE reported revenue of $401.8 million for the quarter and highlighted KHE's "strong enrollment growth":

Kaplan Higher Education (KHE) includes Kaplan's domestic and international post-secondary education businesses, made up of fixed-facility colleges as well as online post-secondary and career programs. *Higher education revenue grew 36% for the second quarter of 2009 and 31% for the first half of 2009 due mostly to strong enrollment growth. Operating income at KHE improved 74% in the second quarter of 2009, reflecting this strong enrollment growth. Operating income increased 31% for the first half of 2009 as the strong enrollment growth was offset by increased marketing and advertising costs in the first quarter of 2009, including a $21.0 million national media campaign. At June 30, 2009, KHE's enrollments totaled 103,300, a 31% increase compared to total enrollments of 78,700 at June 30, 2008. All KHE divisions contributed to the enrollment growth in the first half of 2009, with Kaplan University's online offerings growing the strongest at 45%.*

196.    As detailed in ¶91, for the second quarter of 2009, KHE's revenues accounted for approximately 35.6% of Washington Post's revenues for the quarter, while the entire Kaplan segment accounted for approximately 57.5% of the Company's revenues for the quarter.

197.    Also on July 31, 2009, and in response to the positive results in the July 31, 2009 press release, *Wall Street Strategies* raised its 12-month price target for Washington Post common stock from $400.00 to $450.00 and described Kaplan as the "earnings engine" and "saving grace for Washington Post."

198.    In response to Defendants' false and misleading statements in the July 31, 2009 press release, the price of Washington Post stock rose 7.73%, or $32.50, from a closing price of $419.10 per share on July 30, 2009, to close at $451.50 per share on July 31, 2009, on a 96.5% increase on trading volume, as set forth in the chart below:



199.    The statements referenced in ¶¶193-95 were materially false and misleading when made as they represented and/or omitted facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading, as evidenced by the factual detail contained throughout this Complaint.    In addition, the statements referenced in ¶¶193-95 were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.    The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- The Company was solely focused on increasing enrollment numbers at any cost, without regard to students' well-being, academic success, growing debt (caused by the financial aid Kaplan talked them into and virtually assured they would take) or preparedness for employment following graduation.    Indeed, the Company operated a sales force, disguised as Admissions Advisors, and Kaplan viewed students solely as leads utilized to attain internal, undisclosed enrollment quotas.    To that end, as detailed by a host of Confidential Witnesses, including CW 13, the Company's Kaplan division would promote Admissions Advisors and increase their compensation based only on whether those Admissions Advisors met or exceeded

their enrollment quotas. Conversely, Kaplan would routinely fire Admissions Advisors who failed to meet those enrollment quotas. The Company's quota-driven business practices constituted a gross violation of applicable rules and regulations, and because it was a key driving force behind Kaplan's financial performance, constituted a material fact that should have been disclosed to investors.

- While touting Washington Post's revenue "increase" and "strong enrollment growth" at Kaplan, Defendants omitted the fact that the Company's revenue and enrollments were founded upon a systemically predatory business model, including diverse predatory recruiting and financial aid practices focused on "prospects'" "pain and fears." By engaging in a uniform pattern and practice of manipulative salesmanship that played on "emotions" and an ability to "create the urgency," Defendants effectively oversaw a telemarketing machine that was only capable of increasing enrollments by hounding and harassing "leads" on a nearly constant basis. Thus, Defendants clearly disguised and effectively hid the true reasons behind the financial performance of the Company's education division – and future business prospects – throughout the Class Period.

- As set forth herein, Kaplan's recruiting and financial aid practices were unethical, predatory and in direct violation of Title IV. The Company lured students to Kaplan through blatant misrepresentations regarding, among other things, accreditation, the transferability of credits, students' future job prospects, and the ultimate cost of attending a Kaplan institution. In fact, and in violation of HEA regulations, Kaplan routinely paid students' enrollment fees. Indeed, once students agreed to enroll, the Company set its sights on causing the students to apply for as much financial aid as possible, a practice that put the Company's Kaplan division at the precipice of violating the 90/10 Rule.

- Indeed, as set forth by CW 17 and CW 21, Kaplan's standard practice was to actively circumvent the 90/10 Rule by transferring federal funds from main to branch campuses. When facing DOE scrutiny, Kaplan routinely shut down campuses and immediately open up new campuses nearby that engaged in identical practices. By violating HEA regulations and Title IV in this way, Defendants were able to boost Washington Post's reported financial results and grossly mislead the market as to the truth behind both Kaplan's enrollment figures and Washington Post's financial performance and future business prospects.

- Due to the fact that Kaplan's recruiting practices were in blatant violation of applicable regulations, as well as Title IV, Washington Post faced the very real risk of losing the ability to receive federal financial aid – the source of approximately 82% of KHE's revenue during the Class Period.

- Due to predatory recruiting and financial aid practices in the Company's Kaplan division, which resulted in students routinely and unnecessarily borrowing the maximum amount of federal financial aid and turning those monies over to Kaplan, the Company's revenue numbers were inflated throughout the Class Period.

- As a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, the Company's Class Period revenue and enrollment numbers, as well as Washington Post's future business prospects.

200.    On August 1, 2009, *The Washington Post* published an article entitled "Washington Post Co. Returns to Profit with Cost-Cutting," which stated:

> **The Post Co. is now largely an education company -- its Kaplan education unit provided 58 percent of the parent company's second-quarter revenue,** as opposed to the newspaper division, which chipped in 15 percent. Nevertheless, the ongoing decline in advertising revenue at The Post -- exacerbated by the recession -- had been so sharp that it dragged the entire company into the red in the first quarter, **despite continued growth by Kaplan** and The Post's Cable One cable company.

201.    On August 4, 2009, Washington Post filed its quarterly report on Form 10-Q for the quarter ended June 28, 2009, which confirmed the Company's previously announced financial results and was signed by Graham and Jones (the "Second Quarter 2009 10-Q"). The Second Quarter 2009 10-Q also contained Sarbanes-Oxley certifications signed by Graham and Jones stating the 10-Q did not include any material misrepresentations.

202.    On September 11, 2009, Washington Post hosted its annual Shareholders Day, wherein it gave slide presentations on the Company's various segments, including Kaplan. The opening slide falsely stated *"Mission Statement: Kaplan helps individuals achieve their education and career goals. We build futures one success story at a time."*

203.    Moreover, the slide presentation highlighted Kaplan's significant growth in student enrollments, which were driven by its predatory (and undisclosed) enrollment practices. For example, the presentation included a bar chart of "Student Growth Enrollments," showing Kaplan University's enrollment growth from 34 students in 2001 to *over 52,500 students in June 2009*. Likewise, according to the Company, "Student Growth Enrollments" in KHEC increased from 14,628 students in 2001 to *over 42,000 in June 2009.* The September 11, 2009 presentation explained *Kaplan's "future,"* as being rooted in *"set[ting] the standard for academic excellence."*

204.    In response to Defendants' false and misleading statements on September 11, 2009, Washington Post common stock closed up 4.08%, or $17.98, from a closing price of $440.83 per share on September 10, 2009, to close at a price of $458.81 per share on September 11, 2009, on a 83.6% increase on trading volume, as evidenced in the chart below:



205.    The statements referenced in ¶¶201-03 were materially false and misleading when made as they represented and/or omitted facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading, for reasons set forth in ¶199 above, and as evidenced by the factual detail contained throughout this Complaint.  In addition, the statements referenced in ¶¶201-03 were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- Contrary to their statements, Defendants were not concerned with helping students "achieve their education and career goals," but rather were only concerned with the federal funds received from enrollments. The Company truly boosted enrollments by any means necessary, and utilized improper compensation of recruiters and high-pressure sales tactics to enroll anyone and everyone. Indeed, the many Confidential Witnesses detailed herein discuss Kaplan's recruitment of homeless persons, and the mentally ill, as well as Kaplan's outright lies regarding students' job prospects. *See supra* at §VI(F). All of these undisclosed tactics, which ran clearly contrary to Defendants' public statements, not to mention the Company's publicly available code of conduct, served to artificially inflate both Washington Post's financial results and stock price.

- By focusing on enrollment numbers as opposed to the quality of its leads, the Company's Kaplan division was by no means setting a standard of "academic excellence." Put simply, no institution of "academic excellence" would depend upon vast armies of sales people, working 14 hours a day, seven days a week, from football field-sized call centers, whose sole task was to meet enrollment quotas or be fired. Nor would any company focused on "academic excellence" recruit its students through Company-approved scripts – to be utilized in its massive call centers – that focused on "prospects'" pain, fear, and emotional weaknesses. These tactics are clearly not the hallmarks of higher learning. A reasonable investor would understand the true, "behind the curtain," Washington Post to be a far cry from what Defendants represented to the market during the Class Period. In fact, CW 5 details how many students at Kaplan could neither read nor write. *See supra* at §§VI(E-F).

206.    On October 30, 2009, Washington Post issued a press release reporting its financial results for the third quarter ended September 27, 2009, which stated in relevant part:

> The Washington Post Company (NYSE: WPO) today reported ***net income of $17.1 million ($1.81 per share) for its third quarter ended September 27, 2009, compared to net income of $10.4 million ($1.08 per share) for the third quarter of last year***.

> \*        \*        \*

> ***Revenue for the third quarter of 2009 was $1,148.7 million, up 2% from $1,128.7 million in the third quarter of 2008. The increase is due to revenue growth at the education*** and cable television divisions. Revenues were down at the Company's newspaper publishing, magazine publishing and television broadcasting divisions.

207.    The October 30, 2009 press release went on to state, in pertinent part:

> ***Education division revenue totaled $684.5 million for the third quarter of 2009, a 14% increase over revenue of $602.7 million for the same period of 2008. Kaplan reported operating income of $45.9 million for the third quarter of 2009, down 10% from $51.1 million in the third quarter of 2008.***

> \*        \*        \*

*For the first nine months of 2009, education division revenue totaled $1,927.4 million, a 12% increase over revenue of $1,722.5 million for the same period of 2008. Kaplan reported operating income of $115.2 million for the first nine months of 2009, down 21% from $145.3 million for the first nine months of 2008.*

208. Continuing, the press release stated that KHE reported revenue of $408.7 million for the quarter, and attributed the Company's robust revenue gains at KHE to "strong enrollment growth":

> Kaplan Higher Education (KHE) includes Kaplan's domestic post-secondary education businesses, made up of fixed-facility colleges as well as online post-secondary and career programs. *Higher education revenue grew 35% for the third quarter of 2009 and 34% for the first nine months of 2009 due mostly to strong enrollment growth. Operating income at KHE improved 93% in the third quarter of 2009, reflecting this strong enrollment growth. Operating income increased 55% for the first nine months of 2009 due to this strong enrollment growth*, offset by increased marketing and advertising costs in the first quarter of 2009, including a $21.0 million national media campaign. *At September 30, 2009, KHE's enrollments totaled 103,800, a 28% increase compared to total enrollments of 81,400 at September 30, 2008. Enrollment growth was particularly strong at Kaplan University's online offerings, which grew at 37% in the first nine months of 2009.*

209. As detailed in ¶91, KHE's revenues during the third quarter of 2009 accounted for approximately 35.6% of Washington Post's revenues for the quarter, while the entire Kaplan segment accounted for nearly 59.5% of the Company's third quarter 2009 revenues.

210. On November 6, 2009, Washington Post filed its quarterly report on Form 10-Q for the quarter ended September 27, 2009, which confirmed the Company's previously announced financial results and was signed by Graham and Jones (the "Third Quarter 2009 10-Q"). The Third Quarter 2009 10-Q also contained Sarbanes-Oxley certifications signed by Graham and Jones stating the Form 10-Q did not include any material misrepresentations. Nevertheless, the Third Quarter 2009 10-Q did contain several false and misleading statements regarding Kaplan's increased enrollments, which omitted key facts concerning the truth behind the Company's financials and future business prospects. More specifically, Defendants never disclosed that Kaplan's increased enrollments were driven by predatory enrollment practices, as detailed extensively herein. Without

72

disclosing the true reasons behind enrollment gains, the Third Quarter 2009 10-Q detailed KHE's

purportedly positive enrollment growth, stating as follows:

|  | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| 2009 Enrollments | 95,600 | 94,700 | 103,800 | |
| 2008 Enrollments | 74,200 | 72,200 | 81,400 | 79,800 |
| 2007 Enrollments | 65,700 | 61,200 | 67,000 | 65,700 |

211.    Although the price of Washington Post common stock fell approximately 4.4%

following issuance of the October 30, 2009 press release and traded essentially flat after release of

the Third Quarter 2009 10Q, Defendants continued to mislead the market.  Indeed, had Defendants

now made false and misleading statements and revealed the Company's true financial condition,

market expectations would have been corrected and the common stock price would have fallen

substantially.

212.    The statements referenced in ¶¶206-08, 210 were materially false and misleading

when made as they represented and/or omitted facts which then existed and disclosure of which was

necessary to make the statements not false and/or misleading, for reasons set forth in ¶199, and as

evidenced by the factual detail contained throughout this Complaint.  In addition, the statements

referenced in ¶¶206-08, 210 were materially false and misleading when made because they

represented and/or omitted adverse facts which then existed and disclosure of which was necessary

to make the statements not false and/or misleading.  The true facts, which were known to or

recklessly disregarded by each of the Defendants, were:

- Despite putting the source of the Company's financial performance at issue and attributing Washington Post's revenue increase to "strong enrollment growth" at Kaplan, Defendants omitted the material fact that the Company's revenue and enrollments trends were dependent on and driven by a systemically predatory business model and blatantly illegal conduct, as extensively detailed herein.

- Had Defendants not allowed Kaplan to manipulate prospective students, demand would have drastically declined, the Company's financial performance would have suffered materially, and the market would have learned that Defendants lacked a

reasonable basis for their statements regarding Washington Post's financial performance, outlook, and future business prospects.

213.    Like the market, analysts took notice of Washington Post's dependence upon Kaplan. On November 9, 2009, *Morningstar* issued an analyst report entitled "Kaplan, Cable Carry Washington Post in 3Q" stating in pertinent part:

> **Washington Post Company WPO reported third-quarter earnings Friday that underscore the sharpening contrast in the fortunes of its business units. Strong performance at its education and cable television divisions offset the persistent parade of privation at its struggling legacy media enterprises.** We're maintaining our fair value estimate.
>
> **Total third-quarter revenue of $1.15 billion marked a 2% increase from the same period a year earlier. A healthy 14% increase in revenue at the Kaplan education division (60% of sales)** and a 4% revenue improvement at the Cable One business unit (17% of sales) **offset an extended hemorrhaging of revenue at the print and broadcast media operations, including the namesake newspaper.** The grim chorus of collapse included a 20% revenue decline at the Washington Post newspaper unit (14% of sales), a 17% revenue decline at the television business (6% of sales), and a 33% revenue decline at the Newsweek magazine business (4% of sales).
>
> \*      \*      \*
>
> **As we observe the legacy print operations' protracted suffering amid the virulent head winds of declining readership and ad revenue, we note that the third quarter marked a milestone for the education division. For the first time ever, Kaplan accounted for more than 59% of total company revenue. In our view, Washington Post Company has evolved from being primarily a newspaper publisher with a growing education business to an education business that owns a newspaper publisher.** We think this has both symbolic and practical financial implications for the company and its investors. As the Kaplan unit exercises greater sway at the top line, we think the broader dynamics of the company's business model will gradually follow its lead.

214.    Washington Post's newspaper division continued to suffer, and on November 24, 2009, *Reuters* reported that Washington Post was closing its last U.S. news bureaus, located in Chicago, Los Angeles and New York, as "the money-losing newspaper retrenches to focus on politics and local news." Put simply, it was increasingly clear that the Company's education division was critical to the Company's financial viability and future business prospects, thus magnifying both

the motivation for and the impact of Defendant's fraud.  Indeed, on November 24, 2009, *Wall Street Strategies* described the Kaplan education division as the "earnings engine for Washington Post."

215.    On December 7, 2009, Graham participated on behalf of the Company at the UBS Global Media & Communications Conference.  During the conference, Graham made numerous false and misleading statements while purportedly discussing the Company's operating philosophy and most recent financial results.  In fact, Graham omitted a host of key facts as he spoke with great familiarity about Kaplan and KHE while dedicating much of his speech to crediting Kaplan for the Company's overall strength, stating in part:

> The foremost reason for the strength of The Washington Post Company's performance this year – and for the past several years – is Kaplan, and particularly Kaplan Higher Education.

*     *     *

> . . . I've talked at these sessions in the past about how proud I am of Kaplan and of Kaplan people and of what Kaplan does in the world.  *In the last few years, Kaplan Higher Education division, while not the only business at Kaplan that is performing strongly, has produced such outstanding results over time and has grown so fast that it is now Kaplan's largest business.  And it is The Washington Post Company's largest business and one of the largest proprietary higher ed businesses in the United States*, although far from the largest.

> Let me now outline some of what I think is great about Kaplan Higher Ed.  First, when the U.S. economy hit a terrible bump a year ago and banks and businesses began performing so badly, it was as if the whole country was seized by an impulse to go back to school and acquire skills to get a new or a better job.  Kaplan Higher Ed, and particularly Kaplan's online program, was already a very big business.  At the beginning of 2009, we had 42,000 students online.  That's a pretty big university.

> *But from this very large base we recorded a 45% increase in online students.  And now Kaplan's online enrollment stands at 60,000.*  The online components of most proprietary institutions of higher ed have also grown strongly in 2009, and so did traditional institutions of higher education if they had room to expand.  *I am proud that Kaplan's online higher ed programs have grown as fast as they have from 34 students nine years ago to 60,000 today*.

> *We have grown very fast indeed, although, as I said, we're not the largest such institution, and all our growth has been achieved with student outcomes as our top priority.  Andy Rosen, Kaplan's CEO, has instilled that value throughout the Company, drawing on his 17 years of hands-on management experience at*

75

*Kaplan, but most of all from his many years of CEO of Kaplan University and Kaplan Higher Education.*

216.    The December 7, 2009 presentation continued with Graham touting Kaplan's

supposed focus on "helping . . . students acquire skills that can lead to better jobs":

> *If you go to Kaplan University, you will find the experience exceedingly studentcentric and focused on outcomes.* Whether you attend one of Kaplan University's campuses or study online, there is plenty of interaction with your professors and fellow students. We are not a research institution, and we don't field sports teams. *Everything is focused on helping our students acquire skills that can lead to better jobs. You'll get a degree and credentials that are meaningful to employers.*

*        *        *

> The growth of proprietary education tells a compelling story. These institutions have grown largely because students want training and credentials that will meet real workforce needs. *In addition, we provide extensive support services and counseling specifically designed to meet the needs of adult learners.* We offer more than 150 academic programs and regularly add specializations that address changes in national and local business demands.

217.    Graham concluded his presentation by making the following false and misleading

statements:

> We make no apologies that this is a business. *It is a successful business because we serve students who have not been well-served by traditional post-secondary institutions. We are market-driven.* Most of our students pay for their own education.  They cannot rely on their parents at their average age of 33. *While they depend heavily on government loans, they decide for themselves how to spend those dollars in pursuit of their own educational goals.*
>
> *Kaplan advisers provide financial aid guidance and work with students on the best way to structure and repay their educational loans. While the vast majority of our students repay their debt, we cannot claim complete success. Economic conditions that have resulted in large numbers of home mortgage defaults have also increased turmoil in other credit areas.*

218.    Defendants' false and misleading statements served to maintain artificial inflation in

the price of Washington Post common stock and, as result of the December 7, 2009 presentation, the

price of Washington Post common stock traded essentially flat between its closing price of $411.75

per share on December 6, 2009, and closing price of $409.53 per share on December 7, 2009.  But

for Defendants' false and misleading statements, the truth regarding Washington Post's financial condition and future business prospects would have been revealed and the price of Washington Post common stock would have declined substantially as the artificial inflation was removed.

219.    The statements referenced in ¶¶215-17 were materially false and misleading when made as they represented and/or omitted facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading, for reasons set forth in ¶199, and as evidenced by the factual detail contained throughout this Complaint.  In addition, the statements referenced in ¶¶215-17 were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.   The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- The truth commanded a far different explanation from Defendants when explaining the reasons behind Washington Post's and Kaplan's financial performance; reality was a far cry from Defendants' statements claiming "growth has been achieved with student outcomes as our top priority" and that Kaplan was "exceedingly studentcentric."  In truth, the Company's financial performance depended upon Kaplan's continued ability to utilize warehouse-sized call centers in multiple locations where Admissions Advisors' jobs and compensation hung in the balance, driven solely by whether they could meet internal enrollment quotas.  To meet these quotas, Admissions Advisors were expected to and did employ a host of deceptive and manipulative sales tactics.  For example, Washington Post's official Kaplan recruiting scripts specifically told Admissions Advisors to focus on potential students' "pain and fears."  Indeed, to the extent Kaplan was "studentcentric," the central focus was on manipulating and deceiving those very same students it claimed to prioritize.

- Despite Graham touting that "everything is focused on helping our students acquire skills that can lead to better jobs" and providing students with "a degree and credentials that are meaningful to employers," the Confidential Witnesses described herein – as well as other reliable, corroborative sources – document Kaplan's systemic, internally known deficiencies.  For example, Kaplan routinely enrolled students in programs despite knowing that the students' backgrounds, criminal history, or mental health problems would specifically prohibited them – in the highly unlikely event they graduated – from finding meaningful employment in their field. *See* supra at §VI(F).

- Defendants' statements that Kaplan provides students with "extensive support services" and "Kaplan advisors provide financial aid guidance and work with students" were outright falsehoods. In truth, a host of Kaplan facilities lacked basic career services programs. *See supra* at ¶139.

- Far from being "market driven," the Company's Kaplan unit was, in reality, a quota driven enterprise that ran roughshod over applicable federal rules and regulations. By touting a commitment to student excellence and student service, Defendants were not paying mere lip service to aspirational goals. Quite the opposite, Defendants were materially misleading the market by knowingly describing the Company's Kaplan unit as operating under a certain philosophy when, in reality, it was exactly the opposite. Had Defendants revealed the truth, market expectations for Kaplan's performance and enrollment levels (and thus Washington Post's) would have been corrected. Put simply, investors value a company focused on "student outcomes" as its "top priority" in a far different manner than they value a company focused solely on achieving enrollment quotas through manipulative and deceptive recruiting tactics, along with a host of other bad practices – internally sanctioned by the Company – as detailed throughout this Complaint.

- Had Kaplan not manipulated prospective students, demand would have drastically declined, the Company's financial performance would have suffered materially, and the market would have learned that Defendants lacked a reasonable basis for their statements regarding Washington Post's financial performance, outlook, and future business prospects.

220.    On February 24, 2010, Washington Post issued a press release reporting its financial results for the 2009 fourth quarter and full-year ended January 3, 2010, which stated in relevant part:

*The Washington Post Company (NYSE: WPO) today reported **net income of $91.2 million ($9.78 per share) for the fiscal year ended January 3, 2010, up from $65.8 million ($6.87 per share) for the fiscal year ended December 28, 2008. Net income for the fourth quarter of 2009 was $82.2 million ($8.71 per share), up from $18.8 million ($2.01 per share) for the fourth quarter of 2008.***

\*        \*        \*

***Revenue for 2009 was $4,569.7 million, up 2% compared to revenue of $4,461.6 million in 2008. For the fourth quarter of 2009, revenue was $1,238.4 million, up 6% from $1,163.6 million in 2008. The increases are due primarily to strong revenue growth at the education division** and increased revenue at the cable division, partially offset by revenue declines at the Company's newspaper publishing, magazine publishing and television broadcasting divisions.*

221.    The February 24, 2010 press release went on to state:

***Education division revenue in 2009 increased to $2,636.6 million, a 13% increase from $2,331.6 million in 2008. For the fourth quarter of 2009, education division***

*revenue totaled $709.3 million, a 16% increase over revenue of $609.1 million for the same period of 2008.*

*Kaplan reported operating income of $194.8 million for 2009, compared to $206.3 million in 2008; operating income for the fourth quarter of 2009 was $79.6 million, compared to $61.0 million in the fourth quarter of 2008.*

222.    The February 24, 2010 press release also reported KHE's revenue of $420.4 million for the quarter, and attributed increased revenues at KHE to "strong enrollment growth," stating in part:

Kaplan Higher Education (KHE) includes Kaplan's domestic post-secondary education businesses, made up of fixed-facility colleges as well as online post-secondary and career programs. *Higher education revenue grew by 33% for 2009 and 30% for the fourth quarter of 2009 due mostly to strong enrollment growth. Operating income at KHE increased 59% in 2009 due to this strong enrollment growth, offset by increased marketing and advertising costs in the first quarter of 2009, including a $21.0 million national media campaign. Operating income at KHE increased 70% in the fourth quarter of 2009, also reflecting this strong enrollment growth. At December 31, 2009, KHE's enrollments totaled 104,900, a 32% increase compared to total enrollments of 79,800 at December 31, 2008. Enrollment growth was particularly strong at Kaplan University's online offerings, which grew at 47% in 2009.*

223.    As detailed in ¶91, KHE's fourth quarter 2009 revenues accounted for approximately 33.9% of Washington Post's revenues for the quarter, while the entire Kaplan segment accounted for approximately 57.3% of the Company's revenues for the quarter.

224.    Analysts responded positively to Defendants' false and misleading statements. For example, later on February 24, 2010, *Zacks Equity Research* commented in part:

The Education division delivered strong performance -- **revenue was up 16% to $709.3 million, which we think will continue in fiscal 2010. At fiscal year-end 2009, enrollment totaled 104,900, up 32%. The increase in enrollment was particularly strong at Kaplan University's online offerings, which surged 47% in the year.**

225.    In response to the false and misleading statements contained in the February 24, 2010 press release, the price of Washington Post common stock increased nearly 2%, or $7.79, from a

closing price of $412.51 per share on February 23, 2010, to close at a price of $420.30 per share on February 24, 2010, on a 209.8% increase on trading volume.

226.    On March 2, 2010, Washington Post filed its annual report on form 10-K for the year ended January 3, 2010, which confirmed the Company's previously announced financial results and was signed by Graham and Jones (the "2009 10-K"). The 2009 10-K also contained Sarbanes-Oxley certifications signed by Graham and Jones and stated that the Form 10-K did not include any material misrepresentations. Nevertheless, as set forth below, the 2009 10-K did contain several false and misleading statements regarding Kaplan's financial performance and future business prospects.

227.    Among other things, the 2009 10-K highlighted the education segment as Washington Post's "largest operating division," accounting for "58% of the Company's consolidated revenues in 2009." Confirming, the 2009 10-K stated, "[t]he Company has devoted significant resources and attention to this division, given the attractiveness of investment opportunities and growth prospects."

228.    In addition, the 2009 10-K misled the market as to the Company's adherence to HEA and applicable regulations, stating:

> For the years ended January 3, 2010, December 28, 2008 and December 30, 2007, approximately $1,283 million, $904 million and $745 million, respectively, of the Company's education division revenue was derived from financial aid received by students under Title IV programs. ***Management believes that the Company's education division schools that participate in Title IV programs are in material compliance with standards set forth in the HEA and the Regulations***.

229.    The 2009 10-K also reiterated the Company's false mantra that KHE was focused on helping its students, stating:

> Kaplan Higher Education provides a wide array of certificate, diploma and degree programs – on campus and online – ***designed to meet the needs of students seeking to advance their education and career goals***.

230.    The 2009 10-K further touted the Company's enrollment numbers, omitting critical information and stating, in part:

Kaplan University

Kaplan University specializes in online education, is accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools and holds other programmatic accreditations. Most of Kaplan University's programs are offered online, while others are offered in a traditional classroom format at ten campuses in Iowa, Nebraska and Maryland. Kaplan University also includes Concord Law School, the nation's first fully online law school. *At year-end 2009, Kaplan University had approximately 60,400 students enrolled in online programs and 5,120 students enrolled in its classroom-based programs.*

Kaplan Higher Education Campuses

At the end of 2009, Kaplan's Higher Education Campuses business consisted of 73 schools in 19 states *that were providing classroom-based instruction to approximately 44,500 students (including the 5,120 students enrolled at Kaplan University's on-ground campuses).* Each of these schools is accredited by one of several regional or national accrediting agencies recognized by the U.S. Department of Education.

231.    In addition, the 2009 10-K discussed KHE's "initiatives" to mitigate the risk of student default rates:

> *Kaplan Higher Education has implemented initiatives to mitigate the increased risk of student loan defaults for Kaplan University and Kaplan Higher Education Campuses' students. Kaplan has dedicated resources focused on helping the students who are at risk of default. Kaplan personnel contact students and provide assistance, which includes providing students with specific loan repayment information, lender contact information and debt counseling. Kaplan has also implemented a financial literacy and counseling program for current students and has refined and improved its student retention programs, resulting in improved retention rates.* Students who withdraw prior to program completion demonstrate a higher loan default rate than those who continue through to graduation. Although Kaplan has dedicated resources to mitigate the increased risk of student loan defaults by its students, there is no guarantee that such efforts will be successful. In

232.    In addition, the Company assured investors of the Company's "various measures to reduce the percentage of its receipts attributable to Title IV funds:"

> The proportion of Kaplan Higher Education's revenue from certificate and associate degree programs is composed of a higher percentage of Title IV funds than is the case for its bachelor's and other degree programs. A majority of Kaplan Higher Education students are enrolled in certificate and associate degree programs. *Kaplan Higher Education is taking various measures to reduce the percentage of its receipts attributable to Title IV funds, including emphasizing direct-pay and employer-paid education programs, encouraging students to carefully evaluate the*

81

*amount of Title IV borrowing, and developing additional professional development and continuing education programs.* Although Kaplan is taking steps to address compliance with the 90/10 Rule, there can be no guarantee that these measures will be adequate to prevent the 90/10 Rule calculations from exceeding 90% in the future.

233.    The statements referenced in ¶¶220-22, 226-32 were materially false and misleading when made as they represented and/or omitted facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading, for reasons set forth in ¶199, and as evidenced by the factual detail contained throughout this Complaint.  In addition, the statements referenced in ¶¶220-22, 226-32 were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- Defendants omitted disclosure of the true reasons behind the "strong revenue growth at the education division."  With Admissions Advisors' compensation and employment directly dependent upon meeting internally established enrollment quotas, it was well known within the Company that a host of nefarious tactics were what drove the education division's revenue growth.

- Defendants lacked a reasonable basis for believing that the Company's education division schools were, with respect to Title IV, in "material compliance with standards set forth in the HEA and [DOE] Regulations."  Defendants omitted the fact that Kaplan was actively engaging in blatantly fraudulent practices to avoid detection of known violations of the 90/10 Rule. *See supra* at ¶165 (the Company's education division manipulated OPEID numbers to hide the fact that campuses had reached or exceeded the 90% threshold).  Defendants also failed to reveal that the Kaplan knowingly violated applicable rules and regulations by, among other things, paying enrollment fees (via credit card or other means) for its own students.  Similarly, Kaplan routinely made hiring and firing decisions based solely upon whether objective enrollment quotas were met, in direct violation of HEA regulations. *See supra* at §VI(E).

- It was simply false to describe Kaplan as "designed to meet the needs of students seeking to advance their education and career goals." For all intents and purposes, Kaplan had next to no admissions criteria, and would routinely admit students who lacked basic reading and writing skills, did not have access to a computer – despite the fact that they would be enrolled in online classes, or had known criminal backgrounds or mental health problems that would unequivocally prohibited them from finding employment in the fields of study in which Kaplan enrolled them. All of this resulted in massive drop-out rates and miniscule graduation rates. Moreover,

nearly 70% of Kaplan students dropped-out after attending Kaplan for a median period of only 4.2 months.

- Far from working to help students minimize their dependence on federal financial aid and to counsel those same students effectively in order to avoid potential defaults, the Company's education division routinely employed a host of deceptive practices designed to maximize its students' dependence upon federal financial aid. For example, it was common practice for Kaplan Admissions Advisors – not financial aid advisors – to enter EFC (expected family contribution) information into a prospective student's paperwork. Routinely, Admissions Advisors would enter into EFC of zero, regardless of the prospective students' actual EFC, to make it appear to students upon enrollment that they would be eligible for the maximum amount of financial aid from the federal government. Kaplan would also push students to take the maximum amount available so the Company could pocket it. It was also standard practice for Kaplan personnel to "log into" online classes as if they were the students themselves so that Kaplan would be able to count absentee students as enrolled and thus keep open the spigot of federal financial aid flowing into the Company's coffers. Clearly, these are not the standard operating procedures of a Company focused on "initiatives to mitigate the increased risk of student loan defaults."

- The result of the foregoing was that the risk of the Company's education division losing access to federal financial aid or being found in violation of applicable rules or regulations was substantially different from what Defendants represented to the market. Had investors known the truth, their expectations for the Company's financial performance, future business prospects, and potential for additional, expensive regulation would have been substantially different, and the price of Washington Post common stock would not have been artificially inflated throughout the Class Period.

234.    Clearly, the market believed Defendants' false and misleading statements. For example, on March 5, 2010, *Wall Street Strategies* raised its 12-month price target of Washington Post common stock from $450.00 to $480.00, commenting, "**[t]he revenue increase can be attributed to solid revenue growth at the education division . . . . The education segment . . . remains the single most important revenue source accounting for nearly 75% of revenues . . . [and] the primary growth engine for the Company**." Had investors and market analysts known the true facts surrounding "the single most important revenue source" of the Company, they would have put a far different (lower) valuation on the price of Washington Post stock.

235.    On March 19, 2010, *Morningstar* issued an analyst report entitled "Washington Post's For-Profit Education Business Will Offset Secular Declines at the Company's Media Assets."

The report revealed a small portion of the truth to the market as it called into question the Company's cohort default rates, and made much of the fact that Kaplan's cohort default rates "are fairly high relative to those of its competitors," stating in pertinent part:

> **Washington Post may have its roots in media, but the firm's for-profit education unit, Kaplan, generates the majority of companywide revenue and profits.  While we think the for-profit education industry has structural competitive advantages, Kaplan's relatively high cohort default rates indicate the quality of its programs is inferior to its peers.**  In our opinion, investors interested in this industry would be better served looking elsewhere for a higher-quality education company.

*    *    *

> **Despite these favorable dynamics, Kaplan's cohort default rates (percentage of students who have defaulted on their student loans) are fairly high relative to those of its competitors.  Although not excessive, these rates could rise if Kaplan's students cannot find jobs and do not repay their loans.  If these default rates rise, the company could be in danger of losing access to Title IV funds (federal student loans; responsible for 83% of Kaplan's higher education revenue) at some of its campuses.  As a result, we expect Kaplan to be more selective in admissions and to allocate more resources reaching out to former students to repay their loans.  We expect these actions to curtail growth and margin expansion going forward.**

236.    The above partial revelation had little impact on the price of Washington Post stock, however, because of the continued existence of Defendants false statements in the market.  Indeed, because of Defendants' fraud, the market was unaware of the true extent of Kaplan's fraudulent enrollment practices, internal quota system, deceptive financial aid practices, and nefarious tactics used to circumvent detection of 90/10 Rule violations.

237.    As time went on, the Company's dependence on Kaplan only grew stronger and the market took notice.  For example, on March 25, 2010, *The Business Insider* commented, "The Post Co. has weathered the downturn better than most of its peers because it can lean on the prosperous-education service and cable TV operations that now account for nearly three-fourths of its revenue."

238.    Given Kaplan's apparent, continually soaring profits and revenues, the market began to look at the Washington Post as a value play.  For example, on April 5, 2010, *Barron's* published

an article entitled, "Washington Post Is Dirt Cheap: the Post may be America's most undervalued media company" stating in pertinent part:

> **WASHINGTON POST MAY BE THE MOST UNDERVALUED media company in America today. That's because investors give it virtually no credit for Kaplan, a large and rapidly growing education division that generates more than half the company's revenue and profit**.
>
> Post CEO Don Graham, cut from the Warren Buffett cloth, rejects a spinoff of the lucrative Kaplan franchise.
>
> \*        \*        \*
>
> The Post has a market value of $4.2 billion, but a sum-of-the-parts analysis suggests it is worth $8.5 billion. This analysis is based on the valuations of comparable public companies, not lofty and sometimes unrealistic "private market" estimates often favored by media-stock boosters. At $8.5 billion, the Post would trade for more than $900 a share.
>
> The best way for the company to boost its share price would be to spin off Kaplan, which probably would command a generous valuation in the hot for-profit education sector. Ranked by revenue, it is No. 2 in the industry, behind Apollo Group (APOL).
>
> **With $2.6 billion in 2009 revenues and nearly $300 million in pretax operating profit, Kaplan can stand on its own**. So can the rest of the Post's operations, largely because of the profits generated by cable TV and the TV stations.
>
> Wall Street likes focused companies, and the media and cable-TV industry has obliged. Time Warner (TWX), Cablevision (CVC), Liberty Media (LINTA) and E.W. Scripps (SSP) have broken up -- all to the benefit of shareholders.
>
> **But the Graham family, led by CEO Don Graham, doesn't buy the idea of a breakup of Washington Post. "In whose interest is a Kaplan spinoff?" Graham said last week. "It would be in the interest of the investment bankers doing the deal. *It wouldn't be in the interest of Washington Post shareholders.*"**
>
> **The 64-year-old Graham, son of the late Katharine Graham, has long been influenced by Warren Buffett, whose Berkshire Hathaway (BRKA) has held a sizable stake in the Post since the 1970s. Buffett hates financial engineering, and has done minimal shuffling of businesses in the 45 years he has controlled Berkshire. Graham agrees. *"Over the years, if Kaplan and the other Post properties earn more money, we'll be rewarded in the stock market,"* Graham says. "It's been our theory since we went public in 1971."**
>
> Some suspect the Grahams want to keep Kaplan as a financial security blanket to ensure that if the media business declines in the coming decade, the Washington Post newspaper, the family's treasure, will survive. The talk is that when the Graham

family meets, they say: "Thank goodness for Kaplan." Largely because of Kaplan, the Post has avoided some of the trials experienced by newspaper publishers like the New York Times (NYT), McClatchy (MNI) and Gannett (GCI).

EVEN WITHOUT A KAPLAN SPINOFF, Post shares look attractive. Given Kaplan's growth, the Post may come to be seen as an education company and garner a higher stock-market valuation. At the current share price, investors effectively are paying nothing for the noneducation parts of the Post. Says Thomas Russo, a partner at Gardner, Russo, and Gardner, a Lancaster, Pa., investment firm that has been a longtime holder: "The Post is a coiled spring, What releases the spring, I don't know." Russo says he is willing to be patient, betting Post management delivers for holders under the guidance of a top-notch board of directors, led by Buffett

239.    In response to the positive statements made in April 5, 2010 *Barron's* article, the price of Washington Post common stock increased 8.6%, or $38.26, from a closing price of $444.74 per share on April 2, 2010, to close at a price of $483 per share on April 5, 2010, as set forth in the chart below:



240.    The statements referenced in ¶238 were materially false and misleading when made as they represented and/or omitted facts which then existed and disclosure of which was necessary to

make the statements not false and/or misleading, for reasons set forth in ¶199 and as evidenced by the factual detail contained throughout this Complaint.  In addition, the statements referenced in ¶238 were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- It was both deceptive and misleading of Graham to state that he was acting on "the interest of Washington Post shareholders," and that stockholders would be "rewarded in the stock market."  At the time, Graham and the other Defendants lacked a reasonable basis for such positive statements because they were well aware that the Company's life-boat, Kaplan, was obtaining the vast majority of its revenues because of manipulative, and unethical enrollment and financial aid practices. *See supra* at ¶ §§VI(F), (L).  In addition, Kaplan was actively skirting Title IV regulations, and engaging in routine practices in violation of HEA, among other applicable laws. *See supra* at §§VI(F), (H), (I).

241.    On April 15, 2010, Washington Post's common stock reached its Class Period high of $541.38 per share.

242.    On May 7, 2010, Washington Post issued a press release reporting its financial results for the first quarter ended April 4, 2010, which stated, in relevant part:[12]

> The Washington Post Company (NYSE: WPO) today reported ***net income available for common stock of $45.4 million ($4.91 per share) for its first quarter ended April 4, 2010, compared to a net loss available for common stock of $19.2 million ($2.04 loss per share) in the first quarter of last year***.
>
> *       *       *
>
> ***Revenue for the first quarter of 2010 was $1,171.2 million, up 11% from $1,054.1 million in 2009. The increase is due to revenue growth at the education***, television broadcasting and cable television divisions, offset by revenue declines at the magazine publishing and newspaper publishing divisions. The Company reported operating income of $92.5 million in the first quarter of 2010, compared to an

---

[12] Washington Post's newspaper division continued to suffer, and on May 5, 2010, the Company announced it had retained Allen & Company to explore the possible sale of *Newsweek* magazine.

operating loss of $19.6 million in 2009. Operating results improved at all of the Company's divisions for the quarter.

243.    The May 7, 2010 press release went on to discuss Kaplan in pertinent part, as follows:

*Education division revenue totaled $711.4 million for the first quarter of 2010, a 20% increase over revenue of $593.5 million for the first quarter of 2009. Kaplan reported first quarter 2010 operating income of $57.9 million, up from $11.2 million in the first quarter of 2009.*

244.    In addition, the press release stated KHE reported revenue of $442.6 million for the first quarter and highlighted KHE's "strong enrollment growth and improve margins:"

*Higher education revenue and operating income grew significantly in the first quarter of 2010 due to strong enrollment growth and improved margins. Student starts increased in the first quarter of 2010 compared to the prior year, particularly at Kaplan University;* however, the percentage growth rate was lower than in the first quarter of 2009. A summary of KHE student enrollment for the first quarter of 2010 as compared to 2009 is as follows:

|  | As of March 31, | | % Change |
|---|---|---|---|
|  | 2010 | 2009 | |
| KHE Student Enrollment | | | |
| Total students | | | |
| Kaplan University | 70,514 | 51,735 | 36 |
| Kaplan Higher Education Campuses | 48,779 | 43,854 | 11 |
|  | 119,293 | 95,589 | 25 |

|  | For the Quarter Ended | |
|---|---|---|
|  | March 31, 2010 | March 31, 2009 |
| New student starts | | |
| Kaplan University | 25,169 | 21,135    19 |
| Kaplan Higher Education Campuses | 15,346 | 14,607    5 |
|  | 40,515 | 35,742    13 |

245.    As detailed in ¶91, KHE's first quarter 2010 revenues accounted for approximately 37.8% of Washington Post's revenues for the quarter, while the entire Kaplan segment accounted for approximately 60.7% of the Company's revenues for the quarter.

246.    Despite addressing proposed DOE regulations and their potential impact on Kaplan's eligibility for Title IV funding, the May 7, 2010 press release omitted key facts, stating in pertinent part:

> The U.S. Department of Education is expected to issue proposed regulations in the second quarter of 2010 that could amend or add to existing Title IV regulations. The proposed regulations may include revised standards governing the payment of incentive compensation to admissions and financial aid advisors; a new definition of "gainful employment" that is based on student tuition and debt levels and other factors; and other changes to Title IV eligibility requirements for institutions, programs and students. The changes ultimately made to the Title IV regulations could adversely affect, among other things, Kaplan's ability to retain admissions and financial aid advisors and the ability of Kaplan Higher Education division's programs and students to qualify for Title IV financial assistance, and could otherwise have a material adverse effect on Kaplan's operating results. The Department of Education has stated its intent to publish any new final regulations by November 1, 2010, which is the deadline for the regulations to take effect by July 1, 2011.

247.    Although the price of Washington Post common stock fell slightly on May 7, 2010, closing down approximately 2.5% at $476.52, as the Company revealed ongoing struggles in its media divisions and offered *Newsweek* for sale, Defendants' false and misleading statements, however, served to maintain artificial inflation in the price of Washington Post common stock. But for Defendants' false and misleading statements, the price of Washington Post stock would have declined even further.

248.    On May 11, 2010, Washington Post filed its quarterly report on form 10-Q for the quarter ended April 4, 2010, which confirmed the Company's previously announced financial results and was signed by Graham and Jones (the "First Quarter 2010 10-Q"). The First Quarter 2010 10-Q also contained Sarbanes-Oxley certifications signed by Graham and Jones and stated the Form 10-Q did not include any material misrepresentations. Nevertheless, the First Quarter 2010 10-Q did contain several false and misleading statements regarding Kaplan's enrollments and financial performance.

249.    On May 13, 2010, the Company held its annual stockholders meeting. During the meeting, Graham made numerous false and misleading statements. For example, Graham purported to discuss the "potential problem" of proposed federal regulations affecting Kaplan. Obfuscating the truth, Graham labeled the regulations as "extreme" and touted so-called success stories resulting from Kaplan – never revealing to investors that the source of Kaplan's touted growth was the Company's predatory, manipulative, and fraudulent business practices that valued hitting quotas above all other things. Specifically, Graham stated, in part:

> But first I want to talk about ongoing federal regulatory issues at Kaplan, because I think one of my jobs in communicating with you on occasions like this is to tell you things you'd want to know, both about things that are going better than expected at the Company and about potential problems. And this is certainly a potential problem.
>
> *In the first quarter, revenues, operating income and student counts at Kaplan Higher Education have grown at very, very rapid paces. This is a function of the mission I've talked about: when people fear losing their jobs or, indeed, have lost them, they seek another credential, and are smart to do so.*
>
> Kaplan Higher Education is a counter-cyclical business, and the cycle is probably turning as the economy recovers. I do not expect revenue and operating income to continue to increase at anything like these rates.
>
> *             *             *
>
> The proposal has not been finalized. But if the draft recommendations were implemented, they could potentially deny half of our Higher Ed students eligibility for federal student financial aid. Should these standards be applied to students with similar backgrounds in traditional schools – like the University of Chicago or Penn State University – a significant portion of students in career-focused programs would similarly be denied eligibility for student loans, which highlights the extreme nature of the regulation.
>
> *             *             *
>
> They are people like Elisha Ray, a single mother from Ridgecrest, California, who sought to enter law enforcement, but realized federal agency positions require at least an undergraduate degree. She earned her criminal justice degree at Kaplan University and has since found a position as a financial management analyst with the Department of Defense, doubling her previous salary at a real estate office.

They are people like Barbara Hess, who posted on Facebook yesterday: "After being out of school for 5 years, I start tonight. Doing this for me and my 2-year-old son. So we can have a better life."

*Kaplan's higher education campuses and online university enrolled over 100,000 students last year. But the real story is not the aggregate number of students we help. It is the individual success stories that our programs make possible. These are successes that sometimes pay double. They will often serve, we believe, as a beacon for our students' children to emulate.*

*In short, we're not just proud of the quality education Kaplan offers. We believe in the schools' mission to help people get ahead.*

There are two primary factors driving the Education Department's current focus on our sector. The Department is concerned that many students are having difficulty repaying their student loans in this weak economy. In addition, the Department is concerned that there are certain investors who could purchase schools with the intent of growing revenue quickly, without regard for educational quality.

*These are legitimate concerns, and we share those concerns.* However, the solutions proposed by the Department of Education would do far more harm than good. They would dramatically reduce access to higher education and prospects for better employment for millions of prospective students. Low income, minority and adult learners would be disproportionately impacted. These students have historically been underserved by traditional institutions. They make up a significant portion of Kaplan's enrollment.

*    *    *

*What I do know is that Kaplan's Higher Ed programs are changing lives. Many of our students see Kaplan as their best opportunity to acquire the skills and credentials they need to build their futures. Over 200,000 Kaplan graduates are a testament to that promise.*

250.    The statements referenced in ¶¶242-44, 248-49 were materially false and misleading when made as they represented and/or omitted facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading, for reasons set forth in ¶199 and as evidenced by the factual detail contained throughout this Complaint.  In addition, the statements referenced in ¶¶242-44, 248-49 were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was necessary

to make the statements not false and/or misleading.  The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- Defendants continued to mislead the market as to the true reasons behind the supposed "strong enrollment growth" at Kaplan.  This time, however, Defendants also pointed to increased "student starts" – a metric not reported in other Class Period SEC filings.  Although Defendants were attempting to paint the picture of healthy enrollment growth, they omitted the material facts that the Company's revenue and Kaplan enrollments were founded upon a systemically predatory business model, including diverse predatory recruiting and financial aid practices focused on students' "pain and fears," and enrolling students at "any cost," as extensively detailed herein.

- Although the Company purported to addresses potential DOE regulations and their potential impact on Kaplan's eligibility for Title IV funding, Defendants omitted the fact that Kaplan was actively engaging in known unethical and illegal practices to both boost enrollments and circumvent the 90/10 Rule.

- Despite touting the "very, very rapid" growth of revenues, operating income, and student counts at KHE, and despite attributing such growth to the Company's "mission," Graham and the other Defendants were well aware that the Company's Kaplan division was taking advantage of the down economy to further manipulate, deceive, and defraud prospective students in order to get them to enroll at KHE schools.  Rather than helping students, Kaplan was preying on them in order to maximize the amount of federal financial aid brought into Kaplan and Washington Post.  Investors, no doubt, would have found the true reasons behind Kaplan's improved financial performance to be important in their decision-making.  Put simply, a purported institute of higher education that is, in reality, focused on scamming its students holds far less value than a legitimate for-profit education enterprise.

- Although Graham pointed to "individual success stories" about which he claimed to be familiar, his extensive knowledge of Kaplan's actual business practices undermined the veracity of his statements.  Graham and the other Defendants were well aware that Kaplan was not focused on providing a "quality education" and that Kaplan's mission was not "to help people get ahead."  Quite the opposite, Kaplan's top-down mission was to enroll any student under nearly any circumstance in order to maximize the federal financial aid received by the Company's education division.  Indeed, if Kaplan actually operated in the manner described by Graham to Washington Post shareholders, it would not have routinely fired Admissions Advisors for failing to meet enrollment quotas.  Far from "changing lives" for the better, Defendants were well aware that they were systematically destroying the future of tens of thousands of Kaplan students who upon dropping out of Kaplan (70% drop-out within 4.2 months) would be saddled with nontransferable credits and exorbitant amounts of student loan debt.  These facts were material to the market, and had they been disclosed – as opposed to the glowing false statements Graham

made – market expectations would have been corrected and the price of Washington Post common stock would have declined substantially.

• Had the Company's Kaplan division not manipulated prospective students, demand would have drastically declined, the Company's financial performance would have suffered materially, and the market would have learned that Defendants lacked a reasonable basis for their statements regarding Washington Post's financial performance, outlook, and future business prospects.

251. Then, on June 10, 2010, Senator Tom Harkin, chair of the U.S. Senate's Health, Education, Labor and Pensions Committee ("HELP"), announced that he would be holding a series of hearings to examine federal spending at for-profit colleges. The press release provided in pertinent part:

Senator Tom Harkin (D-IA), Chairman of the Health, Education, Labor and Pensions (HELP) Committee, today announced that he plans to hold a series of hearings to examine federal education spending at for-profit higher education institutions. The hearings will begin June 24th.

"In the past two years we have made major new investments to expand federal financial aid," said Harkin. "Pell Grants and student loans now provide more than $20 billion to for-profit higher education companies every year. We need to ensure for-profit colleges are working well to meet the needs of students and not just shareholders. We owe it to students and taxpayers to make sure these dollars are being well spent."

Between 1998 and 2008 the for-profit sector has grown from 550,000 students to 1.8 million, a 225 percent increase. Students at for-profit institutions are borrowing more, and more frequently, than their peers at non-profit schools, and according to the Department of Education, one in five students who left a for-profit college in 2007 defaulted on their loan within three years.

The Committee will examine a broad range of issues related to the growing role of the for-profit higher education sector, including the scope and rapid growth of the federal investment in for-profit higher education and the corresponding opportunities and risks for students and taxpayers. Details on the first hearing will be available in the coming weeks.

252. On June 16, 2010, the DOE announced that it was proposing new tougher regulations on the industry designed to protect college students and taxpayers from abusive or fraudulent practices, like those that the 22 CWs discussed herein uniformly corroborate.

253.    On June 24, 2010, the HELP Committee held a hearing on the for-profit education industry. As part of the hearing, the HELP Committee released a report entitled, "Emerging Risk? An Overview of the Federal Investment in For-Profit Education" (the "June 24, 2010 HELP Report").[13]

254.    The June 24, 2010 HELP Report noted that "[e]vidence suggests that for-profit schools charge higher tuition than comparable public schools, spend a large share of revenues on expenses unrelated to teaching, experience high dropout rates, and, in some cases, employ abusive recruiting and debt-management practices." The June 24, 2010 HELP Report further noted "mounting reports of questionable practices" at for-profit colleges. With regard to job-placement data provided by colleges in the for-profit education industry to prospective students, the report found that "there is no agreed-upon definition of how placement in a relevant field is calculated. For example, a restaurant dishwasher or even a janitor might be considered a 'placement' by a culinary school." Pointing to financial results bloated by Title IV dollars, the report further stated:

> For-profit schools have significant operating profit margins among companies listed on U.S. stock exchanges. For FY2009, one company reported an operating profit of $489 million on revenues of $1.3 billion, a 37 percent margin. By comparison, this margin was more than triple that of Raytheon, and double that of Apple.

255.    On July 1, 2010, U.S. Senator Dick Durbin was quoted in a variety of media reports criticizing for-profit colleges and calling for more regulation. Comparing the growth of for-profit educational institutions to the subprime mortgage bubble, Senator Durbin discussed the need for "legislation to strengthen regulation of for profit-schools" because the schools were leaving students with "worthless diplomas" and "whopping levels of debt."

---

[13] Testimony, materials, and video of the June 24, 2010 hearing are available online at the HELP Committee's website. *See* http://help.senate.gov/hearings/hearing/?id=464686ba-5056-9502-5d95-e21a6409cc53 (last visited June 12, 2011). A copy of the HELP Committee's June 24, 2010 report is available online at: http://harkin.senate.gov/documents/pdf/4c23515814dca.pdf.

256.    On August 2, 2010, the Company announced it signed a contract to sell *Newsweek* –

rendering Washington Post even more dependent on Kaplan's revenues.

257.    On August 3, 2010, news began to leak into the market concerning the findings from

an undercover investigation conducted by the GAO on recruiting techniques used in the for-profit

higher education industry.  For example, on August 3, 2010, *The New York Times* published an

article entitled "For-Profit Colleges Mislead Students, Report Finds," stating in pertinent part:

> Undercover investigators posing as students interested in enrolling at 15 for-profit colleges found that recruiters at four of the colleges encouraged prospective students to lie on their financial aid applications — and all 15 misled potential students about their programs' cost, quality and duration, or the average salary of graduates, according to a federal report.

> The report and its accompanying video are to be released publicly Wednesday by the Government Accountability Office, the auditing arm of Congress, at an oversight hearing on for-profit colleges by the Senate Committee on Health, Education Labor and Pensions.

> The report does not identify the colleges involved, but it includes both privately held and publicly traded institutions in Arizona, California, Florida, Illinois, Pennsylvania, Texas and Washington, D.C. According to the report, the colleges in question were chosen because they got nearly 90 percent of their revenues from federal aid, or they were in states that are among the top 10 recipients of Title IV money.

> The fast-growing for-profit education industry, which received more than $4 billion in federal grants and $20 billion in Department of Education loans last year, has become a source of concern, with many lawmakers suggesting that too much taxpayer money is being used to generate profits for the colleges, instead of providing students with a useful high-quality education.

> The report gave specific instances in which some colleges encouraged fraud. At one college in Texas, a recruiter encouraged the undercover investigator not to report $250,000 in savings, saying it was "not the government's business." At a Pennsylvania college, the financial representative told an undercover applicant who had reported a $250,000 inheritance that he should have answered "zero" when asked about money he had in savings — and then told him she would "correct" his form by reducing the reported assets to zero, a change she later confirmed by e-mail and voicemail.

> At a college in California, an undercover investigator was encouraged to list three nonexistent dependents on the financial aid application.

In addition to the colleges that encouraged fraud, all the colleges made some deceptive statements. At one certificate program in Washington, for example, the admissions representative told the undercover applicant that barbers could earn $150,000 to $250,000 a year, when the vast majority earn less than $50,000 a year. And at an associate degree program in Florida, the report said, a prospective student was falsely told that the college was accredited by the same organization that accredits Harvard and the University of Florida.

According to the report, courses in massage therapy and computer-aided drafting that cost $14,000 at a California for-profit college were presented as good values, when the same courses cost $520 at a local community college.

Six colleges in four states told the undercover applicants that they could not speak with financial aid representatives or find out what grants and loans they were eligible for until they completed enrollment forms agreeing to become a student and paid a small application fee.

And one Florida college owned by a publicly traded company told an undercover applicant that she needed to take a 50-question test, and answer 18 questions correctly, to be admitted — and then had a representative sit with her and coach her through the test. A representative at that college encouraged the applicant to sign an enrollment contract, while assuring her it was not legally binding.

But in some instances, the report said, the applicants were given accurate and helpful information, about likely salaries and not taking out more loans than they needed

258.    Following the revelation of the GAO investigation, on August 3, 2010, the price of Washington Post began what would be a two-week decline.  As news continued to come out concerning details of the government's investigation and the anticipated repercussions from the investigation on Washington Post's business and prospects, Washington Post stock crumbled. News of the GAO report was the tip of the proverbial iceberg.

259.    On August 4, 2010, the GAO issued its report detailing its findings.  At the request of Congress, the GAO undertook its investigation to determine if for-profit colleges engaged in fraudulent, deceptive or otherwise questionable marketing practices.  The GAO's report cited many instances of abuse in the sector, finding that many of the companies in the industry – including the Company's Kaplan division – employed fraudulent and deceptive practices in their student recruitment, targeting students who used federal financial aid to pay for their schooling.  The study

was presented at a HELP Committee hearing held on August 4, 2010, as part of the ongoing government inquiry into the for-profit education sector. This was the second of the Senate's hearings on the industry, and was entitled "For Profit Schools: The Student Recruitment Experience."[14]

260.    Specifically, the GAO report detailed severely abusive recruiting practices at fifteen for-profit campuses, two of which were Kaplan campuses, one located in Pembroke Pines, Florida, the other in Riverside, California.[15] For example, a GAO investigator posing as a potential student at Kaplan's Pembroke Pines campus uncovered the following predatory practices:

- A Kaplan admissions officer falsely stated that the college was accredited by the same agency that accredits Harvard University and the University of Florida - a common tactic described by many confidential witnesses herein (*see supra* at ¶127);

- A representative told the applicant that she needed to answer 18 questions correctly on a 50 question test to be accepted, but then a test "proctor" sat in the room with her, and "coached" her through the test;

- The applicant was not allowed to speak to a financial aid representative until after she enrolled;

- The applicant had to sign an agreement to pay $50 a month to the college while enrolled - a widespread Company policy designed to skirt to 90/10 rule, confirmed by many confidential witnesses herein (*see supra* at ¶164);

- The admissions representative said the applicant should switch from criminal justice to the medical assistant certificate program because she could make up to $68,000 a year. However, according to the GAO, 90 percent of medical assistants make less than $40,000 a year;

---

[14] Testimony, materials, and video of the August 4, 2010 hearing are available online at the HELP Committee's website. *See* http://help.senate.gov/hearings/hearing/?id=19454102-5056-9502-5d44-e2aa8233ba5a (last visited June 12, 2011). A copy of the GAO's August 4, 2010 report is attached hereto as ***Exhibit D*** and is also available online at: http://harkin.senate.gov/documents/pdf/d10948t.pdf. On November 30, 2010, GAO reissued the report to clarify and add more precise wording and provide more detail on certain examples.

[15] Video clips depicting the GAO's undercover applications, as well as voicemail messages from for-profit recruiters are available online at http://www.gao.gov/products/GAO-10-948T (last visited June 12, 2011).

- When asked about paying back student loans, the Kaplan representative allegedly told the applicant: "You gotta look at it . . . I owe $85,000 to the University of Florida. Will I pay it back? Probably not . . . . I look at life as tomorrow's never promised . . . . Education is an investment, you're going to get paid back tenfold, no matter what";

- When the applicant asked about financial aid, two Kaplan representatives refused to answer the applicant's questions, but instead debated with him about his commitment level to his education for 30 minutes - as described herein, Kaplan used various tactics, such as never saying Kaplan's total tuition costs out loud to a potential student, as a means to hide the overwhelming cost of a Kaplan education (*see supra* at ¶132);

- After first saying the criminal justice program would take 18 months to complete, the representative changed that to two years. The representative then said that student loans would fully cover the program's cost. Yet, the GAO noted that the applicant would need to take out both federal student loans and private loans to finish the program in less than three years;

- The representative told the applicant that massage therapists earn $100 per hour;

- The representative told the applicant that repaying the student loans would not be an issue once he got his new job; and

- The representatives used "hard sell" marketing techniques, such as becoming argumentative, calling the applicant afraid, and scolding the applicant for not wanting to take out loans - such hard sell tactics are confirmed by the Company's scripts, and described by many confidential witnesses herein (*see supra* at §VI(F)).

261.    On August 5, 2010, the *South Florida Business Journal* reported on Kaplan's response to the startling revelations in the GAO report. The article stated, in part:

> In an e-mailed response, Mark Harrad, VP of communications at Kaplan University in Washington, D.C., said the actions described in the GAO report "*are contrary to our standards and values in every way.*"

> He said as soon as Kaplan learned of them, it initiated its own internal investigation and, as a result, suspended enrollment at its Pembroke Pines campus.

> Investigations there and at its Riverside, Calif., campus are ongoing.

> "We will take all necessary actions – including termination – with respect to any employee found to be in violation of *our clearly outlined standards and the code of conduct that is emphasized in our repeated training and our day-to-day operations*," Harrad wrote. "*The actions described in the GAO report are simply unacceptable.* We will do everything we can to ensure that such incidents are not repeated anywhere at our 75 campuses or among our 16,000 higher education employees."

98

262.    The day after revealing it had suspended enrollment at one of its Kaplan schools, Washington Post issued a press release announcing the Company's financial results for the second quarter ended July 4, 2010, which stated in relevant part:

> The Washington Post Company (NYSE: WPO) today reported *net income available for common shares of $91.9 million ($10.00 per share) for the second quarter ended July 4, 2010, compared to net income available for common shares of $12.2 million ($1.30 per share) for the second quarter of last year*.
>
> \*        \*        \*
>
> The Department of Education recently issued notices of proposed rulemaking. If enacted, the proposed rules may have a material effect on the future operations and results of Kaplan as further described in the division results below.
>
> \*        \*        \*
>
> *Revenue for the second quarter of 2010 was $1,201.8 million, up 11% from $1,083.2 million in the second quarter of 2009. Operating income increased in the second quarter of 2010 to $163.5 million, from $19.5 million in the second quarter of 2009.* Revenue and operating results improved at all of the Company's divisions for the quarter.
>
> *For the first six months of 2010, the Company reported net income available for common shares of $137.3 million ($14.90 per share), compared to a net loss available for common shares of $6.9 million ($0.74 per share) for the same period of 2009.*
>
> \*        \*        \*
>
> *Revenue for the first half of 2010 was $2,343.8 million, up 12% from $2,091.5 million in the first half of 2009, due to increased revenues at the Company's education,* television broadcasting and cable television divisions, offset by a slight revenue decline at the Company's newspaper division.

263.    The press release went on to state in pertinent part:

> *Education division revenue totaled $747.3 million for the second quarter of 2010, a 15% increase over revenue of $649.3 million for the same period of 2009. Kaplan reported operating income of $109.0 million for the second quarter of 2010, up 88% from $58.1 million in the second quarter of 2009.*
>
> *For the first six months of 2010, education division revenue totaled $1,458.7 million, a 17% increase over revenue of $1,242.9 million for the same period of 2009. Kaplan reported operating income of $166.9 million for the first six months of 2010, up from $69.3 million for the first six months of 2009.*

264.    The press release, also reported KHE's revenue of $475.1 million for the quarter and although highlighting KHE's "enrollment growth, improved student retention and increased margins", the press release announced that total KHE enrollments increased at a substantially lower rate than the prior year

> *Higher education revenue and operating income grew significantly in the first half of 2010 due to enrollment growth, improved student retention and increased margins. Total KHE enrollments increased 18% in the first half of 2010, compared to 31% in the first half of 2009.* A summary of KHE student enrollment at June 30, 2010, and June 30, 2009, is as follows:

|  | As of June 30, | | % |
| --- | --- | --- | --- |
|  | 2010 | 2009 | Change |
| Kaplan University | 67,409 | 52,591 | 28 |
| Kaplan Higher Education Campuses | 44,812 | 42,112 | 6 |
|  | 112,221 | 94,703 | 18 |

265.    As detailed in ¶91, KHE's second quarter 2010, revenues accounted for approximately 39.5% of Washington Post's revenues for the quarter, while the entire Kaplan segment accounted for approximately 62.2% of the Company's revenues for the quarter.

266.    Then, that same day, *The New York Times* reported that Kaplan had suspended enrollment at its Pembroke Pines, Florida and Riverside, California campuses as a result of the undercover investigations disclosed in the GAO Report. *The New York Times* went on to state:

> Melissa Mack, a Kaplan spokeswoman, said the company suspended enrollment at the two campuses pending an investigation of the G.A.O. findings, and meanwhile was working "to ensure that such incidents are not repeated anywhere at our 75 campuses or among our 16,000 higher-education employees."
>
> Kaplan's higher-education programs enrolled more than 112,000 students as of June 30.

267.    Although Defendants continued to highlight enrollment growth and purported positive financial results in the Company's education division, following publication of the August 6, 2010 press release, and on the heels of bits and pieces of the Company's true business practices reaching the market, which partially illuminated the falsity of Defendants' Class Period statements, the price of Washington Post stock declined 7.6% or $31.05 from a closing price of $408.61 per

share on August 5, 2010, to a closing price of $377.56 per share on August 6, 2010. But for Defendants' continued false statements and material omissions concerning the Company's financial success, the price of Washington Post stock would have declined further.

268.    On August 11, 2010, Washington Post filed its quarterly report with the SEC on Form 10-Q for the quarter ended July 4, 2010, which confirmed the Company's previously announced financial results and was signed by Graham and Jones (the "Second Quarter 2010 10-Q"). The Second Quarter 2010 10-Q also contained Sarbanes-Oxley certifications signed by Graham and Jones and stated that the Form 10-K did not include any material misrepresentations. Nevertheless, the Second Quarter 2010 10-Q did contain several false and misleading statements regarding Kaplan's financial performance and future business prospects, and disclosures related to the DOE's pending regulations.

269.    For example, the Second Quarter 2010 10-Q highlighted Kaplan's increase in revenues for the thirteen weeks ended *July 4, 2010, of $747.3 million compared to revenue of $649.3 million for the thirteen weeks ended June 28, 2009.*

270.    Moreover, the Second Quarter 2010 Form 10-Q elaborated on the pending regulations even further, revealing that the Company's Kaplan division would be required to submit extensive financial and operational information to the Health, Education, Labor and Pension Committee of the U.S. Senate. The Second Quarter 2010 Form 10-Q stated, in pertinent part:

> In the summer of 2010, the Health, Education, Labor and Pension Committee ("the Committee") of the U.S. Senate commenced an industry-wide review of private sector higher education institutions. The institutions owned and operated by Kaplan's Higher Education Division (KHE) are included in the scope of this industry-wide review. The scope of the hearings are being established and directed by the chairman of the Committee. Two hearings have been conducted thus far and additional hearings are anticipated. The ultimate outcome of the hearings and implications to the operation of KHE's institutions are presently unknown.
>
> As part of the Committee's review of private sector higher education institutions, investigators from the United Sates Government Accountability Office (GAO) performed undercover tests at 15 private sector higher education institutions,

including two campuses of KHE. In August 2010, the GAO issued a report which was critical of the recruiting tactics at several schools, including the two Kaplan campuses. The Company is in the process of evaluating the GAO findings and completing its own internal investigation.

**In addition, in August 2010, Kaplan and other companies that operate private sector higher education institutions received a request from the Committee to provide extensive information dating back to 2006 covering financial results, management, operations, personnel, recruiting, enrollment, graduation, student withdrawals, receipt of Title IV funds, accreditation, regulatory compliance and other items.** The Company is working to cooperate fully with the Committee's request.

271.    In response to Defendants' disclosures detailing that the Company's Kaplan division would be submitting, on the heels of the GAO report and investigation, detailed financial and operational data to the U.S. Senate, the price of Washington Post common stock dropped an additional 4.65%, or $17.73, from a closing price of $380.98 per share on August 10, 2010 to close at a price of $363.25 per share on August 11, 2010, on a 111.8% increase on trading volume. The following day, the price of Washington Post common stock dropped another 3.97%, or $14.42, on August 12, 2010, to close at a price of $348.83 per share, as demonstrated in the chart below:



272.    The statements referenced in ¶¶261-64, 268-69 were materially false and misleading when made as they represented and/or omitted facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading, for reasons set forth in ¶199 above, and as evidenced by the factual detail contained throughout this Complaint. In addition, the statements referenced in ¶¶261-64, 268-69 were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading. The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- Although pieces of information had reached the market, Defendants continued to highlight the purported strong enrollment growth and financial performance of the Company's Kaplan division. Even at this late stage of the Class Period, Defendants never admitted or revealed the true cause of the Company's financial performance. Instead, Defendants and Company representatives continued to mislead the market by feigning concern about the problems at Kaplan, while shutting down enrollment at only two Kaplan campuses. Had Defendants revealed the truth, the Company would have had to suspend enrollment across Kaplan's entire enterprise.

### The Truth Is Finally Revealed

273.    On August 13, 2010, after the market closed, the DOE released data on student-loan repayment rates at the nation's colleges and universities. The data showed that the repayment rates were 54% at public colleges and universities, 56% at private non-profit institutions and 36% at for-profit colleges. **The data showed that the repayment rate at Washington Post's Kaplan University was a mere 28%**, among the lowest of all for-profit institutions.

274.    When news of Kaplan's paltry repayment statistics hit the market, the price of Washington Post common stock quickly dropped once again, falling more than 8%, or $27.83 per share, from a closing price of $343.48 on August 13, 2010, to a closing price of $315.65 per share on August 16, 2010, the next trading day.

275.    As set forth above, as news leaked into the market concerning the GAO report, Kaplan's deceptive practices, enrollment suspensions, and extremely low student loan repayment

103

rates, the price of Washington Post stock declined significantly.  For example, in a short two-week

period, investors bore the brunt of multiple stock declines.  All told, between August 2, 2010 and

August 16, 2010, the price of Washington Post common stock dropped more than *26%, $112.53 per*

*share,* as demonstrated in the chart below:



276.    As a result of Defendants' false statements and omissions, Washington Post common

stock traded at artificially inflated prices throughout the Class Period.  When the truth was revealed

by a series of partial disclosures, Company's shares were hammered by massive sales, sending them

down approximately *41.7%, or $225.73 per share*, from their Class Period high.  The impact of

Defendants' fraud is demonstrated in the chart below:



## VIII.  POST CLASS PERIOD EVENTS AND DISCLOSURES

277.   Following the close of the Class Period, additional events reached the market and further demonstrated not only the falsity of Defendants' Class Period statements, but also the extent to which Washington Post's financial performance and future business prospects depended upon Defendants' ability to defraud both Kaplan students and investors by continuing to implement Kaplan's systemically predatory business model.

278.   For example, on August 21, 2010, *Barron's* published an article entitled "This Just In: Washington Post Is Cheaper than Dirt," a follow-up to its April 5, 2010 article previously mentioned, stating in pertinent part:

> **Washington Post's shares and reputation took a hit recently with a report by the U.S. Department of Education that repayment rates on government loans by students at the Post's fast-growing Kaplan higher education unit are some of the lowest among leaders in the for-profit education industry.**
>
> The Post's stock, at $348, is down 17% so far this month and 22% below the price of $445 when we wrote favorably on the company ("Washington Post is Dirt Cheap,"

105

April 5). We argued the Post (ticker: WPO) was attractive on a sum-of-the-parts basis but failed to anticipate the potential damage to Kaplan, which has been viewed as the company's most valuable asset.

**Now the stock market seems to be assigning a negative value to the overall Kaplan education franchise**, which generated $167 million of operating income in the first half of 2010. Although the stock looks even more attractively priced today, the cloud over Kaplan may take time to lift.

*     *     *

**The Kaplan situation is embarrassing and troublesome for the Post because the higher-education operation -- both physical campuses and online study -- accounts for virtually all of Kaplan's profits.** The original test-preparation business is slightly in the red. The Education Department reported that just 28% of former Kaplan students were paying principal on their government student loans, which accounts for the bulk of Kaplan's revenues. Other for-profit schools were in the 25% to 54% range, including Apollo Group at 44% and Career Education at 35%. By comparison, Harvard's student-repayment rate is 84%.

*     *     *

**The report emboldened critics who've argued that for-profit schools recruit under-prepared students to high-cost programs that add little to their job skills or employment prospects while saddling them with significant debt.** The Post asserts that the government figures don't include students participating in various government-sponsored debt management programs.

279.    On September 13, 2010, U.S. Secretary of Education Arne Duncan ("Duncan") issued a press release announcing that a review of DOE data for all U.S. institutions evidenced the national cohort default rate for 2008 averaged 7%. Specifically, the data represented the cohort of borrowers whose first loan repayments came due between October 1, 2007 and September 30, 2008, and who defaulted on their payments before September 30, 2009. Duncan commented:

The data also tells us that students attending for-profit schools are the most likely to default . . . While for-profit schools have profited and prospered thanks to federal dollars, some of their students have not. Far too many for-profit schools are saddling students with debt they cannot afford in exchange for degrees and certificates they cannot use. This is a disservice to students and taxpayers, and undermines the valuable work being done by the for-profit education industry as a whole.

280.    The DOE data also reported the 2008 CDR for individual schools, including Kaplan campuses – many of whose 2008 CDR was head and shoulders in excess of the nation's 7% average. As a sample, the DOE data reported the following 2008 CDR rates for Kaplan campuses:

- Brooklyn, Ohio: 25.7%;
- Harrisburg, Pennsylvania: 22.6%;
- Boston, Massachusetts: 20.1%;
- San Antonio, Texas: 20.5%;
- Columbus, Ohio: 20.9% ;
- Dayton, Ohio: 21.3%;
- Merrilville, Indiana: 20.2%;
- Stockton, California: 20.3%;
- Las Vegas, Nevada: 19.2%;
- Dallas, Texas: 21%; and
- Tesst College, Beltsville, Maryland: 20.1%

281.    While the above information was not revealed to the market until September 2010, it was undoubtedly known to Defendants throughout the Class Period.

282.    On September 27, 2010, KHE introduced its "Kaplan Commitment" program, which "allow[s] prospective students to attend classes for an introductory period worry free, without paying tuition." According to KHE, "[t]he provisional admittance program will also lower the risk that the federal government lends money unnecessarily to students with a low chance of success in the rigorous Kaplan learning environment." The implementation of this program was an inherent admission of Defendants' fraud.

283.    On September 30, 2010, the HELP Committee held a third hearing focusing on whether for-profit colleges were benefitting their students. As part of the hearing, numerous witnesses spoke about their experiences at for-profit institutions. For example, Danielle Johnson

("Ms. Johnson"), a former student of Kaplan University's Nursing program, discussed her "disheartening experience," with Kaplan University.

284.    Ms. Johnson testified that she was misled by an Assistant Director of Admissions at Kaplan regarding her ability to complete Kaplan's nursing program by working at a health center in her hometown, as well as about the amount of in-class hours required to complete the program. Additionally, Ms. Johnson discussed how she failed both her midterm and final exams in Anatomy & Physiology but was passed in the class. After taking on $9,642.25 in student loans to attend Kaplan University, Ms. Johnson eventually dropped out and enrolled in community college. Ms. Johnson concluded her remarks to the HELP Committee, stating in pertinent part:

> Hindsight, I see how everything happens at too fast of a pace. Our very first day, during orientation, we were trained in CPR within a matter of hours. I am now certified but cannot recall how to do anything and can see how I do not feel confident at all if it came down to trying to save a life. I now feel like I am at a place where I am stuck and have no real future with what I am being taught, or being kept from. I feel like [sic] at a place where I don't know how I can continue. I want to but I don't know how. This has been a very disheartening experience and I hope by telling my story [I] can prevent it from happening to anyone else.

285.    Based in part on the testimony above, and documents produced by Kaplan and other for-profit education companies to Chairman Harkin, the Committee released a report titled "The Return of the Federal Investment in for-Profit Education: Debt without a Diploma" (the "September 30, 2010 HELP Report").[16]

286.    The September 30, 2010 HELP Report made a number of notable findings, including that student enrollment at for-profit colleges masks high withdrawal rates. For instance, fourteen out of sixteen schools analyzed recruited a greater number of new students than their entire starting

---

[16] Materials from the September 30, 2010 HELP Committee hearing can be found online at: http://help.senate.gov/hearings/hearing/?id=3e235bb6-5056-9502-5df5-5d5b0f000e01 (last visited June 12, 2011). A copy of the report is also available online at: http://help.senate.gov/imo/media/doc/Education%20Report.pdf.

enrollment in 2008-09, however their net enrollment only increased by 22%. The report also found that students at for-profit colleges leave without a diploma at an alarming rate. For example, while 959,000 students enrolled at the 16 schools reviewed during 2008-09, 547,000, or 57%, withdrew by August 2010. The September 30, 2010 HELP Report also found that almost all students at for-profit schools take out student loans and they are likely to amass significant debt. For example, for 2008-09 students withdrawing from associate's or bachelor's programs, median attendance was approximately 20 weeks. A student who attended a for-profit college for that length of time would have to pay approximately $8,000 to $11,000 in tuition. As set forth above, 70% of students attending Kaplan drop-out after a median time period of only 4.2 months.

287.    On October 19, 2010, the Florida Attorney General announced that it had commenced an investigation into alleged deceptive trade practices at five proprietary school groups located in Florida, including Kaplan. Since that time, the Florida Attorney General has served KHE with a subpoena seeking records.

288.    Once prospective students – like the market – became aware of the fraudulent business practices at the Company's Kaplan division, new student enrollment at Kaplan slowed significantly. For example, on November 5, 2010, Washington Post issued a press release announcing its third quarter 2010 results. Although KHE student enrollments increased by 8% compared to the same period in the 2009, that 8% represented a significant slowdown over the third quarter of 2009.[17] Moreover, the November 5, 2010 press release announced that in KHE's Kaplan Higher Education Campuses segment, student enrollment had decreased 7% from September 30, 2009 to September 30, 2010.

---

[17] As a point of comparison, KHE enrollments for the third quarter of 2009 increased 28% compared to the same period in 2008. Although Defendants stated that enrollment growth could slow over time, the market was never alerted to the fact that it would be the discovery of, and forced end to, Defendants' massive fraud that would be the catalyst for the dramatic slowdown.

289.    On November 9, 2010, *The New York Times* published an article entitled "Scrutiny

Takes Toll on For-Profit College Company," a true and correct copy of which is attached hereto as

***Exhibit E***.  The article stated, in pertinent part:

> . . . According to 2009 data released this summer by the Department of Education, only 28 percent of Kaplan's students were repaying their student loans. That figure is well below the 45 percent threshold that most programs will need to remain fully eligible for the federal aid on which they rely. By comparison, 44 percent of students at the largest for-profit, the University of Phoenix, were repaying their loans.
>
> Kaplan is facing several legal challenges. The Florida attorney general is investigating eight for-profit colleges, including Kaplan, for alleged misrepresentation of financial aid and deceptive practices regarding recruitment, enrollment, accreditation, placement and graduation rates.
>
> Kaplan is also facing several federal whistle-blower lawsuits whose accusations dovetail with the findings of an undercover federal investigation of the for-profit industry this summer, including video of high-pressure recruiting and unrealistic salary promises.
>
> \*      \*      \*
>
> Using hidden cameras, investigators from the Government Accountability Office found deception or fraud at 15 for-profit colleges, including two Kaplan campuses.
>
> The undercover videos showed Kaplan recruiters in Florida and California making false or questionable statements to prospective students — suggesting for example, that massage therapists earn $100 an hour, and that student loans need not be paid back.
>
> \*      \*      \*
>
> But dozens of current and former Kaplan employees said the videos painted a representative picture.
>
> "They are not outliers; they are in the middle of the field, the middle of the bell curve," said William Wratten, a former Kaplan admissions adviser in Chicago, who resigned after a year and a half because he disagreed with company practices. "Maybe not the exact same activities, but the mind-set was the same: Do whatever it takes to get the sale, to keep your job."
>
> \*      \*      \*
>
> Four whistle-blower suits against Kaplan under the federal False Claims Act have been made public in the last few years, all making accusations that the company used

110

deceptive practices in its quest for profits, including enrolling unqualified students and paying recruiters for each student enrolled, a practice forbidden by federal law.

In addition, the suits allege, Kaplan kept students on the books after they dropped out, inflated students' grades and manipulated placement data to continue receiving financial aid.

*        *        *

But many current and former Kaplan employees and students — including those, like Mr. Wratten, not involved in the lawsuits — said in interviews that they believed the company was concerned most with getting students' financial aid, and that Kaplan's fast-growing revenues were based on recruiting students whose chances of succeeding were low.

*        *        *

Carlos Urquilla-Diaz, a former Kaplan instructor and administrator who is one of the Miami whistle-blowers, recalled a PowerPoint presentation showing African-American women who were raising two children by themselves as the company's primary target.

Such women, Mr. Urquilla-Diaz said, were considered most likely to drop out before completing the program, leaving Kaplan with the aid money and no need to provide more services.

"The idea was, we'll take anybody, and I mean anybody," he said.

Victoria Gatsiopoulos, a former instructor and director of career services at a Kaplan College in Pittsburgh, said in her complaint that the school made promises to students of "how their lives will magically change" if they attended Kaplan classes.

One prospective student with financial difficulties, the complaint said, was promised in writing that "in five years she would have a job in a hospital, a big house in Florida, enough money to go to Disney World with her family and a new Lexus."

Ms. Gatsiopoulos said Kaplan representatives routinely misled prospective students about the jobs they could get after graduation.

"One of our biggest programs was criminal justice," she said. "Students who were recruited were led to believe that they could get into the C.I.A. or F.B.I. or Border Patrol or crime-scene investigation when they graduated, and earn $40-$50,000. But those jobs all require advanced training."

In reality, Ms. Gatsiopoulos said, graduates would often get the same $8 to $9-an-hour security guard jobs they could have had without Kaplan training.

Ms. Gatsiopoulos's complaint said that Kaplan also manipulated its reported placement rates so that a graduate employed in sales at Wal-Mart, for example, would be reported as working in accounting management, and that a telemarketer was reported as working in "business administration fashion merchandising."

She also charges that Kaplan would raise instructors' grades for students so they remained eligible for federal aid. Former Kaplan instructors not involved in the litigation made similar claims.

"More than once, when I refused to inflate a student's grade, they went ahead and did it on their own," Ms. Gatsiopoulos said.

*      *      *

The broadest complaint against Kaplan is the one from Florida, in which the former dean of paralegal studies, Ben Wilcox, is one of three plaintiffs.

Kaplan officials say there is reason to distrust all three plaintiffs.

Mr. Wilcox is under indictment on charges of hacking into Kaplan's computer system and sending out harassing e-mails.

"They'll tell you all sorts of terrible things about me," Mr. Wilcox said, adding that Kaplan is intent on discrediting him because of his access to incriminating evidence. "But the bottom line is that Kaplan is a cold-hearted scam to make money by taking student loans from the government, and leaving students with debt that they'll never be able to pay off."

290.    On November 12, 2010, Washington Post announced that Bill Gates had stepped down from the Company's Board of Directors.  Approximately two months later, on January 20, 2011, Washington Post announced that Warren Buffet (who had been a member of the Board since 1996) would not be a candidate for re-election to the Company's Board of Directors.

291.    Then, on December 7, 2010, KHE announced it would be laying off 770 employees due to decreasing enrollments, stating in pertinent part:

Faced with slowing enrollments at its colleges and at Kaplan University, Kaplan Inc. announced on Tuesday that it was eliminating about 770 jobs, or about 5 percent of the work force in its Kaplan Higher Education division. Kaplan, part of the Washington Post Company, did not say where the cuts were being made but in a brief news release, an executive said personnel needs were changing because "we have made a strategic decision to become more selective in the students we enroll, focusing on students who are most likely to thrive in a rigorous academic environment and meet their financial obligations."

112

292.     On December 22, 2010, *The Huffington Post* published an article entitled, "At Kaplan University, 'Guerrilla Registration' Leaves Students Deep In Debt." The article stated in pertinent part:[18]

> Far from an aberration, [a former student's] experience typifies the results of a practice known informally inside Kaplan as "guerrilla registration": academic advisors have long enrolled students in classes they never take, without their consent and sometimes even after they have sought to withdraw from the university, in order to maximize the company's revenues, according to interviews with former employees.
>
> Managers at Kaplan--the highly profitable educational arm of the Washington Post Co.-- have for years pressured academic advisors to use this method to boost enrollment numbers, the former employees said, offering accounts consistent with dozens of complaints filed by former students with the Florida Attorney General's Office and reviewed by The Huffington Post.
>
> Guerrilla registration has been part of a concerted effort by the university to keep students enrolled as long as possible in order to harvest more of the federal financial aid dollars that make up nearly all of the company's higher education revenues, according to former Kaplan academic advisor Sheldon Cobbler, who described the practice in detail.
>
> Most advisors had access to a company database that allowed them to view students' e-mail correspondence without their knowledge, said Cobbler, who worked at Kaplan's Fort Lauderdale, Fla., corporate office from 2007 through July of this year. The advisors routinely searched through students' e-mails to look up their user names and passwords for Kaplan's enrollment system, and then they used that information to sign in using multiple student identities, enrolling them in classes they never intended to join, he said.
>
> "The company didn't want students to withdraw," Cobbler said. "They wanted them to stay in class by any means."

293.     On January 18, 2011, *change.org* published an article entitled "Former Kaplan Students Tell The Washington Post: Shut Down Kaplan University Online" stating in pertinent part:

> All they wanted was an education. All they got was debt.
>
> More and more former students at Kaplan University - the lucrative chain of "for-profit" colleges owned by the Washington Post Company - are coming forward with

---

[18] A true and correct copy of the December 22, 2010 article is attached hereto as ***Exhibit F***.

horror stories about the bogus classes, surprise fees and deceptive policies they encountered as they struggled to achieve the American dream. And they're asking for your help.

Led by former student Shannon Croteau - who was 11 classes away from graduating with a bachelor's degree in paralegal studies when she discovered she was out of financial aid, $30,000 in debt at [sic] that the degree would be worthless in her home state of New Hampshire - a group of former students are demanding that Graham shut down Kaplan University until changes are made.

They want the Washington Post and Kaplan University Online to handle student grievances with an independent, third-party system. That way, allegations of foul play will be handled fairly, instead of being swept under the rug.

294.    On February 6, 2011, Senator Harkin held another hearing on recruiting practices of for-profit education companies. Indeed, at this hearing, Harkin referenced actual "scripts" given to admission advisors at for-profit education companies, including Kaplan. Specific to Kaplan, Harkin stated, in pertinent part:

**Kaplan University also encourages its recruiters to focus on pain and fear. This is a page from a manual dated July 8, 2009. With side notes about "advisor call control" and maintaining "rapport with PROSPECT," the document is similar to ITT's with questions to "uncover the pain and fear." At the bottom, in big capital, bold letters is the takeaway message for staff. "It is all about uncovering their pain and fears. Once they are reminded of how bad things are, this will create a sense of urgency to make this change." Sixteen pages of sales tactics later, the recruiter is taught to "restate back word for word, the better you restate the brighter the dream."**

**Another Kaplan document says "keep digging until you uncover their pain, fears and dreams...." If you get the prospect to think about how tough their situation is right now and if they discuss the life they can't give their family because they don't have a degree, you will dramatically increase your chances of gaining a commitment from the student. "Get to their emotions and you will create the urgency!" According to the Department of Education 30 percent of student loan borrowers at Kaplan default within three years of leaving school.**

295.    On February 7, 2010, the Illinois Attorney General sent Washington Post a Civil Investigation Demand, seeking information relating to Illinois residents who attend Kaplan University's online programs.

296.    Kaplan's declining financial performance and enrollment trends continued.  By February 23, 2011, Washington Post issued a press release announcing KHE's total enrollments had declined 8% (from both sectors) compared to enrollments as of December 31, 2009.  Moreover, for the fourth quarter of 2010, Kaplan's revenue totaled $699.8 million, a 1% decline from $709.3 million for the same period of 2009.  Specifically, revenue at KHE had decreased 9.6% from $420.2 million in the fourth quarter of 2009 to $405.6 million in the fourth quarter of 2010.

297.    These post-Class Period events serve to further corroborate the detailed accounts of the myriad confidential witnesses described herein.  Put simply, once the curtain was pulled back and Defendants' scheme was revealed, Kaplan's and Washington Post's performance suffered dramatically.  The declining enrollment trends are further indicia of how Washington Post would have performed during the Class Period absent Defendants' fraudulent omissions and misrepresentations concerning Kaplan's systemically predatory business model.

## IX.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS REGARDING WASHINGTON POST'S BUSINESS CONDUCT AND ETHICS

298.    During the Class Period, Washington Post publicly discussed the Company's strong principals, and stated goal to conduct the Company's operations in accordance with the highest standards of business ethics.  For example, the Company's 2009 Form 10-K cited to Washington Post's "Code of Ethics" and referenced its location on the Company's website www.washingtonpostco.com.  But, the Statement of Ethical Principals contained a host of false and misleading statements that were designed to mislead the market.  For instance, the Statement of Ethical Principals states, "We believe in doing the right thing, and we believe that the long-term success of our businesses depends on it."

299.    Moreover, the Company goes on to state, Washington Post "conduct[s] our operations in accordance with the highest standards of business ethics and in compliance with all applicable laws." Continuing, the Statement of Ethical Principal states:

> Our policy is to promote full compliance with all applicable laws, rules and regulations of federal, state, county and local governments, and other appropriate private and public regulatory agencies. To the extent any of us has questions about a particular circumstance that may involve illegal conduct, you should seek advice from the applicable Company or divisional legal department.

300.    Washington Post's public persona was to demand its "employees act with honesty and integrity, avoiding actual or apparent conflicts of interest." The Company also had certain mandates directing the dissemination of accurate and complete reporting and financial information:

> The Company's employees are responsible for the accurate and complete reporting of financial information within their respective areas of responsibility and for the timely notification to senior management of the unit where each such individual is employed of significant transactions, trends and other financial or non-financial information that may be material to the Company. Material filed with regulatory bodies and other public communications should contain full, fair, accurate, timely and understandable disclosure.

301.    According to the Company, any waivers from the Statement of Ethics, "will not be granted except in very limited circumstances":

> Any waivers of such requirements for directors and executive officers of the Company may only be made by the Board or the Audit Committee of the Board after disclosure of all material facts by the individual seeking the waiver and will be promptly disclosed as required by law or stock exchange regulations. Any waivers for other individuals may only be granted by the chief financial officer or the general counsel after disclosure of all material facts by the individual seeking the waiver.

302.    Undoubtedly, the business conduct and integrity of Washington Post and its management are material to investors. Contrary to statements made by Defendants during the Class Period, neither Washington Post nor its management acted ethically or with integrity. Not only were Defendants in violation of multiple rules and regulations, such as the HEA and Title IV, but they failed to adequately disclose to investors that the Company's strength was rooted in its unethical, abusive, and fraudulent business practices.

116

## X.     ADDITIONAL SCIENTER ALLEGATIONS

303.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding, their control over, and/or receipt and/or modification of Washington Post's and Kaplan's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Washington Post and Kaplan, participated in the fraudulent scheme alleged herein.

304.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including each of the Individual Defendants.

305.     The Individual Defendants were privy to confidential and proprietary information concerning Washington Post's Kaplan, and its operations, finances, financial condition, and present and future business prospects.  The Individual Defendants also had access to material adverse non-public information concerning Washington Post's Kaplan as discussed in detail above.  Because of their positions with Washington Post, the Individual Defendants had access to non-public information about its business, finances, enrollment, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and

committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or were severely reckless in disregarding the fact that adverse facts specified herein had not been disclosed to, and were being concealed from (in order to mislead), the investing public.

306.    Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases, and other statements prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. The Individual Defendants were also able to, and did, directly or indirectly, control the conduct of Washington Post's business, the information contained in its filings with the SEC, and its public statements. Moreover, the Individual Defendants made or directed the making of affirmative statements to the investing public, and participated in meetings, conference calls, and discussions concerning such statements. Each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations that were being made were then false and misleading. As a result, each of the Individual Defendants is responsible for the accuracy of Washington Post's corporate releases detailed herein and is therefore responsible and liable for the misrepresentations and omissions contained therein.

307.    The Individual Defendants are liable as direct participants and co-conspirators with respect to the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the

Individual Defendants were able to and did, directly or indirectly, control the conduct of Washington Post's and Kaplan's business.

308.    As senior executive officers and/or directors and controlling persons of a publicly traded company whose common stock and other securities were, and are, registered with the SEC pursuant to the Exchange Act, and whose shares traded on the NYSE and are governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Washington Post's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Washington Post's common stock would be based upon truthful and accurate information.   The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

309.    The Individual Defendants are liable as primary participants in a fraudulent scheme and wrongful course of business which operated as a fraud or deceit on purchasers of Washington Post common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.   The fraudulent scheme employed by the Individual Defendants was a success, as it deceived the investing public regarding Washington Post's prospects and business, artificially inflated the price of Washington Post common stock, and caused Plaintiff and other members of the Class to purchase Washington Post common stock at inflated prices and suffer losses when the relevant truth regarding Washington Post's true financial condition was revealed and the artificial inflation was removed from the price of the stock.

## XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET DOCTRINE

310.    At all relevant times, the market for Washington Post common stock was an efficient market for the following reasons, among other things:

(a)    Washington Post common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Washington Post filed periodic public reports with the SEC; and

(c)    Washington Post regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

311.    As a result, the market for Washington Post common stock promptly digested current information regarding Washington Post from all publicly-available sources and reflected such information in the price of Washington Post common stock.  Under these circumstances, all purchasers of Washington Post common stock during the Class Period suffered similar injury through their purchase of Washington Post common stock at artificially inflated prices and a presumption of reliance applies.

## XII.    LOSS CAUSATION/ECONOMIC LOSS

312.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the value of Washington Post common stock.  Defendants' creation and implementation of a systemically predatory business model operated as a fraud or deceit on Class Period purchasers of Washington Post common stock by misrepresenting the Company's financials and future business prospects, including but not limited to, misrepresenting the strength and source of the Company's revenues, the volume of student enrollments in Washington Post's degree programs, and the Company's compliance with applicable laws.  Defendants improperly concealed Washington Post's true financial condition and future

business prospects, failing to disclose Washington Post's systemically predatory business model. Consequently, the price of its common stock was artificially inflated throughout the Class Period.

313.    Defendants' false and misleading statements had their intended effect and directly and proximately caused, or were a substantial contributing cause of Washington Post's common stock trading at artificially inflated levels, reaching a Class Period high of $541.38 per share on April 15, 2010.

314.    As a result of Defendants' fraudulent conduct as alleged herein, the prices at which Washington Post common stock traded were artificially inflated, at varying levels, throughout the Class Period.  When Plaintiff and other members of the Class purchased their Washington Post common stock, the true value of such common stock was substantially lower than the prices actually paid by Plaintiff and the other members of the Class.

315.    Later, however, when the truth regarding Washington Post's true financial circumstances was revealed through a series of partial disclosures set forth in detail above, and Defendants' prior misrepresentations, omissions, and fraudulent conduct became apparent to the market, the price of Washington Post common stock fell as the prior artificial inflation was removed. As a result of their purchases of Washington Post common stock during the Class Period at artificially inflated prices, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws, when such artificial inflation dissipated.

316.    By misrepresenting the success of the Company's business and concealing its improprieties, Defendants presented a misleading picture of Washington Post's financial condition and future business prospects.  For example, Defendants' consistent statements that the Company was achieving strong and ever-increasing enrollment results, caused and maintained the artificial inflation in the price of Washington Post common stock throughout the Class Period – even as

negative news reached the market – until the truth was finally an fully revealed at the close of the Class Period.

317.    As a result of Defendants' materially false and misleading statements and documents, as well as the adverse, undisclosed information known to the Defendants, Plaintiff and other members of the Class relied, to their detriment on such statements and documents, and/or the integrity of the market, in purchasing their Washington Post common stock at artificially inflated prices during the Class Period.  Had Plaintiff and the other members of the Class known the truth, they would not have taken such actions.

318.    As explained herein, these false statements directly or proximately caused, or were a substantial contributing cause of, the damages and economic loss suffered by Plaintiff and other members of the Class, and maintained the artificial inflation in the prices of Washington Post's common stock throughout the Class Period until the truth leaked out and was partially revealed to the market, at which time the prior inflation came out of the stock.  Defendants' false and misleading statements had the intended effect and directly and proximately caused, or were a substantial contributing cause, of Washington Post's stock trading at artificially inflated levels throughout the Class Period.

319.    Through a series of partial disclosure events regarding the Company's financial outlook and future business prospects, which culminated in the revelations that, among other things, student-loan repayment rates at Kaplan University were only *28%,* that Kaplan faced the loss of Title IV funding due to pending government regulations, and that the Company engaged in aggressive and unethical recruitment practices – in contradiction of Defendants' Class Period statements regarding the Company's financials, future business prospects, and adherence to applicable laws – the artificial inflation came out of the price of Washington Post common stock.

320.    The events and partial disclosures during the Class Period, set forth more specifically above, included a May 7, 2010 press release announcing pending government regulation could impact Kaplan's receipt of Title IV funding, an August 3, 2010 disclosure announcing the GAO's investigation into for-profit schools, an August 4, 2010 disclosure detailing unethical recruitment practices at two Kaplan facilities, an August 6, 2010 disclosure detailing the pending DOE regulations and their potential impact on Kaplan, an August 11, 2010 disclosure regarding Kaplan's investigation into the GAO's allegations, and that the HELP Committee requested extensive information related to Kaplan's operations.

321.    Defendants, however, mitigated or at least minimized the impact of these partial revelations of the truth in a further attempt to mislead the market's expectations for the Company by, among other things, consistently touting the Company's strong revenues and increasing enrollment rates. For a time, Defendants were successful. Defendants' false and misleading statements limited the declines and maintained the artificial inflation in Washington Post's common stock.

322.    Nevertheless, the market's expectations were ultimately corrected on August 13, 2010, with the disclosure of Kaplan University's low student loan repayment rate of 28% along with an announcement by the DOE regarding its proposed new regulations governing an institution's eligibility to receive federal financial aid. These partial disclosures had a dramatic effect on the price of Washington Post common stock. For example, it fell by 8.10% or $ 27.83 per share, from a closing price of $343.48 on August 13, 2010, to a closing price of $315.65 per share on August 16, 2010, the following trading day, on heavy increase in trading volume. The cumulative impact of these declines was that the price of Washington Post common stock fell *41.7%* from its Class Period high, causing substantial harm to investors who suffered losses as the artificial inflation generated by Defendants' fraud was removed.

323.    The timing and magnitude of the decline in Washington Post common stock negates any inference that the loss suffered by Plaintiff and other Class members were caused by changed market conditions, macroeconomic factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  As a result of their purchases of Washington Post common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws when the above-described revelations reached the market and the artificial inflation was removed.

## XIII.  NO SAFE HARBOR

324.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Washington Post who knew that those statements were false when made. Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## XIV.  COUNT I:  FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

325.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against all Defendants.

326.    During the Class Period, Washington Post and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Washington Post common stock; and (iii) cause Plaintiff and other members of the Class to purchase Washington Post common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Washington Post and the Individual Defendants took the actions set forth herein.

327.    These Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Washington Post's common stock in violation of §10(b) of the Exchange Act and Rule 10b-5.  These Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued as controlling persons of Washington Post, as alleged below.

328.    In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participating in the making of affirmative statements and reports, to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17

C.F.R. §229.10, *et seq*.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition, future business prospects, and operational performance, so that the market prices of Company common stock would be based on truthful, complete and accurate information.

329.    Washington Post and each of the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future business prospects of Washington Post as specified herein.

330.    These Defendants each employed devices, schemes and artifices to defraud while in possession of material adverse non-public information. These Defendants also engaged in acts, practices, and a course of conduct, as alleged herein, in an effort to assure investors of Washington Post's value, performance, and financial and operational growth. These acts included the making of, or the participation in the making of, untrue statements of material facts and omitting to state necessary facts in order to make the statements made about Washington Post and its business operations and future business prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Washington Post common stock during the Class Period.

331.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of her/his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the

Company's financial performance, projections and/or reports; and (iii) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which each knew or disregarded with recklessness was materially false and misleading.

332.    Each of these Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that each failed to ascertain and to disclose such facts, even though such facts were available to each of them. Such Defendants' material misrepresentations and/or omissions were done knowingly or with recklessness and for the purpose and effect of concealing Washington Post's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.    As demonstrated by Defendants' misstatements of the Company's financial condition and performance throughout the Class Period, each of the Individual Defendants, if he or she did not have actual knowledge of the misrepresentations and omissions alleged, was reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false and misleading.

333.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Washington Post common stock were artificially inflated, at varying levels, throughout the Class Period.  In ignorance of the fact that market prices of Washington Post common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or disregarded with recklessness by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Washington Post common stock during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among other things, the common stock price declines

identified herein that released the artificial inflation from the price of Washington Post common stock.

334. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known of the true performance, future business prospects and intrinsic value of Washington Post, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Washington Post common stock during the Class Period, or they would not have done so at artificially inflated prices which they paid.

335. By virtue of the foregoing, Washington Post and the Individual Defendants have each violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

336. As a direct and proximate result of Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period when the artificial inflation was released from Washington Post common stock, as detailed herein.

## XV.  COUNT II:  FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

337. Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein. This claim is asserted against the Individual Defendants.

338. Each of the Individual Defendants acted as a controlling person of Washington Post within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's fraudulent financial reporting and actual performance, each of the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination

of the various statements which Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

339.    In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.

340.    As set forth above, Washington Post and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, each of the Individual Defendants is liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period when the artificial inflation was released from Washington Post common stock, as detailed herein.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action and designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## XVI.  JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  June 24, 2011                ROBBINS GELLER RUDMAN
                                     & DOWD LLP


                                     _____
                                     /s/ ROBERT J. ROBBINS
                                     ROBERT J. ROBBINS

                                     DAVID J. GEORGE (*pro hac vice*)
                                     ROBERT J. ROBBINS (*pro hac vice*)
                                     120 E. Palmetto Park Road, Suite 500
                                     Boca Raton, FL  33432
                                     Telephone:  561/750-3000
                                     561/750-3364 (fax)
                                     Email:  dgeorge@rgrdlaw.com
                                     Email:  rrobbins@rgrdlaw.com

                                     *Attorneys for Lead Plaintiff*

DATED:  June 24, 2011                LAW OFFICE OF ROGER M. ADELMAN


                                     _____
                                     /s/ ROGER M. ADELMAN
                                     ROGER M. ADELMAN

                                     ROGER M. ADELMAN  (DC Bar No.  056358)
                                     1100 Connecticut Avenue, NW – Suite 730
                                     Washington, DC  20036
                                     Telephone:  202/822-0600
                                     202/822-6722 (fax)
                                     Email:  radelman@erols.com

                                     *Local Counsel for Lead Plaintiff*

                                     SULLIVAN, WARD, ASHER & PATTON, P.C.
                                     MICHAEL J. ASHER
                                     15800 Northwestern Highway
                                     1000 Maccabees Center
                                     Southfield, MI  48075
                                     Telephone:  248/746-0700
                                     248/746-2760 (fax)

                                     *Additional Counsel for Lead Plaintiff*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 24, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.  The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this notice as service of this document by electronic means.

*/s/ Robert J. Robbins*
ROBERT J. ROBBINS