# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**PLUMBERS LOCAL #200 PENSION FUND,**
individually and on behalf of all others
similarly situated,

           **Plaintiff,**

    **v.**

**WASHINGTON POST COMPANY,**
**DONALD E. GRAHAM,**
**HAL S. JONES,**

          **Defendants.**

Civil Action No. 10-cv-01835 (BJR)

**ORDER ON MOTION TO DISMISS**

This matter is before the court on **Defendants' Motion to Dismiss** [Docket No. 17; Filed August 26, 2011] ("Motion to Dismiss") and **Defendants' Request for Judicial Notice** [Docket No. 18; Filed August 26, 2011] ("Motion for Notice"). Pursuant to the briefing schedule approved by the court, Plaintiff filed responses in opposition to the Motions on October 11, 2011 [Docket Nos. 21 & 22], and Defendants filed replies on November 9, 2011 [Docket Nos. 24 & 25]. The Motions have been fully briefed and are ripe for resolution. Having reviewed the pleadings relevant to these issues and being fully informed,

IT IS HEREBY **ORDERED** that the Motion to Dismiss is **GRANTED**; the Motion for Judicial Notice is **DENIED as moot**.

## I. Factual Background

Plumber's Local #200 Pension Fund is the lead Plaintiff in a putative federal securities fraud class action suit brought pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act and Securities Exchange Commission Rule 10b-5. Defendant Washington Post ("WPO") is the parent company of Kaplan, Inc. ("Kaplan"). Among Kaplan's holdings is Kaplan Higher Education Corp. ("KHE"), a private for-profit college with approximately seventy campuses nationwide. Defendant Donald E. Graham is the Chairman of the Board and CEO of WPO. Defendant Hal S. Jones is the Senior Vice President and CFO of WPO. The lawsuit addresses dramatic decreases in the value of WPO stock in temporal proximity to revelations that the Department of Education ("DOE") and elected officials were investigating admissions and financial aid fraud throughout the for-profit college industry.

During the Class Period, which is pled as July 31, 2009 through August 13, 2010, Plaintiff alleges that Defendants "fail[ed] to disclose that WPO's business was driven by illegal predatory enrollment practices" and provided "false statements behind WPO's financial performance and future business prospects." *Plaintiff's Opposition* [#21] at 12. More specifically, Plaintiff contends that the individually named "Defendants misrepresented the true nature, cause, and driving force behind WPO's education division's financial performance during the [Class Period]." *Id.*

The allegations of fraud and falsity during the Class Period are manifest. To summarize,

> the Complaint explains, through 22 confidential witnesses as well as sworn testimonies of two former employees, how during the Class Period Defendants misled investors through a series of calculated statements attributing WPO's positive (or less negative) financial performance to

2

legitimate business practices and growth at Kaplan and KHE.  Only when
government authorities investigated and reported on numerous questionable
practices in the for-profit education industry – practices that were standard,
company-wide and top-down at KHE – were market expectations corrected as
the artificial inflation was stripped from WPO's stock price.

*Id.* at 13-14.

## II.  Standard of Review

To state a private securities fraud claim, a complaint must sufficiently plead that:  (1)

there was a material misstatement or omission; (2) made with scienter, i.e., an intent to

defraud; (3) in connection with the sale or purchase of security; (4) that was relied upon by

plaintiffs; (5) which resulted in economic loss; and (6) that loss was caused by the material

misstatement or omission.  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  To

curb potentially abusive lawsuits, motions to dismiss claims related to securities fraud are

reviewed under the standard prescribed by the Private Securities Litigation Reform Act

("PSLRA").  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1054-55 (9th

Cir. 2008).  This heightened pleading standard exceeds those set forth in Fed. R. Civ. P. 8 &

9.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313, 317 (2007).  In

particular, a pleading must "specify each statement alleged to have been misleading [and] the

reason or reasons why the statement is misleading" and must "state with particularity facts

giving rise to a strong inference that the defendant acted with the required state of mind."  15

U.S.C. § 78u-4(b)(1), (2).

In performing the relevant analysis, the court must accept all factual allegations in the

complaint as true.  *Tellabs*, 551 U.S. at 322.  The court must also "consider the complaint in

its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6)

motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[1]  *Id.*  In relation to scienter, "[t]he inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter."  *Id.* at 323.  This consideration necessarily requires the court to consider all inferences, both for and against plaintiffs' claims. *Id.* at 323-24.  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

### III. Analysis

Sufficient allegations of scienter are necessary to plead securities fraud.  Scienter requires a showing that Defendants intended "to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 188 (1976).  The D.C. Circuit has defined scienter as "[e]ither intentional wrongdoing or 'extreme recklessness.'" *Liberty Prop. Trust v. Republic Props. Corp.*, 577 F.3d 335, 342 (D.C. Cir. 2009) (citation omitted).  While extreme recklessness is a lesser form of intent, it is not a "'should have known' standard." *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 639 (D.C. Cir. 2008) (citation omitted).  Rather, extreme recklessness can only be shown where there  is an "extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."

---

[1] To the extent that a dispute exists regarding the type of information the court may take judicial notice of here, see *Defendants' Motion for Notice* [#18], while the court may take judicial notice of the majority of documents put forth by Defendants, the court finds it unnecessary to resolve the parties' dispute.  Because the court limits its analysis to the issue of scienter, which issue is sufficiently fleshed out in the Complaint, the Motion for Notice is denied as moot.

*SEC v. Steadman*, 967 F.2d 636, 641 (D.C. Cir. 1992) (citation omitted).  Stated another way, scienter can only be shown where "the danger was so obvious that the actor was aware of it and consciously disregarded it."  *Dolphin*, 512 F.3d at 639.

To determine whether a "strong inference of scienter" exists, the court "engage[s] in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged."  *Tellabs*, 551 U.S. at 314. To this end, "[a]n inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct."  *Id*.  In such a case, the allegations fail to satisfy the stringent pleading requirements of the PSLRA.

The parties address six core allegations contained in the Complaint that speak to the issue of scienter.  Specifically, Plaintiffs contend that the following allegations supply a strong inference of scienter:

(1) The twenty-two confidential witness statements consistently reference company-wide or "top-down" policies relating to abusive and/or improper recruiting and financial aid practices, mandatory quotas, and employee compensation;

(2) Defendant Graham attended several Compensation Committee meetings during the relevant class period and Kaplan/KHE executives attended other meeting and calls during this same time;

(3) "[D]ata was monitored closely at WPO and Kaplan," *Plaintiff's Opposition* [#21] at 52, which included information related to enrollment, financial aid, and anonymous employee complaints regarding enrollment practices at KHE;

(4) The individually named Defendants were the employees designated by WPO to communicate with the market and to sign public financial disclosures related to Kaplan;

(5) Kaplan, of which KHE is a part, is the core business of WPO; and

(6) Soon after expiration of the Class Period, Kaplan implemented the "Kaplan Commitment" program to address admissions practices and released its admissions script for public review.  The post-Class Period publication of poor rates of financial aid payback at several KHE schools also evidences knowledge during the Class Period.

In addition, the parties address the absence of one particular allegation typically related to scienter.  Specifically, Defendants note that the Complaint does not plead evidence of any suspicious stock sales by the individually named Defendants during the relevant Class Period.  Frequently, the court is tasked with determining whether such sales supply an inference in favor of finding scienter.  In that context, the mere existence of suspicious stock sales is not viewed as providing dispositive proof of scienter.  *See In re Fed. Nat'l Mortg. Ass'n Sec., Deriv. & ERISA Litig.*, 503 F. Supp. 2d 1, 3 n.1 (D.D.C. 2007) ("*Fannie Mae I*").  Similarly, the lack of allegations of suspicious stock sales is not dispositive of whether Plaintiff's Complaint, as a whole, supplies sufficient allegations of scienter.  *Tellabs*, 551 U.S. at 325.  Nevertheless, the lack of such allegations supplies an opposing inference that factors into the court's comparative analysis.  *See, e.g.*, *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1253 & n.3 (11th Cir. 2008); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1177-78 (C.D. Cal. 2007).

As a preliminary matter, other than the allegations regarding Defendant Graham's attendance at several Kaplan Compensation Committee meetings and a statement made by

6

him at a stockholder meeting, Plaintiff points to no specific conduct that speaks to the personal knowledge of the individually named Defendants.  The essence of the inference that Plaintiff asks the court to draw is that the individually named Defendants' position of authority over Kaplan and KHE means that they must have known of the pervasive misconduct or that they recklessly disregarded warning signs that would have led to their actual knowledge.  Were the court to adopt the standard urged by Plaintiff, all high-ranking individuals would be at risk of being pled into a federal securities fraud lawsuit.  Given the heightened pleading standard articulated by the PSLRA, Plaintiff's general proposition cannot stand.  *See In re Fed. Nat'l Mortg. Ass'n Sec., Deriv. & ERISA Litig.*, 503 F. Supp. 2d 25, 40(D.D.C. 2007) ("*Fannie Mae* II") ("[S]cienter cannot be inferred solely because a defendant is a corporate officer.").  Nevertheless, an employee's position may provide an inference of scienter that, when viewed with other allegations, tips the balance from a general inference, to a strong inference.  Accordingly, the court considers the allegations and the inferences each party asks the court to draw stemming from those allegations.

### A.    Confidential Witnesses

The confidential witness statements describe a company-wide policy of abusive or unethical admissions and financial aid practices.  *See Complaint* [#14] at 15-25.  The statements also describe witnesses' beliefs that their compensation was tied to their ability to successfully carry out these questionable practices.  *See id.* at 38-69.  The witnesses noted that Kaplan management encouraged and pressured their employees to engage in such practices by, among other things, forcing them to use a script that played on the fears of potential students and firing employees who did not meet enrollment quotas.  *See id.* at 55-57

7

Although no witness attributes any knowledge directly to the individually named Defendants or specifically identifies any interaction with them during the relevant time period,[2] Plaintiff contends that because the witness statements are uniform and come from various employment levels within Kaplan, there is virtually no way the individually named Defendants were not also aware of and/or encouraging such practices. *See Plaintiff's Opposition* [#21] at 50-52.

By contrast, Defendants emphasize the lack of allegations that the witnesses ever interacted with the individually named Defendants or that any witness had information that could speak to the individually named Defendants' scienter during the Class Period. *Motion to Dismiss* [#17-1] at 28; *see infra* note 2. Given that the witnesses' information references Kaplan and KHE practices, and the fact that the individually named Defendants did not work for either subsidiary, Defendants argue that "[t]here is no reason why as a matter of course [WPO] management should know – let alone any fact suggesting that they actually did know – of alleged wrongdoing on the ground at KHE." *Id.* at 29-30; *see also Defendants' Reply* [#24] at 11 (recognizing that "[n]ot one of the confidential witnesses is alleged to have had any contact with the individually named defendants concerning KHE's business in general, much less the allegedly improper practices in particular").

---

[2] The only confidential witness that alleges individual contact with a Defendant is confidential witness #2. That witness was employed by Kaplan from 2005-2010. Although the witness claims to have assisted Defendant Jones at some point during his/her tenure, the Complaint does not specify that this occurred during the Class Period. *See Complaint* [#14] at 16-17. Defendants argue that regardless of when the interaction occurred, any statement attributed to this witness should be disregarded because the witness does not attribute any knowledge to Defendant Jones regarding the alleged fraud. *Motion to Dismiss* [#17-1] at 28-29.

Moreover, in relation to the alleged script that Plaintiff contends evidences KHE's fraudulent admissions scheme, Defendants argue that absent specific allegations that the individually named Defendants were aware of the script (of which there are none), "[s]enior [WPO] executives could hardly be expected to review recruiting documents used at a second-level subsidiary." *Defendants' Reply* [#24] at 11.   Further, given the lack of allegations tying the individually named Defendants to the script, Defendants argue that it is a more reasonable inference that, if such a script existed, Defendants were not aware of it.

After considering the parties' arguments and reviewing the relevant allegation, the court agrees with Defendants that the allegations are insufficient to supply an inference of scienter.   The court is particularly persuaded by the fact that the witness statements speak only to an alleged predatory scheme, assuming the allegations are true, that was encouraged by KHE and Kaplan.   No witness is able to attribute any knowledge of this scheme to the individually named Defendants.   Therefore, the inferential leap Plaintiff asks the court to make regarding executives two levels above where the alleged conduct was prevalent is tenuous, at best.   Without corroborative allegations regarding the individually named Defendants' knowledge, such allegations do nothing to tip the balance in favor of finding a strong inference of scienter.   *See, e.g.*, *Metzler*, 540 F.3d at 1069 n.13 (noting that "[t]he problem . . . is not that the confidential witnesses are inadequately identified – the problem is that these witnesses do not convey information sufficient to support a strong inference of scienter that the PSLRA requires").[3]

_____

[3] The court is particularly mindful of the holding in *Metzler*.   That case also dealt with allegations of securities fraud committed by executives of a for-profit college.   There, the Ninth Circuit found that despite several witnesses' interactions with the individually named Defendants and

The inference that the individually named Defendants should have known what was happening at KHE based on the witness statements or the prevalent use of an alleged script is insufficient.  *See generally SEC v. Shanahan*, 646 F.3d 536, 544-45 (8th Cir. 2011).  The lack of witness statements tying knowledge of the questionable practices or scripts to the individually named Defendants is a hurdle Plaintiff has not met.  *See, e.g.*, *Mizzaro*, 544 F.3d at 1247-49 (holding that, regardless of widespread fraud, the failure of witnesses to tie knowledge of the fraud to individually named defendants prohibited finding of scienter); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 141-42 (D. Conn. 2007) (recognizing the difficulty of finding scienter when no witness can attest to knowledge of individually named defendants).  In other words, to the extent that Plaintiff "seek[s] to establish scienter through an assumption that Defendants knew what their employees knew, this is inadequate."  *In re Apollo Group*, 2011 WL 5101787, at *15 (holding that despite the detailed and numerous confidential witness statements describing the alleged fraud, "[n]one of these [witnesses] actually indicate any scienter on Defendants' part" and therefore cannot supply a strong inference of scienter).

### B.    Executive Meetings

---

their attribution of knowledge to them based on that specific interaction, a strong inference of scienter was not pled.  *See Metzler*, 540 F.3d at 1058, 1067-69.  This holding is compelling for two primary reasons.  First, the allegations in *Metzler* created a closer link between the witnesses and the individually named Defendants.  Second, the executives in *Metzler* were actually employed by the college and were far more involved in the day-to-day operations of the company than has been alleged here.  The court also notes similar holdings regarding similar allegations in cases involving the for-profit college industry.  *See, e.g.*, *In re Appollo Group, Inc. Sec. Litig.*, Nos. CV-10-1735, -10-2044, -10-2121, 2011 WL 5101787 (D. Ariz. Oct. 27, 2011); *In re Lincoln Educ. Servs. Corp. Sec. Litig.*, No. 10-460, 2011 WL 3912832 (D.N.J. Sept. 6, 2011); *see also Gaer v. Am. Pub. Educ.*, No. 10-cv-81, slip. op. (N.D.W. Va. Dec. 8, 2011).

Plaintiff alleges that Kaplan executives participated in several meetings and conference calls where admissions and financial aid practices were discussed. *See Complaint* [#14] at 46. The only allegation relating to any of the individually named Defendants' participation relates to Defendant Graham's attendance at Kaplan Compensation Committee meetings on two occasions. *See id.* Plaintiffs contend, without any factual support, that the subject of those meetings included employee compensation of low-level KHE employees in relation to their admissions quotas. From these allegations, Plaintiff asks the court to infer that the participation of the individually named Defendants or their agents in meetings or calls where questionable admissions and enrollment compensation practices were discussed equates to scienter.

By contrast, Defendants argue that the Complaint does not contain any factual basis for the inference that the compensation of low-level KHE admissions employees was discussed at the two meetings attended by Defendant Graham. *Motion to Dismiss* [#17-1] at 30. Rather, Defendants contend that the more plausible inference for the court to draw from Defendant Graham's participation is that the meetings involved discussions regarding the compensation of higher-level executives. *Id.* at 31. Defendants contend that even assuming that the meetings involved compensation paid to low-level admissions employees of KHE, there is no factual basis for the inference that Plaintiff asks the court to draw, i.e., that Defendant Graham or other executives correlated the practices discussed with fraud. *See id.* Defendants also point out that Kaplan and KHE managements' participation at meetings and conference calls allegedly referencing admissions and financial aid practices does not equate to scienter of the individually named Defendants. Moreover, Defendants contend that even if

11

the individually named Defendants had knowledge of "a plan compensating admissions employees based only on enrollments," there is no allegation that these individuals in particular knew that such a practice would violate DOE regulations.   *Defendants' Reply* [#24] at 7.   In short, Defendants contend that there is no basis for the inference that Defendant Graham's participation at two compensation committee meetings and Kaplan and KHE executives' participation at other meetings and conference calls during the Class Period equates to scienter to the individually named Defendants of the alleged fraud.

Considering the parties' arguments, the court concludes that the allegations relating to Defendant Graham's participation at two Kaplan Compensation Committee meetings, and Kaplan/KHE executives' participation at other meetings where the allegedly improper scheme was discussed, only get Plaintiff so far.   The court finds that as the allegations relate to Defendant Graham's specific conduct, the Complaint fails to provide sufficient detail regarding the information he received at those meetings and how such information informed him of the alleged fraud.   On this point, the D.C. Circuit provides clear guidance on how to view information gained from participation in committees.   *See Fannie Mae* II, 503 F. Supp. 2d at 40-41. In essence, Plaintiff asks the court to infer that Defendant Graham was informed of the alleged fraud during the meetings, but does not explain what he learned, from whom he learned it, and how he responded to it.   Absent sufficient allegations of this nature, Defendant Graham's participation does not supply a strong inference of scienter.   *See id.*; *see also Metzler*, 540 F.3d at 1069 (noting that "a plaintiff cannot avoid dismissal by reliance on an [isolated allegation] that stands in contrast to a host of other insufficient allegations" (emphasis in original)).

12

The allegations related to other Kaplan and KHE executives' participation fare no better. They do not sufficiently detail those individuals' knowledge nor most importantly do they provide the necessary link from those individuals to the individually named Defendants. Assuming that the Kaplan and KHE executives had sufficient knowledge of the questionable practices, at best the allegations give rise to an inference that the individually named Defendants were negligent for not also deriving this information. Negligence is not enough. *Fannie Mae* II, 503 F. Supp. 2d at 40-41; *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999) ("[A]llegations that a securities fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate . . . ." (citation omitted)).

## C.   Data Monitoring

Plaintiff alleges that Kaplan employed sophisticated data tracking systems related to admissions and financial aid. Specifically, the systems tacked employee enrollment numbers and quota goals. An additional system tracked internal employee complaints regarding KHE's enrollment practices. Plaintiff alleges that these records demonstrated "the results of Kaplan's predatory business practices" and were "available to approximately 800 employees, ranging from the Kaplan's top executives, including Kaplan CEO and Chairman Rosen and KHE CEO Conlon." *Complaint* [#14] at 67-68. Plaintiff also alleges that the data was discussed at weekly Kaplan board meetings and quarterly executive meetings attended by Kaplan executives. *Id.* at 68. Thus, from these allegations, Plaintiff asks the court to infer that the alleged predatory practices "were well known within the Company's Kaplan

13

division, both by the rank and file employees and by the executives, including the Individual

Defendants." *Id.* at 69.

By contrast, Defendants point to the obvious flaw in Plaintiff's allegations, namely

that the individually named Defendants are not alleged to have actually reviewed any data

which would have allegedly tipped them off to the fraud. *See id.* at 31-32. Defendants also

contend that the data monitoring allegations are not sufficiently detailed to prompt the

conclusion that Plaintiff would have the court draw, i.e., that Kaplan or KHE executives

discussed the data at the meetings and correlated a particular fraudulent meaning to it. *Id.* at

32. Further, Defendants note the absence of any allegation that the individually named

Defendants had access (as WPO executives) to the data-monitoring systems at Kaplan and

KHE that Plaintiff claims reveal the fraud. *Defendants' Reply* [#24] at 14.

On balance, the court finds that allegations that data tracking systems exposing the

fraud were in place and were being closely monitored do not speak to whether the

individually named Defendants monitored or were made aware of such data. Although

Plaintiff alleges that WPO and specifically, the individually named Defendants did monitor

such data, there is no corroborating factual support for this assertion. Further, even if such

allegations existed, "corporate management's general awareness of the day-to-day workings

of the company's business does not establish scienter – at least absent some additional

allegation of specific information conveyed to management and related to the fraud."

*Metzler*, 540 F.3d at 1068 (noting that the "more 'cogent and at least as compelling'"

inference is that the company "maintained its information tracking systems for the necessary

and legitimate purpose of running its business" (citation omitted)).

### D.      Market Designees

Plaintiff alleges that because the individually named Defendants were the WPO designees to speak to the market about Kaplan and KHE, including the individuals tasked with verifying and endorsing publicly filed materials, this involvement equates to scienter. *Plaintiff's Opposition* [#21] at 55.  In its opposition on this point, Plaintiff does not direct the court to any specific allegation in the Complaint regarding the individually named Defendants' market interactions, or the contents thereof, but does note the Complaint's allegation that the individually named Defendants each signed certifications attesting to the correctness of WPO's public filings, which included information about Kaplan and KHE. *See Complaint* [#14] at 13-14; 75-78, 82-86, 91-93.  A review of the Complaint also reveals references to Defendant Graham's participation at the UBS Global Media & Communications Conference during the Class Period wherein he noted strong enrollment growth at KHE and touted KHE's educational offerings. *Id.* at 79-80.

The Complaint also references Defendant Graham's comments made at a 2010 stockholders meeting wherein he noted the rapid enrollment growth at KHE and several student success stories.  Defendant Graham also referenced the DOE's investigation into the for-profit college industry and noted that the investigation raised legitimate concerns about the stability of financial aid repayments in the current economy.  *Id.* at 94-95.  Plaintiff contends that these collective public filings and statements were misleading because they hid "the true reasons behind the supposed 'strong enrollment growth' at Kaplan" and "omitted the fact that Kaplan was actively engaging in known unethical and illegal practices to both boost enrollments and circumvent" financial aid reporting requirements.  *Id.* at 96.  Plaintiff

contends that "Graham and other Defendants were well aware that the Company's Kaplan division was taking advantage of the down economy to further manipulate, deceive, and defraud prospective students in order to get them to enroll at KHE schools" and increase the value of WPO stock. *Id.* at 96-97.

By contrast, Defendants argue that the individually named Defendants' public statements and filings do not lead to an inference that they had knowledge of any fraud that they were withholding from the market. Moreover, Defendants contend that the statements were, in fact, accurate. The strong growth was attributable to increased enrollment. *See Motion to Dismiss* [#17-1] at 36-37. More specifically, Defendants argue that the statements made by Defendant Graham touting KHE's educational programs are unrefuted in the Complaint and amount to mere puffery, as opposed to material misstatements or omissions. *See id.* at 40-42. Absent specific allegations which speak to the individually named Defendants' knowledge that the facts they were giving or were averring to were false (of which there are none), Defendants maintain that its not plausible to infer that the individually named Defendants' general knowledge of Kaplan and KHE business details means that they "would drill down on 'small-bore details' about enrollment practices at a second-level subsidiary." *Defendants' Reply* [#24] at 14 (citation omitted).

Considering the parties' arguments, the court concludes that Plaintiff's allegations that the individually named Defendants were the designees to communicate with the market and were the signatories on public filings do not lead to finding a strong inference of scienter. Equating scienter to public filings would eviscerate the heightened PSLRA requirements and establish scienter in every case where there is an error or mistake in a

publicly filed document. *See Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006). Such filings only become probative where the statements contained therein are "glaring[ly]" suggestive of fraud. *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 545 (5th Cir. 2008) (citation omitted). Here, the court notes that correlations between increased revenue and enrollment growth in the public filings and statements were technically accurate. While crediting Plaintiff's contention that such statements did not tell the whole picture, they were not glaringly fraudulent. Further, while Defendant Graham's statement to stockholders that he was concerned about low repayment rates of financial aid in the for-profit college industry may be one of Plaintiff's most compelling allegations of scienter, "[v]iewing the [Complaint] in its totality, . . . this statement does not raise a 'strong inference' of scienter." *Metzler*, 540 F.3d at 1069 (recognizing that heightened PSLRA standard cannot be met by one statement that is "not so indicative of fraudulent intent that it carries the weight of the entire 181-page complaint for purposes of establishing a 'strong inference' of scienter").

E.      **Core Business**

Plaintiff contends that because Kaplan and KHE account for a significant share of WPO's overall business, the court should reasonably infer that the individually named Defendants were heavily involved in these subsidiaries' operations and thus had knowledge of the alleged fraud being perpetrated there. *Plaintiff's Opposition* [#21] at 57. Specifically, Plaintiff alleges that "Kaplan was not a far flung subsidiary, as Defendants would have this Court now believe. To that end, Kaplan accounted for between 57.3% and 62.2% of the Company's total revenues throughout the Class Period." *Id.* at 58 (citing *Complaint* [#14] at

17

37-38).   In light of that, Plaintiff contends that "the strong inference is that WPO's top executives, including the Individual Defendants, knew the truth about how Kaplan and, in turn, how WPO made their living." *Id.* at 59.

Defendants respond that the more compelling inference the court should draw from Kaplan's success is that WPO executives allowed Kaplan and KHE executives free reign to continue to conduct the business as they saw fit, without constraint from the ultimate parent company.   *See Motion to Dismiss* [#17-1] at 30.   Moreover, Defendants challenge the viability of the "core business" theory, noting that it has never been adopted in this Circuit. *Defendants' Reply* [#24] at 15.   Defendants ask the court to consider the fact "[t]hat the alleged practices here occurred at a second-level subsidiary" which weakens any assertion that Kaplan's importance should factor into the question of the individually named Defendants' scienter. *Id.* at 16.

As to this issue, the court finds that Plaintiff's characterization of the core business inquiry as a well settled basis for inferring scienter is misleading at best.   As an initial matter, this is an "'exceedingly rare[ly]' used doctrine [which] has not been recognized by this Circuit." *Stevens v. InPhonic*, 662 F. Supp. 2d 105, 121 n.8 (D.D.C. 2009).   Moreover, since the enactment of the PSLRA, several Courts of Appeals have held that the doctrine has been significantly narrowed.   *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000-01 (9th Cir. 2009); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867-68 (5th Cir. 2003).   Even if applicable, "courts have required that the operation in question constitute nearly all of a company's business before finding scienter based on [this] doctrine." *Tyler v. Liz Claiborne, Inc.*, ___ F. Supp. 2d ___, 2001 WL 4498983, at *16 (S.D.N.Y. Sept. 29, 2011).

Although Kaplan, and to a lesser extent KHE, account for a significant portion of WPO's revenue, there is no allegation, nor could there be, that the practices at issue accounted for nearly all of WPO's revenues.  Regardless of the core business doctrine's application, where as here, Plaintiff's allegations rest on convincing the court that WPO executives were aware of admissions and financial aid practices occurring on the ground at a subsidiary of a subsidiary, it is not enough to contend that those executives should have known what was happening based merely on the value of KHE to Kaplan and, in turn, Kaplan to the ultimate parent.  *See Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 490 (S.D.N.Y. 2010).

## F.    Post-Class Period Conduct

Plaintiff contends that investigations and changed practices that occurred in the post-Class Period "bolster the Complaint's particular allegations of Defendants' scienter." *Plaintiff's Opposition* [#21] at 60.  For example, Plaintiff argues that the DOE published financial aid repayment rates attributable to KHE from 2008.  Many of those rates were substantially lower than those of other for-profit institutions.  Plaintiff contends that "[w]hile the above information was not revealed to the market until September 2010, it was undoubtedly known to Defendants throughout the Class Period." *Complaint* [#14] at 110-11. Plaintiff also points to the September 2010 creation of the "Kaplan Commitment" program which provided a grace period for students to enroll and take courses prior to paying tuition. *Id.* at 111.  Plaintiff contends that the "implementation of this program was an inherent admission of Defendants' fraud."  *Id.*  From these events, Plaintiff argues that the court can

infer that the individually named Defendants were well aware of the alleged fraud during the Class Period.

By contrast, Defendants argue that "nothing in the news articles or investigations in this case reveals anything about Mr. Graham or Mr. Jones' state of mind during the class period." *Defendants' Reply* [#24] at 10-11. Indeed, the court notes that Plaintiff asks the court to infer knowledge to individually named Defendants during the Class Period from figures related to conduct that occurred prior to the Class Period and which were only known to DOE prior to their publication after the Class Period. Moreover, Defendants argue that remedial measures taken by Kaplan cannot be used to infer scienter to the individually named Defendants. First, Defendants argue that it "is not remotely indicative of *anyone's* knowledge of improper practices during the class period." *Id.* at 17. Second, Defendants argue that "[f]ar more plausible is the inference that those who would go so far to assist students in making an informed decision were unaware of widespread practices intended to deceive and manipulate potential students – in short, they were acting in good faith all along." *Id.* Moreover, Defendants argue that using the program as evidence of scienter "distorts that program beyond recognition" and should not be reasonably inferred to "evidence . . . scienter on the part of senior executives at KHE, much less at [WPO]." *Id.*

On reviewing Plaintiff's proffered information concerning post-Class Period revelations regarding financial aid repayment rates at several KHE schools and Kaplan's near immediate creation of the "Kaplan Committment" program, the court concludes that Defendants' proposed inferences are more plausible. Data from before the Class Period and creation of a post-Class Period program by Kaplan (as distinct from WPO), prompts the

court to infer little, if nothing, about the individually named Defendants' state of mind during the Class Period.  Where, as here, Plaintiff fails to provide "any corroborating details to indicate that [the post-Class Period conduct] revealed company wide fraud, or that Defendants were aware of the fraud during the Class Period, . . . these post-Class Period [events] do not rectify the lack of scienter pled elsewhere." *Metzler*, 540 F.3d at 1068 n.12.

### G.      Allegations of Motive

Finally, Plaintiff contends that the lack of suspicious stock sales by the individually named Defendants is irrelevant to the question of whether, considering all of the other allegations, there is a strong inference of scienter.  *See Plaintiff's Opposition* [#21] at 60-61. By contrast, Defendants argue that the lack of stock sales cannot be ignored and make the heightened burden borne by Plaintiff even more difficult to meet.  *Defendants' Reply* [#24] at 18.

The court is persuaded by Defendants' argument.  As noted above, "[t]he lack of *any* tangible, personal benefit [from suspicious stock sales] here . . . weighs against the Officer Defendants having scienter."  *In re Wet Seal*, 518 F. Supp. 2d at 1178.  While the lack of stock sales during the class period is not dispositive, as other courts have noted, the lack of these allegations requires that the strength of pro-scienter allegations be "correspondingly greater."  *ECA v. JP Morgan Chase Co.*, 553 F.3d 187, 198-99 (2d Cir. 2009) (citation omitted).  In other words, where there are no suspicious stock sales, the more plausible inference from that fact is "that there was no insider information from which to benefit." *Metzler*, 540 F.3d at 1067.

## IV.  Conclusion

21

Considering the allegations collectively, the court finds that the inference of scienter fails when compared with any opposing inference.  *See Tellabs*, 551 U.S. at 325.  Rather, the opposing inferences emanating from the conduct at issue by far outweigh those that Plaintiff asks the court to draw.   Despite Plaintiff's citation to opposing authority from other courts at each step of the analysis, this court is not persuaded that these facts prompt similar treatment. Read in its totality, the Complaint does not sufficiently allege that Defendants knowingly or recklessly misled the market.   Therefore, the court concludes that Plaintiff has failed to allege sufficient facts to hold Defendants culpable.  Because the court finds that the lack of a strong inference of scienter is dispositive, the court need not consider Defendants' remaining bases for dismissal.  *See In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 178 n.10 (D.D.C. 2007).   Therefore, Plaintiff's securities fraud claim must be dismissed. *See, e.g.*, *id.* at 187.

Moreover, this holding necessarily means that Plaintiff's control-person claim against the individually named Defendants likewise fails.  *See SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 279 (3d Cir. 1992); *see also Fannie Mae* II, 503 F. Supp. 2d at 43-46 (noting that to state a control-person claim "plaintiffs must adequately plead 'culpable participation,'" i.e., that the individually named defendants acted with a sufficient state of mind).   Accordingly,

IT IS HEREBY **ORDERED** as follows:

(1) Defendants' Motion to Dismiss is **GRANTED** and the case is **DISMISSED with prejudice**; and

(2) Defendants' Motion for Notice is **DENIED as moot**.

Dated:  December 23, 2011

_____
BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE