UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PLUMBERS LOCAL #200 PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | Civil No.:1:10-cv-01835-PLF |
| | CLASS ACTION |
| Plaintiff, | DEMAND FOR JURY TRIAL |
| vs. | |
| THE WASHINGTON POST COMPANY, DONALD E. GRAHAM and HAL S. JONES, | |
| Defendants. | |

## [PROPOSED] AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

I. INTRODUCTION AND NATURE OF THE ACTION .................................................1

II. JURISDICTION AND VENUE ..............................................................................8

III. PARTIES ..........................................................................................................8

IV. CLASS ACTION ALLEGATIONS .........................................................................10

V. CONFIDENTIAL SOURCES ................................................................................12

VI. SUBSTANTIVE ALLEGATIONS .........................................................................24

    A. Introduction ...........................................................................................24

    B. Washington Post's Business Model Depends on Maximizing the Amount of Financial Aid Obtained by Kaplan Students, Regardless of Their Ability to Ever Repay It ..........................................................................25

        1. The For-Profit College Business Model Places Low-Income Students in High-Cost Schools ...................................................25

        2. The Vast Majority of For-Profit College Revenue Comes From Federal Student Aid .......................................................................27

    C. The HEA Provides Eligibility Criteria that an Institution Must Meet in Order to Participate in the Federal Student Aid Programs .....................28

        1. Incentive Compensation for Recruiters Is Not Permitted ..........29

        2. Substantial Misrepresentations Are Prohibited ..........................30

        3. Kaplan Is Required to Keep Cohort Default Rates Under 25% ...31

        4. Kaplan Must Comply With the 90/10 Rule ................................32

        5. Kaplan Must Prepare Its Students For Gainful Employment ......32

        6. Kaplan Must Promptly Disburse Federal Student Aid Funds to Students ....................................................................................33

        7. Kaplan Must Meet State Authorization and Accreditation Requirements ..............................................................................33

        8. Other "Applicable Laws" ............................................................34

| | | | |
|---|---|---|---|
| D. | | At All Relevant Times, Kaplan Generated the Majority of Washington Post's Revenues | 36 |
| E. | | Washington Post's Kaplan Was All A "Numbers Game" | 37 |
| | 1. | The Company's Sales Machine Included an Army of Kaplan Admissions Advisors Stationed In Warehouse-Sized Call Centers | 38 |
| | 2. | Like A Boiler Room, Admissions Advisors Were Under Intense Pressure to Meet "Enrollment Quotas" | 39 |
| | 3. | Admissions Advisors' Employment Status Was Directly Tied to Enrollment Numbers | 43 |
| | 4. | Admissions Advisors' Compensation was Directly Tied to Enrollments | 45 |
| F. | | In Order to Artificially Inflate the Company's Financials, Defendants Endorsed and Oversaw Unethical Recruiting Practices | 46 |
| | 1. | "Uncovering the Pain and the Fear – Creating Urgency" – Kaplan's Scripts | 56 |
| | 2. | Kaplan Works the System, and Its Students, In Order to Obtain Financial Aid Awards | 58 |
| G. | | Ability to Benefit - Kaplan Takes One Step Forward and Two Steps Back | 60 |
| H. | | Kaplan's Improper Practices Throughout the Class Period Were Orchestrated to Circumvent the Requirements of the 90/10 Rule | 61 |
| I. | | Kaplan Skirts DOE Reviews | 65 |
| J. | | The GAO Investigates Kaplan, Prompting the Company's Education Division to Dramatically Change Its Practices | 66 |
| | 1. | The GAO Visit to the Pembroke Pines Campus | 66 |
| | 2. | The Impact of GAO Report – Kaplan Scrambles to Minimize the Damage | 67 |
| K. | | The Florida Attorney General Investigates Kaplan, and Reveals the Sworn Testimony of Two Former Kaplan Admissions Advisors | 69 |
| L. | | Throughout the Class Period, Defendants Had Knowledge of and Endorsed Kaplan's Fraudulent Scheme | 71 |
| | 1. | Kaplan Provided Washington Post With Daily Cash Transfers - Except on Days When It Was Violating the 90/10 Rule. | 71 |

|  | 2. | Defendants Actively Lobbied for Less Stringent Department of Education Guidelines .......................................................................................74 |

|  | 3. | Federal Whistleblower Actions Put Defendants on Notice of the Wrongful Misconduct Alleged Herein........................................................75 |

|  | 4. | Kaplan's Extensive Reporting Systems Provided Defendants With Knowledge of Kaplan's Predatory Business Model .................................77 |

VII. DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD .........................................................................80

VIII. POST CLASS PERIOD EVENTS AND DISCLOSURES ............................................123

IX. DEFENDANTS' FALSE AND MISLEADING STATEMENTS REGARDING WASHINGTON POST'S BUSINESS CONDUCT AND ETHICS .............................133

X. ADDITIONAL SCIENTER ALLEGATIONS...............................................................135

XI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ...................................................................................................139

XII. LOSS CAUSATION/ECONOMIC LOSS ....................................................................139

XIII. NO SAFE HARBOR .......................................................................................................143

XIV. COUNT I: FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS .................................................................................................................144

XV. COUNT II: FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS ..................................................148

XVI. JURY TRIAL DEMANDED .........................................................................................149

1.     Lead Plaintiff Iron Workers Local No. 25 Pension Fund ("Plaintiff"), individually and on behalf of a proposed class (the "Class") of all purchasers of the publicly traded common stock of The Washington Post Company ("Washington Post" or the "Company") between July 31, 2009 and August 13, 2010, inclusive (the "Class Period"), by and through its undersigned counsel, brings suit against Washington Post, Donald E. Graham ("Graham") and Hal S. Jones ("Jones") (Graham and Jones are sometimes collectively referred to as the "Individual Defendants") (Washington Post, Graham, and Jones are collectively the "Defendants").

2.     Plaintiff seeks remedies under the Securities Exchange Act of 1934 (the "Exchange Act") as a result of the fraudulent scheme undertaken by Defendants and the economic loss suffered when the true facts were revealed to the public through a series of disclosure events. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

## I.     INTRODUCTION AND NATURE OF THE ACTION

3.     For decades, Washington Post operated as a well-known media company, most recognizable for its newspaper publication. Times, however, have changed. As set forth herein, the Company's very viability has become ever more reliant upon revenues generated by its education division. Specifically, Washington Post operates Kaplan, Inc. ("Kaplan"), what the Company describes as "one of the world's largest diversified providers of educational services." Of relevance here is Kaplan Higher Education ("KHE"), the Company's for-profit, post-secondary education division whose U.S. operations include more than 70 campuses in 20 states, as well as online offerings through Kaplan University.

4.     Put simply, throughout the Class Period, Kaplan was the financial lifeline that kept the Company from drowning from the poor performance of Washington Post's newspaper. To that end, as set forth herein, Kaplan provided daily cash infusions to Washington Post throughout the

Class Period despite the fact that doing so violated Kaplan's capital requirements necessary to maintain accreditation. What investors did not know, however, was that Defendants engaged in a fraudulent scheme designed to boost Kaplan's student enrollments, financial results, and future business prospects. The result of Defendants' fraudulent scheme was to artificially inflate the price of Washington Post stock during the Class Period.

5.     Defendants' fraud involved two layers of deceit. First, Defendants oversaw Kaplan's systematic use of predatory and deceptive recruiting and financial aid practices, among other things, specifically implemented for the purpose of boosting financial results in the Company's education division. Second, and most pertinent here, Defendants misrepresented the true nature, cause, and driving force behind Washington Post's education division's financial performance and future business prospects throughout the Class Period.

6.     The market learned of the pervasive fraud occurring at Kaplan through bits and pieces of information that became public during the Class Period. Following the close of the Class Period, additional information continued to seep out. For example, on February 6, 2011, excerpts from a Kaplan recruiting script - the Company-approved formula for convincing "prospects" (*i.e.*, potential students) to enroll and pay exorbitant tuition fees funded (almost exclusively) by federal financial aid dollars - became public. On the floor the United States Senate, the curtain was pulled back ever so slightly to demonstrate the level of deceit implemented in the Company's education division during the Class Period. The following quotes are excerpts from the Company's official Kaplan recruiting script (capitalization and emphasis in original):

> IT IS ALL ABOUT UNCOVERING THEIR <u>PAIN AND FEARS</u>. ONCE THEY ARE REMINDED OF HOW BAD THINGS ARE, THIS WILL CREATE A SENSE OF URGENCY TO MAKE THIS CHANGE.

<p style="text-align:center">*        *        *</p>

KEEP DIGGING UNTIL YOU UNCOVER THEIR PAIN, FEARS AND DREAMS. DO NOT ANSWER FOR THEM. <u>LET THEM PAINT THEIR OWN PICTURE</u>. IF YOU GET THE PROSPECT TO THINK ABOUT HOW TOUGH THEIR SITUATION IS RIGHT NOW AND IF THEY DISCUSS THE LIFE THEY <u>CAN'T</u> GIVE THEIR FAMILY BECAUSE THEY DON'T HAVE A DEGREE, YOU WILL DRAMATICALLY INCREASE YOUR CHANCES OF GAINING A COMMITMENT FROM THE STUDENT.

IF YOU CAN STIR UP THEIR EMOTIONS, YOU WILL <u>CREATE URGENCY</u>!

\*      \*      \*

IF YOU CAN HELP THEM UNCOVER THEIR TRUE PAIN AND FEAR. IF YOU GET THE PROSPECT TO THINK ABOUT HOW TOUGH THEIR SITUATION IS RIGHT NOW, IF YOU TALK ABOUT THE LIFE THEY CAN'T GIVE THEIR FAMILY RIGHT NOW BECAUSE THEY DON'T HAVE A DEGREE . . . YOU DRAMATICALLY INCREASE YOUR CHANCES OF ENROLLING THIS PROSPECTIVE STUDENT. GET TO THEIR EMOTIONS, AND YOU WILL CREATE THE URGENCY!

> -- Excerpts from Kaplan scripts, Senator Tom Harkin, Chairman of the Senate Committee on Health Education Labor and Pensions, Floor Statement, February 6, 2011.[1]

7.      Indeed during his February 6, 2011 speech on the floor of the U.S. Senate, Chairman Harkin specifically referred to Kaplan's official, internal sales script, demonstrating the Company ran Kaplan like a boiler-room sales machine, disguised as an institution of higher learning, focused on enrollment quotas and "numbers" above anything else. Discussing Washington Post's Kaplan on the U.S. Senate Floor, Harkin further stated:

Kaplan University also encourages its recruiters to focus on pain and fear. This is a page from a manual dated July 8, 2009. With side notes about "advisor call control" and maintaining "rapport with PROSPECT," the document is similar to ITT's with questions to "uncover the pain and fear." At the bottom, in big capital, bold letters is the takeaway message for staff. "It is all about uncovering their pain and fears. Once they are reminded of how bad things are, this will create a sense of urgency to make

---

[1] A true and correct copy of the Company's Kaplan recruiting script is attached hereto as **_Exhibit A_**.

this change." Sixteen pages of sales tactics later, the recruiter is taught to "restate back word for word, the better you restate the brighter the dream."

Another Kaplan document says "keep digging until you uncover their pain, fears and dreams. . . ." If you get the prospect to think about how tough their situation is right now and if they discuss the life they can't give their family because they don't have a degree, you will dramatically increase your chances of gaining a commitment from the student. "Get to their emotions and you will create the urgency!" According to the Department of Education 30 percent of student loan borrowers at Kaplan default within three years of leaving school.

8.     Despite the fact that these and other now-documented predatory practices drove the vast majority of the Company's Class Period revenue, Defendants publicly touted Kaplan as "exceedingly student centric" where "everything is focused on helping our students." What Defendants - who spoke knowingly about Kaplan during the Class Period - did not disclose, however, was that Kaplan was nothing more than a telemarketing machine that relied on collections agency tactics to manipulate, deceive, and mislead tens of thousands of people to enroll at Kaplan and incur substantial amounts of student loan debt that the Company knew (and did not care) that the students would never be able to repay. Employing virtual armies of salespeople disguised as "Admissions Advisors," the Company utilized several football field-sized call centers that ran 14 hours a day, seven days a week, to maintain and increase reported enrollments in Washington Post's education division by hounding and harassing potential students into enrolling.

9.     In stark contrast to Defendants' rhetoric, the reality is that Kaplan simply does not educate its students. The vast majority of Kaplan students drop out without ever completing their education, incurring tens of thousands of dollars in federal student loan debt along the way. Indeed, Washington Post's educational division – specifically Kaplan – was a market leader (unbeknownst to investors during the Class Period) in for-profit education drop out rates, ***with nearly 70% of its students leaving school after attending for a median time period of only 4.2 months***, as demonstrated in the chart below:

## Ten Highest Withdrawal Rates
### for Associates Programs
(Students enrolling between 8/08 and 7/09 as of 8/10)

| Institution | Total Students | % Completed | % Still Enrolled | % Withdrawn | Median Months Attended before Withdrawal |
|---|---|---|---|---|---|
| Bridgepoint | 7,931 | 1.2% | 14.4% | 84.4% | 3.7 |
| Lincoln | 6,160 | 15.5% | 14.6% | 69.9% | 4.3 |
| Kaplan | 33,324 | 12.5% | 18.4% | 69.1% | 4.2 |
| Corinthian | 44,436 | 6.9% | 26.6% | 66.5% | 4.1 |
| Apollo | 177,368 | 4.7% | 28.9% | 66.4% | 4.2 |
| Keiser | 9,041 | 12.0% | 23.0% | 65.0% | 7.1 |
| Ed. Mgmt. Corp. | 32,107 | 2.9% | 33.5% | 63.7% | 5.4 |
| Rasmussen | 7,758 | 7.8% | 29.2% | 63.0% | 5.5 |
| Career Ed. Corp. | 54,553 | 24.8% | 13.6% | 61.7% | 4.1 |
| Westwood | 2,541 | 17.0% | 25.5% | 57.6% | 4.4 |

10.     Washington Post, like any other business, is free to construct and implement any business model that it chooses. So then, the fact that it built Kaplan's for-profit education business model on a foundation of predatory enrollment and financial aid practices – identifying, exploiting and preying upon the "pains and fears" of the very students it told the market it was sworn to educate and help succeed – does not form the basis for Plaintiff's claim. To be sure and plain, Plaintiff's claims arise from Defendants' false and misleading statements regarding the true nature of its business model and the true reasons behind the Company's reported enrollments, financial results, and future business prospects - which were all touted to the market. While bragging to the market of its revenue being driven by its educational ideals, the quality of the education it provided, and the return on investment enjoyed by its students, the truth was that its revenues were being driven by nefarious, predatory, and exploitive enrollment and financial aid practices. Defendants' lies and omissions regarding Washington Post's financials and future business practices, which both understated the risks facing the Company and artificially inflated the value of its stock throughout the Class Period, are the bedrock of Plaintiff's claims. As demonstrated below, when the truth was

revealed, the artificial inflation came out of Washington Post's stock and Plaintiff and the Class suffered massive losses.

11.     As mentioned above, almost all of Kaplan's revenues are generated through tuition payments. The vast majority of students rely on federal financial aid provided by Title IV ("Title IV") of the Higher Education Act of 1965, as amended (the "HEA"). Consequently, during the Class Period, the Company and Kaplan derived a vast majority of their revenue from Title IV funding. As a result of Kaplan's dependence on Title IV funding, the Company is highly regulated by federal, state and private accreditation agencies, including the Accrediting Council for Independent Colleges and Schools ("ACICS"). In order to be and remain eligible to receive Title IV funds, each Kaplan institution must comply with the standards set forth in the HEA.

12.     The HEA and the U.S. Department of Education ("DOE") impose requirements on institutions seeking to participate in Title IV student financial aid programs. For example, these regulations prohibit misleading prospective students, as well as paying incentive compensation to Admissions and Financial Aid Advisors based on meeting enrollment quotas. Institutions must also prepare their students for "gainful employment in a recognized occupation,"[2] and maintain accreditation by a recognized accrediting commission in each state in which they operate. Any institution that violates these regulations risks losing its Title IV funding eligibility. For the Company, losing Title IV eligibility would be a death knell that would decimate both Kaplan and Washington Post's financial condition.

---

[2] To qualify for Federal aid, the law requires that most for-profit programs and certificate programs at nonprofit and public institutions prepare students for gainful employment in a recognized occupation. On June 7, 2011, the Obama Administration released final regulations regarding "gainful employment" which will be discussed in more detail below.

6

13.     As detailed below, 24 former Company employees (including recruiters/sales people) and students located throughout the United States confirmed that Defendants used a variety of deceptive and predatory tactics to lure prospective students into enrolling at Kaplan, and taking all available financial aid, all for the single-minded purpose of generating as much revenue (from federal financial aid) as possible.  Washington Post swept up that financial aid revenue on a daily basis – in violation of Kaplan's applicable accreditation standards.  The strong growth reported by the Company during the Class Period was unequivocally and materially based on abusive and predatory enrollment and financial aid practices, none of which Defendants revealed to the market when discussing the Company's financial performance or risk profile.  Thus, Defendants' omissions rendered Washington Post's reported financial results and statements regarding its future business prospects, as well as statements regarding risks facing the Company, materially false and misleading when made.

14.     Despite Defendants' best efforts, and a lengthy and successful run of subterfuge, they could not keep their scheme under wraps forever.  Through a series of partial disclosures regarding the Company's true financial condition and future business prospects, the artificial inflation came out of the price of Washington Post common stock.  For example, on August 4, 2010 the U.S. Government Accountability Office ("GAO") issued the findings of its undercover investigation into for-profit colleges, including Kaplan.  Among other things, the GAO report detailed multiple severely abusive and manipulative practices at two Kaplan campuses.  The multiple partial disclosures at the end of the Class Period culminated in an 8.1% drop on August 16, 2010.  That drop resulted from a DOE publication on federal student-loan repayment rates at the nation's colleges and universities demonstrating that student loan repayment rates by Kaplan students were an abysmal *28%*, compared to 54% at public colleges and 56% at private non-profit institutions.

This repayment rate was revealed to be one of the lowest among all major for-profit education companies.

15.     As a result of Defendants' false statements and omissions, Washington Post common stock traded at artificially inflated prices throughout the Class Period.  As the truth emerged and seeped into the market, however, the Company's shares were hammered by massive sales, sending them down approximately ***41.7%, or $225.73 per share***, from their Class Period high.

## II.     JURISDICTION AND VENUE

16.     Jurisdiction is conferred by §27 of the Exchange Act.  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. §240.10b-5.

17.     Venue is proper in this District pursuant to §27 of the Exchange Act.  Many of the false and misleading statements were made in or issued from this District.

18.     Washington Post's principal executive offices are located at 1150 15th Street, N.W., Washington, D.C. 20071.

19.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.     PARTIES

20.     Plaintiff Iron Workers Local No. 25 Pension Fund purchased Washington Post common stock on the open market during the Class Period, as set forth in its certification previously filed with the Court.  On April 21, 2011, the Court appointed Iron Workers Local No. 25 Pension Fund as Lead Plaintiff in this action.

21.     Defendant Washington Post is a diversified education and media company, with principal executive offices located in Washington D.C.  As discussed above, the Company's Kaplan

subsidiary is a for-profit educational institution that purports to provide an extensive range of education and related services worldwide for students and professionals. Kaplan operates through four segments: (i) KHE; (ii) Kaplan Test Preparation; (iii) Kaplan International; and (iv) Kaplan Ventures. KHE, through Kaplan University and its Kaplan Higher Education Campuses ("KHEC"), provides a wide array of certificate, diploma and degree programs – on campus and online – which are purportedly designed to meet the needs of students seeking to advance their education and career goals.

22.     Although Kaplan University specializes in online education, with a vast majority of its programs offered online, it also offers traditional classroom formats at 12 campuses in Iowa, Maine, Maryland and Nebraska and 5 Kaplan University Learning Centers in 4 additional states. Moreover, Kaplan University includes Concord Law School, a fully online law school. At the end of 2010, Kaplan University had approximately 58,200 students enrolled in online programs and 7,400 students enrolled in its classroom-based programs.

23.     KHEC consists of 73 schools in 19 states that provide classroom-based instruction to approximately 44,500 students (including the 5,120 students enrolled at Kaplan University's on-ground campuses).

24.     Defendant Graham has served as Chairman of the Board and Chief Executive Officer of Washington Post since 1993.

25.     Defendant Jones has served as the Senior Vice President-Finance and Chief Financial Officer ("CFO") of Washington Post since January 2009. Jones has spent 19 years at the Company and Kaplan, serving in a variety of senior management positions with a focus on finance, auditing and accounting. For instance, prior to becoming Senior Vice President-Finance and CFO of the Company, Jones served as Chief Executive Officer of Kaplan Professional, and was responsible for

Kaplan's professional businesses in financial services, real estate, technology and engineering in the United States and the United Kingdom. Prior to joining Kaplan Professional, Jones served as CFO of Kaplan, Inc. from 1997 to 2000 and Chief Operating Officer of Kaplan International, based in London, from 2003 to 2007. In these varying capacities, Jones had intimate knowledge of the financial relationship between Washington Post and Kaplan, the interplay between the companies' management teams and the Washington Post's reliance on the income generated by Kaplan.

26.     Throughout the Class Period, Graham and Jones were responsible for ensuring the accuracy of Washington Post's public filings and other public statements, and they both personally attested to and certified the accuracy of Washington Post's financial statements. During the Class Period – specifically on August 4, 2009, November 9, 2009, March 2, 2010, May 11, 2010, and August 11, 2010 – Graham and Jones each signed certifications included in the Company's public filings stating:

> 1. I have reviewed this quarterly report on Form [10-Q or 10-K] of the Registrant;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report.

## IV.     CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Washington Post common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their

immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

28.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of August 13, 2010, the last day of the Class Period, Washington Post had almost 9 million shares of stock outstanding, owned by hundreds if not thousands of shareholders.

29.     There is a well-defined community of interest in the questions of law and fact involved here. Questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members include:

(a)     whether the Exchange Act was violated by Defendants;

(b)     whether Defendants omitted and/or misrepresented material facts;

(c)     whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     whether the price of Washington Post common stock was artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

30.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

31.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests in conflict with those of the Class.

32.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## V.     CONFIDENTIAL SOURCES

33.     Plaintiff makes the allegations herein, concerning the falsity of Defendants' statements and the scienter of the Individual Defendants, based upon the investigation undertaken by Plaintiff's counsel, which included analysis of publicly available news articles and reports, public filings, securities analysts' reports and advisories about Washington Post, interviews of dozens of former employees and Kaplan students, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

34.     The allegations made herein are supported by the first-hand knowledge of 24 confidential witnesses ("CWs"). These CWs include many former Company employees who were employed during the Class Period and provided facts from various departments, as well as students who fell victim to Washington Post's systemically predatory business model for Kaplan. As detailed below, the CWs each served in positions at Washington Post's Kaplan division or had first-hand experiences that provided them with access to the information they are alleged to possess.

35.     Confidential Witness #1 ("CW 1") was employed by the Company at KHE's Orlando, Florida office as a Director of Admissions from July 2009 until July 2010. While at KHE, CW 1 oversaw three teams of Admissions Advisors whose primary responsibility consisted of "contacting people" who had requested information and "trying to sign them up." CW 1 reported to Senior

Director of Admissions Renee Flowers ("Flowers"), who reported to Orlando site Vice President Ed Siska ("Siska"). Siska reported to Vice President of Admissions Mike Jones ("M. Jones"), who reported to Senior Vice President Scott Kilgore ("Kilgore"). CW 1 was one of 12 Directors of Admissions at the Orlando, Florida facility. While working at the Company, CW 1 oversaw anywhere from 40 to 55 Admission Advisors. Among other things, CW 1 has knowledge regarding scripts for Admissions Advisors, aggressive enrollment quotas, predatory recruitment and financial aid practices, and the Company's compensation structure for Admissions Advisors.

36. Confidential Witness #2 ("CW 2") was employed by the Company at Kaplan's Chicago, Illinois office as an Administrative Assistant for approximately 5 years until August 2010. When CW 2 first began working at the Company, CW 2 spent the majority of her/his time providing assistance to executives of Kaplan Professional. In approximately March 2009, CW 2 began providing assistance to KHE executives. While employed by the Company, CW 2 provided assistance to a number of Washington Post and Kaplan executives, including: Defendant Jones, Senior Vice President, General Counsel and Secretary of Washington Post Veronica Dillon, Kaplan Professional CEO and President Eric Cantor ("Cantor"), General Counsel for Kaplan Mary Jane Miller, KHE President Beth Hollenberg ("Hollenberg"), and KHE CFO Lionel Lenz ("Lenz"). Among other things, CW 2 has knowledge regarding Kaplan's weekly executive meetings and quarterly Senior Executive Meetings held in the Delhi Conference room of the Chicago, Illinois office (and offsite at up-scale resorts), internal presentations and e-mails regarding the 90/10 Rule (a requirement that no more than 90% of Kaplan's revenue could come from financial aid), Cohort Default Rates, gainful employment and financial aid, and the Company's extensive focus on enrollment numbers.

37.    Confidential Witness #3 ("CW 3") was employed by the Company at Kaplan's Columbus, Ohio campus as an Office Manager/Assistant Controller from August 2008 until September 2009, when CW 3 left on her/his own accord because CW 3 was troubled by Kaplan's business operations. As the Assistant Controller, CW 3 oversaw the "finances and the business operations" of the Columbus campus. Specifically, CW 3's duties included approving the amount a student was supposed to pay in cash, as opposed to receiving financial aid, towards tuition, signing off on student stipends, tracking and reporting the campus' accounts receivables, and preparing and submitting Admission Advisors' enrollment commissions. For example, each quarter CW 3 prepared an Excel spreadsheet showing the enrollments and graduations of each student recruited by an Academic Advisor, and submitted the spreadsheet to payroll in Alpharetta, Georgia. While with the Company, CW 3 reported to the Columbus, Ohio campus President James Vaas ("Vaas"), who, according to CW 3, was "forced" to retire at the end of 2008 because he "didn't push the numbers." Vaas was then replaced by another Campus President, who CW 3 then reported to. Among other things, CW 3 has knowledge regarding the Company's predatory enrollment practices, including the emphasis on increasing enrollments at all costs, and the Columbus, Ohio campus' improper practices designed to circumvent the requirements of the 90/10 Rule.

38.    Confidential Witness #4 ("CW 4") began her/his employment with the Company at Kaplan Financial in Chicago, Illinois, and eventually transferred to Kaplan University in Davenport, Iowa, where she/he worked as an Admission Advisor from July 2007 to July 2010. CW 4 was terminated from the Company after being outspoken about what CW 4 viewed as unethical admissions practices at the Davenport, Iowa campus. CW 4 was one of approximately eight or nine Admissions Advisors at the Davenport, Iowa campus, and reported to Director of Admissions Jason Wieleski ("Wieleski"), who reported to Campus President Mark Garland ("Garland"). Among other

things, CW 4 has knowledge regarding the pressure on Admissions Advisors to meet enrollment quotas, the Company's predatory recruitment practices and unethical enrollment practices, and compensation perquisites given to Admissions Advisors.

39. Confidential Witness #5 ("CW 5") worked as the Executive Director of Kaplan's Indianapolis, Indiana campus for approximately five months, from February 2010 until July 2010, when CW 5 resigned because the Company was "too numbers driven." As the Executive Director of the Indianapolis, Indiana campus, CW 5 was hired to "hire, train and build the campus," and oversaw 14 employees, including nine Admissions Advisors, two Financial Aid Representatives and three Academic Advisors. CW 5 reported to a Kaplan Regional Vice President. According to CW 5, there was "no doubt" that the Company's quota-driven enrollment and compensation policies created an environment and culture where Kaplan Admissions Advisors routinely lied to prospective students. Among other things, CW 5 has knowledge regarding Kaplan's scripts and the Company's use of predatory recruitment and financial aid practices.

40. Confidential Witness #6 ("CW 6") worked for the Company as an Admissions Advisor at Bauder College, a KHE campus in Atlanta, Georgia, from December 2009 until May 2010, until CW 6 left the Company on her/his own accord after it was made clear that CW 6 would likely be terminated for "not meeting enrollment quotas." As an Admission Advisor, CW 6 was part of the high school team, which focused on enrolling high school students who would start at Bauder College during the summer following their graduation. CW 6 reported to Associate Director of Admissions Dee Vanks ("Vanks"), who reported to a Director of Admissions. The Associate Director and Director of Admissions reported to Campus President Reggie Morton ("Morton"). CW 6 has information regarding the pressure to meet enrollment quotas, the Company's predatory recruiting practices, including recruitment at a local homeless shelter, and a meeting with Campus

15

President Morton, Director Vanks, and a Financial Aid Director during which Morton told CW 6 that she/he would be fired if CW 6 did not enroll more students.

41.     Confidential Witness #7 ("CW 7") worked for the Company from February 2004 through September 2009, in Kaplan's Fort Lauderdale, Florida facility. CW 7 worked in the Company's Admissions department from February 2004 until April 2008, first as an Admissions Advisor, and later as a Director of Admissions for the military team. In April 2008, CW 7 was promoted to Director of Student Relations/Director of Compliance. As Director of Compliance, CW 7 reported to Executive Director of Compliance for KHE Sue Edwards ("Edwards"). Edwards reported to Senior Vice President of Regulatory Affairs Elaine Neely ("Neely"), who reported to Executive Vice President of Compliance and General Counsel for KHE, Janie Block ("Block"). As Director of Compliance, CW 7 reviewed all student complaints, including academic and financial aid complaints. Among other things, CW 7 has information regarding complaints made by students against the Company, weekly conference calls held to discuss student complaints, the tracking and monitoring of all calls made by Admission Advisors, and Kaplan CEO Andy Rosen's ("Rosen") knowledge of student complaints.

42.     Confidential Witness #8 ("CW 8") worked for the Company from September 2009 until December 2010, as an Admissions Advisor at KHE's Orlando, Florida facility. CW 8 reported to Associate Director of Admissions Kristen Pugh ("Pugh"), who reported to Director of Admissions Tara Davis ("Davis"). Davis reported to Senior Director of Admissions Flowers. According to CW 8, the internal "motto" at Kaplan was "one dial – one file," which meant "we were supposed to get on the phone and enroll students that day." CW 8 has information regarding Kaplan's compensation structure for Admissions Advisors, the Company's predatory recruitment practices, Kaplan's scripts

used to enroll students, and the impact of the August 4, 2010 GAO report on Kaplan's enrollment practices.

43.     Confidential Witness #9 ("CW 9") worked for the Company as a Director of Admissions in Kaplan's Orlando, Florida call center from July 2009 until December 2010.  As Director of Admissions, CW 9 oversaw Admissions Advisors seeking to enroll students in Kaplan's Information Technology school.  Among other things, CW 9 has information regarding the pressure to meet enrollment quotas, executive's knowledge of Kaplan's enrollment practices and scripts, the impact of the GAO report on Kaplan's recruitment practices and enrollment, and Kaplan's HyperQuality tracking system used to monitor Admissions Advisor's calls.

44.     Confidential Witness #10 ("CW 10") worked for the Company as the Executive Director/President of Kaplan's Columbus, Ohio campus for approximately nine months, until the end of February 2010, when CW 10 was terminated as a result of raising concerns about the enrollment process.  CW 10 reported to Regional Vice President Sandy Ugol ("Ugol"), who reported to Group Vice President Dominick Fedele ("Fedele").  Ugol oversaw the North Central Region of Kaplan, which included campuses in Cincinnati, Columbus, and Cleveland, Ohio and Baltimore, Maryland.  Among other things, CW 10 has information regarding the immense pressure to maintain retention rates and meet enrollment numbers at the Columbus, Ohio campus.

45.     Confidential Witness #11 ("CW 11") worked for the Company from 2005 through 2010.  CW 11 began her/his employment with the Company as a Director of Education at Kaplan's San Antonio, Texas campus and was promoted in 2009 to Executive Director of the Houston, Texas campus.  As Executive Director, CW 11 reported to Regional Director of Operations Mark Ferguson ("Ferguson"), who reported to Western Division Manager David Stevenson.  CW 11 was responsible for the entire operation of the campus, including admissions, the education department, financial aid,

and career services. CW 11 has information regarding the pressure on the Admissions Department to enroll students and weekly accountability meetings held every Friday.

46.     Confidential Witness #12 ("CW 12") worked for the Company at KHE, but was "rolled into" Kaplan in approximately the first quarter of 2010.  CW 12 began working for the Company in 2005 as an Accountant in Kaplan's Accounts Receivable Department.  In 2007, CW 12 became a Business Analyst in the Financial Planning & Analysis Department.  As a Business Analyst, CW 12 reported to Manager of Business Development Johnny Goodwin, who reported to Executive Director of Financial Planning & Analysis Candace Tenhundfeld, who reported to the Vice President/Controller Kevin Corser ("Corser").  CW 12 was responsible for managing the requirements for the Company's internal "dashboard" reporting system, which was utilized to generate a snapshot of key business metrics, including drop-out rates, student starts and the percentage of revenue a school derived from financial aid.  Among other things, CW 12 has information regarding the dashboard system and reports, as well as Kaplan's key business metrics, including drop-out rates.

47.     Confidential Witness #13 ("CW 13") began working for the Company at Kaplan's Cypress Creek, Florida facility in February 2009, and then transferred to the Plantation, Florida facility in early 2009, where CW 13 remained until the end of 2010.  At the Cypress Creek facility, CW 13 reported to Director of Admissions Jordan McMullen ("McMullen"), who reported to Adam Kalish, who oversaw Admissions at the Cypress Creek facility.  While at the Plantation, Florida center, CW 13 reported to Director of Admissions Jennifer Estiverne, who reported to Chief Director of Admissions Samantha Snyder ("Snyder").  Snyder reported to a Center Director.  CW 13 has information regarding the Company's predatory recruitment practices, including the use of scripts,

the compensation structure for Admissions Advisors, and the GAO investigation, which included a visit to the Pembroke Pines, Florida Kaplan facility.

48.     Confidential Witness #14 ("CW 14") worked for the Company as a Director of Admissions for Kaplan University at the Phoenix "call-center" from December 2008 until January 2010.  CW 14 reported to Vice President of Admissions M. Jones and to Senior Vice President Kilgore.  CW 14 has information regarding Admissions Advisors' compensation and employment status being tied to student enrollments, Kaplan's aggressive recruitment tactics, the negative impact on enrollments of the Company's policy to no longer accept Ability to Benefit ("ATB") students, and the impact of the GAO report on Kaplan's scripts and Admission Advisors' compensation.

49.     Confidential Witness #15 ("CW 15") was employed with the Company from March 2010 to January 2011 as a Staff Accountant in Kaplan's Alpharetta, Georgia facility.  CW 15 was one of 20 Staff Accountants, and her/his primary responsibilities included revenue accounting and financial analysis for the Kaplan campuses.  Specifically, CW 15 was assigned to seven Kaplan campuses, including those in Cincinnati, Ohio, Corpus Christi, Texas, El Paso, Texas, Arlington, Texas, Omaha, Nebraska, and Lubbock, Texas.  CW 15 and the other Staff Accountants reported to Accounting Operations Manager Jason Edwards, who reported to Jennifer Frisky ("Frisky").  Frisky reported to Kaplan's Controller.  CW 15 has information concerning the data in Kaplan's "CampusVue" revenue accounting system, including among other things, drop out rates for Kaplan students and accounting changes that were implemented after the GAO report.

50.     Confidential Witness #16 ("CW 16") worked for the Company as a Director of Finance at Kaplan's Tesst College in Baltimore, Maryland for over a year until she/he departed in March 2010.  CW 16 was responsible for finance and accounting functions, including oversight of

the "bursar" functions, profit and loss, and budgeting.[3]  Although CW 16 was not involved directly in the administration of financial aid, she/he performed accounting tasks related to financial aid and collected on student accounts.  When she/he began at Kaplan's Tesst College, CW 16 reported to Campus President Mark Millen ("Millen").  Millen was terminated in approximately mid-2009 after an internal audit resulted in "400 audit findings."  Millen was temporarily replaced by Regional Vice President of Operations Ugol, until Consultant Colleen McDermott took over as Campus President.  Ugol reported to Group Vice President of Operations Fedele.  CW 16 has information related to Tesst College's negative internal audit and accreditation findings, that covered, among other things, incomplete registration paperwork, financial aid, and professors who did not have degrees.  In fact, according to CW 16 prior to the school's accreditation audit, the campus staff were provided with an "answer sheet" as to accreditation questions.  CW 16 also has information related to Tesst College's drop-out rates, concern over retention rates, and lack of concern related to student defaults on tuition payments.

     51.     Confidential Witness #17 ("CW 17") initially began with the Company in June 2006 as a Financial Aid Trainer, until CW 17 moved into the role of Compliance Specialist in August 2008, and worked at Kaplan through February 2010.  As a Financial Aid Trainer, she/he reported to Betsy Tellock.  As a Compliance Specialist, CW 17 reported to Vice President of Compliance Edwards, who was eventually replaced by Kristi Ford ("Ford").  Edwards, and later Ford, reported to Vice President of Regulatory Affairs Neely, who reported to General Counsel Block.  CW 17 believed Block reported to Kaplan CEO Rosen.  CW 17's primary responsibility as a Compliance Specialist included performing audits and overseeing corrective action plans for ground campuses

---

[3] A bursar is a senior professional financial administrator in a school or university.

across the nation. According to CW 17, the Kaplan campuses were audited once per year, and twice per year if remediation of audit findings was necessary. CW 17 has information related to the internal audits of 35 Kaplan campuses, including the Excel reports generated regarding these audits, DOE scrutiny of Kaplan campuses, and Kaplan's "shifting" of financial aid between Kaplan's main and branch campuses to circumvent the 90/10 Rule.

52. Confidential Witness #18 ("CW 18") worked for the Company as a Vice President of Communications at KHE's Fort Lauderdale, Florida facility from February 2009 through June of 2009. CW 18 was responsible for overseeing internal and external communications, as well as community outreach functions for KHE, including Kaplan University, KHEC, Concord Law School, Kaplan Virtual Education and Colloquy. CW 18 has information related to KHE President Jeff Conlon's ("Conlon") receipt of daily enrollment reports and Conlon's emphasis on "follow[ing] the money" when it came to online education.

53. Confidential Witness #19 ("CW 19") worked for the Company's Kaplan division in Ft. Lauderdale, Florida from December 2008 to July 2010 as a Senior Manager of Market Research. CW 19 reported to Vice President of Brand and Strategic Marketing Linda Mignone. CW 19's responsibilities included conducting market research, including surveys, pertaining to "measurement, awareness, preference, and consideration" relating to the Kaplan brand. CW 19's research was related to consolidating the Kaplan brand and creating an "intent to enroll" in KHE classes. Among other things, CW 19 has information regarding Kaplan's "segmentation studies" that focused on which prospective students were the "most attractive" from a long-term "revenue perspective," the Company's reliance on purchasing leads from low quality aggregators, as well as the Company's reliance on Kaplan for revenue.

54.    Confidential Witness #20 ("CW 20") was employed with the Company for about a year, ending in June 2009, as the Director of Financial Aid at the Company's Baltimore, Maryland Tesst College campus. CW 20 left on her/his own accord because certain practices at the campuses were "unacceptable." CW 20 worked closely with Campus President Mark Millen and the Regional Vice President Mike Mella. As such, CW 20 has information regarding the predatory recruitment of prospective students, including those with felonies who required bonding for gainful employment. CW 20 also has knowledge of issues pertaining to the academic calendar for the electrician program and lack of compliance with program accreditation in accordance with the Maryland Higher Education Commission, as well as the Company's intentional misuse of "professional judgment" in waiving a student's dependency status in order to obtain Title IV funding.

55.    Confidential Witness #21 ("CW 21") worked for the Company as a Federal Regulatory Affairs Manager at Kaplan, for three years, until November 2009, at Kaplan's Alpharetta, Georgia "headquarters." While at the Company, CW 21's responsibility included corresponding with the DOE regarding certifications, renewals, and changes in personnel and programs, and preparing and submitting the annual summary of certification for the Kaplan campuses to the DOE. CW 21 was also responsible for providing information about Kaplan for the DOE's website regarding financial aid and placement rates. While at the Company, CW 21 reported to Executive Director of Federal Regulatory Affairs Deana Echols ("Echols"), who, in turn, reported to Senior Vice President of Regulatory Affairs Neely. Neely reported to Executive Vice President of Regulatory Affairs and General Counsel Block, who, in turn, reported to Kaplan President Conlon. CW 21 has information related to the Company's policy to no longer enroll ATB students and the Company's transfer of federal funds between campuses to skirt the 90/10 Rule.

56.     Confidential Witness #22 ("CW 22") was enrolled in the online Criminal Justice Bachelor's degree program at Kaplan from 2008 until 2011.  Among other things, CW 22 has information regarding Kaplan's predatory recruitment practices towards the mentally ill and misrepresentations regarding the transferability of credits.

57.     Confidential Witness #23 ("CW 23") worked as a Chief Information Officer at the Company's *The Washington Post* newspaper division from April 2001 through the end of December 2009.  CW 23 reported to President of *The Washington Post* newspaper, Steve Hills, who, in turn reported to Graham.  CW 23 has information related to the semi-annual "planning" meetings attended by executives of the Company's divisions and Defendants Graham and Jones, where executives voiced concerns about Kaplan's excessive growth and operations.  She/he also has insight into the Company's accounting system and the standard practice of all the subsidiaries to send their financial data to the Company's corporate office on a monthly, quarterly, and annual basis.

58.     Confidential Witness #24 ("CW 24") worked for the Company from September 2009 to June 2011 as a Treasury Manager for KHEC and then a Treasury Manager for Kaplan.  She/he worked at KHEC from September 2009 through January 2010 until the Company reorganized all KHEC's treasury and accounting functions under Kaplan.  As a result, CW 24 then began working as a Treasury Manager for Kaplan.  As a Treasury Manager, CW 24's responsibilities included reconciling Title IV funds, transferring money to Washington Post's corporate account, forecasting Kaplan's cash position, and, at the end of each quarter, analyzing Kaplan's schools' accreditation liquidity and balance sheets and transferring money between corporate and school accounts to meet accreditation standards.  While at the Company, CW 24 reported to Vice President of Tax and Treasury Terrance Bay ("Bay"), who reported to Kaplan Controller Corser.  Corser reported to Kaplan CFO Matt Seelye ("Seelye"), who reported to Jones.  CW 24 has information related to

Kaplan's daily process of transferring money from Kaplan University and KHE directly to Washington Post, a process that continually caused Kaplan to have insufficient cash assets required to meet accreditation standards. CW 24 also has information concerning Kaplan's violation of the 90/10 Rule and how Kaplan would stop sending money to Washington Post during such times. CW 24 also detailed instances of Kaplan's failure to timely post federal financial aid funds to students' accounts, which also occurred at times when Kaplan was violating the 90/10 Rule.

## VI. SUBSTANTIVE ALLEGATIONS

### A. Introduction

59. For-profit colleges, which are either privately-owned or owned by publicly traded companies, offer post-secondary education to a wide-variety of students. Unlike their state-operated and not-for-profit brethren, whose primary goal is to provide a quality education for their students, for-profit colleges are profit-driven, bottom-line businesses. Towards that end, these for-profit colleges charge their students significantly more to attend than not-for-profit schools (often twice as much or more), and students at for-profit schools end-up with substantially more debt upon graduation (if, indeed, they graduate at all) than students at non-profit colleges. Moreover, most for-profit colleges rely extremely heavily on federal funds (in the form of Pell Grants, Stafford Loans and the like) – up to 90% of their gross revenues are derived in this way.

60. As described more fully throughout this Complaint, in an attempt to cannibalize federal funds, Washington Post created a business model for Kaplan that mandates its salespeople – in order to meet quotas and not be fired – to engage in predatory and deceptive recruitment and enrollment practices, as well as misleading financial aid practices, which result in extremely low graduation rates and massive amounts of defaulted student loans. Of course, it is not these untoward business practices that create the basis for liability here, as Washington Post is free to conduct its business as it sees fit. Rather, Defendants are liable to Plaintiff and the Class for the damages caused

24

by their failure to disclose the Company's systemically predatory for-profit education business model to the market and Washington Post shareholders, providing instead a completely different (and exceedingly misleading) picture of what drove Company revenue, and consequently misrepresenting the nature and substance of the Company's financials and future business prospects, during the Class Period. These misrepresentations and material omissions caused Washington Post common stock to trade at artificially inflated prices throughout the Class Period.

61.     Enrollment at for-profit colleges grew dramatically in the past decade. To be sure, between 1998 and 2008, enrollment at for-profit colleges expanded by approximately 236%, while enrollment at traditional institutions of higher learning rose only approximately 31% during that same period.[4]

62.     Washington Post's secret business model for Kaplan, as detailed below, was well-hidden for years, until, through a series of partial disclosures, the truth was revealed. When the truth came out, the artificial inflation was removed from the price of Washington Post common stock, and its shareholders incurred substantial damages.

**B.      Washington Post's Business Model Depends on Maximizing the Amount of Financial Aid Obtained by Kaplan Students, Regardless of Their Ability to Ever Repay It**

**1.      The For-Profit College Business Model Places Low-Income Students in High-Cost Schools**

63.     Historically, families with greater needs generally sought lower-cost colleges to maximize the utility of available federal loans and grants, getting the most out of every dollar to reduce out-of-pocket expenses and minimize heavy debt burdens. Conversely, families with greater

---

[4] The expansion of the sector has been so extraordinary that the largest for-profit – the University of Phoenix – today enrolls more students than the entire for-profit sector enrolled in 1991.

financial resources often sought higher-cost institutions because they could afford to pay in excess of what federal loans covered, and presumably received a better quality education. For-profit colleges have turned this traditional relationship between costs and means on its head by targeting and preying upon students with the greatest financial needs and convincing them to incur massive debt, regardless of their ability to repay the loans in the unlikely event they graduate and find employment. *See* supra at ¶9 (approximately 70% of Kaplan students drop-out after a median period of only 4.2 months).

64.     Indeed, low-income and minority students, respectively, make up 50% and 37% of students at for-profit colleges respectively, while, on average, for-profit colleges cost five and a half times the price of community colleges offering similar programs and degrees. Bachelor's degree recipients at for-profit colleges have median debt of $31,190 compared with $17,040 at private, non-profit institutions and $7,960 at public colleges. At four-year for-profit colleges, low-income students must find a way to finance, on average, almost $25,000 each year, with only a 22% chance of graduating. At Kaplan, students have a miniscule 12.5% chance of graduating. *See* ¶9. On the other hand, students at four-year private nonprofit institutions need to finance, typically, only $16,600, and graduate at rates three times higher. Moreover, private non-profit institutions, while costing students less, actually spend three and a half times more on each student than for-profit institutions do.[5]

65.     As detailed herein, the cost of attending Kaplan was approximately $371 per credit hour. For students who were able to complete their studies, a two-year associate's degree cost approximately $35,000, while a four-year bachelor's degree cost approximately $65,000.

---

[5] *See* "Subprime Opportunity: The Unfulfilled Promise of For-Profit Colleges and Universities," *The Education Trust* (Nov. 22, 2010), http://www.edtrust.org/dc/Subprime (last visited June 24, 2011).

66.     Prospective Kaplan students typically obtain these funds by turning, usually at the direction of the Company, to the federal government.  For students with financial need, the federal government helps pay for higher education through Title IV.  Title IV covers the administration of the United States federal student financial aid programs, and includes Pell Grants, Stafford Loans, and other forms of federal financial aid.  Title IV aid is a combination of grants and low-interest loans available in limited quantity to students enrolled at any type of college.

### 2.     The Vast Majority of For-Profit College Revenue Comes From Federal Student Aid

67.     The reason for-profit colleges recruit low-income students for a high-cost education is as simple as it is nefarious: this formula maximizes the amount of federal loans and grants the students must take on in order to be able to afford classes, and, as a result, maximizes the amount of federal loans and grant monies that the for-profit colleges are able to generate.  As much as 90% of revenue generated at for-profit colleges comes from federal student aid.[6]  Indeed, in 2007-08, approximately 97% of undergraduates attending for-profit 2-year colleges took out student loans, while only 13% of undergraduates attending 2-year public institutions took out student loans.  Similarly, during that same time period, approximately 95% of undergraduates attending for-profit four-year colleges took out student loans, while only 47% of undergraduates attending public 4-year colleges took out student loans.  The staggering statistical disconnect demonstrates the loan driven nature of for-profit colleges, including Washington Post's Kaplan.

68.     Though federal financial aid is intended for the benefit of the student, as a practical matter, aside from education-related expenses, student aid disbursements go directly to the student's school.  Thus – as long as the school can keep enrollment rates steady or increase them – the more

---

[6] Twenty-four percent of 2008 graduates of for-profit colleges took out federal loans in excess of $40,000.

money a for-profit college charges per credit, the more revenue the institution will generate in guaranteed federal dollars from loans taken out by low-income and other at-risk students.

69.     Federal Pell Grants and Stafford Loans, together with aid from smaller Title IV programs, make up the lion's share of for-profit colleges' revenues.[7] While for-profit colleges enroll close to 10% of all higher education students, they currently receive approximately 24% of all Title IV funds. Indeed, between 2000 and 2009, the amount of Pell Grants, Stafford Loans, and other Title IV aid packages given to for-profit institutions grew from $4.6 billion to $26.5 billion, representing a sizeable burden for U.S. taxpayers.[8]

70.     Here, the Company's reliance on Title IV monies has only expanded in recent years. For example, in 2002, Title IV funds accounted for $160 million, or 64% of total KHE revenues, and 26% of Kaplan revenues, resulting in 36% and 74% of KHE and Kaplan's respective revenues coming from sources other than Title IV funds. By 2009, however, funds received under Title IV programs soared to approximately $1.3 billion, or approximately 83% of total KHE revenues, and 49% of Kaplan revenues. In 2010, the funds received under Title IV programs accounted for approximately $1.5 billion, or approximately 82%, of total KHE revenues, and 50% of Kaplan revenues.

### C.     The HEA Provides Eligibility Criteria that an Institution Must Meet in Order to Participate in the Federal Student Aid Programs

71.     In the early 1990s, Congress was concerned that certain schools were engaging in a series of unethical practices leading to the admission of unqualified students just to obtain federal

---

[7] A Pell Grant is a post-secondary educational federal grant sponsored by the DOE that does not have to be repaid. A Stafford Loan is a student loan offered to eligible students enrolled in accredited American institutions of higher education. The repayment period for a Stafford Loan typically begins upon graduation or withdrawal by the student from the institution of higher education.

[8] In 2009, for-profit colleges collected $4.4 billion of the $18.2 billion in Federal Pell Grants.

financial aid. This led, ultimately, to students being unable to repay their loans – leaving the government and taxpayers holding the bag. As mentioned below, Congress and the DOE took a number of actions to address this situation.

### 1. Incentive Compensation for Recruiters Is Not Permitted

72.     In 1992, Congress and the DOE enacted the "incentive compensation provision" of the HEA, which prohibits schools from paying student recruiters and employees involved in financial aid "any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid." 20 U.S.C. §1094(a)(20). In 2002, the DOE clarified the "incentive compensation plan" by issuing a series of "safe harbor" regulations, 34 C.F.R. 668.14(b)(22)(ii).

73.     Most relevant here, 34 C.F.R. 668.14(b)(22)(ii)(A) provides that a school may make up to two adjustments (upward or downward) to a covered employee's annual salary or fixed hourly wage rate within any 12-month period without the adjustment being considered an incentive payment, *provided that no adjustment is based solely on the number of students recruited, admitted, enrolled, or awarded financial aid*.

74.     Additionally, 34 C.F.R. 668.14(b)(22)(ii)(D) provides that profit-sharing and bonus payments to all or substantially all of a school's full-time employees are not incentive payments based on success in securing enrollments or awarding financial aid, as long as the profit-sharing or bonus payments are substantially the same amount or the same percentage of salary or wages, and as long as the payments are made to all or substantially all of the school's full-time professional and administrative staff, compensation paid as part of a profit-sharing or bonus plan is not considered a violation of the incentive payment prohibition.

75.     Finally, 34 C.F.R. 668.14(b)(22)(ii)(F) provides that generally, clerical pre-enrollment activities are not considered recruitment or admission activities. Accordingly, a school

may make incentive payments to individuals whose responsibilities are limited to pre-enrollment activities that are clerical in nature. ***However, soliciting students for interviews is a recruitment activity, not a pre-enrollment activity, and individuals may not receive incentive compensation based on their success in soliciting students for interviews.***

## 2. Substantial Misrepresentations Are Prohibited

76. The HEA now prohibits an institution receiving Title IV funds from "engag[ing] in substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates." 20 U.S.C. §1094(c)(3)(A). Upon a determination that an institution has made such a misrepresentation, the Office of the Secretary (the "Secretary") of the DOE may suspend or terminate the institution's Title IV eligibility status, and may also impose a civil penalty of up to $27,500 for each violation or misrepresentation. *Id*.; §1094(c)(3)(B)(i); Fed. Civ. Penalties Adjustment Act, as amended, 24 U.S.C. §2461 note.

77. The statute itself does not define "substantial misrepresentation," but the DOE has issued regulations defining the terms "misrepresentation" and "substantial misrepresentation," and providing example categories of statements that qualify as regarding the nature of a school's education program, its financial charges, and the employability of its graduates. 34 C.F.R.§§668.71-75. A "misrepresentation" is defined as a false, erroneous, or misleading statement. 34 C.F.R. §668.71(b). A "substantial misrepresentation" is defined as "[a]ny misrepresentation on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment." *Id*.

78. In addition, the HEA states that any "[m]isrepresentation by an institution of the nature of its educational program includes, but is not limited to, false, erroneous or misleading statements" concerning, among other things:

The particular type(s), specific source(s), nature and extent of its accreditation;

Whether a student may transfer course credits earned at the institution to any other institution; and

The availability, frequency and appropriateness of its courses and programs to the employment objectives that it states its programs are designed to meet.

*See* 34 C.F.R. §668.72 (a), (b) and (f)

79.     Further, institutions are required by the HEA to provide and "accurately describe (i) the cost of attending the institution, including (ii) tuition and fees, (iii) books and supplies, (iv) estimates of typical student room and board costs or typical commuting costs, and (v) any additional cost of the program in which the student is enrolled or expresses a specific interest" to prospective and enrolled students. *See* 20 U.S.C. §1092(a)(1)(E).

### 3.     Kaplan Is Required to Keep Cohort Default Rates Under 25%

80.     To remain eligible to participate in Title IV programs, educational institutions must maintain an appropriate Cohort Default Rate ("CDR").  CDR is the percentage of a school's borrowers who enter repayment on certain federal student loans during a particular federal fiscal year (October 1 to September 30), and who default prior to the end of the next fiscal year.  The "cohort" is the group of students who first enter into student loan repayment during a federal fiscal year, and the CDR for each cohort is the percentage of the cohort members who default on their student loans prior to the end of the following federal fiscal year.  The CDR was initiated in the late 1980s to address the growing concern that fly-by-night trade schools were preying upon minorities and low income populations to build their enrollments by enticing academically under-qualified students to apply for grants and guaranteed student loans that the students were unlikely to repay.

81.     Under current law, if an institution's CDR exceeds 10% for any one of the three preceding years, it must delay for 30 days the release of the first disbursement of U.S. federal student loan proceeds to first time borrowers enrolled in the first year of an undergraduate program.

Institutions with three consecutive CDRs of 25% or greater or with a CDR greater than 40% in any one federal fiscal year could lose eligibility to participate in certain Title IV programs.

### 4. Kaplan Must Comply With the 90/10 Rule

82. Under the HEA, proprietary institutions of higher education – including Washington Post's Kaplan – must comply with the 90/10 Rule. Specifically, a proprietary institution will be ineligible to participate in Title IV programs if, for any two consecutive fiscal years, it derives more than 90% of its revenue, as defined in the Rule, from Title IV programs. An institution that derives more than 90% of its revenue from Title IV programs for any single fiscal year will be placed on provisional certification for two fiscal years and will be subject to possible additional sanctions by the DOE in the exercise of its broad discretion.

83. The HEA requires Washington Post's Kaplan to demonstrate on an annual basis that at least 10% of its revenue is derived from sources other than Title IV programs, and Washington Post's Kaplan division must report the calculation as a footnote to its annual audited financial statements. Further, Washington Post's certified public accountant is expected to test the accuracy of its 90/10 assertion as part of the audit of the institution's financial statements. If Washington Post exceeds the 90% threshold for two consecutive institutional fiscal years, it could be subject to loss of Title IV eligibility.

### 5. Kaplan Must Prepare Its Students For Gainful Employment

84. The HEA further requires that programs at for-profit institutions – other than those clearly designated as "liberal arts" or not designed to lead to a degree – must prepare students for "gainful employment in a recognized occupation" to be eligible for Title IV federal student aid. On June 7, 2011, the Obama administration released final regulations requiring career college programs to better prepare students for "gainful employment" or risk losing access to federal aid. Under the regulations, a program would be considered to lead to gainful employment if it meets at least one of

the following three metrics: (1) at least 35% of former students are repaying their loans (defined as reducing the loan balance by at least $1); (2) the estimated annual loan payment of a typical graduate does not exceed 30% of his or her discretionary income; or (3) the estimated annual loan payment of a typical graduate does not exceed 12% of his or her total earnings.

### 6. Kaplan Must Promptly Disburse Federal Student Aid Funds to Students

85. In addition, the *Federal Student Aid Handbook*, an online handbook reviewed and approved by the appropriate offices in Federal Student Aid and the Office of Postsecondary Education, mandates that all institutions receiving Federal Student Aid "must make disbursements [to students] as soon as administratively feasible *but no later than 3 business days* after receiving funds from the Department [of Education]." *See* Information for Financial Aid Professionals, 2009-2010 *Federal Student Aid Handbook*, Vol. 4, at 4-26, and 2010-2011 *Federal Student Aid Handbook*, Vol. 4, at 4-22, true and correct copies of the relevant portions of which are attached hereto as *Exhibit B* and *Exhibit C*, respectively.

### 7. Kaplan Must Meet State Authorization and Accreditation Requirements

86. State authorization and accreditation by an accrediting commission recognized by the DOE are also required for an institution to become and remain eligible to participate in Title IV programs. As such, Washington Post's Kaplan is also governed by state regulations and requirements of accrediting agencies, including ACICS, Accrediting Commission of Career Schools and Colleges, and the Higher Learning Commission of the North Central Association.

87. For example, ACICS requires each accredited institution to maintain retention and placement standards of 60% and 65%, respectively. An institution with retention and/or placement rates lower than those standards may be subject to reporting by ACICS. Other requirements of the accrediting agencies include:

- "Advertising, recruiting, and admissions information adequately and accurately represent the programs, requirements, and services available to students."

- "An institution may not delegate without supervision these [recruiting] activities to anyone whose economic incentives are to recruit prospects through means that are unethical or subject to public criticism or to admit ill-prepared applicants."

- "Recruiting shall be ethical and compatible with the educational objectives of the institution. . . . The following minimums apply: (a) An institution shall ensure that any person or entity engaged in admissions or recruitment activities on its behalf is communicating current and accurate information regarding courses and programs, services, tuition, terms, and operating policies."

- Schools are required "to describe themselves to prospective students fully and accurately and to follow practices that permit prospective students to make informed and considered enrollment decisions without undue pressure. The school's recruitment efforts must attract students who are qualified and likely to complete and benefit from the training provided by the school and not simply obtain enrollments. . . . Each school observes ethical practices and procedures in the recruitment of its students."

- "No misrepresentations should be made in student recruitment, including. . . b. misrepresenting job placement and employment opportunities for graduates; c. misrepresenting program costs; d. misrepresenting abilities required to complete intended program."

88. In addition, other state accreditation laws mandated that Kaplan's for-profit schools maintain certain levels of capital or an average percentage of their liabilities on hand as cash. According to CW 24, the asset to liability ratio requirements varied depending on the regulatory state or region, but in general, the ratio was approximately 1.5 to 1 (assets to liabilities).

### 8. Other "Applicable Laws"

89. In addition to laws specifically mandated by the HEA, throughout the Class Period, Washington Post confirmed that it was abiding by "all applicable laws." The Federal Trade Commission has issued administrative "Guides" to "specifically address the application of [the misrepresentation prohibition under 15 U.S.C. §45] to the advertising, promotion, marketing, and sale of courses or programs of instruction offered by private vocational or distance education

schools." Guides For Private Vocational and Distance Education Schools, Part 254, §254.0(b) states

"[p]ractices inconsistent with these Guides may result in corrective action by the Commission."

90.     Pursuant to §254.3(a)(3) governing "Misrepresentation of extent or nature of accreditation or approval":

It is deceptive for an industry member to misrepresent, directly or indirectly, the extent or nature of any approval by a State agency or accreditation by an accrediting agency or association. For example, an industry member should not:

Misrepresent that students successfully completing a course or program of instruction can transfer the credit to an accredited institution of higher education.

91.     In addition, §254.4 specifically lays out the following:

§254.4 Misrepresentation of facilities, services, qualifications of staff, status, and employment prospects for student after training

(a) It is deceptive for an industry member to misrepresent, directly or indirectly, in advertising, promotional materials, or in any other manner, the size, location, services, facilities, or equipment of its school or the number or educational qualifications of its faculty and other personnel. For example, an industry member should not:

(2) Misrepresent, through statements or pictures, the nature or efficacy of its courses, training devices, methods, or equipment.

(3) Misrepresent the availability of employment while the student is undergoing instruction or the role of the school in providing or arranging for such employment.

*     *     *

(4) Misrepresent the availability or nature of any financial assistance available to students. If the cost of training is financed in whole or in part by loans, students should be informed that loans must be repaid whether or not they are successful in completing the program and obtaining employment.

*     *     *

(7) Misrepresent the nature and extent of any personal instruction, guidance, assistance, or other service, including placement assistance, it will provide students either during or after completion of a course.

*     *     *

(d) It is deceptive for an industry member, in promoting any course of training in its advertising, promotional materials, or in any other manner, to misrepresent, directly or by implication, whether through the use of text, images, endorsements, or by other means, the availability of employment after graduation from a course of training, the success that the member's graduates have realized in obtaining such employment, or the salary that the member's graduates will receive in such employment.

92.     Pursuant to §254.7(b), governing "Deceptive sales practices" states:

It is deceptive for an industry member to fail to disclose to a prospective student, prior to enrollment, the total cost of the program and the school's refund policy if the student does not complete the program.

### D.     At All Relevant Times, Kaplan Generated the Majority of Washington Post's Revenues

93.     The Washington Post conducts its business operations in five segments: (1) education; (2) cable television; (3) newspaper publishing; (4) television broadcasting; and (5) magazine publishing. According to the Company's March 2, 2010 annual reports on Form 10-K for the year ended January 3, 2010 (the "2009 10-K"), throughout the relevant period, the Company and its subsidiaries employed approximately 21,500 persons on a full-time basis. Worldwide, Kaplan employed approximately 15,000 persons on a full-time basis. Of those 21,500, Washington Post's Kaplan also employs substantial numbers of part-time employees who serve in instructional and administrative capacities. During peak seasonal periods, Kaplan's part-time workforce exceeds 19,000 employees.

94.     Throughout the Class Period, it was crystal clear to both Defendants and the market that Kaplan's financial performance was key to the overall financial health of the Company. Reeling from poor performance in its traditional newspaper business, Washington Post increasingly relied upon Kaplan, the Company's "largest business," and Defendants credited KHE specifically as "the strength of The Washington Post Company's performance."

95.     The chart below demonstrates the Company's increased dependence on its for-profit education business during the Class Period:[9]

| Time Period | WPO Revenue (in Millions) | Kaplan Revenue (in Millions) | KHE Revenue (in Millions) | Percentage of WPO Revenue Derived from Kaplan | Percentage of WPO Revenue Derived from KHE |
|---|---|---|---|---|---|
| 2Q 2009 | $1,128.5 | $649.3 | $401.8 | 57.5% | 35.6% |
| 3Q 2009 | $1,148.7 | $684.5 | $408.7 | 59.5% | 35.6% |
| 4Q 2009 | $1,238.4 | $709.3 | $420.4 | 57.3% | 33.9% |
| 1Q 2010 | $1,171.2 | $711.4 | $442.6 | 60.7% | 37.8% |
| 2Q 2010 | $1,201.8 | $747.3 | $475.1 | 62.2% | 39.5% |

96.     Thus, Washington Post's financial performance and future business prospects – as well as its stock price – were heavily dependent on Kaplan. In turn, Defendants' fraudulent scheme depended upon their ability to keep Kaplan's revenues artificially inflated. But for Kaplan's student enrollments, and the hundreds of millions of dollars in federal financial aid that those enrollments brought with them, Washington Post would have imploded. Put simply, because revenues at Washington Post's newspaper publishing, magazine publishing and television broadcasting divisions were in severe decline as their businesses struggled, Defendants were highly motivated to defraud the market and mask the true reasons behind the education division's seemingly positive financial performance. Towards that end, its predatory business model was a closely held secret that Defendants kept from the market.

   **E.     Washington Post's Kaplan Was All A "Numbers Game"**

97.     To artificially boost revenues at Kaplan, Defendants oversaw and omitted any disclosure of a predatory corporate culture that transformed supposed Admissions Advisors into sales persons, potential students into "leads," and student enrollments into sales. As detailed herein,

---

[9] Washington Post is abbreviated as "WPO."

Washington Post's Kaplan continually grew its enrollments and, consequently, its revenues, throughout the Class Period by operating football field sized call centers where Admissions Advisors were subject to quota-based recruiting that was directly determinative of Admissions Advisor's employment status and compensation. As a result, the Company engaged in rampant fraud through aggressive and manipulative recruitment and enrollment practices – all of which were hidden from investors.

### 1. The Company's Sales Machine Included an Army of Kaplan Admissions Advisors Stationed In Warehouse-Sized Call Centers

98.    Unlike a typical institute of higher education, which may have a small handful of admissions advisors available for phone calls, the Company's Kaplan division hyper-aggressively used a veritable army of Admissions Advisors, working out of warehouse-sized call centers, to recruit, pressure and pursue leads (*i.e.*, students), until they agreed to attend a Kaplan school and, inevitably, apply for staggering amounts of federal financial aid.

99.    For example, beginning in December 2008, Kaplan University began leasing a two-story, 124,500-square-foot building in Orlando, Florida, which was utilized as, and internally referred to as, a "call center." After its opening, the Orlando call center operated seven days a week, 14 hours a day (from 9:00 a.m. to 11 p.m. EST). It housed approximately 800 employees, the vast majority of which work on the call center's second floor, where there were two diagonal rows of cubicles – *each row spanning the length of a football field*. Internally, CW 8 recalled that the second floor was referred to as the "sales floor."

100.    More specifically, CW 8 explained that the cubicles on the "sales floor" were organized in groups of approximately 10-12 cubicles, with five or six cubicles facing one another. At the end of each section of 10-12 cubicles, within the giant rows, are two larger, secluded cubicles for the Associate Director and Director of Admissions. The part of the facility's first floor used as a

call center is set up the same way. The only thing separating each group of 10-12 cubicles on the sales floor is a small walking space. The Orlando, Florida call center also includes a group meeting area reserved for team and whole site "huddles."

101. At the Company's football field-sized call-centers, highly trained Admissions Advisors work the phones incessantly in order to meet enrollment quotas. According to CW 13, the Company trains its sales force using, among other things, the Dimensions of Professional Admissions training program, or "DPA," that focuses on utilizing sales techniques. CW 8 recalled that during CW 8's initial training program at the Orlando, Florida call center, one advisor, upon seeing the techniques being used, asked the Kaplan training personnel whether they were working at "an admissions job or a sales job?" CW 8 recalled that she/he and others were being trained for a "sales job" and "were told that we were expected to sell."

102. According to CW 7, the Company's sole educational focus was a mere "numbers game." CW 1 confirmed that Kaplan's business model during the Class Period was based on Admission Advisors getting a certain number of enrollments. CW 3 stated the Admissions Advisors were trained to say "whatever it took to make numbers." Indeed, according to CW 11, Company executives created a "strictly about the numbers" culture, and "didn't want to hear excuses or see the details – just the results."

### 2. Like A Boiler Room, Admissions Advisors Were Under Intense Pressure to Meet "Enrollment Quotas"

103. Unlike a typical admissions advisor at a university – but like a salesman – Kaplan's Admissions Advisors were subject to strict enrollment quotas. According to CW 9, Kaplan's entire business "was geared toward enrollments." Indeed, according to CW 1, Admission Advisors were "*only* responsible for enrolling students." The fulfillment of enrollment goals (which were bright-line quotas) was *the* determining factor used within the Company to determine and set each

Admissions Advisor's employment status and compensation. CW 8 recalled the internal motto at Kaplan was "one dial -- one file," which meant Admissions Advisors were required to "get on the phone and enroll students that day."

104.    The Company's enrollment quotas were used throughout Kaplan and hung over all Admissions Advisors' heads at Kaplan's various facilities. If quotas went unmet, Admissions Advisors were fired and replaced. For example, at the Atlanta, Georgia, facility, Admissions Advisors were required to conduct at least five interviews per day, to make 100 or more calls per day to prospective students, often calling the same person seven times in one day, and to enroll approximately five students per week. If these incredibly aggressive tactics were not used, such as serial phone calls akin to horror stories typically relegated to the world of credit collection, quotas would not be met and Kaplan would not hesitate to terminate its sales force.

105.    According to CW 1, at the Orlando, Florida facility, Admission Advisors were required to conduct seven interviews a week, make 85 calls per day, have 7.5 hours of "talk time" per week, and enroll at least one student. CW 3 recalled that at the Columbus, Ohio Campus, the campus had a quota of 98 enrollments per month. In addition CW 4 stated, Kaplan University Admissions Advisors were expected to have 15 interviews, and enroll three students per week in Davenport, Iowa. In fact, according to CW 4, Davenport, Iowa campus President Garland consistently told Admissions Advisors to work 16-hour days in order to achieve enrollment quotas. If Admissions Advisors missed their quotas for a specific month or term, the number by which they fell short was added to their quotas for the next month or quarter.

106.    The status of enrollment quotas was specifically and constantly discussed within the Company's Kaplan division. For example, CW 9 recalled the Orlando, Florida facility had a "daily projections meeting" that took place "right before 2 p.m." because the enrollment numbers "had to

go up the chain." Meeting attendees included all of the Orlando Directors of Admissions, led by Senior Director of Admissions Powell. These meetings took place "right on the sales floor." CW 9 stated Kaplan "had a big white board in the middle of floor where all of the Advisors could see." Each Director of Admissions had to write a daily projection for enrollments on the white board. There is no doubt that meeting enrollment quotas was absolutely critical within the Company.

107. Further, Admissions Advisors' numbers were internally tracked on the Company's "CC Pulse" tracking system. CW 1 recalled that CC Pulse was used to generate "a ton of internal reports." Specifically, CC Pulse generated a "Scorecard" for each Admission Advisor that showed where a given Admission Advisor was toward meeting his/her individual minimum enrollment "goals" (*i.e.*, quotas).

108. Moreover, Admissions Advisors were constantly singled-out by upper management for doing well, or on the other hand, publicly chastised for not meeting their required numbers. According to CW 6, at the Atlanta, Georgia facility, the Admissions department held two meetings per day that lasted about 20 minutes, where the activities of individual Admissions Advisors were pointed out to the entire facility. According to CW 3, at the Columbus, Ohio Campus, Director of Admissions Brown had a white board in his office that detailed the enrollment goals and actual enrollments for each Admission Advisor (much like a sales board one might find in the back of a car dealership). CW 11, a former KHE Executive Director, stated that she/he participated in Weekly Accountability Meetings every Friday at 11:00 a.m., led by Regional Director of Operations Ferguson, where the Executive Directors were required to report on the status of enrollments, retention rates, and lead conversions. Each of the Executive Directors would be "put on the spot" in front of all the other Directors. CW 11 recalled that they "would go right down the line" and that it was always a "very difficult call." Likewise, CW 14, a former Executive Director in Phoenix,

Arizona, stated that Kilgore met on a weekly basis with all Directors of Admissions and Campus Executive Directors via a Kaplan-wide teleconference – every Wednesday at 9 a.m. CW 14 and the other Directors in the Phoenix facility would go to the "Maricopa Room" to participate in the calls. During the calls, each Director had to "report the numbers," which included budget updates and "start numbers." CW 14 recalled that it was common for Kilgore and Vice President of Admissions M. Jones to "undress" the Executive Directors for not meeting enrollment quotas. Similarly, CW 1 stated that enrollments were stressed during Daily Management Meetings, at the Orlando, Florida facility. If after one week into an enrollment cycle a Director of Admissions' team was not meeting enrollment quota targets, that Director of Admissions would be responsible for putting together an "action plan." Furthermore, according to CW 3, every quarter, an Excel spreadsheet showing the enrollments and student graduations by each Admissions Advisor per quarter was submitted to corporate payroll in Alpharetta, Georgia.

109. As if being internally tracked or frequently reprimanded by superiors was not enough pressure, Washington Post's Kaplan division added to the pressure of meeting sales goals by implementing several mechanisms on its sales floors. The Company's education division used a variety of "motivational" tactics to create a competitive internal sales environment, where Admissions Advisors were made aware of how other advisors performed enrolling students – or making sales. For example, at Kaplan call-centers, whenever an Admissions Advisor made an enrollment, or met an enrollment quota or "goal," the Associate Director of Admissions would reward the Admissions Advisor with a visually conspicuous prize, such as balloon tied to the Admission Advisor's cubicle, or colored felt triangle-shaped flags that stated "I hit my goal." At the Orlando, Florida facility, Admissions Advisors were inundated with balloons, whistles, New Year's Eve blowers and clappers, which, according to CW 8 "were going off all over the place . . . every

time someone made a sale." Likewise, according to CW 18, at the Fort Lauderdale, Florida call facility, a bell would ring loudly every time a student was enrolled, to inform the entire center of the sale. CW 18 recalled that when she/he first began working at Kaplan, CW 18 was excited to hear the bell. But, after continuously hearing Admissions Advisors pressuring students to enroll, towards the end of CW 18's tenure with the Company's education division, the bell made CW 18's stomach turn.

110. The factual allegations set forth herein were provided by the independently corroborating accounts of several confidential witnesses, including CW 1, CW 4, CW 5, CW 6, CW 8, CW 9, CW 11, CW 14, and CW 18.

### 3. Admissions Advisors' Employment Status Was Directly Tied to Enrollment Numbers

111. It was well-known and indisputable throughout Washington Post's Kaplan that employees were fired for not making their enrollment quotes or goals. In fact, CW 14, a former Director of Admissions in the Company's Phoenix, Arizona facility, stated Kaplan's internal policy was explicit: "it was written in the compensation plan that if you don't meet your numbers, you will be terminated."

112. Specifically, each Admissions Advisor was subject to a 90-day review after his/her respective start date. Throughout this 90-day window, Admissions Advisors were rewarded "production points" based on the Admissions Advisors' activities throughout the review period. If, at the end of the 90-day review, the Admissions Advisor did not have 25 production points, she/he was *automatically terminated*. More specifically, during the first week an Admission Advisor was not hitting her/his goals, the Admission Advisor received a verbal warning from her/his Director of Admissions. If the Admission Advisor did not meet the minimum goals for a second straight week, the Admission Advisor would then receive a written warning. According to CW 1, a former

Director of Admissions in the Orlando, Florida facility, it was "understood" that after receipt of a written warning, "the next step was termination."

113.    According to CW 11, the internal pressure to enroll students was "very well known," and Kilgore and other Kaplan executives made "veiled threats about losing jobs" on weekly Executive Director calls.  CW 10 confirmed that campus enrollments were the topics of the Monday Morning Director calls.  Indeed, CW 10 recalled it was "always" meet your numbers or lose your job.

114.    In fact, CW 5 was specifically told by her/his superiors that the "goals will never be lowered – if you don't make the numbers, you will be gone."  During CW 3's tenure at the Admissions Department in Columbus, Ohio, at least four of the ten Admissions Advisors were terminated for "not meeting enrollment goals."

115.    Admissions Advisors who were unable to attain enrollment quotas were often placed on a "personal improvement plan."  When placed on a "personal improvement plan," they typically were given just two weeks to improve their enrollment numbers and keep their jobs.

116.    The pressure and emphasis on enrollments was not merely limited to those in Admissions, but was widespread throughout all of Kaplan.  CW 10, the former President of Kaplan's Columbus, Ohio campus, recalled that she/he was under immense pressure to meet enrollment numbers, and was specifically told she/he "had to make enrollment budget or [she/he] would be let go.  They didn't care who we were enrolling or how we did it – just get the numbers."

117.    The factual allegations set forth herein were provided by the independently corroborating accounts of several confidential witnesses, including CW 1, CW 3, CW 4, CW 5, CW 10, CW 11, CW 13, and CW 14.

### 4. Admissions Advisors' Compensation was Directly Tied to Enrollments

118.    Kaplan compensated Admission Advisors on a "Gem Tier" system. Based on making quotas, an Admissions Advisor could move up the Gem Tier system, and every level offered increased compensation. The tiers were as follows (from lowest to highest): Aquamarine, Ruby, Sapphire, Emerald, and Diamond. By using the Gem Tier system, the Company's Kaplan division paid different salaries to Admission Advisors based exclusively on the number of enrollments they achieved.

119.    To be sure, the *only* factor that mattered in moving up the Gem Tier system was meeting enrollment quotas. Although, on paper, the compensation structure purported to have a number of components, including attendance, professionalism, performance, quality, enrollments and starts, in reality, the *only* way to advance and get a raise was to meet enrollment quotas. CW 8 stated it "all came down to enrollments and starts – if you hit your numbers, they liked you and your other scores would be better." If enrollments were not met, the other scores were irrelevant. The emphasis was always on enrollments – no ifs, ands, or buts about it.

120.    CW 13 confirmed that increases in compensation could only be attained by meeting enrollment quotas. For example, when CW 13 joined Kaplan in February 2008, her/his annual salary was $30,000. Within three months of employment and after attaining an enrollment quota of 30 students in three months, CW 13's salary was increased to $42,000, annually. Put simply, CW 13 received a $12,000 raise in just three months of employment based *solely* on CW 13's ability to attain the assigned enrollment quota. Likewise, CW 8 confirmed that after her/his first review, she/he skipped three Gem Tiers because CW 8 enrolled "lots of PDLs," or personally developed leads.

45

121. Not only did Admissions Advisors' salaries increase if they made enrollment quotas, but inversely, Admissions Advisors' salaries were "always at risk" if they did not meet enrollment goals. If an Admission Advisors did not meet monthly enrollment goals commensurate with their Gem Tier, their compensation would be reduced as a direct result of the inability to meet enrollment goals. According to CW 8, if an Admissions Advisor continued to miss enrollment quotas, the Admissions Advisor would be terminated. CW 8 stated, "Your ass got fired if you don't meet goal."

122. According to CW 5, "if you are a producer, you are going to make more money." CW 9 confirmed that the "whole compensation plan" was designed to put pressure on Admissions Advisors to enroll students. According to CW 1, although the Company's Kaplan division "tried to make it appear" that it took factors other than enrollments into account in the compensation structure, that was really "just lipstick on the pig."

123. Defendants were aware of, and endorsed Kaplan's compensation structure. In fact, according to the Company's March 24, 2010 Proxy, during 2009 the Company's Compensation Committee met on two specific occasions to discuss "detailed questions from the Compensation Committee regarding Kaplan compensation plans." According to the Proxy, the meetings were attended by, among others, Graham, and Rosen.

124. The factual allegations set forth herein were provided by the independently corroborating accounts of several confidential witnesses, including CW 1, CW 5, CW 8, CW 9, CW 13, and CW 14.

## F. In Order to Artificially Inflate the Company's Financials, Defendants Endorsed and Oversaw Unethical Recruiting Practices

125. Due to the Company's emphasis on revenues obtained from enrollments, as well as the pressure put on executives and Admissions Advisors to maintain enrollments at Kaplan, the Company created and essentially mandated unethical recruitment practices. According to CW 5,

there is "no doubt" that the policies Washington Post's Kaplan had in place were designed to make Admissions Advisors "lie" to prospective students. Indeed, the Gem Tier salary system, according to CW 5 is set up so the Admissions Advisors are "encouraged to lie."

126. One factor that encouraged deception in recruiting was that each Admission Advisor's credit towards their enrollment quotas was given the moment a potential student completed the enrollment form; it had nothing to do with the student actually attending a single class.

127. Admissions Advisors were tasked with calling prospective students or "leads" as they were referred to internally. Kaplan purchased the majority of its leads from low quality aggregators. Indeed, it was more profitable to buy leads from low quality aggregators and enroll any student than to focus on enrolling quality students. These leads were then routed to Admissions Advisors' computer queues by Assistant Admissions Directors. After speaking with a "lead" on the phone or in person, if the potential student expressed interest in attending a Kaplan school, the student would then make a deposit. Because the vast majority of personal checks were rejected, the majority of students made deposits using credit cards. Due to the poor credit of Kaplan's potential enrollees, a universal practice was for Admissions Advisors to instruct potential students to go to Wal-Mart and obtain pre-paid cards in order to make their deposits. According to CW 1 "[w]e would even do the research for them on the phone." In other words, Admissions Advisors would tell leads where the closest Wal-Mart was located.

128. Before a student was enrolled, several forms were required, including an application form, an enrollment agreement, and financial aid forms. Prospective students' files were supposed to have copies of each student's driver's license or ID and Social Security card. As confirmed by

numerous confidential witnesses, however, at Kaplan, in order to more easily close sales, these procedures were almost never followed.

129. According to CW 4, although all forms were supposed to be signed prior to enrollment, CW 4 was directed by her/his superior, Wieleski, to merely obtain the registration fee and to "deal with the rest" later. Moreover, CW 4 recalled that when a student eventually did sign the required enrollment forms, because the student signature was signed after the date the student paid their registration fee, Admissions Advisors were ordered by Wieleski to back-date the student's signature to make it appear that the payment of the registration fee and signing of the enrollment form occurred on the same day. CW 4 recalled that these back-dating practices occurred at least once a week. CW 3 confirmed that frequently students would start classes before "financial aid was even completed."

130. Indeed, CW 1 stated that for the first four weeks of a given enrollment cycle, Admission Advisors focused solely on getting enrollments. On the final Friday of the enrollment cycle, Admission Advisors started getting students "cleared," meaning the Admission Advisors would re-establish contact with the prospective students they had enrolled and encourage them to login to classes as quickly as possible. The purpose of this switch in emphasis was that once a student logged into classes, he/she was considered to have officially "started." Even though students were not supposed to be enrolled until they had received final approval for their financial aid, if it was getting close to the start date of the term, Admissions Advisors were instructed to enroll students who had only received preliminary approval, resulting in students receiving less financial aid. CW 1 explained that Admissions Advisors would tell students that "classes are filling up fast, so they should login at midnight as soon as the logins were available." The result was that students would sign up for classes and be locked into attending Kaplan.

131.     Admissions Advisors were told by their superiors to tell students anything they could in order to get a student to enroll.  According to CW 14, who attended multiple speeches given by Kilgore, Kilgore "encouraged" very aggressive admission policies.  For example, the following were commonplace at Kaplan:

- Potential students were told they could earn an associate's degree in 18 to 22 months instead of two years, and a bachelor's degree in two and half years instead of four years;

- Potential students were told that they were not paying for their education, financial aid was, and that there were no out-of-pocked expenses;

- Potential students who were unable to afford the $20 registration fee to enroll were often told to donate blood plasma, or encouraged to make changes to their lifestyle, such as avoiding going out to dinner, or to the movies, to pay for the fee;

- Admissions Advisors were encouraged to enroll students mid-term just to get the enrollment, even though starting school mid-term ending up costing the student more money;

- Admissions Advisors told students that Kaplan's accreditation was the same as Ivy League schools;

- CW 8 recalled that if a potential student was still deciding whether to enroll, Admissions Advisors would tell the potential student, "let me put you on hold and check with my supervisor on the fifth floor – I gotta get approval." The truth of the matter was that there was no fifth floor, and there was no approval process.  According to CW 8, this tactic was a repeated directive from the Associate Director of Admissions, who "told the team" to say that in the huddles;

- Although Kaplan offered multiple start dates for students to begin at Kaplan, Admissions Advisors were told to only offer students enrollment in the most immediate date.  For example, CW 5 was instructed by the Regional Vice President that "we don't want to hold their hand for two months.  That is not a good use of time"; and

- In addition, "low performing" Admissions Advisors received ongoing training on how to "close a student."  For example, if an Admissions Advisor called a prospective student that was currently at work, Admissions Advisors were trained to "keep going" on the phone until the prospective student hung up.

132. Students were also misled as to whether any previous credits earned from another institution of higher education would transfer to Kaplan. When asking about the transfer of credits, Admissions Advisors were directed to tell potential students that a student's credit audit could be requested during a student's first term enrolled at Kaplan. In truth, if the students asked, the audits could have been performed at any time prior to enrollment. Kaplan did not want to give students a reason to delay enrollment, even if the delay would have resulted in informing students that none of their previously earned credits would transfer to Kaplan.

133. In those instances where potential leads still were unable to pay for their registration fees, Kaplan would pay the fee for them - in direct violation of HEA regulations and the Company's Code of Ethics. For example, CW 13 recalls multiple instances where a student was unable to pay the $95 registration fee required to enroll, and Director of Admissions McMullen provided Admissions Advisors with an American Express card number to be used by the prospective student to cover the registration fee. Specifically, McMullen instructed Admissions Advisors to go "outside" and use "their cell phones" to call the prospective student and provide the potential enrollee with the American Express card number for payment of the registration fee.

134. This unethical and illegal practice of paying potential students' enrollment fees was corroborated by additional confidential witnesses. Indeed, CW 10 recalled that in September 2009, two students signed written statements saying that Kaplan Admission Advisor John Strock ("Strock") gave the students money to cover the school's application fee. CW 10 reported this incident to both Kaplan's legal team and Human Resources department. Within a couple of weeks, Regional Vice President for Admissions Dave Bryant informed CW 10 that Kaplan would not punish Strock because Strock was the "number one producing Admission Advisor." In October or November of 2009, Strock was promoted to Assistant Director of Admissions.

135.    In pursuit of federal aid dollars, Kaplan even encouraged Admissions Advisors to sign up students with backgrounds and life circumstances demonstrating that they had little chance of success, including students who worked multiple jobs, were single parents without a babysitter, did not own a computer, or who could not afford the application fee.  According to CW 5, the Company's promise to prospective students that they would receive academic support was also a "bold-faced lie."  Defendants encouraged Kaplan's sales force to "stretch the truth" because they knew the education Kaplan offered was "not commensurate with the cost."  In fact, CW 5 recalls that at the Indianapolis, Indiana campus, there were a "bunch of students who couldn't even read or write."

136.    With respect to face-to-face interactions with potential students, Admissions Advisors were instructed not to verbally tell students the cost of tuition, but were instead instructed to show potential students the cost of their Kaplan education on a piece of paper as a way of minimizing the actual cost.  Admissions Advisors were supposed to show potential students a sheet of paper that explained the costs for a particular degree, but they were not supposed to say the cost out loud.

137.    Although there are countless accounts of fraud at the Company's Kaplan division, two particular accounts warrant further detail.  CW 4 recalled a potential student named Tammy who came in for an interview.  CW 4 described Tammy as "filthy" and said it was clear she "wasn't making sense."  Tammy was rambling about finding her dead sister and actually lay down on the floor during the interview to show CW 4 the pose in which she found her sister.  Tammy had trouble coming up with the $20 application fee and she took the entrance exam three times, barely passing on her third and final attempt.  Additionally, Tammy only wanted to enroll in online courses despite the fact that she did not own a computer.  Although CW 4 expressed serious reservations, at Associate Director of Admission Wieleski's insistence, Tammy was enrolled at Kaplan.  CW 4

recalled that Tammy dropped out of Kaplan two weeks later. According to CW 4, Wieleski's reply in this disturbing situation, and in many others where it was clear potential students should not have been enrolled, was, "You gotta do what you gotta do. You gotta get those numbers." CW 6 recalled similar unethical practices, and recalled at least two occasions when Kaplan Admissions Advisors recruited students from a local homeless shelter. Indeed, CW 6 and her/his team were told by their supervising Coordinator that Admissions Advisors enrolled two homeless people, and also paid each homeless person's $50 to $100 enrollment fee.

138. Likewise, CW 22, a former Kaplan student, was explicitly lied to by an Admissions Advisor regarding the limitations of her/his bipolar disorder, in order to secure CW 22's enrollment with Kaplan. CW 22 explained that when deciding to enroll with Kaplan, CW 22 explained to the Admissions Advisor that she/he was enrolling at Kaplan to become a probation officer, and that she/he was currently on disability and took medication multiple times a day for bipolar disorder. The Admissions Advisor told CW 22 that her/his disability and bipolar disorder would not impact her/his profession as a probation officer, and that CW 22 would be able to obtain a well-paying job as a probation officer after completing Kaplan's program. CW 22 was also assured that the credits earned at Kaplan could be transferred anywhere.

139. After enrolling and taking classes at Kaplan, CW 22 eventually contacted the Ohio Department of Education ("Ohio DOE") and the U.S. Probation Office to inquire about becoming a probation officer. During the call with the Ohio DOE, CW 22 learned that credits earned at Kaplan could not be transferred anywhere. In addition, from speaking with the U.S. Probation Office, CW 22 learned that she/he was automatically disqualified from being a probation officer due to her/his bipolar disorder. Besides CW 22's mental health disqualification, the age limit for becoming a probation officer at the time of the application is 37, and CW 22 was already older than 37 at the

time. CW 20 confirmed that Kaplan allowed students with felony charges to enroll in its heating, air conditioning, and ventilation programs and incur substantial amounts of debt, despite knowing that their felonies would prevent the students from becoming a bonded employee capable of obtaining employment. The above examples are just a few of a multitude of the Kaplan students impacted by Kaplan's unethical recruiting activities

140.    Another deceptive practice used by Kaplan, according to CW 5, was to manipulate the add/drop periods in order to lock students into paying tuition. For example, while the "add/drop" period spanned the entire first week of the first semester a student was enrolled at Kaplan, for every semester going forward, the add/drop period was limited to a single day. As a result, Kaplan students only had one day to decide whether to leave a class, after which they were locked-in to paying for the entire course.

141.    Moreover, according to CW 7, the majority of students would "find out they could not afford the school." These students would invariably end up dropping out and defaulting on their loans. CW 7 stated that taxpayers would end up "holding the bag while [Washington Post CEO/Defendant] Don Graham makes a fortune." Kaplan was "always willing" to "push the envelope" as far as it could "as long as they were making money." Even though they "preach" they are an education company – "it is a big façade. They are all about making money."

142.    Admissions Advisors knew as they were enrolling students that they were setting the students up to fail in order to attain enrollment quotas. Courses at Kaplan cost as much as $371 per credit hour, and most students did not have the means to pay for college without extensive financial assistance. For example, according to CW 13, many students were enrolled in the online program, even though they did not own a computer that they could use to attend class and complete assignments.

143.     Once enrolled by an Admissions Advisor, it was the academic team's "job" to "keep" students in school.  According to CW 5, however, "we had nine Admission Reps and three Academic Advisors," so "the focus" was clearly on enrolling students, as opposed to advising and assisting students once they were enrolled.  In fact, although Washington Post claimed that its focus was students overall future success, some Kaplan facilities offered absolutely no career planning services to graduates.  For example, according to CW 13, the Cypress Creek and Plantation, Florida facilities did not offer career services to graduates.  Towards the end of CW 13's employment with Kaplan, Admissions Advisors were tasked with "networking" in the community to try and build relationships with "staffing companies" and potential employers in order to be able to refer graduates to places offering potential employment opportunities.  However, CW 13 was "not aware of any graduates getting jobs" after completing courses at Kaplan.

144.     Furthermore, the unethical practices within the Company's education division were encouraged by Kaplan executives.  For example, CW 14 recalled that Kilgore "encouraged bad admissions practices." In fact, CW 14 stated that in either late 2009 or early 2010, Kilgore made speeches to all Kaplan Directors of Admissions that "let everyone know" that "if you can't produce the numbers, somebody else would."  The first speech CW 14 recalled was called "Command Philosophy."  The second speech Kilgore made was entitled "Meet the Tiger."

145.     According to CW 9, Kilgore's "job was being out in the field."  He held focus groups and town hall meetings all the time with Admissions Advisors.  The enrollment issues and sales practices would always come up."  In fact, CW 9 estimated that Kilgore visited the Orlando, Florida facility "at least every couple of months," and held town hall meetings with "everyone from the floor – maybe 800 people."  Focus groups, however, were smaller meetings consisting of approximately three to five Admissions Advisors.

146.     Moreover, according to CW 5, KHE CEO Conlon was referred to internally at Kaplan as "Mr. Numbers," and was constantly asking people about "the numbers, the number of leads and the ratio to enrollment." In fact, according to CW 18, Conlon received daily Sales Reports detailing daily enrollment activities. According to CW 18, at a meeting with Conlon, after discussing CW 18's 10-year vision for online education, she/he was specifically told by Conlon to "follow the money."

147.     Moreover, according to CW 9, Company executives were also aware of the Company's enrollment practices through a "compliance violations list," and that the Company used a HyperQuality tracking system to monitor Admissions Advisors' calls.

148.     According to CW 1, every call in the Orlando, Florida facility was recorded using a QueueMetrics call center monitoring software. Kaplan retained a company in India to listen to and score the calls. Not every call was "scored," but instead only a random sampling. Directors of Admissions, including CW 1, pulled the Quality Scores for Admission Advisors from the QueueMetrics software.

149.     According to CW 8, Company executives were made aware of the Admissions practices through "intra-Company website -- KUNET." Within KUNET, there was a "Just Ask" section that was supposed to allow Admissions Advisors to anonymously ask questions. CW 8 recalled that there "were always questions about whether the stuff we were doing was alright."

150.     The factual allegations set forth herein were provided by the independently corroborating accounts of several confidential witnesses, including CW 1, CW 3, CW 4, CW 5, CW 6, CW 7, CW 8, CW 9, CW 10, CW 13, CW 14, CW 18, CW 19, CW 20, and CW 22.

### 1. "Uncovering the Pain and the Fear – Creating Urgency" – Kaplan's Scripts

151. Not only were the Company's unethical practices known throughout Kaplan, but they were memorialized in the Company's telephonic "scripts" that, as mentioned above, specifically directed Admissions Advisors to prey on potential students' "pain and fears" and to "stir up" students' emotions and "create urgency" to enroll in Kaplan.

152. In addition to requiring Admissions Advisors to uncover "the pain and the fear," the enrollment script contained a "Rubric Attribute" that emphasized the sales nature of the calls. It specifically stated: "Empower the student to respond/ Advisor Call Control"; "Advisor asked positive questions to encourage prospect buy-in, while providing the prospect with the opportunity to ask questions"; "Advisor picks up on buying signals"; and "Build/Maintain Rapport w/ Prospect."

153. Kaplan's scripts were paramount to Kaplan's enrollment process. Upon starting work with the Company's education division, Kaplan issued a binder with a laminated copy of the script to each Admissions Advisor. In fact, the first 30 days of Admissions Advisors' employment was spent memorizing Kaplan's scripts. According to CW 13, the script consisted of a 32-page PowerPoint presentation, and provided details about Kaplan, including its history and emphasized that Washington Post was the parent company of Kaplan. To that end, the script had a graph depicting how Kaplan represented more than 50% of Washington Post's total revenue.

154. The scripts were based on an "outcome based" sales strategy designed to make the potential enrollee think about his or her inspiration for enrolling in college and the outcomes the potential enrollee sought to achieve. According to CW 13 the "whole idea" was to keep the potential enrollee on the phone by utilizing the script. The Admissions Advisors asked questions that prompted potential enrollees to consider how a college education at Kaplan might improve their income potential. CW 4 confirmed that Admissions Advisors would say things such as "look at your

life now" to convince prospects that attending Kaplan was a viable way to change their lives and economic situations.

155. Moreover, the scripts were designed to and did create a sense of urgency and panic so that students would enroll with Kaplan. According to CW 8, if students showed "any hesitation" Admissions Advisors would manipulate the prospects by using their own words against them. For example, Admissions Advisors would start sales calls with leading questions designed to pull out key facts, which could be used later in the sales process as emotional lightening rods. CW 8 stated that if a prospective student said their grandmother would be at their graduation, but later said they could not afford the tuition deposit, CW 8 was trained (like all of the sales force in the Company's Kaplan division) to "tell them to get it from their grandma." "We were always urging them to get it done now – we preached that all day, every day."

156. On top of manipulating students, the sales scripts used in the Company's Kaplan division contained outright lies. For example, the script stated that Concord Law School, Kaplan's online law school, was 70 years old and was accredited. The truth was that Concord Law School had only been in existence for a mere 13 years, since 1998. Moreover, although Concord Law School was accredited by the National Conference of Bar Examiners it was not accredited by the American Bar Association ("ABA") – the largest, and most reputable law school accreditation association in the country. As a result of Concord Law School's lack of ABA accreditation, graduates are not permitted to practice law, or even sit for the bar, in any state outside of California. These facts, however, were not disclosed to potential law students.

157. The factual allegations set forth herein were provided by the independently corroborating accounts of several confidential witnesses, including CW 4, CW 8, and CW 13.

## 2. Kaplan Works the System, and Its Students, In Order to Obtain Financial Aid Awards

158.    Admission Advisors implemented a multitude of false and misleading practices surrounding financial aid.  For example, CW 8 detailed a specific example of Admission Advisors acting unethically in order to obtain financial aid on behalf of a Kaplan student.[10]  Around July 3, 2010 and July 6, 2010, Associate Director of Admissions Pugh and another Admissions Advisor applied for a FAFSA pin on behalf of the student.  The FAFSA is the form required to be submitted to the federal government in order to obtain federal financial aid.  Included in the FAFSA is a Master Promissory Note ("MPN") which must be signed by the student.  After applying for the FAFSA pin on behalf of this student, Pugh and the other Admissions Advisor received the pin, and electronically signed the MPN on the student's behalf.  According to CW 8, this blatantly fraudulent tactic was used because it was close to the enrollment deadline, and "Kristen [Pugh] needed to hit her numbers."  CW 8 became aware of this situation because the student was selected for document verification, and CW 8 spoke directly with the student about the incident.

159.    On a daily basis, Kaplan also manipulated potential student's Estimated Family Contribution ("EFC").  The EFC is the amount of money that students and their family's are expected to contribute to the student's education.  When calculating financial aid, this number is used to offset the amount of federal financial aid a student is entitled to receive.  Kaplan wanted students with an EFC of zero, because those students - and thus Kaplan - would receive more government financial aid as a result.  According to CW 8, when Kaplan saw an EFC of zero, "all

---

[10] In the interest of privacy, Plaintiff is not identifying the former Kaplan student by name.  If the Court desires specific identification, Plaintiff will provide it to the Court and counsel for Defendants.

they see is money signs." CW 16 confirmed that potential students were informed by Admissions personnel that they would receive "100 percent financial aid."

160.    Prior to June 2010, the Kaplan internal policy stated that Admissions Advisors could not even transfer a call to Financial Aid unless the Admissions Advisor put in the EFC number into the computer system. Admissions Advisors entered the EFC information into an Orion system used by both Financial Aid and Admissions. CW 8 recalled that it was a common practice for Admissions Advisors to enter an EFC of zero, regardless of the prospective student's actual EFC, in order for the student to "see all that money" was available to them "once they got to Financial Aid."

161.    Admissions Advisors also logged into classes on behalf of students in order to ensure the disbursement of federal financial aid dollars. CW 8 explained that in order for Kaplan to get money from the government, the student has to log in to classes within "the first seven days of the start." So, it was common for Admissions Advisors to log in on students behalf in order to guarantee federal monies.

162.    According to CW 6, the Financial Aid department would rush prospective students and their parents through the process and would get "irritated" when students asked questions. CW 6 explained that Kaplan's policy was that the more prospective students and their parents knew about the long-term debt they were signing up for, the less likely it was they would actually enroll. In other words, the Company's financial aid department deliberately sought to minimize disclosure of the truth to prospective students in order to further boost Kaplan enrollments.

163.    The factual allegations set forth herein were provided by the independently corroborating accounts of several confidential witnesses, including CW 6, CW 8, and CW 16.

### G.     Ability to Benefit - Kaplan Takes One Step Forward and Two Steps Back

164.     Up until October 2009, Washington Post's education division permitted students who had not received a high school diploma to enroll in its Kaplan's institutions, as long as those students completed and passed an ATB test.  Throughout Kaplan, these students were known as ATB students.  According to CW 17, although Kaplan was theoretically giving opportunities to students without high school diplomas, in reality, Kaplan was enrolling representatives of the "at risk population" and "setting them up to fail."  That is, ATB students were enrolled and incurred federal student loans in the amount of $12,000 – and often much more - but were simply not capable of completing the programs in which they enrolled.  Therefore, they were instantaneously "at risk" of defaulting on their student loans.  CW 17 also stated that ATB students represented a significant portion of Kaplan's drop rate because Kaplan failed to properly staff the schools to provide the requisite amount of assistance and support that Kaplan knew ATB students would require.

165.     In October 2009, Kaplan stopped admitting ATB students. According to CW 11, Kaplan became "arrogant – they wanted to be the Harvard of proprietary schools."  What the Company was not prepared for, however, and what Defendants did not disclose to investors, was that the decision to stop taking ATB students caused an immediate drop in enrollments.

166.     Despite ceasing to enroll ATB students, Kaplan did not alter its marketing. So, ATB students remained the primary target of Kaplan's marketing.  For example, according to CW 11, for some time after the Company's education division no longer admitted ATB students, 30% of the potential-student leads generated were still ATB students.  Regardless of the fact that Kaplan would no longer enroll 30% of its leads, the Company still expected Kaplan Admissions Advisors to have the same conversion rate of leads to enrollments and to enroll the same number of students.  The change in policy of no longer enrolling ATB students, but yet still requiring Admissions Advisors to

have the same conversion rates and enrollment quotas only added to the level of aggression used to recruit new students. Instead of cleaning up its act, the Company's education division had, in reality, poured fuel on the fraudulent recruiting fire burning at Kaplan. CW 14 confirmed that, despite the fact that the new policy precluded Admissions Advisors from contacting a large number of potential leads, the Company's Kaplan division made "no change" to either enrollment quotas or the Admissions Advisor compensation policies.

167. The factual allegations set forth herein were provided by the independently corroborating accounts of several confidential witnesses, including CW 11, CW 14, and CW 17.

## H. Kaplan's Improper Practices Throughout the Class Period Were Orchestrated to Circumvent the Requirements of the 90/10 Rule

168. The Company's Kaplan division routinely set up improper and undisclosed practices to circumvent the 90/10 Rule. For example, CW 3 recalled generally that in 2008 or 2009, after the state of Ohio cut funding to Kaplan's Columbus, Ohio campus, the Financial Aid Director set up cash payments for students that the Director "knew they couldn't afford." "Every student had some type of cash payment because of the 90/10 rule." According to CW 3, there was "no way" the student could afford the cash payments – "they couldn't even afford $10." As a result, the Columbus campus had a problem with collecting accounting receivables from students. The problem reached such extremes that Kaplan Controller Neil Amari set up a conference call for every Friday at 10 a.m. for each Assistant Controller working at Ohio campuses "to ask what are you doing to collect this money."

169. In violation of regulatory standards, Kaplan had a way of skirting the 90/10 Rule and continuing to collect federal financial aid, even when campuses had already exceeded their 90% federal funds limit. For example, CW 17 stated Kaplan shifted "things between the main and branch campuses." Indeed, Kaplan had main campuses, and branch campuses. CW 17 explained that by

recording and applying financial aid using different Office of Postsecondary Education Identifier ("OPEID") numbers, federal funds were applied to schools other than the schools for which they were intended. Simply stated, if a main campus had exceeded 90% funding from federal funds, the funds were "moved" to a branch of the main campus, in order to keep the main campus in line with the 90/10 Rule. CW 17 explained that she/he was specifically instructed by Financial Aid Trainer James Blackburn, to record financial aid in this manner. These practices were also confirmed by CW 21, who recalls being told multiple times by Executive Director of Federal Regulatory Affairs Echols to manipulate OPEID numbers in this manner to hide the fact that a campus has reached its 90% threshold.

170.    According to CW 17, approximately one third of the 76 campuses she/he looked into had issues with exceeding the 90/10 Rule. Inevitably, by August or September of each year, there were a large number of Kaplan campuses that already had more than 90% their of funding coming from federal student aid. As a result, CW 17 explained that these campuses placed all pending federal student aid applications "in a holding pattern" until the new year began, known as a "90/10 hold."

171.    Kaplan also improperly withheld disbursing funds to students' accounts because, had it timely done so, it would have violated the 90/10 Rule. Indeed, CW 24 detailed how, for two weeks in November 2009, Kaplan withheld timely disbursing approximately $200 million in federal financial aid funds to students, so that it could create the fiction of compliance with the 90/10 Rule. According to CW 24, Kaplan held back this money because, if it was posted to student accounts, it would have been obvious that Kaplan's institutions were receiving more than 90% of their revenues from federal funds. CW 24 also recalled student funds being improperly withheld for approximately a week on at least three other occasions during the Class Period. Such actions were in clear violation

of federal regulations. As mentioned above, pursuant to the *Handbook for Federal Student Aid*, all institutions receiving financial aid are required to disburse funds to students within 3 days of receiving them. Additional details concerning the accounts of CW 24 are provided herein at ¶¶199-207.

172. In addition to the foregoing, Kaplan violated the 90/10 Rule through its "Gift of Knowledge Scholarship." To qualify under the 90/10 Rule, an institution must receive at least 10% of its students' tuition funds in cash, rather than from federal financial aid or student loans. To create the appearance of 90/10 Rule compliance, Kaplan payed its employees to become students at Kaplan University.

173. High ranking Kaplan executives, including Rosen, who was then the President of Kaplan University, concocted a scheme to manipulate Kaplan's compliance with the 90/10 Rule and Title IV regulations. Specifically, because Kaplan did not have enough cash-paying students to satisfy the 100% threshold, Kaplan created an MBA graduate program in May 2005. It then filled that MBA program with Kaplan employees. These employee "students" would then receive the "Gift of Knowledge Scholarship," which would pay for the entire cost of tuition. That scholarship money, however, was nothing more than recycled student loan monies derived from other legitimate Kaplan students: it was simply moved into a Gift of Knowledge Scholarship account. The employee students who received the scholarship would use the funds to pay tuition. This fraudulent framework created the appearance that the employee students were cash paying students, and thus provided Kaplan with enough students to artificially maintain eligibility for Title IV funds under the 90/10 Rule.

174. Kaplan executives talked about the so-called scholarship program in terms of "green money" and "blue money." Green money represented cash, and blue money represented Title IV

funds the Company used to fund the Gift of Knowledge Scholarship. Despite the fact that Gift of Knowledge Scholarship recipients were paid with blue money, the Company counted it as green money in its internal 90/10 Rule calculus.

175. Kaplan's scheme worked well, and was expanded over time to include employee students taking bachelors' level classes. Thus, despite the Company's apparent compliance with the 90/10 Rule, the truth was that nearly 100% of Kaplan's cash came from federal student loans.

176. For example, Ms. Kari Jorgensen ("Jorgensen") was given the "Gift of Knowledge" in 2006 to pursue an MBA with Kaplan. Jorgensen was, at the time, an assistant to Chris Caywood, the then Vice President of Law and Legal Studies. Although Ms. Jorgensen never paid any of her own money to Kaplan, Kaplan counted her as a cash-paying student. Despite the fact that all of Ms. Jorgensen's tuition was funded through the blue money that made up the Gift of Knowledge Scholarship, Kaplan reported her to the Higher Learning Commission ("HLC") as a green money, cash-paying student.

177. In addition, Kaplan reported Ms. Jorgensen to the U.S. Internal Revenue Service as a green money, cash-paying student. Kaplan thus counted the green money "paid" by Ms. Jorgensen as cash received by the school. Attached hereto as ***Exhibit D*** is a Form 1098-T stating that Ms. Jorgensen was billed $17,465 for qualified tuition and related expenses. That amount, however, was only paid in blue money. Ms. Jorgensen never paid Kaplan green money.

178. The fraud demonstrated above, which was further carried out on Kaplan's books, was utilized over and over with many Kaplan employees, enabling Kaplan to subvert the 90/10 Rule's actual requirements.

179. With its fraudulent misconduct exposed by the end of the Class Period, Kaplan began exceeding the 90/10 Rule. For all of 2010, Kaplan University reported that 91.7% of its revenue

came from Title IV loans. The only reason Kaplan survived is because it received "temporary relief" provided by 2008 legislation. Moreover, the figure would have been higher but for Washington Post itself lending $18 million to students. Initially, it charged them a 15% interest rate, according to congressional investigators. Washington Post said that in the summer of 2010, it cut the rate to 6.8% for new and existing loans.

180. The use of blue money to fund the Gift of Knowledge Scholarship was well known amongst Kaplan executives, including Kaplan CEO and Chairman Rosen, as well as Kaplan's previous CEO, Jonathan Grayer. Notably, as set forth by CW 23, Kaplan's CEOs participated in semi-annual "planning" meetings attended by executives of the Company's divisions and Defendants Graham and Jones, where executives voiced concerns about Kaplan's excessive growth and operations.

181. The foregoing allegations are based, in part, on documents and facts set forth in various *qui tam* actions against Kaplan, media reports, and other litigation, as well as the extensive, ongoing investigation of Plaintiff's counsel.

## I. Kaplan Skirts DOE Reviews

182. Kaplan regularly shut down campuses that were under DOE scrutiny or at risk of adverse findings in audits by regulatory or accreditation representatives. Kaplan would then open campuses nearby, employing the same practices. For example, in February 2010, Kaplan shut down the Lauderhill, Florida campus and opened the Pembroke Pines, Florida campus. According to CW 17, staff and students from the Lauderhill campus had been "a mess" in terms of compliance, and they were all transferred to the new Pembroke Pines campus.

183. This practice occurred across all of the Company's Kaplan division, as Kaplan also closed schools that were under government investigation and scrutiny, and re-opened nearby campuses, in California, Michigan, and Indianapolis. For example, Kaplan acquired Maric College

and immediately closed the legacy Maric College campuses in Los Angeles, San Diego, Irwindale, and Pomona, California - which were facing DOE scrutiny - only to open new campuses nearby. Similarly, Kaplan closed the Detroit, Michigan campus that was at risk of DOE compliance violations but immediately opened the Dearborn, Michigan campus and transferred staff and students to the new campus. In Indianapolis, Indiana, Kaplan opened a second school for the same reason, to avoid having the first Indianapolis campus shut down by the DOE.

### J. The GAO Investigates Kaplan, Prompting the Company's Education Division to Dramatically Change Its Practices

#### 1. The GAO Visit to the Pembroke Pines Campus

184. On August 3, 2010, news reached the market that the GAO conducted an investigation into for-profit schools. Among other things, the GAO sent undercover investigators, posing as students, to Kaplan's Pembroke Pines, Florida facility, and the GAO report – along with undercover video – detailed fraudulent, deceptive, and illegal financial aid and recruiting practices as all 15 for-profit colleges that were chosen (because they received nearly 90% of their revenues from federal aid) for investigation. According to CW 13, once the GAO released its report, there was a "huge huddle" at Kaplan's Plantation, Florida center the day after the GAO "released the video" and the personnel at the center were chanting "no more goals."

185. As a result of the events that transpired at the Pembroke Pines facility, CW 13 stated that the Plantation, Florida campus and *all other campuses in the region* were "shut down for three months." During that time, employees and Admissions Advisors were not allowed to email or speak with students or potential enrollees. According to CW 13, who worked at the Pembroke Pines facility for a period of three months after the release of the GAO report, she/he went to work "everyday with [her/his] laptop and watched cartoons." Kaplan continued to pay regular salaries to

the personnel at the Plantation, Florida facility, despite the fact that they did not perform any work for a period of three months after the GAO investigation was made public.

### 2. The Impact of GAO Report – Kaplan Scrambles to Minimize the Damage

186.     After the August 4, 2010 GAO report shined a bright light on Kaplan's predatory enrollment and deceptive financial aid practices, the Company scrambled to institute changes at Kaplan in order to attempt to minimize the damage. One of the major changes dealt with extensive revisions to Kaplan's recruiting script. Indeed, around August 12, 2010, and again approximately two weeks later, Kaplan distributed new scripts.

187.     According to CW 14, the new script grew in length to approximately 50 pages. As opposed to telling Admissions Advisors what they should say, as the previous script had done, the new scripts focused on telling Admissions Advisors what they were not permitted to say. CW 14 explained that Kaplan executives were "absolutely aware all along" of the enrollment practices in the Company's education division, as evidenced by the change in policies following release of the GAO report. Summing up the difference between the scripts, CW 14 stated, "it was like night and day after the GAO report."

188.     CW 9 confirmed that after release of the GAO report, there was a "de-emphasis on" enrollments and more of an emphasis on compliance. For example, Admissions Advisors were no longer permitted to tell prospective students that Kaplan's institutions had the same regional accreditation as Ivy League schools. The new script also forced Admissions Advisors to disclose that it was up to receiving schools as to whether Kaplan credits could transfer to another institution. In the past, Admissions Advisors assured potential students there would be no issues with transferring credits earned at Kaplan to other schools. CW 8 recalled that Admissions Advisors at the Orlando, Florida call center were "pulled off the phone for four hours" in July/August 2010 to

review the new scripts, which were approximately 36 pages long. The person in charge of the training, David Klester made the Admissions Advisors go through the new script "line by line."

189. Moreover, after the GAO report, according to CW 9, the Company's Kaplan division made a conscious effort not to pursue "certain leads." CW 9 explained that Kaplan "cut way back on the lower-level type leads." As a result of Kaplan's new-found compliance with federal regulations, Kaplan's business froze. CW 9 stated that prior to the GAO report, her/his team enrolled approximately 70 students per month in the Information Technology school. After the GAO report, enrollments dropped to a mere 7 per month.

190. According to CW 8, after the GAO Report was released, it was not uncommon "to see 30 people walked out in a day for compliance issues," meaning that Kaplan would terminate approximately 30 Admissions Advisors in a day for not making proper disclosures to potential students. Needless to say, prior to the GAO report, these Admissions Advisors would not even have faced reprimands for such misconduct, so long as they were exceeding minimum enrollment quotas. Indeed, they may have been given raises.

191. There were also significant changes to the compensation structure at the Company's Kaplan division following release of the GAO report. According to CW 13, the salaries paid to Admissions Advisors became "locked-in" and no longer widely fluctuated up and down based on the attainment of enrollment quotas every quarter or every six months.

192. Put simply, following release of the GAO report, the Company's Kaplan division recognized that its predatory business model had been exposed and froze everything. CW 14 recalled that there "were no more reviews, no more goals." Indeed, the Company even stopped terminating Admissions Advisors at the end of the 90-day review for not meeting production points, despite the fact that this was a written policy. In fact, CW 14 stated that Kaplan Admissions

Advisors would get emails "every day" after the GAO report "telling us to no longer use the words 'enrollments' or 'starts,' and 'goals' were taken away."

193. Although the Company's education division did make substantial cosmetic changes to its scripts and compensation structure, Kaplan was still up to its old tricks. For example, regarding Kaplan's Concord Law School, CW 8 asked during the new script training whether she/he was permitted to disclose to prospective students that they had to live in California to attend the law school and that the students "can't sit for the bar exam." CW 8 was specifically told by a trainer, "no . . . we don't want to tell them that."

194. Moreover, according to CW 8, Kaplan instituted a new compensation plan on October 31, 2010. CW 8 explained that for the first performance review following the change in compensation structure, Admissions Advisors received their compensation based on "which program the Advisor scored better on." In other words, the Admissions Advisors would be given a review using metrics from both the previous and the new compensation structures. The Admissions Advisors' compensation was based on which of the two programs resulted in higher compensation.

195. The factual allegations set forth herein were provided by the independently corroborating accounts of several confidential witnesses, including CW 8, CW 9, CW 13, and CW 14.

### K. The Florida Attorney General Investigates Kaplan, and Reveals the Sworn Testimony of Two Former Kaplan Admissions Advisors

196. On October 19, 2010, Florida Attorney General Bill McCullum announced commencement of an investigation into alleged deceptive trade practices at five proprietary school groups located in Florida, including Kaplan (the "AG Investigation"). In the course of the AG Investigation, two former Kaplan Admissions Advisors, Elena Bright ("Bright") and Mark Stegall ("Stegall"), sat for deposition and provided sworn testimony concerning Kaplan's unethical

enrollment and financial aid practices. True and correct copes of the Bright and Stegall deposition transcripts are attached hereto as ***Exhibits E*** and ***F***, respectively.

197. Bright worked for Washington Post's Kaplan from August 2009 through November 2010, as an Admissions Advisor in the Orlando, Florida call center. While at Kaplan, Bright reported to Scott Becket. Stegall worked for the Company from April 1, 2009 to December 3, 2009, as a Senior Admissions Officer, also in the Orlando, Florida call center. While working at Kaplan, Stegall reported to Gordon King. Throughout their depositions, Bright and Stegall ***both*** provided sworn testimony that, among other things:

- Admissions Advisors at Kaplan were under tremendous and ongoing pressure to meet enrollment goals, and if goals were not met, Admissions Advisors were fired;

- The Company's Gem-Tier compensation structure for compensating Admissions Advisors was based "solely" on enrollments. Consequently, the ***only*** way to move up a level in the Gem Tier, which would result in a monetary raise, was to make certain enrollment numbers;

- Among other things, Admissions Advisors told students that Kaplan had the same accreditation as Harvard or Yale. Admissions Advisors also provided prospective students with salary estimates of $50,000 and $100,000, which they claimed would be achieved upon receipt of a Kaplan degree, and were told to infer to students that all their credits from Kaplan would transfer to other schools; and

- Kaplan's policy regarding financial aid prohibited Admissions Advisors from transferring a potential student to the financial aid department to discuss the amount of financial aid a student would be awarded until the student had given a "commitment" to attend Kaplan.

198. The sworn testimony attached hereto, resulting from the Florida Attorney General's investigation of Kaplan's (now well-documented) illegal and deceptive business practices, provides powerful corroborative facts that support both the accounts of the CWs detailed herein, as well as Plaintiff's allegations of fraud.

L. **Throughout the Class Period, Defendants Had Knowledge of and Endorsed Kaplan's Fraudulent Scheme**

1. **Kaplan Provided Washington Post With Daily Cash Transfers - Except on Days When It Was Violating the 90/10 Rule.**

199.     Throughout the Class Period, Washington Post was so financially dependent on Kaplan that it relied on daily cash infusions sent up from Kaplan in order to keep the Company running. According to CW 24, Kaplan's former Treasury Manager, Kaplan operated with "no cash" from a balance sheet perspective because Washington Post required any excess cash to be funneled upwards to the Company on a daily basis. CW 24 equated such transfers between Kaplan and the Washington Post as daily "automatic sweep[s]." In total, these daily sweeps resulted in annual transfers from Kaplan to Washington Post of over $1 billion.

200.     More specifically, in 2009, the money from Kaplan's various institutions was sent to a "main concentration account" at Sun Trust Bank, in the name of "Kaplan Inc." By 2010, Kaplan also opened two Citibank accounts in the names of "Kaplan Higher Education" and "Kaplan University." CW 24 recalled that funds were typically pulled into the main concentration account within one to two days of being sent to the school from the federal government. The majority of the money from this "main" account was then sent directly to the Company into an intercompany account numbered 2451. About $15-$20 million remained in the account as a reserve, discussed in more detail below. According to CW 24, all the transfers from Kaplan University or KHE were recorded in the general ledger via an intercompany account numbered 1516. This was a Company-wide practice.

201.     According to CW 24, the cash infusions were sent every day - except for days when Kaplan's institutions were operating in violation of the 90/10 Rule. On these days, Kaplan needed to keep the cash on hand, and literally sent *no money* to Washington Post. CW 24 recalls that Corser was responsible for determining when money was to be held back. CW 24 voiced her/his ethical

concerns about this process with Bay and Corser. When the daily cash sweeps would be reduced to $0.00, CW 24 would speak with Washington Post Assistant Treasurer Aloma Myers ("Myers") to explain that Kaplan would not be transferring any funds to the Company because its institutions were operating in violation of the 90/10 Rule.

202.     This practice of Kaplan withholding money on days it was in violation of 90/10 was well-known.     For example, on November 13, 2009, CW 24 sent an email to her/his superiors, including Corser, Bay, and Kaplan Senior Treasury Manager Ted Katz ("Katz"), informing them that Kaplan University was "still holding back" on processing financial aid batches "to comply with the 90/10 Rule."  CW 24 was then called directly by Corser and told not to reference the 90/10 Rule in emails.  According to CW 24, Vice President of Financial Aid James Blackburn was responsible for performing the analysis that demonstrated that Kaplan was violating in the 90/10 Rule in November 2009.

203.     Washington Post was heavily dependent upon these daily sweeps, which totaled over $1 billion per year (averaging over $2.5 million per day) in order to keep the Company afloat.  In addition, given the materiality and monetary significance of the funds transferred, it was patently obvious to the Individual Defendants, high-ranking Company executives, and Washington Post itself when the cash sweeps would suddenly decrease to zero dollars. The fact that Washington Post's daily sales sweeps of Kaplan's cash would shut down on certain days during the Class Period, given the importance of such funds to the Company, supports an inference that high ranking officials at Washington Post, including Defendants, were aware of the reasons why the money spigot of federal funds from Kaplan was periodically suddenly turned off.

204.     Moreover, prior to his current position at the Company, Jones worked as CFO of both Kaplan and Kaplan Professional.  As a result, he would have undoubtedly been aware of the

intricacies of the daily cash infusions between Kaplan and Washington Post. Simply stated, this massive change in upward cash flow would have sounded alarms at Washington Post, further supporting an inference that Defendants acted with knowledge or severe recklessness that their Class Period statements regarding the Company, its risk profile, and its future business prospects were materially false and misleading when made.

205. In addition, due to these daily cash sweeps, Kaplan's institutions operated in violation of various state accreditation standards that mandated that Kaplan's for-profit schools maintain a certain level of capital, or an average percentage of their liabilities on hand as cash. For example, CW 24 recalls that, on average, Kaplan was required to keep a ratio of 1.5 to 1 for assets to liabilities. She/he explained that Kaplan's institutions were constantly violating these accreditation standards across the board because all excess cash was sent to Washington Post. The schools simply did not keep sufficient amounts on hand, as required. CW 24 estimated that approximately 20 of Kaplan's campuses were subject to mandatory capital regulations. While the majority of campuses were never caught in violation, CW 24 recalled that both Bauder College and Hesser College were cited during the Class Period by accreditation bodies for not meeting cash requirements.

206. In an effort to avoid being cited for such violations, at the end of every quarter, money was taken from the "main concentration account" and sent back to Kaplan's schools via intercompany account 2451. It was only after these transfers that CW 24 would perform her/his required ratio analysis to "confirm" the schools were operating within accreditation guidelines. Indeed, while at the Company, one of CW 24's responsibilities included maintaining an Excel spreadsheet using numbers from Kaplan's Oracle accounting system, which specified the asset to liability ratio for each school based on state accrediting body standards. Prior to her/his employment with Kaplan in September of 2009, this spreadsheet was maintained by Corser and Seelye.

207.   From the Kaplan side, Bay was responsible for reporting to Washington Post Corporate Treasurer Dan Lynch ("Lynch") on the Washington Post side, to convey the total amount that needed to be returned to Kaplan each quarter.  Moreover, Kaplan stopped sending money to the Company around December 15 of each year in anticipation of the Company sending funds back consistent with these practices.  At the end of each year, Washington Post sent approximately $250-$300 million back to Kaplan to make up for capital shortages.  According to CW 24, Myers and Lynch were aware that these quarterly transfers were necessary for Kaplan's institutions to comply with accreditation standards.  Many Kaplan and Washington Post executives were aware of such practices, including Corser, Bay and Katz.

208.   Despite knowing Kaplan repeatedly violated the 90/10 Rule, repeatedly violated applicable student lending guidelines, and repeatedly operated in violation of mandatory capital requirements, Defendants disclosed none of these facts to investors during the Class Period.

## 2.   Defendants Actively Lobbied for Less Stringent Department of Education Guidelines

209.   Throughout the Class Period, the Company actively increased its lobbying efforts to Congress in order to maintain less stringent DOE regulations, ostensibly, to keep their scheme afloat.  For example, in 2009, Washington Post spent over $240,000 on lobbying efforts related to Kaplan, compared to only $150,000 in 2008.  In 2010, Washington Post spent $1,129,473 on lobbying efforts related to Kaplan.  In fact, throughout 2010, the Company engaged 3 separate lobbying firms, comprising 11 separate lobbyists, dedicated to the Company's Kaplan-related lobbying efforts.

210.   In Graham's own words, Kaplan was of "utmost importance" to the Company.  For example, an August 24, 2010, *The Washington Post* article entitled, "Higher Ed Community Focuses on Post, Kaplan" revealed that Graham had been actively lobbying and speaking to lawmakers in

response to the rising pitch of criticism of the for-profit sector. The article was published only 20 days after the results of the GAO Report were revealed. It stated, in pertinent part:

> *Inside Higher Ed* reports that Donald E. Graham, chairman and chief executive of The Post Co., has "visited several members of Congress to lobby on Kaplan's behalf," sourcing the statement to a staffer for Sen. Tom Harkin (D-Iowa). . . .
>
> I asked Graham about the lobbying efforts. He told me this afternoon in a telephone interview: ***"I don't do it unless the issue is of central importance to our company, and this one is."*** He said he spoke to lawmakers in response to the rising pitch of criticism of the for-profit sector. "I'm very glad of what Kaplan Higher Education does, and very proud to speak out for it," he said. "I'm speaking up as I think any CEO of a corporation should."

211. On information and belief, Defendants increased their lobbying efforts throughout the Class Period and directly afterwards because Defendants knew that Kaplan could not survive stricter DOE regulations. Defendants were keenly aware that Kaplan was routinely operating in violation of the 90/10 Rule and that its sales force – compensated in grotesque violation of the HEA – utilized strong-arm recruiting tactics to suck in students who were taking on an inordinate amount of debt that they would never be able to pay back in exchange for worthless degrees. This manifest risk to the Company was not adequately disclosed during the Class Period, and was actively obfuscated by Defendants' materially false and misleading statements. Indeed, Washington Post increased its lobbying efforts by *1,000%* in three years. Moreover, Graham's personal lobbying efforts support an inference of his scienter. By speaking publicly about Kaplan, both in the press and to Congress, Graham demonstrated extensive familiarity with Kaplan's operations and business prospects. With Graham's self-professed belief that Kaplan was of "central importance" to Washington Post in mind, the inference of scienter as to Defendant Graham is strong and compelling.

### 3. Federal Whistleblower Actions Put Defendants on Notice of the Wrongful Misconduct Alleged Herein

212. As set forth in the Company's 2009 10-K, the Company's Kaplan subsidiary was named as a defendant in several federal whistleblower actions. The actions alleged severe

misconduct at the Company's most important subsidiary, including: extensive improper compensation practices for Admissions Advisors in violation of the HEA; widespread aggressive and manipulative recruitment tactics that were used to boost enrollment numbers; the improper inflation of students' grades for purposes of maintaining minimum academic achievement levels required for Title IV funding; rampant violations of the 90/10 Rule; falsified accreditation documents; and multiple instances regarding various other failures to comply with the requirements of the HEA. As of the date of the 2009 10-K, the actions were: *United States of America ex rel. Carlos Urquilla-Diaz v. Kaplan University,* No. 1:09-20756 (S.D. Fla.); *United States of America ex rel. Jorge Torres v. Kaplan Higher Education Corp.*, No. 1:09-21722 (S.D. Fla.); *United States of America ex rel. Victoria Gatsiopoulos v. ICM School of Business & Medical Careers*, No. 1:09-21720 (S.D. Fla.); and *United States of America ex rel. Charles Jajdelski v. Kaplan Higher Education Corp.*, No. 2:05-cv-1054 (D. Nev.).

213. The Company described the actions as including "claims under the federal False Claims Act (31 U.S.C. §376, *et seq*.) relating to eligibility for Title IV funding." In addition, the 2009 10-K indicated that Washington Post would be defending the actions.

214. There is no doubt the Defendants were aware of the existence of the federal whistleblower actions and the allegations contained therein. Those actions detail legion violations of HEA and applicable regulations that, if proven, materially threatened Kaplan's eligibility to continue receiving vital Title IV funds, which, in turn, threatened Washington Post's financial condition and future business prospects.

215. These facts, therefore, bolster the numerous CW accounts contained herein and provide support for an inference that Defendants were aware of, or recklessly disregarded, the substantial misconduct and wrongdoing occurring at Kaplan throughout the Class Period.

### 4. Kaplan's Extensive Reporting Systems Provided Defendants With Knowledge of Kaplan's Predatory Business Model

216. Throughout the Class Period, Kaplan sent its detailed financial reports directly to Washington Post on a monthly, quarterly and annual basis. Indeed, CW 23 detailed that if financials were not delivered by all of the Company's subsidiaries on a timely basis, they would be subject to negative repercussions.

217. Moreover, in June 2010, Washington Post assumed the responsibilities of Kaplan-related payables, including all student stipends. According to CW 24, this decision was made at the direction of Rosen and other Kaplan executives in order to provide justification for Kaplan's continuous transferring of significant funds to Washington Post.

218. Semi-annually, in the spring and fall of each year, executives from each of the Washington Post's subsidiaries attended meetings along with Graham and Jones, where various executives voiced their "concerns" about Kaplan's extreme growth, hiring practices, and acquisition practices. CW 23 detailed how these three-day meetings were centered on "status reporting" and the "long term views" of the Company as a whole. In addition to Defendants and the Company's subsidiaries' executives, CW 23 recalled that Kaplan's CEO, Conlon, Corporate Human Resources Executive Anne McDaniels, and Graham's associate, Jerry Rotherberg, also attended these meetings. Kaplan's CEO made presentations about the Company's business plan and Kaplan's operating income, costs and revenues. Jones, on the other hand, made presentations about the financial performance of the Company as a whole. These meetings were typically held offsite. For example, CW 23 attended a meeting at a conference center at the Wye River in east Maryland, as well as a meeting in Florida. CW 23 detailed how executives of the Company's subsidiaries brought up multiple concerns in front of Graham and Jones about Kaplan's explosive growth, hiring practices,

and acquisition practices. According to CW 23, Graham appeared to let Kaplan's executives "slide" and ignored the proffered concerns.

219. In addition, records demonstrating the results of Kaplan's predatory business practices were readily available to hundreds of Company employees. According to CW 12, the Company's Kaplan division used a Pro-Clarity software for a "Dashboard" reporting system, which was accessible through Kaplan's intranet. CW 12 described the Dashboard report as providing "instant insight" into "what was going on" within the Company's Kaplan division.

220. Each campus was assigned a campus number within the Dashboard report and CampusVue. For example, CW 12 recalled that Kaplan University was Campus 42. The KHEC campus in Cedar Falls, Iowa was Campus 36. The front page of the Dashboard report, available to Company's top executives, provided a "snapshot" of key business metrics, which included the following:

- The "Conversion Rate View" calculated the number of student leads that eventually turned into enrollments;

- The "90/10 View" showed the percentage of revenue each school derived from federal financial aid. The first view a user could access within the 90/10 view showed the ten campuses with the highest percentage of revenue derived from federal financial aid;

- The "Student Starts View" calculated taking starts net of reverse starts. Reverse starts include students that graduate, drop out and take a leave of absence; and

- The "Drop Rate Calculation View" determined the rate at which students were dropping out of Kaplan institutions.

221. According to CW 12, once in the Dashboard, the user could "drill down into each of the numbers" to get a "detailed view of each region and then each campus." The front page provided the key business metrics "rolled up to the national level."

222.  The Dashboard was available to approximately 800 employees, ranging from the Kaplan's top executives, including Kaplan CEO and Chairman Rosen and KHE CEO Conlon, down to the Campus Director level employees.

223.  The Dashboard provided both financial and operational data for the Company's Kaplan division, including specific data discussed below for Kaplan University and KHE.  Kaplan University and KHE financial and operational data was fed into the Dashboard report from the CampusVue system.  The amount of data available to the viewer was determined by the employee's position within the Company.  For example, Rosen and Conlon were able to see a snapshot of the Company's national operations, and according to CW 12, both Rosen and Conlon viewed the system regularly.

224.  In addition to reviewing data in the Dashboard reporting system, every Monday at 10:00 a.m., Kaplan executives met for a Weekly Executive Staff Meeting.  The Weekly Executive Staff meeting was held in the "Delphi" conference room, and typically was attended by approximately 10-15 Kaplan executives, including Hollenberg, KHE CEO Conlon, CEO of Kaplan Professional Schools Jim Rosenthal, and their respective direct reports, such as Higher Education CFO Lenz and Professional CFO Michael Peyer.

225.  Kaplan executives also conducted a Quarterly Senior Executive Meeting that was held at high end hotels and/or resorts.  For example, in April 2010, the Company's Kaplan division held its Senior Quarterly Senior Executive Meeting at the Four Seasons hotel in Chicago.

226.  The factual allegations set forth herein were provided by the independently corroborating accounts of several confidential witnesses, including CW 2, CW 12, CW 23 and CW 24.

227.    Thus, as a result of the methods by which Kaplan tracked the results of its predatory business model, through, among other things, reports, meetings, conference calls and town hall meetings, its predatory business practices, though well hidden from the market, were well known within the Company's Kaplan division, both by the rank and file employees and by the executives, including the Individual Defendants.

## VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD[11]

228.    The Class Period begins on July 31, 2009.  On that date, Washington Post issued a press release reporting its financial results for the second quarter ended June 28, 2009, which stated, in relevant part:

The Washington Post Company (NYSE: WPO) today ***reported net income of $11.4 million ($1.30 earnings per share) for its second quarter ended June 28, 2009, compared to a net loss of $2.7 million ($0.31 loss per share) for the second quarter of last year.***

\*        \*        \*

***Revenue for the second quarter of 2009 was $1,128.5 million, up 2% from $1,106.2 million in the second quarter of 2008. The increase is due to revenue growth at the education*** *and cable television* ***divisions.*** Revenues were down at the Company's newspaper publishing, magazine publishing and television broadcasting divisions.

229.    Discussing Kaplan, the press release further stated, in pertinent part:

***Education division revenue totaled $649.3 million for the second quarter of 2009, a 13% increase over revenue of $576.5 million for the same period of 2008. Kaplan reported operating income of $58.1 million for the second quarter of 2009, up 23% from $47.4 million in the second quarter of 2008.***

***For the first six months of 2009, education division revenue totaled $1,242.9 million, an 11% increase over revenue of $1,119.7 million for the same period of***

---

[11] In order to not just plead Defendants' false and misleading statements without any context, Plaintiff has attempted to provide the Court with context in this section by bolding and italicizing Defendants' statements Plaintiff contends are false and misleading, either as a result of outright misrepresentations or omissions of material fact that should have been included and were necessary to make the statements made not false and misleading.

***2008. Kaplan reported operating income of $69.3 million for the first six months of 2009, down 26% from $94.2 million for the first six months of 2008***.

230.     In addition, the press release stated KHE reported revenue of $401.8 million for the

quarter and highlighted KHE's "strong enrollment growth":

Kaplan Higher Education (KHE) includes Kaplan's domestic and international post-secondary education businesses, made up of fixed-facility colleges as well as online post-secondary and career programs. ***Higher education revenue grew 36% for the second quarter of 2009 and 31% for the first half of 2009 due mostly to strong enrollment growth. Operating income at KHE improved 74% in the second quarter of 2009, reflecting this strong enrollment growth. Operating income increased 31% for the first half of 2009 as the strong enrollment growth was offset by increased marketing and advertising costs in the first quarter of 2009, including a $21.0 million national media campaign. At June 30, 2009, KHE's enrollments totaled 103,300, a 31% increase compared to total enrollments of 78,700 at June 30, 2008. All KHE divisions contributed to the enrollment growth in the first half of 2009, with Kaplan University's online offerings growing the strongest at 45%.***

231.     As detailed in ¶95, for the second quarter of 2009, KHE's revenues accounted for

approximately 35.6% of Washington Post's revenues for the quarter, while the entire Kaplan

segment accounted for approximately 57.5% of the Company's revenues for the quarter.

232.     Also on July 31, 2009, and in response to the positive results in the July 31, 2009

press release, *Wall Street Strategies* raised its 12-month price target for Washington Post common

stock from $400.00 to $450.00 and described Kaplan as the "earnings engine" and "saving grace for

Washington Post."

233.     In response to Defendants' false and misleading statements in the July 31, 2009 press

release, the price of Washington Post stock rose 7.73%, or $32.50, from a closing price of $419.10

per share on July 30, 2009, to close at $451.50 per share on July 31, 2009, on a 96.5% increase on

trading volume, as set forth in the chart below:



234.    The statements referenced in ¶¶228-30 were materially false and misleading when made as they represented and/or omitted facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading, as evidenced by the factual detail contained throughout this Complaint.  In addition, the statements referenced in ¶¶228-30 were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- The Company was solely focused on increasing enrollment numbers at any cost, without regard to students' well-being, academic success, growing debt (caused by the financial aid Kaplan talked them into and virtually assured they would take) or preparedness for employment following graduation.  Indeed, the Company operated a sales force, disguised as Admissions Advisors, and Kaplan viewed students solely as leads utilized to attain internal, undisclosed enrollment quotas.  To that end, as detailed by a host of Confidential Witnesses, including CW 13, the Company's

Kaplan division would promote Admissions Advisors and increase their compensation based only on whether those Admissions Advisors met or exceeded their enrollment quotas. Conversely, Kaplan would routinely fire Admissions Advisors who failed to meet those enrollment quotas. The Company's quota-driven business practices constituted a gross violation of applicable rules and regulations, and because it was a key driving force behind Kaplan's financial performance, constituted a material fact that should have been disclosed to investors.

- While touting Washington Post's revenue "increase" and "strong enrollment growth" at Kaplan, Defendants omitted the fact that the Company's revenue and enrollments were founded upon a systemically predatory business model, including diverse predatory recruiting and financial aid practices focused on "prospects'" "pain and fears." By engaging in a uniform pattern and practice of manipulative salesmanship that played on "emotions" and an ability to "create the urgency," Defendants effectively oversaw a telemarketing machine that was only capable of increasing enrollments by hounding and harassing "leads" on a nearly constant basis. Thus, Defendants clearly disguised and effectively hid the true reasons behind the financial performance of the Company's education division – and future business prospects – throughout the Class Period.

- As set forth herein, Kaplan's recruiting and financial aid practices were unethical, predatory and in direct violation of Title IV. The Company lured students to Kaplan through blatant misrepresentations regarding, among other things, accreditation, the transferability of credits, students' future job prospects, and the ultimate cost of attending a Kaplan institution. In fact, and in violation of HEA regulations, Kaplan routinely paid students' enrollment fees. Indeed, once students agreed to enroll, the Company set its sights on causing the students to apply for as much financial aid as possible, a practice that put the Company's Kaplan division at the precipice of violating the 90/10 Rule.

- Indeed, as set forth by CW 17 and CW 21, Kaplan's standard practice was to actively circumvent the 90/10 Rule by transferring federal funds from main to branch campuses. When facing DOE scrutiny, Kaplan routinely shut down campuses and immediately open up new campuses nearby that engaged in identical practices. By violating HEA regulations and Title IV in this way, Defendants were able to boost Washington Post's reported financial results and grossly mislead the market as to the truth behind both Kaplan's enrollment figures and Washington Post's financial performance and future business prospects.

- Moreover, Washington Post relied on daily cash infusions from Kaplan in order to keep it afloat. These multi-million dollar infusions were sent every day, except for days when Kaplan's institutions were operating in violation of the 90/10 Rule. In addition, these cash infusions resulted in Kaplan's schools violating various state accreditation standards that mandated Kaplan's schools maintain a certain level of capital, or maintain an average percentage of their liabilities on hand as cash. By failing to disclose these practices, as well as known violations of the 90/10 Rule during the Class Period, Defendants materially misrepresented the Company's risk

profile, which caused the price of Washington Post common stock to be artificially inflated.

- Due to the fact that Kaplan's recruiting and money transferring practices were in blatant violation of applicable regulations, as well as Title IV, Washington Post faced the very real risk of losing the ability to receive federal financial aid – the source of approximately 82% of KHE's revenue during the Class Period.

- Due to predatory recruiting and financial aid practices in the Company's Kaplan division, which resulted in students routinely and unnecessarily borrowing the maximum amount of federal financial aid and turning those monies over to Kaplan, the Company's revenue numbers were inflated throughout the Class Period.

- As a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company, the Company's Class Period revenue and enrollment numbers, as well as Washington Post's future business prospects.

235. On August 1, 2009, *The Washington Post* published an article entitled "Washington Post Co. Returns to Profit with Cost-Cutting," which stated:

> **The Post Co. is now largely an education company -- its Kaplan education unit provided 58 percent of the parent company's second-quarter revenue**, as opposed to the newspaper division, which chipped in 15 percent. Nevertheless, the ongoing decline in advertising revenue at The Post -- exacerbated by the recession -- had been so sharp that it dragged the entire company into the red in the first quarter, **despite continued growth by Kaplan** and The Post's Cable One cable company.

236. On August 4, 2009, Washington Post filed its quarterly report on Form 10-Q for the quarter ended June 28, 2009, which confirmed the Company's previously announced financial results and was signed by Graham and Jones (the "Second Quarter 2009 10-Q"). The Second Quarter 2009 10-Q also contained Sarbanes-Oxley certifications signed by Graham and Jones stating the 10-Q did not include any material misrepresentations.

237. On September 11, 2009, Washington Post hosted its annual Shareholders Day, wherein it gave slide presentations on the Company's various segments, including Kaplan. The opening slide falsely stated *"Mission Statement: Kaplan helps individuals achieve their education and career goals. We build futures one success story at a time."*

84

238. Moreover, the slide presentation highlighted Kaplan's significant growth in student enrollments, which were driven by its predatory (and undisclosed) enrollment practices. For example, the presentation included a bar chart of "Student Growth Enrollments," showing Kaplan University's enrollment growth from 34 students in 2001 to *over 52,500 students in June 2009*. Likewise, according to the Company, "Student Growth Enrollments" in KHEC increased from 14,628 students in 2001 to *over 42,000 in June 2009.* The September 11, 2009 presentation explained ***Kaplan's "future,"*** as being rooted in ***"set[ting] the standard for academic excellence."***

239. In response to Defendants' false and misleading statements on September 11, 2009, Washington Post common stock closed up 4.08%, or $17.98, from a closing price of $440.83 per share on September 10, 2009, to close at a price of $458.81 per share on September 11, 2009, on a 83.6% increase on trading volume, as evidenced in the chart below:



240.     The statements referenced in ¶¶236-38 were materially false and misleading when made as they represented and/or omitted facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading, for reasons set forth in ¶234 above, and as evidenced by the factual detail contained throughout this Complaint.  In addition, the statements referenced in ¶¶236-38 were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- Contrary to their statements, Defendants were not concerned with helping students "achieve their education and career goals," but rather were only concerned with the federal funds received from enrollments.  The Company truly boosted enrollments by any means necessary, and utilized improper compensation of recruiters and high-pressure sales tactics to enroll anyone and everyone.  Indeed, the many Confidential Witnesses detailed herein discuss Kaplan's recruitment of homeless persons, and the mentally ill, as well as Kaplan's outright lies regarding students' job prospects.  *See supra* at §VI(F).  All of these undisclosed tactics, which ran clearly contrary to Defendants' public statements, not to mention the Company's publicly available code of conduct, served to artificially inflate both Washington Post's financial results and stock price.

- By focusing on enrollment numbers as opposed to the quality of its leads, the Company's Kaplan division was by no means setting a standard of "academic excellence."  Put simply, no institution of "academic excellence" would depend upon vast armies of sales people, working 14 hours a day, seven days a week, from football field-sized call centers, whose sole task was to meet enrollment quotas or be fired.  Nor would any company focused on "academic excellence" recruit its students through Company-approved scripts – to be utilized in its massive call centers – that focused on "prospects'" pain, fear, and emotional weaknesses.  These tactics are clearly not the hallmarks of higher learning.  A reasonable investor would understand the true, "behind the curtain," Washington Post to be a far cry from what Defendants represented to the market during the Class Period.  In fact, CW 5 details how many students at Kaplan could neither read nor write.  *See supra* at §§VI(E-F).

241.     On October 30, 2009, Washington Post issued a press release reporting its financial results for the third quarter ended September 27, 2009, which stated in relevant part:

The Washington Post Company (NYSE: WPO) today reported **net income of $17.1 million ($1.81 per share) for its third quarter ended September 27, 2009, compared to net income of $10.4 million ($1.08 per share) for the third quarter of last year**.

\* \* \*

**Revenue for the third quarter of 2009 was $1,148.7 million, up 2% from $1,128.7 million in the third quarter of 2008. The increase is due to revenue growth at the education** and cable television divisions. Revenues were down at the Company's newspaper publishing, magazine publishing and television broadcasting divisions.

242. The October 30, 2009 press release went on to state, in pertinent part:

**Education division revenue totaled $684.5 million for the third quarter of 2009, a 14% increase over revenue of $602.7 million for the same period of 2008. Kaplan reported operating income of $45.9 million for the third quarter of 2009, down 10% from $51.1 million in the third quarter of 2008.**

\* \* \*

**For the first nine months of 2009, education division revenue totaled $1,927.4 million, a 12% increase over revenue of $1,722.5 million for the same period of 2008. Kaplan reported operating income of $115.2 million for the first nine months of 2009, down 21% from $145.3 million for the first nine months of 2008.**

243. Continuing, the press release stated that KHE reported revenue of $408.7 million for the quarter, and attributed the Company's robust revenue gains at KHE to "strong enrollment growth":

Kaplan Higher Education (KHE) includes Kaplan's domestic post-secondary education businesses, made up of fixed-facility colleges as well as online post-secondary and career programs. **Higher education revenue grew 35% for the third quarter of 2009 and 34% for the first nine months of 2009 due mostly to strong enrollment growth. Operating income at KHE improved 93% in the third quarter of 2009, reflecting this strong enrollment growth. Operating income increased 55% for the first nine months of 2009 due to this strong enrollment growth**, offset by increased marketing and advertising costs in the first quarter of 2009, including a $21.0 million national media campaign. **At September 30, 2009, KHE's enrollments totaled 103,800, a 28% increase compared to total enrollments of 81,400 at September 30, 2008. Enrollment growth was particularly strong at Kaplan University's online offerings, which grew at 37% in the first nine months of 2009**.

244.     As detailed in ¶95, KHE's revenues during the third quarter of 2009 accounted for approximately 35.6% of Washington Post's revenues for the quarter, while the entire Kaplan segment accounted for nearly 59.5% of the Company's third quarter 2009 revenues.

245.     On November 6, 2009, Washington Post filed its quarterly report on Form 10-Q for the quarter ended September 27, 2009, which confirmed the Company's previously announced financial results and was signed by Graham and Jones (the "Third Quarter 2009 10-Q"). The Third Quarter 2009 10-Q also contained Sarbanes-Oxley certifications signed by Graham and Jones stating the Form 10-Q did not include any material misrepresentations. Nevertheless, the Third Quarter 2009 10-Q did contain several false and misleading statements regarding Kaplan's increased enrollments, which omitted key facts concerning the truth behind the Company's financials and future business prospects. More specifically, Defendants never disclosed that Kaplan's increased enrollments were driven by predatory enrollment practices, as detailed extensively herein. Without disclosing the true reasons behind enrollment gains, the Third Quarter 2009 10-Q detailed KHE's purportedly positive enrollment growth, stating as follows:

|                  | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| --- | --- | --- | --- | --- |
| 2009 Enrollments | 95,600 | 94,700 | 103,800 |  |
| 2008 Enrollments | 74,200 | 72,200 | 81,400 | 79,800 |
| 2007 Enrollments | 65,700 | 61,200 | 67,000 | 65,700 |

246.     Although the price of Washington Post common stock fell approximately 4.4% following issuance of the October 30, 2009 press release and traded essentially flat after release of the Third Quarter 2009 10Q, Defendants continued to mislead the market. Indeed, had Defendants now made false and misleading statements and revealed the Company's true financial condition, market expectations would have been corrected and the common stock price would have fallen substantially.

247.     The statements referenced in ¶¶241-43, 245 were materially false and misleading when made as they represented and/or omitted facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading, for reasons set forth in ¶234, and as evidenced by the factual detail contained throughout this Complaint.  In addition, the statements referenced in ¶¶241-43, 245 were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- Despite putting the source of the Company's financial performance at issue and attributing Washington Post's revenue increase to "strong enrollment growth" at Kaplan, Defendants omitted the material fact that the Company's revenue and enrollments trends were dependent on and driven by a systemically predatory business model and blatantly illegal conduct, as extensively detailed herein.

- In November of 2009, Kaplan improperly withheld disbursement of federal student loan funds to students' accounts because doing so would have put Kaplan in violation of the 90/10 Rule.  According to CW 24, for two weeks in November 2009, Kaplan withheld disbursing approximately *$200 million* in federal financial aid funds to students so that Kaplan could appear compliant with the 90/10 Rule.  Had Kaplan properly disbursed such funds to its schools at this time, the market would have learned that Kaplan's schools were operating in violation of the 90/10 Rule, the Company would have risked losing billions of dollars in Title IV funding, and investors would have understood the true risks their investments in Washington Post common stock entailed.

- Had Defendants not allowed Kaplan to manipulate prospective students, demand would have drastically declined, the Company's financial performance would have suffered materially, and the market would have learned that Defendants lacked a reasonable basis for their statements regarding Washington Post's financial performance, outlook, and future business prospects.

248.     Like the market, analysts took notice of Washington Post's dependence upon Kaplan. On November 9, 2009, *Morningstar* issued an analyst report entitled "Kaplan, Cable Carry Washington Post in 3Q" stating in pertinent part:

> **Washington Post Company WPO reported third-quarter earnings Friday that underscore the sharpening contrast in the fortunes of its business units. Strong**

**performance at its education and cable television divisions offset the persistent parade of privation at its struggling legacy media enterprises.** We're maintaining our fair value estimate.

**Total third-quarter revenue of $1.15 billion marked a 2% increase from the same period a year earlier. A healthy 14% increase in revenue at the Kaplan education division (60% of sales)** and a 4% revenue improvement at the Cable One business unit (17% of sales) **offset an extended hemorrhaging of revenue at the print and broadcast media operations, including the namesake newspaper.** The grim chorus of collapse included a 20% revenue decline at the Washington Post newspaper unit (14% of sales), a 17% revenue decline at the television business (6% of sales), and a 33% revenue decline at the Newsweek magazine business (4% of sales).

\*     \*     \*

**As we observe the legacy print operations' protracted suffering amid the virulent head winds of declining readership and ad revenue, we note that the third quarter marked a milestone for the education division. For the first time ever, Kaplan accounted for more than 59% of total company revenue. In our view, Washington Post Company has evolved from being primarily a newspaper publisher with a growing education business to an education business that owns a newspaper publisher.** We think this has both symbolic and practical financial implications for the company and its investors. As the Kaplan unit exercises greater sway at the top line, we think the broader dynamics of the company's business model will gradually follow its lead.

249. Washington Post's newspaper division continued to suffer, and on November 24, 2009, *Reuters* reported that Washington Post was closing its last U.S. news bureaus, located in Chicago, Los Angeles and New York, as "the money-losing newspaper retrenches to focus on politics and local news." Put simply, it was increasingly clear that the Company's education division was critical to the Company's financial viability and future business prospects, thus magnifying both the motivation for and the impact of Defendant's fraud. Indeed, on November 24, 2009, *Wall Street Strategies* described the Kaplan education division as the "earnings engine for Washington Post."

250. On December 7, 2009, Graham participated on behalf of the Company at the UBS Global Media & Communications Conference. During the conference, Graham made numerous false and misleading statements while purportedly discussing the Company's operating philosophy

and most recent financial results. In fact, Graham omitted a host of key facts as he spoke with great

familiarity about Kaplan and KHE while dedicating much of his speech to crediting Kaplan for the

Company's overall strength, stating in part:

> The foremost reason for the strength of The Washington Post Company's performance this year – and for the past several years – is Kaplan, and particularly Kaplan Higher Education.

<div align="center">*       *       *</div>

> . . . I've talked at these sessions in the past about how proud I am of Kaplan and of Kaplan people and of what Kaplan does in the world. ***In the last few years, Kaplan Higher Education division, while not the only business at Kaplan that is performing strongly, has produced such outstanding results over time and has grown so fast that it is now Kaplan's largest business. And it is The Washington Post Company's largest business and one of the largest proprietary higher ed businesses in the United States***, although far from the largest.

> Let me now outline some of what I think is great about Kaplan Higher Ed. First, when the U.S. economy hit a terrible bump a year ago and banks and businesses began performing so badly, it was as if the whole country was seized by an impulse to go back to school and acquire skills to get a new or a better job. Kaplan Higher Ed, and particularly Kaplan's online program, was already a very big business. At the beginning of 2009, we had 42,000 students online. That's a pretty big university.

> ***But from this very large base we recorded a 45% increase in online students. And now Kaplan's online enrollment stands at 60,000.*** The online components of most proprietary institutions of higher ed have also grown strongly in 2009, and so did traditional institutions of higher education if they had room to expand. ***I am proud that Kaplan's online higher ed programs have grown as fast as they have from 34 students nine years ago to 60,000 today***.

> ***We have grown very fast indeed, although, as I said, we're not the largest such institution, and all our growth has been achieved with student outcomes as our top priority. Andy Rosen, Kaplan's CEO, has instilled that value throughout the Company, drawing on his 17 years of hands-on management experience at Kaplan, but most of all from his many years of CEO of Kaplan University and Kaplan Higher Education***.

251. The December 7, 2009 presentation continued with Graham touting Kaplan's

supposed focus on "helping . . . students acquire skills that can lead to better jobs":

*If you go to Kaplan University, you will find the experience exceedingly studentcentric and focused on outcomes.* Whether you attend one of Kaplan University's campuses or study online, there is plenty of interaction with your professors and fellow students. We are not a research institution, and we don't field sports teams. *Everything is focused on helping our students acquire skills that can lead to better jobs. You'll get a degree and credentials that are meaningful to employers*.

\*     \*     \*

The growth of proprietary education tells a compelling story. These institutions have grown largely because students want training and credentials that will meet real workforce needs. *In addition, we provide extensive support services and counseling specifically designed to meet the needs of adult learners*. We offer more than 150 academic programs and regularly add specializations that address changes in national and local business demands.

252.   Graham concluded his presentation by making the following false and misleading statements:

We make no apologies that this is a business. *It is a successful business because we serve students who have not been well-served by traditional post-secondary institutions. We are market-driven*. Most of our students pay for their own education. They cannot rely on their parents at their average age of 33. *While they depend heavily on government loans, they decide for themselves how to spend those dollars in pursuit of their own educational goals*.

*Kaplan advisers provide financial aid guidance and work with students on the best way to structure and repay their educational loans. While the vast majority of our students repay their debt, we cannot claim complete success. Economic conditions that have resulted in large numbers of home mortgage defaults have also increased turmoil in other credit areas*.

253.   Defendants' false and misleading statements served to maintain artificial inflation in the price of Washington Post common stock and, as result of the December 7, 2009 presentation, the price of Washington Post common stock traded essentially flat between its closing price of $411.75 per share on December 6, 2009, and closing price of $409.53 per share on December 7, 2009. But for Defendants' false and misleading statements, the truth regarding Washington Post's financial

condition and future business prospects would have been revealed and the price of Washington Post common stock would have declined substantially as the artificial inflation was removed.

254. The statements referenced in ¶¶250-52 were materially false and misleading when made as they represented and/or omitted facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading, for reasons set forth in ¶234, and as evidenced by the factual detail contained throughout this Complaint. In addition, the statements referenced in ¶¶250-52 were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading. The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- The truth commanded a far different explanation from Defendants when explaining the reasons behind Washington Post's and Kaplan's financial performance; reality was a far cry from Defendants' statements claiming "growth has been achieved with student outcomes as our top priority" and that Kaplan was "exceedingly studentcentric." In truth, the Company's financial performance depended upon Kaplan's continued ability to utilize warehouse-sized call centers in multiple locations where Admissions Advisors' jobs and compensation hung in the balance, driven solely by whether they could meet internal enrollment quotas. To meet these quotas, Admissions Advisors were expected to and did employ a host of deceptive and manipulative sales tactics. For example, Washington Post's official Kaplan recruiting scripts specifically told Admissions Advisors to focus on potential students' "pain and fears." Indeed, to the extent Kaplan was "studentcentric," the central focus was on manipulating and deceiving those very same students it claimed to prioritize.

- While Graham acknowledged that Kaplan had "grown very fast indeed" he failed to inform investors that Kaplan's extreme growth had become a growing concern throughout Washington Post. For example, CW 23 detailed how at semi- annual Company meetings, various executives at the Company's subsidiaries voiced concerns and questions to both Graham and Jones related to Kaplan's explosive growth.

- Despite Graham touting that "everything is focused on helping our students acquire skills that can lead to better jobs" and providing students with "a degree and credentials that are meaningful to employers," the Confidential Witnesses described herein – as well as other reliable, corroborative sources – document Kaplan's systemic, internally known deficiencies. For example, Kaplan routinely enrolled

students in programs despite knowing that the students' backgrounds, criminal history, or mental health problems would specifically prohibited them – in the highly unlikely event they graduated – from finding meaningful employment in their field. *See* supra at §VI(F).

- Defendants' statements that Kaplan provides students with "extensive support services" and "Kaplan advisors provide financial aid guidance and work with students" were outright falsehoods. In truth, a host of Kaplan facilities lacked basic career services programs. *See supra* at ¶252.

- Far from being "market driven," the Company's Kaplan unit was, in reality, a quota driven enterprise that ran roughshod over applicable federal rules and regulations. By touting a commitment to student excellence and student service, Defendants were not paying mere lip service to aspirational goals. Quite the opposite, Defendants were materially misleading the market by knowingly describing the Company's Kaplan unit as operating under a certain philosophy when, in reality, it was exactly the opposite. Had Defendants revealed the truth, market expectations for Kaplan's performance and enrollment levels (and thus Washington Post's) would have been corrected. Put simply, investors value a company focused on "student outcomes" as its "top priority" in a far different manner than they value a company focused solely on achieving enrollment quotas through manipulative and deceptive recruiting tactics, along with a host of other bad practices – internally sanctioned by the Company – as detailed throughout this Complaint.

- Had Kaplan not manipulated prospective students, demand would have drastically declined, the Company's financial performance would have suffered materially, and the market would have learned that Defendants lacked a reasonable basis for their statements regarding Washington Post's financial performance, outlook, and future business prospects.

- Graham's knowledgeable statements to investors and the market about Kaplan and Kaplan Higher Education evidence Graham's intimate knowledge about Kaplan, its subsidiaries and their operations. For example, Graham spoke to investors about Kaplan's "outstanding results" and growth, including pointing out a "45% increase in online students" and online enrollment at 60,000. In addition, Graham spoke to investors about concerns related to Kaplan's students' inability to pay their debts, stating, "we cannot claim complete success." These statements clearly demonstrate Graham's active monitoring of and detailed knowledge concerning Kaplan's operations, including problems associated with its students' debt repayment failures.

255. On February 24, 2010, Washington Post issued a press release reporting its financial results for the 2009 fourth quarter and full-year ended January 3, 2010, which stated in relevant part:

The Washington Post Company (NYSE: WPO) today reported ***net income of $91.2 million ($9.78 per share) for the fiscal year ended January 3, 2010, up from $65.8 million ($6.87 per share) for the fiscal year ended December 28, 2008. Net income***

*for the fourth quarter of 2009 was $82.2 million ($8.71 per share), up from $18.8 million ($2.01 per share) for the fourth quarter of 2008*.

\* \* \*

*Revenue for 2009 was $4,569.7 million, up 2% compared to revenue of $4,461.6 million in 2008. For the fourth quarter of 2009, revenue was $1,238.4 million, up 6% from $1,163.6 million in 2008. The increases are due primarily to strong revenue growth at the education division* and increased revenue at the cable division, partially offset by revenue declines at the Company's newspaper publishing, magazine publishing and television broadcasting divisions.

256.    The February 24, 2010 press release went on to state:

*Education division revenue in 2009 increased to $2,636.6 million, a 13% increase from $2,331.6 million in 2008. For the fourth quarter of 2009, education division revenue totaled $709.3 million, a 16% increase over revenue of $609.1 million for the same period of 2008*.

*Kaplan reported operating income of $194.8 million for 2009, compared to $206.3 million in 2008; operating income for the fourth quarter of 2009 was $79.6 million, compared to $61.0 million in the fourth quarter of 2008.*

257.    The February 24, 2010 press release also reported KHE's revenue of $420.4 million

for the quarter, and attributed increased revenues at KHE to "strong enrollment growth," stating in

part:

Kaplan Higher Education (KHE) includes Kaplan's domestic post-secondary education businesses, made up of fixed-facility colleges as well as online post-secondary and career programs. *Higher education revenue grew by 33% for 2009 and 30% for the fourth quarter of 2009 due mostly to strong enrollment growth. Operating income at KHE increased 59% in 2009 due to this strong enrollment growth,* offset by increased marketing and advertising costs in the first quarter of 2009, including a $21.0 million national media campaign. *Operating income at KHE increased 70% in the fourth quarter of 2009, also reflecting this strong enrollment growth. At December 31, 2009, KHE's enrollments totaled 104,900, a 32% increase compared to total enrollments of 79,800 at December 31, 2008. Enrollment growth was particularly strong at Kaplan University's online offerings, which grew at 47% in 2009.*

258.    As detailed in ¶95, KHE's fourth quarter 2009 revenues accounted for approximately 33.9% of Washington Post's revenues for the quarter, while the entire Kaplan segment accounted for approximately 57.3% of the Company's revenues for the quarter.

259.    Analysts responded positively to Defendants' false and misleading statements.  For example, later on February 24, 2010, *Zacks Equity Research* commented in part:

> The Education division delivered strong performance -- **revenue was up 16% to $709.3 million, which we think will continue in fiscal 2010. At fiscal year-end 2009, enrollment totaled 104,900, up 32%. The increase in enrollment was particularly strong at Kaplan University's online offerings, which surged 47% in the year**.

260.    In response to the false and misleading statements contained in the February 24, 2010 press release, the price of Washington Post common stock increased nearly 2%, or $7.79, from a closing price of $412.51 per share on February 23, 2010, to close at a price of $420.30 per share on February 24, 2010, on a 209.8% increase on trading volume.

261.    On March 2, 2010, Washington Post filed the 2009 10-K, for the year ended January 3, 2010, which confirmed the Company's previously announced financial results and was signed by Graham and Jones.  The 2009 10-K also contained Sarbanes-Oxley certifications signed by Graham and Jones and stated that the 2009 10-K did not include any material misrepresentations.  Nevertheless, as set forth below, the 2009 10-K did contain several false and misleading statements regarding Kaplan's financial performance and future business prospects.

262.    Among other things, the 2009 10-K highlighted the education segment as Washington Post's "largest operating division," accounting for "58% of the Company's consolidated revenues in 2009."  Confirming, the 2009 10-K stated, "[t]he Company has devoted significant resources and attention to this division, given the attractiveness of investment opportunities and growth prospects."

263. In addition, the 2009 10-K misled the market as to the Company's adherence to HEA and applicable regulations, stating:

> For the years ended January 3, 2010, December 28, 2008 and December 30, 2007, approximately $1,283 million, $904 million and $745 million, respectively, of the Company's education division revenue was derived from financial aid received by students under Title IV programs. ***Management believes that the Company's education division schools that participate in Title IV programs are in material compliance with standards set forth in the HEA and the Regulations***.

264. The 2009 10-K also reiterated the Company's false mantra that KHE was focused on helping its students, stating:

> Kaplan Higher Education provides a wide array of certificate, diploma and degree programs – on campus and online – ***designed to meet the needs of students seeking to advance their education and career goals.***

265. The 2009 10-K further touted the Company's enrollment numbers, omitting critical information and stating, in part:

> Kaplan University
>
> Kaplan University specializes in online education, is accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools and holds other programmatic accreditations. Most of Kaplan University's programs are offered online, while others are offered in a traditional classroom format at ten campuses in Iowa, Nebraska and Maryland. Kaplan University also includes Concord Law School, the nation's first fully online law school. ***At year-end 2009, Kaplan University had approximately 60,400 students enrolled in online programs and 5,120 students enrolled in its classroom-based programs.***
>
> Kaplan Higher Education Campuses
>
> At the end of 2009, Kaplan's Higher Education Campuses business consisted of 73 schools in 19 states ***that were providing classroom-based instruction to approximately 44,500 students (including the 5,120 students enrolled at Kaplan University's on-ground campuses).*** Each of these schools is accredited by one of several regional or national accrediting agencies recognized by the U.S. Department of Education.

266. In addition, the 2009 10-K discussed KHE's "initiatives" to mitigate the risk of student default rates:

*Kaplan Higher Education has implemented initiatives to mitigate the increased risk of student loan defaults for Kaplan University and Kaplan Higher Education Campuses' students. Kaplan has dedicated resources focused on helping the students who are at risk of default. Kaplan personnel contact students and provide assistance, which includes providing students with specific loan repayment information, lender contact information and debt counseling. Kaplan has also implemented a financial literacy and counseling program for current students and has refined and improved its student retention programs, resulting in improved retention rates*. Students who withdraw prior to program completion demonstrate a higher loan default rate than those who continue through to graduation. Although Kaplan has dedicated resources to mitigate the increased risk of student loan defaults by its students, there is no guarantee that such efforts will be successful. In

267.    In addition, the Company assured investors of the Company's "various measures to

reduce the percentage of its receipts attributable to Title IV funds:"

The proportion of Kaplan Higher Education's revenue from certificate and associate degree programs is composed of a higher percentage of Title IV funds than is the case for its bachelor's and other degree programs. A majority of Kaplan Higher Education students are enrolled in certificate and associate degree programs. *Kaplan Higher Education is taking various measures to reduce the percentage of its receipts attributable to Title IV funds, including emphasizing direct-pay and employer-paid education programs, encouraging students to carefully evaluate the amount of Title IV borrowing, and developing additional professional development and continuing education programs.* Although Kaplan is taking steps to address compliance with the 90/10 Rule, there can be no guarantee that these measures will be adequate to prevent the 90/10 Rule calculations from exceeding 90% in the future.

268.    The statements referenced in ¶¶255-57, 267 were materially false and misleading

when made as they represented and/or omitted facts which then existed and disclosure of which was

necessary to make the statements not false and/or misleading, for reasons set forth in ¶234, and as

evidenced by the factual detail contained throughout this Complaint.  In addition, the statements

referenced in ¶¶255-57, 267 were materially false and misleading when made because they

represented and/or omitted adverse facts which then existed and disclosure of which was necessary

to make the statements not false and/or misleading.  The true facts, which were known to or

recklessly disregarded by each of the Defendants, were:

- Defendants omitted disclosure of the true reasons behind the "strong revenue growth at the education division." With Admissions Advisors' compensation and employment directly dependent upon meeting internally established enrollment quotas, it was well known within the Company that a host of nefarious tactics were what drove the education division's revenue growth.

- Defendants lacked a reasonable basis for believing that the Company's education division schools were, with respect to Title IV programs, in "material compliance with standards set forth in the HEA and [DOE] Regulations." Defendants omitted the fact that Kaplan was actively engaging in blatantly fraudulent practices to avoid detection of known violations of the 90/10 Rule. *See supra* at ¶169(the Company's education division manipulated OPEID numbers to hide the fact that campuses had reached or exceeded the 90% threshold); ¶171 (Kaplan withheld disbursing federal funds for approximately two weeks in November of 2009 because doing so would put Kaplan's schools in violation of the 90/10 Rule). Defendants also failed to reveal that the Kaplan knowingly violated applicable rules and regulations by, among other things, paying enrollment fees (via credit card or other means) for its own students. Similarly, Kaplan routinely made hiring and firing decisions based solely upon whether objective enrollment quotas were met, in direct violation of HEA regulations. *See supra* at §VI(E). Moreover, Kaplan sent daily cash infusions to Washington Post that caused Kaplan to violate applicable accreditation standards because Kaplan's schools failed to keep sufficient cash on hand.

- It was simply false to describe Kaplan as "designed to meet the needs of students seeking to advance their education and career goals." For all intents and purposes, Kaplan had next to no admissions criteria, and would routinely admit students who lacked basic reading and writing skills, did not have access to a computer – despite the fact that they would be enrolled in online classes, or had known criminal backgrounds or mental health problems that would unequivocally prohibited them from finding employment in the fields of study in which Kaplan enrolled them. All of this resulted in massive drop-out rates and miniscule graduation rates. Moreover, nearly 70% of Kaplan students dropped-out after attending Kaplan for a median period of only 4.2 months.

- Far from working to help students minimize their dependence on federal financial aid and to counsel those same students effectively in order to avoid potential defaults, the Company's education division routinely employed a host of deceptive practices designed to maximize its students' dependence upon federal financial aid. For example, it was common practice for Kaplan Admissions Advisors – not financial aid advisors – to enter EFC (expected family contribution) information into a prospective student's paperwork. Routinely, Admissions Advisors would enter into EFC of zero, regardless of the prospective students' actual EFC, to make it appear to students upon enrollment that they would be eligible for the maximum amount of financial aid from the federal government. Kaplan would also push students to take the maximum amount available so the Company could pocket it. It was also standard practice for Kaplan personnel to "log into" online classes as if they were the students themselves so that Kaplan would be able to count absentee students as enrolled and

thus keep open the spigot of federal financial aid flowing into the Company's coffers. Clearly, these are not the standard operating procedures of a Company focused on "initiatives to mitigate the increased risk of student loan defaults."

- The result of the foregoing was that the risk of the Company's education division losing access to federal financial aid or being found in violation of applicable rules or regulations was substantially different from what Defendants represented to the market. Had investors known the truth, their expectations for the Company's financial performance, future business prospects, and potential for additional, expensive regulation would have been substantially different, and the price of Washington Post common stock would not have been artificially inflated throughout the Class Period.

269. Clearly, the market believed Defendants' false and misleading statements. For example, on March 5, 2010, *Wall Street Strategies* raised its 12-month price target of Washington Post common stock from $450.00 to $480.00, commenting, "**[t]he revenue increase can be attributed to solid revenue growth at the education division . . . . The education segment . . . remains the single most important revenue source accounting for nearly 75% of revenues . . . [and] the primary growth engine for the Company**." Had investors and market analysts known the true facts surrounding "the single most important revenue source" of the Company, they would have put a far different (lower) valuation on the price of Washington Post stock.

270. On March 19, 2010, *Morningstar* issued an analyst report entitled "Washington Post's For-Profit Education Business Will Offset Secular Declines at the Company's Media Assets." The report revealed a small portion of the truth to the market as it called into question the Company's cohort default rates, and made much of the fact that Kaplan's cohort default rates "are fairly high relative to those of its competitors," stating in pertinent part:

**Washington Post may have its roots in media, but the firm's for-profit education unit, Kaplan, generates the majority of companywide revenue and profits. While we think the for-profit education industry has structural competitive advantages, Kaplan's relatively high cohort default rates indicate the quality of its programs is inferior to its peers**. In our opinion, investors interested in this industry would be better served looking elsewhere for a higher-quality education company.

<center>*   *   *</center>

**Despite these favorable dynamics, Kaplan's cohort default rates (percentage of students who have defaulted on their student loans) are fairly high relative to those of its competitors. Although not excessive, these rates could rise if Kaplan's students cannot find jobs and do not repay their loans. If these default rates rise, the company could be in danger of losing access to Title IV funds (federal student loans; responsible for 83% of Kaplan's higher education revenue) at some of its campuses. As a result, we expect Kaplan to be more selective in admissions and to allocate more resources reaching out to former students to repay their loans. We expect these actions to curtail growth and margin expansion going forward.**

271.    The above partial revelation had little impact on the price of Washington Post stock, however, because of the continued existence of Defendants false statements in the market. Indeed, because of Defendants' fraud, the market was unaware of the true extent of Kaplan's fraudulent enrollment practices, internal quota system, deceptive financial aid practices, and nefarious tactics used to circumvent detection of 90/10 Rule violations.

272.    As time went on, the Company's dependence on Kaplan only grew stronger and the market took notice. For example, on March 25, 2010, *The Business Insider* commented, "The Post Co. has weathered the downturn better than most of its peers because it can lean on the prosperous-education service and cable TV operations that now account for nearly three-fourths of its revenue."

273.    Given Kaplan's apparent, continually soaring profits and revenues, the market began to look at the Washington Post as a value play. For example, on April 5, 2010, *Barron's* published an article entitled, "Washington Post Is Dirt Cheap: the Post may be America's most undervalued media company" stating in pertinent part:

**WASHINGTON POST MAY BE THE MOST UNDERVALUED media company in America today. That's because investors give it virtually no credit for Kaplan, a large and rapidly growing education division that generates more than half the company's revenue and profit**.

Post CEO Don Graham, cut from the Warren Buffett cloth, rejects a spinoff of the lucrative Kaplan franchise.

<center>101</center>

The Post has a market value of $4.2 billion, but a sum-of-the-parts analysis suggests it is worth $8.5 billion. This analysis is based on the valuations of comparable public companies, not lofty and sometimes unrealistic "private market" estimates often favored by media-stock boosters. At $8.5 billion, the Post would trade for more than $900 a share.

The best way for the company to boost its share price would be to spin off Kaplan, which probably would command a generous valuation in the hot for-profit education sector. Ranked by revenue, it is No. 2 in the industry, behind Apollo Group (APOL).

**With $2.6 billion in 2009 revenues and nearly $300 million in pretax operating profit, Kaplan can stand on its own**. So can the rest of the Post's operations, largely because of the profits generated by cable TV and the TV stations.

Wall Street likes focused companies, and the media and cable-TV industry has obliged. Time Warner (TWX), Cablevision (CVC), Liberty Media (LINTA) and E.W. Scripps (SSP) have broken up -- all to the benefit of shareholders.

**But the Graham family, led by CEO Don Graham, doesn't buy the idea of a breakup of Washington Post. "In whose interest is a Kaplan spinoff?" Graham said last week. "It would be in the interest of the investment bankers doing the deal. *It wouldn't be in the interest of Washington Post shareholders*."**

**The 64-year-old Graham, son of the late Katharine Graham, has long been influenced by Warren Buffett, whose Berkshire Hathaway (BRKA) has held a sizable stake in the Post since the 1970s. Buffett hates financial engineering, and has done minimal shuffling of businesses in the 45 years he has controlled Berkshire. Graham agrees. "*Over the years, if Kaplan and the other Post properties earn more money, we'll be rewarded in the stock market*," Graham says. "It's been our theory since we went public in 1971**."

Some suspect the Grahams want to keep Kaplan as a financial security blanket to ensure that if the media business declines in the coming decade, the Washington Post newspaper, the family's treasure, will survive. The talk is that when the Graham family meets, they say: "Thank goodness for Kaplan." Largely because of Kaplan, the Post has avoided some of the trials experienced by newspaper publishers like the New York Times (NYT), McClatchy (MNI) and Gannett (GCI).

EVEN WITHOUT A KAPLAN SPINOFF, Post shares look attractive. Given Kaplan's growth, the Post may come to be seen as an education company and garner a higher stock-market valuation. At the current share price, investors effectively are paying nothing for the noneducation parts of the Post. Says Thomas Russo, a partner at Gardner, Russo, and Gardner, a Lancaster, Pa., investment firm that has been a longtime holder: "The Post is a coiled spring, What releases the spring, I don't

know." Russo says he is willing to be patient, betting Post management delivers for holders under the guidance of a top-notch board of directors, led by Buffett

274.    In response to the positive statements made in April 5, 2010 *Barron's* article, the price of Washington Post common stock increased 8.6%, or $38.26, from a closing price of $444.74 per share on April 2, 2010, to close at a price of $483 per share on April 5, 2010, as set forth in the chart below:



275.    The statements referenced in ¶273 were materially false and misleading when made as they represented and/or omitted facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading, for reasons set forth in ¶234 and as evidenced by the factual detail contained throughout this Complaint. In addition, the statements referenced in ¶273 were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not

false and/or misleading. The true facts, which were known to or recklessly disregarded by each of

the Defendants, were:

- It was both deceptive and misleading of Graham to state that he was acting on "the interest of Washington Post shareholders," and that stockholders would be "rewarded in the stock market." At the time, Graham and the other Defendants lacked a reasonable basis for such positive statements because they were well aware that the Company's life-boat, Kaplan, was obtaining the vast majority of its revenues because of manipulative, and unethical enrollment and financial aid practices. *See supra* at ¶ §§VI(F), (L). In addition, Kaplan was actively skirting Title IV regulations, and engaging in routine practices in violation of HEA, among other applicable laws. *See supra* at §§VI(F), (H), (I).

276. On April 15, 2010, Washington Post's common stock reached its Class Period high of

$541.38 per share.

277. On May 7, 2010, Washington Post issued a press release reporting its financial results

for the first quarter ended April 4, 2010, which stated, in relevant part:[12]

> The Washington Post Company (NYSE: WPO) today reported ***net income available for common stock of $45.4 million ($4.91 per share) for its first quarter ended April 4, 2010, compared to a net loss available for common stock of $19.2 million ($2.04 loss per share) in the first quarter of last year***.
>
> \* \* \*
>
> ***Revenue for the first quarter of 2010 was $1,171.2 million, up 11% from $1,054.1 million in 2009. The increase is due to revenue growth at the education***, television broadcasting and cable television divisions, offset by revenue declines at the magazine publishing and newspaper publishing divisions*.* The Company reported operating income of $92.5 million in the first quarter of 2010, compared to an operating loss of $19.6 million in 2009. Operating results improved at all of the Company's divisions for the quarter.

278. The May 7, 2010 press release went on to discuss Kaplan in pertinent part, as follows:

> ***Education division revenue totaled $711.4 million for the first quarter of 2010, a 20% increase over revenue of $593.5 million for the first quarter of 2009. Kaplan***

---

[12] Washington Post's newspaper division continued to suffer, and on May 5, 2010, the Company announced it had retained Allen & Company to explore the possible sale of *Newsweek* magazine.

*reported first quarter 2010 operating income of $57.9 million, up from $11.2 million in the first quarter of 2009*.

279.    In addition, the press release stated KHE reported revenue of $442.6 million for the

first quarter and highlighted KHE's "strong enrollment growth and improve margins:"

*Higher education revenue and operating income grew significantly in the first quarter of 2010 due to strong enrollment growth and improved margins. Student starts increased in the first quarter of 2010 compared to the prior year, particularly at Kaplan University*; however, the percentage growth rate was lower than in the first quarter of 2009. A summary of KHE student enrollment for the first quarter of 2010 as compared to 2009 is as follows:

|  | As of March 31, | | |
|  | 2010 | 2009 | % Change |
| --- | --- | --- | --- |
| KHE Student Enrollment |  |  |  |
| Total students |  |  |  |
|     Kaplan University | 70,514 | 51,735 | 36 |
|     Kaplan Higher Education Campuses | 48,779 | 43,854 | 11 |
|  | 119,293 | 95,589 | 25 |

|  | For the Quarter Ended | |
|  | **March 31, 2010** | **March 31, 2009** |
| --- | --- | --- |
| New student starts |  |  |
|     Kaplan University | 25,169 | 21,135    19 |
|     Kaplan Higher Education Campuses | 15,346 | 14,607    5 |
|  | 40,515 | 35,742    13 |

280.    As detailed in ¶95, KHE's first quarter 2010 revenues accounted for approximately

37.8% of Washington Post's revenues for the quarter, while the entire Kaplan segment accounted for

approximately 60.7% of the Company's revenues for the quarter.

281.    Despite addressing proposed DOE regulations and their potential impact on Kaplan's

eligibility for Title IV funding, the May 7, 2010 press release omitted key facts, stating in pertinent

part:

The U.S. Department of Education is expected to issue proposed regulations in the second quarter of 2010 that could amend or add to existing Title IV regulations. The proposed regulations may include revised standards governing the payment of

incentive compensation to admissions and financial aid advisors; a new definition of "gainful employment" that is based on student tuition and debt levels and other factors; and other changes to Title IV eligibility requirements for institutions, programs and students. The changes ultimately made to the Title IV regulations could adversely affect, among other things, Kaplan's ability to retain admissions and financial aid advisors and the ability of Kaplan Higher Education division's programs and students to qualify for Title IV financial assistance, and could otherwise have a material adverse effect on Kaplan's operating results. The Department of Education has stated its intent to publish any new final regulations by November 1, 2010, which is the deadline for the regulations to take effect by July 1, 2011.

282.   Although the price of Washington Post common stock fell slightly on May 7, 2010, closing down approximately 2.5% at $476.52, as the Company revealed ongoing struggles in its media divisions and offered *Newsweek* for sale, Defendants' false and misleading statements, however, served to maintain artificial inflation in the price of Washington Post common stock.  But for Defendants' false and misleading statements, the price of Washington Post stock would have declined even further.

283.   On May 11, 2010, Washington Post filed its quarterly report on form 10-Q for the quarter ended April 4, 2010, which confirmed the Company's previously announced financial results and was signed by Graham and Jones (the "First Quarter 2010 10-Q").  The First Quarter 2010 10-Q also contained Sarbanes-Oxley certifications signed by Graham and Jones and stated the Form 10-Q did not include any material misrepresentations.  Nevertheless, the First Quarter 2010 10-Q did contain several false and misleading statements regarding Kaplan's enrollments and financial performance.

284.   On May 13, 2010, the Company held its annual stockholders meeting.  During the meeting, Graham made numerous false and misleading statements.  For example, Graham purported to discuss the "potential problem" of proposed federal regulations affecting Kaplan.  Obfuscating the truth, Graham labeled the regulations as "extreme" and touted so-called success stories resulting

from Kaplan – never revealing to investors that the source of Kaplan's touted growth was the Company's predatory, manipulative, and fraudulent business practices that valued hitting quotas above all other things. Specifically, Graham stated, in part:

> But first I want to talk about ongoing federal regulatory issues at Kaplan, because I think one of my jobs in communicating with you on occasions like this is to tell you things you'd want to know, both about things that are going better than expected at the Company and about potential problems. And this is certainly a potential problem.
>
> ***In the first quarter, revenues, operating income and student counts at Kaplan Higher Education have grown at very, very rapid paces. This is a function of the mission I've talked about: when people fear losing their jobs or, indeed, have lost them, they seek another credential, and are smart to do so.***
>
> Kaplan Higher Education is a counter-cyclical business, and the cycle is probably turning as the economy recovers. I do not expect revenue and operating income to continue to increase at anything like these rates.
>
> \*       \*       \*
>
> The proposal has not been finalized. But if the draft recommendations were implemented, they could potentially deny half of our Higher Ed students eligibility for federal student financial aid. Should these standards be applied to students with similar backgrounds in traditional schools – like the University of Chicago or Penn State University – a significant portion of students in career-focused programs would similarly be denied eligibility for student loans, which highlights the extreme nature of the regulation.
>
> \*       \*       \*
>
> They are people like Elisha Ray, a single mother from Ridgecrest, California, who sought to enter law enforcement, but realized federal agency positions require at least an undergraduate degree. She earned her criminal justice degree at Kaplan University and has since found a position as a financial management analyst with the Department of Defense, doubling her previous salary at a real estate office.
>
> They are people like Barbara Hess, who posted on Facebook yesterday: "After being out of school for 5 years, I start tonight. Doing this for me and my 2-year-old son. So we can have a better life."
>
> ***Kaplan's higher education campuses and online university enrolled over 100,000 students last year. But the real story is not the aggregate number of students we help. It is the individual success stories that our programs make possible. These***

*are successes that sometimes pay double. They will often serve, we believe, as a beacon for our students' children to emulate.*

*In short, we're not just proud of the quality education Kaplan offers. We believe in the schools' mission to help people get ahead.*

There are two primary factors driving the Education Department's current focus on our sector. The Department is concerned that many students are having difficulty repaying their student loans in this weak economy. In addition, the Department is concerned that there are certain investors who could purchase schools with the intent of growing revenue quickly, without regard for educational quality.

*These are legitimate concerns, and we share those concerns.* However, the solutions proposed by the Department of Education would do far more harm than good. They would dramatically reduce access to higher education and prospects for better employment for millions of prospective students. Low income, minority and adult learners would be disproportionately impacted. These students have historically been underserved by traditional institutions. They make up a significant portion of Kaplan's enrollment.

\* \* \*

*What I do know is that Kaplan's Higher Ed programs are changing lives. Many of our students see Kaplan as their best opportunity to acquire the skills and credentials they need to build their futures. Over 200,000 Kaplan graduates are a testament to that promise.*

285.    The statements referenced in ¶¶277-79, 283-84 were materially false and misleading when made as they represented and/or omitted facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading, for reasons set forth in ¶234 and as evidenced by the factual detail contained throughout this Complaint.  In addition, the statements referenced in ¶¶277-79, 283-84 were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- Defendants continued to mislead the market as to the true reasons behind the supposed "strong enrollment growth" at Kaplan.  This time, however, Defendants also pointed to increased "student starts" – a metric not reported in other Class Period

SEC filings.  Although Defendants were attempting to paint the picture of healthy enrollment growth, they omitted the material facts that the Company's revenue and Kaplan enrollments were founded upon a systemically predatory business model, including diverse predatory recruiting and financial aid practices focused on students' "pain and fears," and enrolling students at "any cost," as extensively detailed herein.

- Although the Company purported to addresses potential DOE regulations and their potential impact on Kaplan's eligibility for Title IV funding, Defendants omitted the fact that Kaplan was actively engaging in known unethical and illegal practices to both boost enrollments and circumvent the 90/10 Rule.

- Despite touting the "very, very rapid" growth of revenues, operating income, and student counts at KHE, and despite attributing such growth to the Company's "mission," Graham and the other Defendants were well aware that the Company's Kaplan division was taking advantage of the down economy to further manipulate, deceive, and defraud prospective students in order to get them to enroll at KHE schools.  Rather than helping students, Kaplan was preying on them in order to maximize the amount of federal financial aid brought into Kaplan and Washington Post. Investors, no doubt, would have found the true reasons behind Kaplan's improved financial performance to be important in their decision-making.  Put simply, a purported institute of higher education that is, in reality, focused on scamming its students holds far less value than a legitimate for-profit education enterprise.

- In addition, while Graham acknowledged that KHE had "grown at very, very, rapid paces" he failed to inform stockholders that Kaplan's extreme growth had become a growing concern throughout Washington Post.  For example, CW 23 detailed how at semi- annual Company meetings, various executives at the Company's subsidiaries voiced concerns and questions to both Graham and Jones related to problems associated with Kaplan's explosive growth.  These problems, which included illegal recruiting tactics and compensation practices, and threatened the very viability of the Company's largest cash-generating-unit, were never disclosed to investors.

- Graham's discussion with investors about Kaplan's "individual success stories" and enrollment figures, as well as his professed "legitimate concerns" and familiarity with proposed DOE regulations, reaffirm Graham's intimate knowledge about Kaplan, its operations, and whether such operations were conducted in accordance with applicable regulations. Graham was not a mere figurehead who sat isolated from any information about his Company's largest subsidiary.  Quite the opposite, his descriptive, direct statements clearly show Graham's knowledge of Kaplan's operations and conduct, supporting an inference of scienter.

- Although Graham pointed to "individual success stories" about which he claimed to be familiar, his extensive knowledge of Kaplan's actual business practices undermined the veracity of his statements.  Graham and the other Defendants were well aware that Kaplan was not focused on providing a "quality education" and that

Kaplan's mission was not "to help people get ahead." Quite the opposite, Kaplan's top-down mission was to enroll any student under nearly any circumstance in order to maximize the federal financial aid received by the Company's education division. Indeed, if Kaplan actually operated in the manner described by Graham to Washington Post shareholders, it would not have routinely fired Admissions Advisors for failing to meet enrollment quotas. Far from "changing lives" for the better, Defendants were well aware that they were systematically destroying the future of tens of thousands of Kaplan students who upon dropping out of Kaplan (70% drop-out within 4.2 months) would be saddled with nontransferable credits and exorbitant amounts of student loan debt. These facts were material to the market, and had they been disclosed – as opposed to the glowing false statements Graham made – market expectations would have been corrected and the price of Washington Post common stock would have declined substantially.

- Had the Company's Kaplan division not manipulated prospective students, demand would have drastically declined, the Company's financial performance would have suffered materially, and the market would have learned that Defendants lacked a reasonable basis for their statements regarding Washington Post's financial performance, outlook, and future business prospects.

286. Then, on June 10, 2010, Senator Tom Harkin, chair of the U.S. Senate's Health, Education, Labor and Pensions Committee ("HELP"), announced that he would be holding a series of hearings to examine federal spending at for-profit colleges. The press release provided in pertinent part:

Senator Tom Harkin (D-IA), Chairman of the Health, Education, Labor and Pensions (HELP) Committee, today announced that he plans to hold a series of hearings to examine federal education spending at for-profit higher education institutions. The hearings will begin June 24th.

"In the past two years we have made major new investments to expand federal financial aid," said Harkin. "Pell Grants and student loans now provide more than $20 billion to for-profit higher education companies every year. We need to ensure for-profit colleges are working well to meet the needs of students and not just shareholders. We owe it to students and taxpayers to make sure these dollars are being well spent."

Between 1998 and 2008 the for-profit sector has grown from 550,000 students to 1.8 million, a 225 percent increase. Students at for-profit institutions are borrowing more, and more frequently, than their peers at non-profit schools, and according to the Department of Education, one in five students who left a for-profit college in 2007 defaulted on their loan within three years.

The Committee will examine a broad range of issues related to the growing role of the for-profit higher education sector, including the scope and rapid growth of the federal investment in for-profit higher education and the corresponding opportunities and risks for students and taxpayers. Details on the first hearing will be available in the coming weeks.

287. On June 16, 2010, the DOE announced that it was proposing new tougher regulations on the industry designed to protect college students and taxpayers from abusive or fraudulent practices, like those that the 24 CWs discussed herein uniformly corroborate.

288. On June 24, 2010, the HELP Committee held a hearing on the for-profit education industry. As part of the hearing, the HELP Committee released a report entitled, "Emerging Risk? An Overview of the Federal Investment in For-Profit Education" (the "June 24, 2010 HELP Report").[13]

289. The June 24, 2010 HELP Report noted that "[e]vidence suggests that for-profit schools charge higher tuition than comparable public schools, spend a large share of revenues on expenses unrelated to teaching, experience high dropout rates, and, in some cases, employ abusive recruiting and debt-management practices." The June 24, 2010 HELP Report further noted "mounting reports of questionable practices" at for-profit colleges. With regard to job-placement data provided by colleges in the for-profit education industry to prospective students, the report found that "there is no agreed-upon definition of how placement in a relevant field is calculated. For example, a restaurant dishwasher or even a janitor might be considered a 'placement' by a culinary school." Pointing to financial results bloated by Title IV dollars, the report further stated:

---

[13] Testimony, materials, and video of the June 24, 2010 hearing are available online at the HELP Committee's website. *See* http://help.senate.gov/hearings/hearing/?id=464686ba-5056-9502-5d95-e21a6409cc53 (last visited June 12, 2011). A copy of the HELP Committee's June 24, 2010 report is available online at: http://harkin.senate.gov/documents/pdf/4c23515814dca.pdf.

For-profit schools have significant operating profit margins among companies listed on U.S. stock exchanges. For FY2009, one company reported an operating profit of $489 million on revenues of $1.3 billion, a 37 percent margin. By comparison, this margin was more than triple that of Raytheon, and double that of Apple.

290.   On July 1, 2010, U.S. Senator Dick Durbin was quoted in a variety of media reports criticizing for-profit colleges and calling for more regulation. Comparing the growth of for-profit educational institutions to the subprime mortgage bubble, Senator Durbin discussed the need for "legislation to strengthen regulation of for profit-schools" because the schools were leaving students with "worthless diplomas" and "whopping levels of debt."

291.   On August 2, 2010, the Company announced it signed a contract to sell *Newsweek* – rendering Washington Post even more dependent on Kaplan's revenues.

292.   On August 3, 2010, news began to leak into the market concerning the findings from an undercover investigation conducted by the GAO on recruiting techniques used in the for-profit higher education industry. For example, on August 3, 2010, *The New York Times* published an article entitled "For-Profit Colleges Mislead Students, Report Finds," stating in pertinent part:

> Undercover investigators posing as students interested in enrolling at 15 for-profit colleges found that recruiters at four of the colleges encouraged prospective students to lie on their financial aid applications — and all 15 misled potential students about their programs' cost, quality and duration, or the average salary of graduates, according to a federal report.
>
> The report and its accompanying video are to be released publicly Wednesday by the Government Accountability Office, the auditing arm of Congress, at an oversight hearing on for-profit colleges by the Senate Committee on Health, Education Labor and Pensions.
>
> The report does not identify the colleges involved, but it includes both privately held and publicly traded institutions in Arizona, California, Florida, Illinois, Pennsylvania, Texas and Washington, D.C. According to the report, the colleges in question were chosen because they got nearly 90 percent of their revenues from federal aid, or they were in states that are among the top 10 recipients of Title IV money.
>
> The fast-growing for-profit education industry, which received more than $4 billion in federal grants and $20 billion in Department of Education loans last year, has

become a source of concern, with many lawmakers suggesting that too much taxpayer money is being used to generate profits for the colleges, instead of providing students with a useful high-quality education.

The report gave specific instances in which some colleges encouraged fraud. At one college in Texas, a recruiter encouraged the undercover investigator not to report $250,000 in savings, saying it was "not the government's business." At a Pennsylvania college, the financial representative told an undercover applicant who had reported a $250,000 inheritance that he should have answered "zero" when asked about money he had in savings — and then told him she would "correct" his form by reducing the reported assets to zero, a change she later confirmed by e-mail and voicemail.

At a college in California, an undercover investigator was encouraged to list three nonexistent dependents on the financial aid application.

In addition to the colleges that encouraged fraud, all the colleges made some deceptive statements. At one certificate program in Washington, for example, the admissions representative told the undercover applicant that barbers could earn $150,000 to $250,000 a year, when the vast majority earn less than $50,000 a year. And at an associate degree program in Florida, the report said, a prospective student was falsely told that the college was accredited by the same organization that accredits Harvard and the University of Florida.

According to the report, courses in massage therapy and computer-aided drafting that cost $14,000 at a California for-profit college were presented as good values, when the same courses cost $520 at a local community college.

Six colleges in four states told the undercover applicants that they could not speak with financial aid representatives or find out what grants and loans they were eligible for until they completed enrollment forms agreeing to become a student and paid a small application fee.

And one Florida college owned by a publicly traded company told an undercover applicant that she needed to take a 50-question test, and answer 18 questions correctly, to be admitted — and then had a representative sit with her and coach her through the test. A representative at that college encouraged the applicant to sign an enrollment contract, while assuring her it was not legally binding.

But in some instances, the report said, the applicants were given accurate and helpful information, about likely salaries and not taking out more loans than they needed

293.     Following the revelation of the GAO investigation, on August 3, 2010, the price of

Washington Post began what would be a two-week decline.  As news continued to come out

concerning details of the government's investigation and the anticipated repercussions from the investigation on Washington Post's business and prospects, Washington Post stock crumbled. News of the GAO report was the tip of the proverbial iceberg.

294.     On August 4, 2010, the GAO issued its report detailing its findings. At the request of Congress, the GAO undertook its investigation to determine if for-profit colleges engaged in fraudulent, deceptive or otherwise questionable marketing practices. The GAO's report cited many instances of abuse in the sector, finding that many of the companies in the industry – including the Company's Kaplan division – employed fraudulent and deceptive practices in their student recruitment, targeting students who used federal financial aid to pay for their schooling. The study was presented at a HELP Committee hearing held on August 4, 2010, as part of the ongoing government inquiry into the for-profit education sector. This was the second of the Senate's hearings on the industry, and was entitled "For Profit Schools: The Student Recruitment Experience."[14]

295.     Specifically, the GAO report detailed severely abusive recruiting practices at fifteen for-profit campuses, two of which were Kaplan campuses, one located in Pembroke Pines, Florida, the other in Riverside, California.[15] For example, a GAO investigator posing as a potential student at Kaplan's Pembroke Pines campus uncovered the following predatory practices:

---

[14] Testimony, materials, and video of the August 4, 2010 hearing are available online at the HELP Committee's website. *See* http://help.senate.gov/hearings/hearing/?id=19454102-5056-9502-5d44-e2aa8233ba5a (last visited June 12, 2011). A copy of the GAO's August 4, 2010 report is attached hereto as *Exhibit G* and is also available online at: http://harkin.senate.gov/documents/
pdf/d10948t.pdf. On November 30, 2010, GAO reissued the report to clarify and add more precise wording and provide more detail on certain examples.

[15] Video clips depicting the GAO's undercover applications, as well as voicemail messages from for-profit recruiters are available online at http://www.gao.gov/products/GAO-10-948T (last visited June 12, 2011).

- A Kaplan admissions officer falsely stated that the college was accredited by the same agency that accredits Harvard University and the University of Florida - a common tactic described by many confidential witnesses herein (*see supra* at ¶197);

- A representative told the applicant that she needed to answer 18 questions correctly on a 50 question test to be accepted, but then a test "proctor" sat in the room with her, and "coached" her through the test;

- The applicant was not allowed to speak to a financial aid representative until after she enrolled;

- The applicant had to sign an agreement to pay $50 a month to the college while enrolled- a widespread Company policy designed to skirt to 90/10 Rule, confirmed by many confidential witnesses herein (*see supra* at ¶168);

- The admissions representative said the applicant should switch from criminal justice to the medical assistant certificate program because she could make up to $68,000 a year. However, according to the GAO, 90 percent of medical assistants make less than $40,000 a year;

- When asked about paying back student loans, the Kaplan representative allegedly told the applicant: "You gotta look at it . . . I owe $85,000 to the University of Florida. Will I pay it back? Probably not . . . . I look at life as tomorrow's never promised . . . . Education is an investment, you're going to get paid back tenfold, no matter what";

- When the applicant asked about financial aid, two Kaplan representatives refused to answer the applicant's questions, but instead debated with him about his commitment level to his education for 30 minutes - as described herein, Kaplan used various tactics, such as never saying Kaplan's total tuition costs out loud to a potential student, as a means to hide the overwhelming cost of a Kaplan education (*see supra* at ¶136);

- After first saying the criminal justice program would take 18 months to complete, the representative changed that to two years. The representative then said that student loans would fully cover the program's cost. Yet, the GAO noted that the applicant would need to take out both federal student loans and private loans to finish the program in less than three years;

- The representative told the applicant that massage therapists earn $100 per hour;

- The representative told the applicant that repaying the student loans would not be an issue once he got his new job; and

- The representatives used "hard sell" marketing techniques, such as becoming argumentative, calling the applicant afraid, and scolding the applicant for not wanting to take out loans - such hard sell tactics are confirmed by the Company's scripts, and described by many confidential witnesses herein (*see supra* at §VI(F)).

296.     On August 5, 2010, the *South Florida Business Journal* reported on Kaplan's

response to the startling revelations in the GAO report.  The article stated, in part:

> In an e-mailed response, Mark Harrad, VP of communications at Kaplan University
> in Washington, D.C., said the actions described in the GAO report "***are contrary to
> our standards and values in every way***."

> He said as soon as Kaplan learned of them, it initiated its own internal investigation
> and, as a result, suspended enrollment at its Pembroke Pines campus.

> Investigations there and at its Riverside, Calif., campus are ongoing.

> "We will take all necessary actions – including termination – with respect to any
> employee found to be in violation of ***our clearly outlined standards and the code of
> conduct that is emphasized in our repeated training and our day-to-day
> operations***," Harrad wrote. ***"The actions described in the GAO report are simply
> unacceptable***. We will do everything we can to ensure that such incidents are not
> repeated anywhere at our 75 campuses or among our 16,000 higher education
> employees."

297.     The day after revealing it had suspended enrollment at one of its Kaplan schools,

Washington Post issued a press release announcing the Company's financial results for the second

quarter ended July 4, 2010, which stated in relevant part:

> The Washington Post Company (NYSE: WPO) today reported ***net income available
> for common shares of $91.9 million ($10.00 per share) for the second quarter
> ended July 4, 2010, compared to net income available for common shares of $12.2
> million ($1.30 per share) for the second quarter of last year***.

> \*     \*     \*

> The Department of Education recently issued notices of proposed rulemaking. If
> enacted, the proposed rules may have a material effect on the future operations and
> results of Kaplan as further described in the division results below.

> \*     \*     \*

> ***Revenue for the second quarter of 2010 was $1,201.8 million, up 11% from
> $1,083.2 million in the second quarter of 2009. Operating income increased in the
> second quarter of 2010 to $163.5 million, from $19.5 million in the second quarter
> of 2009***.  Revenue and operating results improved at all of the Company's divisions
> for the quarter.

*For the first six months of 2010, the Company reported net income available for common shares of $137.3 million ($14.90 per share), compared to a net loss available for common shares of $6.9 million ($0.74 per share) for the same period of 2009*.

\* \* \*

*Revenue for the first half of 2010 was $2,343.8 million, up 12% from $2,091.5 million in the first half of 2009, due to increased revenues at the Company's education*, television broadcasting and cable television divisions, offset by a slight revenue decline at the Company's newspaper division.

298.    The press release went on to state in pertinent part:

*Education division revenue totaled $747.3 million for the second quarter of 2010, a 15% increase over revenue of $649.3 million for the same period of 2009. Kaplan reported operating income of $109.0 million for the second quarter of 2010, up 88% from $58.1 million in the second quarter of 2009*.

*For the first six months of 2010, education division revenue totaled $1,458.7 million, a 17% increase over revenue of $1,242.9 million for the same period of 2009. Kaplan reported operating income of $166.9 million for the first six months of 2010, up from $69.3 million for the first six months of 2009*.

299.    The press release, also reported KHE's revenue of $475.1 million for the quarter and although highlighting KHE's "enrollment growth, improved student retention and increased margins", the press release announced that total KHE enrollments increased at a substantially lower rate than the prior year

*Higher education revenue and operating income grew significantly in the first half of 2010 due to enrollment growth, improved student retention and increased margins. Total KHE enrollments increased 18% in the first half of 2010, compared to 31% in the first half of 2009*.  A summary of KHE student enrollment at June 30, 2010, and June 30, 2009, is as follows:

|  | As of June 30, | | % Change |
|  | 2010 | 2009 | |
|---|---|---|---|
| Kaplan University | 67,409 | 52,591 | 28 |
| Kaplan Higher Education Campuses | 44,812 | 42,112 | 6 |
|  | 112,221 | 94,703 | 18 |

300. As detailed in ¶95, KHE's second quarter 2010, revenues accounted for approximately 39.5% of Washington Post's revenues for the quarter, while the entire Kaplan segment accounted for approximately 62.2% of the Company's revenues for the quarter.

301. Then, that same day, *The New York Times* reported that Kaplan had suspended enrollment at its Pembroke Pines, Florida and Riverside, California campuses as a result of the undercover investigations disclosed in the GAO Report. *The New York Times* went on to state:

> Melissa Mack, a Kaplan spokeswoman, said the company suspended enrollment at the two campuses pending an investigation of the G.A.O. findings, and meanwhile was working "to ensure that such incidents are not repeated anywhere at our 75 campuses or among our 16,000 higher-education employees."
>
> Kaplan's higher-education programs enrolled more than 112,000 students as of June 30.

302. Although Defendants continued to highlight enrollment growth and purported positive financial results in the Company's education division, following publication of the August 6, 2010 press release, and on the heels of bits and pieces of the Company's true business practices reaching the market, which partially illuminated the falsity of Defendants' Class Period statements, the price of Washington Post stock declined 7.6% or $31.05 from a closing price of $408.61 per share on August 5, 2010, to a closing price of $377.56 per share on August 6, 2010. But for Defendants' continued false statements and material omissions concerning the Company's financial success, the price of Washington Post stock would have declined further.

303. On August 11, 2010, Washington Post filed its quarterly report with the SEC on Form 10-Q for the quarter ended July 4, 2010, which confirmed the Company's previously announced financial results and was signed by Graham and Jones (the "Second Quarter 2010 10-Q"). The Second Quarter 2010 10-Q also contained Sarbanes-Oxley certifications signed by Graham and Jones and stated that the Second Quarter 2010 10-Q did not include any material misrepresentations.

Nevertheless, the Second Quarter 2010 10-Q did contain several false and misleading statements regarding Kaplan's financial performance and future business prospects, and disclosures related to the DOE's pending regulations.

304. For example, the Second Quarter 2010 10-Q highlighted Kaplan's increase in revenues for the thirteen weeks ended ***July 4, 2010, of $747.3 million compared to revenue of $649.3 million for the thirteen weeks ended June 28, 2009.***

305. Moreover, the Second Quarter 2010 Form 10-Q elaborated on the pending regulations even further, revealing that the Company's Kaplan division would be required to submit extensive financial and operational information to the Health, Education, Labor and Pension Committee of the U.S. Senate. The Second Quarter 2010 Form 10-Q stated, in pertinent part:

> In the summer of 2010, the Health, Education, Labor and Pension Committee ("the Committee") of the U.S. Senate commenced an industry-wide review of private sector higher education institutions. The institutions owned and operated by Kaplan's Higher Education Division (KHE) are included in the scope of this industry-wide review. The scope of the hearings are being established and directed by the chairman of the Committee. Two hearings have been conducted thus far and additional hearings are anticipated. The ultimate outcome of the hearings and implications to the operation of KHE's institutions are presently unknown.

> As part of the Committee's review of private sector higher education institutions, investigators from the United Sates Government Accountability Office (GAO) performed undercover tests at 15 private sector higher education institutions, including two campuses of KHE. In August 2010, the GAO issued a report which was critical of the recruiting tactics at several schools, including the two Kaplan campuses. The Company is in the process of evaluating the GAO findings and completing its own internal investigation.

> **In addition, in August 2010, Kaplan and other companies that operate private sector higher education institutions received a request from the Committee to provide extensive information dating back to 2006 covering financial results, management, operations, personnel, recruiting, enrollment, graduation, student withdrawals, receipt of Title IV funds, accreditation, regulatory compliance and other items.** The Company is working to cooperate fully with the Committee's request.

306.     In response to Defendants' disclosures detailing that the Company's Kaplan division would be submitting, on the heels of the GAO report and investigation, detailed financial and operational data to the U.S. Senate, the price of Washington Post common stock dropped an additional 4.65%, or $17.73, from a closing price of $380.98 per share on August 10, 2010 to close at a price of $363.25 per share on August 11, 2010, on a 111.8% increase on trading volume.  The following day, the price of Washington Post common stock dropped another 3.97%, or $14.42, on August 12, 2010, to close at a price of $348.83 per share, as demonstrated in the chart below:



307.     The statements referenced in ¶¶297-99, 303-05 were materially false and misleading when made as they represented and/or omitted facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading, for reasons set forth in ¶234 above, and as evidenced by the factual detail contained throughout this Complaint.  In addition, the statements referenced in ¶¶297-99, 303-05 were materially false and misleading when made because they represented and/or omitted adverse facts which then existed and disclosure of which was

necessary to make the statements not false and/or misleading. The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- Although pieces of information had reached the market, Defendants continued to highlight the purported strong enrollment growth and financial performance of the Company's Kaplan division. Even at this late stage of the Class Period, Defendants never admitted or revealed the true cause of the Company's financial performance. Instead, Defendants and Company representatives continued to mislead the market by feigning concern about the problems at Kaplan, while shutting down enrollment at only two Kaplan campuses. Had Defendants revealed the truth, the Company would have had to suspend enrollment across Kaplan's entire enterprise.

### The Truth Is Finally Revealed

308. On August 13, 2010, after the market closed, the DOE released data on student-loan repayment rates at the nation's colleges and universities. The data showed that the repayment rates were 54% at public colleges and universities, 56% at private non-profit institutions and 36% at for-profit colleges. **The data showed that the repayment rate at Washington Post's Kaplan University was a mere 28%**, among the lowest of all for-profit institutions.

309. When news of Kaplan's paltry repayment statistics hit the market, the price of Washington Post common stock quickly dropped once again, falling more than 8%, or $27.83 per share, from a closing price of $343.48 on August 13, 2010, to a closing price of $315.65 per share on August 16, 2010, the next trading day.

310. As set forth above, as news leaked into the market concerning the GAO report, Kaplan's deceptive practices, enrollment suspensions, and extremely low student loan repayment rates, the price of Washington Post stock declined significantly. For example, in a short two-week period, investors bore the brunt of multiple stock declines. All told, between August 2, 2010 and August 16, 2010, the price of Washington Post common stock dropped more than *26%, $112.53 per share,* as demonstrated in the chart below:



311.    As a result of Defendants' false statements and omissions, Washington Post common stock traded at artificially inflated prices throughout the Class Period.  When the truth was revealed by a series of partial disclosures, Company's shares were hammered by massive sales, sending them down approximately *41.7%, or $225.73 per share*, from their Class Period high.  The impact of Defendants' fraud is demonstrated in the chart below:



## VIII.  POST CLASS PERIOD EVENTS AND DISCLOSURES

312.    Following the close of the Class Period, additional events reached the market and

further demonstrated not only the falsity of Defendants' Class Period statements, but also the extent

to which Washington Post's financial performance and future business prospects depended upon

Defendants' ability to defraud both Kaplan students and investors by continuing to implement

Kaplan's systemically predatory business model.

313.    For example, on August 21, 2010, *Barron's* published an article entitled "This Just In:

Washington Post Is Cheaper than Dirt," a follow-up to its April 5, 2010 article previously

mentioned, stating in pertinent part:

> **Washington Post's shares and reputation took a hit recently with a report by
> the U.S. Department of Education that repayment rates on government loans by
> students at the Post's fast-growing Kaplan higher education unit are some of the
> lowest among leaders in the for-profit education industry.**

The Post's stock, at $348, is down 17% so far this month and 22% below the price of $445 when we wrote favorably on the company ("Washington Post is Dirt Cheap," April 5).We argued the Post (ticker: WPO) was attractive on a sum-of-the-parts basis but failed to anticipate the potential damage to Kaplan, which has been viewed as the company's most valuable asset.

**Now the stock market seems to be assigning a negative value to the overall Kaplan education franchise**, which generated $167 million of operating income in the first half of 2010. Although the stock looks even more attractively priced today, the cloud over Kaplan may take time to lift.

<p style="text-align:center">*        *        *</p>

**The Kaplan situation is embarrassing and troublesome for the Post because the higher-education operation -- both physical campuses and online study -- accounts for virtually all of Kaplan's profits.** The original test-preparation business is slightly in the red. The Education Department reported that just 28% of former Kaplan students were paying principal on their government student loans, which accounts for the bulk of Kaplan's revenues. Other for-profit schools were in the 25% to 54% range, including Apollo Group at 44% and Career Education at 35%. By comparison, Harvard's student-repayment rate is 84%.

<p style="text-align:center">*        *        *</p>

**The report emboldened critics who've argued that for-profit schools recruit under-prepared students to high-cost programs that add little to their job skills or employment prospects while saddling them with significant debt**. The Post asserts that the government figures don't include students participating in various government-sponsored debt management programs.

314.    On September 13, 2010, U.S. Secretary of Education Arne Duncan ("Duncan") issued a press release announcing that a review of DOE data for all U.S. institutions evidenced the national cohort default rate for 2008 averaged 7%. Specifically, the data represented the cohort of borrowers whose first loan repayments came due between October 1, 2007 and September 30, 2008, and who defaulted on their payments before September 30, 2009. Duncan commented:

The data also tells us that students attending for-profit schools are the most likely to default . . .While for-profit schools have profited and prospered thanks to federal dollars, some of their students have not. Far too many for-profit schools are saddling students with debt they cannot afford in exchange for degrees and certificates they cannot use. This is a disservice to students and taxpayers, and undermines the valuable work being done by the for-profit education industry as a whole.

315.    The DOE data also reported the 2008 CDR for individual schools, including Kaplan campuses – many of whose 2008 CDR was head and shoulders in excess of the nation's 7% average. As a sample, the DOE data reported the following 2008 CDR rates for Kaplan campuses:

- Brooklyn, Ohio: 25.7%;

- Harrisburg, Pennsylvania: 22.6%;

- Boston, Massachusetts: 20.1%;

- San Antonio, Texas: 20.5%;

- Columbus, Ohio: 20.9% ;

- Dayton, Ohio: 21.3%;

- Merrilville, Indiana: 20.2%;

- Stockton, California: 20.3%;

- Las Vegas, Nevada: 19.2%;

- Dallas, Texas: 21%; and

- Tesst College, Beltsville, Maryland: 20.1%

316.    While the above information was not revealed to the market until September 2010, it was undoubtedly known to Defendants throughout the Class Period.

317.    On September 27, 2010, KHE introduced its "Kaplan Commitment" program, which "allow[s] prospective students to attend classes for an introductory period worry free, without paying tuition." According to KHE, "[t]he provisional admittance program will also lower the risk that the federal government lends money unnecessarily to students with a low chance of success in the rigorous Kaplan learning environment." The implementation of this program was an inherent admission of Defendants' fraud.

318.    On September 30, 2010, the HELP Committee held a third hearing focusing on whether for-profit colleges were benefitting their students. As part of the hearing, numerous

witnesses spoke about their experiences at for-profit institutions. For example, Danielle Johnson ("Ms. Johnson"), a former student of Kaplan University's Nursing program, discussed her "disheartening experience," with Kaplan University.

319. Ms. Johnson testified that she was misled by an Assistant Director of Admissions at Kaplan regarding her ability to complete Kaplan's nursing program by working at a health center in her hometown, as well as about the amount of in-class hours required to complete the program. Additionally, Ms. Johnson discussed how she failed both her midterm and final exams in Anatomy & Physiology but was passed in the class. After taking on $9,642.25 in student loans to attend Kaplan University, Ms. Johnson eventually dropped out and enrolled in community college. Ms. Johnson concluded her remarks to the HELP Committee, stating in pertinent part:

> Hindsight, I see how everything happens at too fast of a pace. Our very first day, during orientation, we were trained in CPR within a matter of hours. I am now certified but cannot recall how to do anything and can see how I do not feel confident at all if it came down to trying to save a life. I now feel like I am at a place where I am stuck and have no real future with what I am being taught, or being kept from. I feel like [sic] at a place where I don't know how I can continue. I want to but I don't know how. This has been a very disheartening experience and I hope by telling my story [I] can prevent it from happening to anyone else.

320. Based in part on the testimony above, and documents produced by Kaplan and other for-profit education companies to Chairman Harkin, the Committee released a report titled "The Return of the Federal Investment in for-Profit Education: Debt without a Diploma" (the "September 30, 2010 HELP Report").[16]

321. The September 30, 2010 HELP Report made a number of notable findings, including that student enrollment at for-profit colleges masks high withdrawal rates. For instance, fourteen out

---

[16] Materials from the September 30, 2010 HELP Committee hearing can be found online at: http://help.senate.gov/hearings/hearing/?id=3e235bb6-5056-9502-5df5-5d5b0f000e01 (last visited June 12, 2011). A copy of the report is also available online at: http://help.senate.gov/imo/media/doc/Education%20Report.pdf.

of sixteen schools analyzed recruited a greater number of new students than their entire starting enrollment in 2008-09, however their net enrollment only increased by 22%. The report also found that students at for-profit colleges leave without a diploma at an alarming rate. For example, while 959,000 students enrolled at the 16 schools reviewed during 2008-09, 547,000, or 57%, withdrew by August 2010. The September 30, 2010 HELP Report also found that almost all students at for-profit schools take out student loans and they are likely to amass significant debt. For example, for 2008-09 students withdrawing from associate's or bachelor's programs, median attendance was approximately 20 weeks. A student who attended a for-profit college for that length of time would have to pay approximately $8,000 to $11,000 in tuition. As set forth above, 70% of students attending Kaplan drop-out after a median time period of only 4.2 months.

322. On October 19, 2010, the Florida Attorney General announced that it had commenced an investigation into alleged deceptive trade practices at five proprietary school groups located in Florida, including Kaplan. Since that time, the Florida Attorney General has served KHE with a subpoena seeking records.

323. Once prospective students – like the market – became aware of the fraudulent business practices at the Company's Kaplan division, new student enrollment at Kaplan slowed significantly. For example, on November 5, 2010, Washington Post issued a press release announcing its third quarter 2010 results. Although KHE student enrollments increased by 8% compared to the same period in the 2009, that 8% represented a significant slowdown over the third quarter of 2009.[17] Moreover, the November 5, 2010 press release announced that in KHE's Kaplan

_____

[17] As a point of comparison, KHE enrollments for the third quarter of 2009 increased 28% compared to the same period in 2008. Although Defendants stated that enrollment growth could slow over time, the market was never alerted to the fact that it would be the discovery of, and forced end to, Defendants' massive fraud that would be the catalyst for the dramatic slowdown.

Higher Education Campuses segment, student enrollment had decreased 7% from September 30, 2009 to September 30, 2010.

324.    On November 9, 2010, *The New York Times* published an article entitled "Scrutiny Takes Toll on For-Profit College Company," a true and correct copy of which is attached hereto as *Exhibit H*.  The article stated, in pertinent part:

> . . . According to 2009 data released this summer by the Department of Education, only 28 percent of Kaplan's students were repaying their student loans. That figure is well below the 45 percent threshold that most programs will need to remain fully eligible for the federal aid on which they rely. By comparison, 44 percent of students at the largest for-profit, the University of Phoenix, were repaying their loans.
>
> Kaplan is facing several legal challenges. The Florida attorney general is investigating eight for-profit colleges, including Kaplan, for alleged misrepresentation of financial aid and deceptive practices regarding recruitment, enrollment, accreditation, placement and graduation rates.
>
> Kaplan is also facing several federal whistle-blower lawsuits whose accusations dovetail with the findings of an undercover federal investigation of the for-profit industry this summer, including video of high-pressure recruiting and unrealistic salary promises.
>
> *    *    *
>
> Using hidden cameras, investigators from the Government Accountability Office found deception or fraud at 15 for-profit colleges, including two Kaplan campuses.
>
> The undercover videos showed Kaplan recruiters in Florida and California making false or questionable statements to prospective students — suggesting for example, that massage therapists earn $100 an hour, and that student loans need not be paid back.
>
> *    *    *
>
> But dozens of current and former Kaplan employees said the videos painted a representative picture.
>
> "They are not outliers; they are in the middle of the field, the middle of the bell curve," said William Wratten, a former Kaplan admissions adviser in Chicago, who resigned after a year and a half because he disagreed with company practices. "Maybe not the exact same activities, but the mind-set was the same: Do whatever it takes to get the sale, to keep your job."

\*     \*     \*

Four whistle-blower suits against Kaplan under the federal False Claims Act have been made public in the last few years, all making accusations that the company used deceptive practices in its quest for profits, including enrolling unqualified students and paying recruiters for each student enrolled, a practice forbidden by federal law.

In addition, the suits allege, Kaplan kept students on the books after they dropped out, inflated students' grades and manipulated placement data to continue receiving financial aid.

\*     \*     \*

But many current and former Kaplan employees and students — including those, like Mr. Wratten, not involved in the lawsuits — said in interviews that they believed the company was concerned most with getting students' financial aid, and that Kaplan's fast-growing revenues were based on recruiting students whose chances of succeeding were low.

\*     \*     \*

Carlos Urquilla-Diaz, a former Kaplan instructor and administrator who is one of the Miami whistle-blowers, recalled a PowerPoint presentation showing African-American women who were raising two children by themselves as the company's primary target.

Such women, Mr. Urquilla-Diaz said, were considered most likely to drop out before completing the program, leaving Kaplan with the aid money and no need to provide more services.

"The idea was, we'll take anybody, and I mean anybody," he said.

Victoria Gatsiopoulos, a former instructor and director of career services at a Kaplan College in Pittsburgh, said in her complaint that the school made promises to students of "how their lives will magically change" if they attended Kaplan classes.

One prospective student with financial difficulties, the complaint said, was promised in writing that "in five years she would have a job in a hospital, a big house in Florida, enough money to go to Disney World with her family and a new Lexus."

Ms. Gatsiopoulos said Kaplan representatives routinely misled prospective students about the jobs they could get after graduation.

"One of our biggest programs was criminal justice," she said. "Students who were recruited were led to believe that they could get into the C.I.A. or F.B.I. or Border

Patrol or crime-scene investigation when they graduated, and earn $40-$50,000. But those jobs all require advanced training."

In reality, Ms. Gatsiopoulos said, graduates would often get the same $8 to $9-an-hour security guard jobs they could have had without Kaplan training.

Ms. Gatsiopoulos's complaint said that Kaplan also manipulated its reported placement rates so that a graduate employed in sales at Wal-Mart, for example, would be reported as working in accounting management, and that a telemarketer was reported as working in "business administration fashion merchandising."

She also charges that Kaplan would raise instructors' grades for students so they remained eligible for federal aid. Former Kaplan instructors not involved in the litigation made similar claims.

"More than once, when I refused to inflate a student's grade, they went ahead and did it on their own," Ms. Gatsiopoulos said.

<div align="center">*     *     *</div>

The broadest complaint against Kaplan is the one from Florida, in which the former dean of paralegal studies, Ben Wilcox, is one of three plaintiffs.

Kaplan officials say there is reason to distrust all three plaintiffs.

Mr. Wilcox is under indictment on charges of hacking into Kaplan's computer system and sending out harassing e-mails.

"They'll tell you all sorts of terrible things about me," Mr. Wilcox said, adding that Kaplan is intent on discrediting him because of his access to incriminating evidence. "But the bottom line is that Kaplan is a cold-hearted scam to make money by taking student loans from the government, and leaving students with debt that they'll never be able to pay off."

325.    On November 12, 2010, Washington Post announced that Bill Gates had stepped down from the Company's Board of Directors.  Approximately two months later, on January 20, 2011, Washington Post announced that Warren Buffet (who had been a member of the Board since 1996) would not be a candidate for re-election to the Company's Board of Directors.

326.    Then, on December 7, 2010, KHE announced it would be laying off 770 employees due to decreasing enrollments, stating in pertinent part:

<div align="center">130</div>

Faced with slowing enrollments at its colleges and at Kaplan University, Kaplan Inc. announced on Tuesday that it was eliminating about 770 jobs, or about 5 percent of the work force in its Kaplan Higher Education division. Kaplan, part of the Washington Post Company, did not say where the cuts were being made but in a brief news release, an executive said personnel needs were changing because "we have made a strategic decision to become more selective in the students we enroll, focusing on students who are most likely to thrive in a rigorous academic environment and meet their financial obligations."

327. On December 22, 2010, *The Huffington Post* published an article entitled, "At Kaplan University, 'Guerrilla Registration' Leaves Students Deep In Debt." The article stated in pertinent part:[18]

Far from an aberration, [a former student's] experience typifies the results of a practice known informally inside Kaplan as "guerrilla registration": academic advisors have long enrolled students in classes they never take, without their consent and sometimes even after they have sought to withdraw from the university, in order to maximize the company's revenues, according to interviews with former employees.

Managers at Kaplan--the highly profitable educational arm of the Washington Post Co.-- have for years pressured academic advisors to use this method to boost enrollment numbers, the former employees said, offering accounts consistent with dozens of complaints filed by former students with the Florida Attorney General's Office and reviewed by The Huffington Post.

Guerrilla registration has been part of a concerted effort by the university to keep students enrolled as long as possible in order to harvest more of the federal financial aid dollars that make up nearly all of the company's higher education revenues, according to former Kaplan academic advisor Sheldon Cobbler, who described the practice in detail.

Most advisors had access to a company database that allowed them to view students' e-mail correspondence without their knowledge, said Cobbler, who worked at Kaplan's Fort Lauderdale, Fla., corporate office from 2007 through July of this year. The advisors routinely searched through students' e-mails to look up their user names and passwords for Kaplan's enrollment system, and then they used that information to sign in using multiple student identities, enrolling them in classes they never intended to join, he said.

---

[18] A true and correct copy of the December 22, 2010 article is attached hereto as ***Exhibit I.***

"The company didn't want students to withdraw," Cobbler said. "They wanted them to stay in class by any means."

328. On January 18, 2011, *change.org* published an article entitled "Former Kaplan Students Tell The Washington Post: Shut Down Kaplan University Online" stating in pertinent part:

All they wanted was an education. All they got was debt.

More and more former students at Kaplan University - the lucrative chain of "for-profit" colleges owned by the Washington Post Company - are coming forward with horror stories about the bogus classes, surprise fees and deceptive policies they encountered as they struggled to achieve the American dream. And they're asking for your help.

Led by former student Shannon Croteau - who was 11 classes away from graduating with a bachelor's degree in paralegal studies when she discovered she was out of financial aid, $30,000 in debt at [sic] that the degree would be worthless in her home state of New Hampshire - a group of former students are demanding that Graham shut down Kaplan University until changes are made.

They want the Washington Post and Kaplan University Online to handle student grievances with an independent, third-party system. That way, allegations of foul play will be handled fairly, instead of being swept under the rug.

329. On February 6, 2011, Senator Harkin held another hearing on recruiting practices of for-profit education companies. Indeed, at this hearing, Harkin referenced actual "scripts" given to admission advisors at for-profit education companies, including Kaplan. Specific to Kaplan, Harkin stated, in pertinent part:

**Kaplan University also encourages its recruiters to focus on pain and fear. This is a page from a manual dated July 8, 2009. With side notes about "advisor call control" and maintaining "rapport with PROSPECT," the document is similar to ITT's with questions to "uncover the pain and fear." At the bottom, in big capital, bold letters is the takeaway message for staff. "It is all about uncovering their pain and fears. Once they are reminded of how bad things are, this will create a sense of urgency to make this change." Sixteen pages of sales tactics later, the recruiter is taught to "restate back word for word, the better you restate the brighter the dream."**

**Another Kaplan document says "keep digging until you uncover their pain, fears and dreams...." If you get the prospect to think about how tough their situation is right now and if they discuss the life they can't give their family**

**because they don't have a degree, you will dramatically increase your chances of gaining a commitment from the student. "Get to their emotions and you will create the urgency!" According to the Department of Education 30 percent of student loan borrowers at Kaplan default within three years of leaving school.**

330.     On February 7, 2010, the Illinois Attorney General sent Washington Post a Civil Investigation Demand, seeking information relating to Illinois residents who attend Kaplan University's online programs.

331.     Kaplan's declining financial performance and enrollment trends continued.  By February 23, 2011, Washington Post issued a press release announcing KHE's total enrollments had declined 8% (from both sectors) compared to enrollments as of December 31, 2009.  Moreover, for the fourth quarter of 2010, Kaplan's revenue totaled $699.8 million, a 1% decline from $709.3 million for the same period of 2009.  Specifically, revenue at KHE had decreased 9.6% from $420.2 million in the fourth quarter of 2009 to $405.6 million in the fourth quarter of 2010.

332.     These post-Class Period events serve to further corroborate the detailed accounts of the myriad confidential witnesses described herein.  Put simply, once the curtain was pulled back and Defendants' scheme was revealed, Kaplan's and Washington Post's performance suffered dramatically.  The declining enrollment trends are further indicia of how Washington Post would have performed during the Class Period absent Defendants' fraudulent omissions and misrepresentations concerning Kaplan's systemically predatory business model.

## IX.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS REGARDING WASHINGTON POST'S BUSINESS CONDUCT AND ETHICS

333.     During the Class Period, Washington Post publicly discussed the Company's strong principals, and stated goal to conduct the Company's operations in accordance with the highest standards of business ethics.  For example, the Company's 2009 10-K cited to Washington Post's "Code   of   Ethics"   and   referenced   its   location   on   the   Company's   website

133

www.washingtonpostco.com. But, the Statement of Ethical Principals contained a host of false and

misleading statements that were designed to mislead the market. For instance, the Statement of

Ethical Principals states, "We believe in doing the right thing, and we believe that the long-term

success of our businesses depends on it."

334.    Moreover, the Company goes on to state, Washington Post "conduct[s] our operations

in accordance with the highest standards of business ethics and in compliance with all applicable

laws." Continuing, the Statement of Ethical Principal states:

> Our policy is to promote full compliance with all applicable laws, rules and
> regulations of federal, state, county and local governments, and other appropriate
> private and public regulatory agencies. To the extent any of us has questions about a
> particular circumstance that may involve illegal conduct, you should seek advice
> from the applicable Company or divisional legal department.

335.    Washington Post's public persona was to demand its "employees act with honesty

and integrity, avoiding actual or apparent conflicts of interest." The Company also had certain

mandates directing the dissemination of accurate and complete reporting and financial information:

> The Company's employees are responsible for the accurate and complete reporting
> of financial information within their respective areas of responsibility and for the
> timely notification to senior management of the unit where each such individual is
> employed of significant transactions, trends and other financial or non-financial
> information that may be material to the Company. Material filed with regulatory
> bodies and other public communications should contain full, fair, accurate, timely
> and understandable disclosure.

336.    According to the Company, any waivers from the Statement of Ethics, "will not be

granted except in very limited circumstances":

> Any waivers of such requirements for directors and executive officers of the
> Company may only be made by the Board or the Audit Committee of the Board after
> disclosure of all material facts by the individual seeking the waiver and will be
> promptly disclosed as required by law or stock exchange regulations. Any waivers
> for other individuals may only be granted by the chief financial officer or the general
> counsel after disclosure of all material facts by the individual seeking the waiver.

337.     Undoubtedly, the business conduct and integrity of Washington Post and its management are material to investors.  Contrary to statements made by Defendants during the Class Period, neither Washington Post nor its management acted ethically or with integrity.  Not only were Defendants in violation of multiple rules and regulations, such as the HEA and Title IV, but they failed to adequately disclose to investors that the Company's strength was rooted in its unethical, abusive, and fraudulent business practices.

## X.     ADDITIONAL SCIENTER ALLEGATIONS

338.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding, their control over, and/or receipt and/or modification of Washington Post's and Kaplan's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Washington Post and Kaplan, participated in the fraudulent scheme alleged herein.

339.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including each of the Individual Defendants.

340.     The Individual Defendants were privy to confidential and proprietary information concerning Washington Post's Kaplan, and its operations, finances, financial condition, and present

and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Washington Post's Kaplan as discussed in detail above. Because of their positions with Washington Post, the Individual Defendants had access to non-public information about its business, finances, enrollment, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Indeed, Kaplan sent detailed financial reports directly to the Company on a monthly, quarterly and annual basis. Moreover, the Individual Defendants met with its subsidiaries' executives semi-annually in the spring and fall of each year, and on multiple occasions multiple executives voiced concerns about Kaplan's extreme growth, hiring practices and acquisition practices. Because of their possession of such information, the Individual Defendants knew or were severely reckless in disregarding the fact that adverse facts specified herein had not been disclosed to, and were being concealed from (in order to mislead), the investing public.

341. Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases, and other statements prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. The Individual Defendants were also able to, and did, directly or indirectly, control the conduct of Washington Post's business, the information contained in its filings with the SEC, and its public statements. Moreover, the Individual Defendants made or directed the making of affirmative statements to the investing public, and participated in meetings, conference calls, and discussions concerning such

136

statements. Each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations that were being made were then false and misleading. As a result, each of the Individual Defendants is responsible for the accuracy of Washington Post's corporate releases detailed herein and is therefore responsible and liable for the misrepresentations and omissions contained therein.

342. The Individual Defendants are liable as direct participants and co-conspirators with respect to the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Washington Post's and Kaplan's business.

343. As senior executive officers and/or directors and controlling persons of a publicly traded company whose common stock and other securities were, and are, registered with the SEC pursuant to the Exchange Act, and whose shares traded on the NYSE and are governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Washington Post's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Washington Post's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

344.     The Individual Defendants are liable as primary participants in a fraudulent scheme and wrongful course of business which operated as a fraud or deceit on purchasers of Washington Post common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The fraudulent scheme employed by the Individual Defendants was a success, as it deceived the investing public regarding Washington Post's prospects and business, artificially inflated the price of Washington Post common stock, and caused Plaintiff and other members of the Class to purchase Washington Post common stock at inflated prices and suffer losses when the relevant truth regarding Washington Post's  true financial condition was revealed and the artificial inflation was removed from the price of the stock.

345.     In addition, as mentioned above, prior to becoming CFO and Senior Vice President-Finance at Washington Post, Jones served in multiple executive positions at Kaplan and its subsidiaries.  Namely, from 1997 to 2000, Jones served as CFO of Kaplan, Inc.  From 2003 to 2007, Jones served as Chief Operating Officer of Kaplan International, based in London.  In addition, prior to his most recent Washington Post position, Jones served as CFO of Kaplan Professional, where he was responsible for Kaplan's professional businesses in financial services, real estate, technology and engineering in the United States and the United Kingdom.

346.     On information and belief, while serving in his multiple executive positions at Kaplan and its various entities, Jones gained intimate knowledge into the inner workings and policies of Kaplan, including those which form the basis of Plaintiff's claims.  For example, Jones served as CFO of both Kaplan and Kaplan Professional.  While in these positions, he undoubtedly became aware of, supervised and/or facilitated the daily cash infusions from Kaplan to the Washington Post, and as a result knew the intricacies of such transfers.  To that end, during the Class Period, Jones knew that the cash infusions resulted in Kaplan violating accreditation standards related to cash

assets. In addition, he was also aware that the days when Washington Post received no money from Kaplan, it was because Kaplan's institutions were in violation of the 90/10 Rule.

## XI.   APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET DOCTRINE

347.    At all relevant times, the market for Washington Post common stock was an efficient market for the following reasons, among other things:

(a)     Washington Post common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Washington Post filed periodic public reports with the SEC; and

(c)     Washington Post regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

348.    As a result, the market for Washington Post common stock promptly digested current information regarding Washington Post from all publicly-available sources and reflected such information in the price of Washington Post common stock.  Under these circumstances, all purchasers of Washington Post common stock during the Class Period suffered similar injury through their purchase of Washington Post common stock at artificially inflated prices and a presumption of reliance applies.

## XII.   LOSS CAUSATION/ECONOMIC LOSS

349.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the value of Washington Post common stock.  Defendants' creation and implementation of a systemically predatory business

model operated as a fraud or deceit on Class Period purchasers of Washington Post common stock by misrepresenting the Company's financials and future business prospects, including but not limited to, misrepresenting the strength and source of the Company's revenues, the volume of student enrollments in Washington Post's degree programs, and the Company's compliance with applicable laws. Defendants improperly concealed Washington Post's true financial condition and future business prospects, failing to disclose Washington Post's systemically predatory business model. Consequently, the price of its common stock was artificially inflated throughout the Class Period.

350. Defendants' false and misleading statements had their intended effect and directly and proximately caused, or were a substantial contributing cause of Washington Post's common stock trading at artificially inflated levels, reaching a Class Period high of $541.38 per share on April 15, 2010.

351. As a result of Defendants' fraudulent conduct as alleged herein, the prices at which Washington Post common stock traded were artificially inflated, at varying levels, throughout the Class Period. When Plaintiff and other members of the Class purchased their Washington Post common stock, the true value of such common stock was substantially lower than the prices actually paid by Plaintiff and the other members of the Class.

352. Later, however, when the truth regarding Washington Post's true financial circumstances was revealed through a series of partial disclosures set forth in detail above, and Defendants' prior misrepresentations, omissions, and fraudulent conduct became apparent to the market, the price of Washington Post common stock fell as the prior artificial inflation was removed. As a result of their purchases of Washington Post common stock during the Class Period at artificially inflated prices, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws, when such artificial inflation dissipated.

353. By misrepresenting the success of the Company's business and concealing its improprieties, Defendants presented a misleading picture of Washington Post's financial condition and future business prospects. For example, Defendants' consistent statements that the Company was achieving strong and ever-increasing enrollment results, caused and maintained the artificial inflation in the price of Washington Post common stock throughout the Class Period – even as negative news reached the market – until the truth was finally an fully revealed at the close of the Class Period.

354. As a result of Defendants' materially false and misleading statements and documents, as well as the adverse, undisclosed information known to the Defendants, Plaintiff and other members of the Class relied, to their detriment on such statements and documents, and/or the integrity of the market, in purchasing their Washington Post common stock at artificially inflated prices during the Class Period. Had Plaintiff and the other members of the Class known the truth, they would not have taken such actions.

355. As explained herein, these false statements directly or proximately caused, or were a substantial contributing cause of, the damages and economic loss suffered by Plaintiff and other members of the Class, and maintained the artificial inflation in the prices of Washington Post's common stock throughout the Class Period until the truth leaked out and was partially revealed to the market, at which time the prior inflation came out of the stock. Defendants' false and misleading statements had the intended effect and directly and proximately caused, or were a substantial contributing cause, of Washington Post's stock trading at artificially inflated levels throughout the Class Period.

356. Through a series of partial disclosure events regarding the Company's financial outlook and future business prospects, which culminated in the revelations that, among other things,

student-loan repayment rates at Kaplan University were only ***28%,*** that Kaplan faced the loss of Title IV funding due to pending government regulations, and that the Company engaged in aggressive and unethical recruitment practices – in contradiction of Defendants' Class Period statements regarding the Company's financials, future business prospects, and adherence to applicable laws – the artificial inflation came out of the price of Washington Post common stock.

357.    The events and partial disclosures during the Class Period, set forth more specifically above, included a May 7, 2010 press release announcing pending government regulation could impact Kaplan's receipt of Title IV funding, an August 3, 2010 disclosure announcing the GAO's investigation into for-profit schools, an August 4, 2010 disclosure detailing unethical recruitment practices at two Kaplan facilities, an August 6, 2010 disclosure detailing the pending DOE regulations and their potential impact on Kaplan, an August 11, 2010 disclosure regarding Kaplan's investigation into the GAO's allegations, and that the HELP Committee requested extensive information related to Kaplan's operations.

358.    Defendants, however, mitigated or at least minimized the impact of these partial revelations of the truth in a further attempt to mislead the market's expectations for the Company by, among other things, consistently touting the Company's strong revenues and increasing enrollment rates. For a time, Defendants were successful. Defendants' false and misleading statements limited the declines and maintained the artificial inflation in Washington Post's common stock.

359.    Nevertheless, the market's expectations were ultimately corrected on August 13, 2010, with the disclosure of Kaplan University's low student loan repayment rate of 28% along with an announcement by the DOE regarding its proposed new regulations governing an institution's eligibility to receive federal financial aid. These partial disclosures had a dramatic effect on the price of Washington Post common stock. For example, it fell by 8.10% or $27.83 per share, from a

closing price of $343.48 on August 13, 2010, to a closing price of $315.65 per share on August 16, 2010, the following trading day, on heavy increase in trading volume. The cumulative impact of these declines was that the price of Washington Post common stock fell *41.7%* from its Class Period high, causing substantial harm to investors who suffered losses as the artificial inflation generated by Defendants' fraud was removed.

360. The timing and magnitude of the decline in Washington Post common stock negates any inference that the loss suffered by Plaintiff and other Class members were caused by changed market conditions, macroeconomic factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. As a result of their purchases of Washington Post common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws when the above-described revelations reached the market and the artificial inflation was removed.

## XIII. NO SAFE HARBOR

361. The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Washington Post who knew that those statements were false when made.

Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## XIV. COUNT I: FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

362.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against all Defendants.

363.    During the Class Period, Washington Post and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Washington Post common stock; and (iii) cause Plaintiff and other members of the Class to purchase Washington Post common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Washington Post and the Individual Defendants took the actions set forth herein.

364.    These Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Washington Post's common stock in violation of §10(b) of the Exchange Act and Rule 10b-5.  These Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued as controlling persons of Washington Post, as alleged below.

365.     In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participating in the making of affirmative statements and reports, to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition, future business prospects, and operational performance, so that the market prices of Company common stock would be based on truthful, complete and accurate information.

366.     Washington Post and each of the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future business prospects of Washington Post as specified herein.

367.     These Defendants each employed devices, schemes and artifices to defraud while in possession of material adverse non-public information.  These Defendants also engaged in acts, practices, and a course of conduct, as alleged herein, in an effort to assure investors of Washington Post's value, performance, and financial and operational growth.  These acts included the making of, or the participation in the making of, untrue statements of material facts and omitting to state necessary facts in order to make the statements made about Washington Post and its business operations and future business prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a

course of business which operated as a fraud and deceit upon the purchasers of Washington Post common stock during the Class Period.

368.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of her/his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial performance, projections and/or reports; and (iii) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which each knew or disregarded with recklessness was materially false and misleading.

369.    Each of these Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that each failed to ascertain and to disclose such facts, even though such facts were available to each of them. Such Defendants' material misrepresentations and/or omissions were done knowingly or with recklessness and for the purpose and effect of concealing Washington Post's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.   As demonstrated by Defendants' misstatements of the Company's financial condition and performance throughout the Class Period, each of the Individual Defendants, if he or she did not have actual knowledge of the misrepresentations and omissions alleged, was reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false and misleading.

370.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Washington Post

common stock were artificially inflated, at varying levels, throughout the Class Period. In ignorance of the fact that market prices of Washington Post common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or disregarded with recklessness by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Washington Post common stock during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among other things, the common stock price declines identified herein that released the artificial inflation from the price of Washington Post common stock.

371. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known of the true performance, future business prospects and intrinsic value of Washington Post, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Washington Post common stock during the Class Period, or they would not have done so at artificially inflated prices which they paid.

372. By virtue of the foregoing, Washington Post and the Individual Defendants have each violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

373. As a direct and proximate result of Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period when the artificial inflation was released from Washington Post common stock, as detailed herein.

## XV.   COUNT II:  FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

374.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against the Individual Defendants.

375.    Each of the Individual Defendants acted as a controlling person of Washington Post within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's fraudulent financial reporting and actual performance, each of the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

376.    In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.

377.    As set forth above, Washington Post and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, each of the Individual Defendants is liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's

common stock during the Class Period when the artificial inflation was released from Washington Post common stock, as detailed herein.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action and designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XVI.  JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: January 25, 2012

ROBBINS GELLER RUDMAN
  & DOWD LLP

*/s/ ROBERT J. ROBBINS*

ROBERT J. ROBBINS

DAVID J. GEORGE (*pro hac vice*)
ROBERT J. ROBBINS (*pro hac vice*)
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
Email: dgeorge@rgrdlaw.com
Email: rrobbins@rgrdlaw.com

**Attorneys for Lead Plaintiff**

DATED: January 25, 2012

LAW OFFICE OF ROGER M. ADELMAN

*/s/ ROGER M. ADELMAN*

ROGER M. ADELMAN

ROGER M. ADELMAN (DC Bar No. 056358)
1100 Connecticut Avenue, NW – Suite 730
Washington, DC 20036
Telephone: 202/822-0600
202/822-6722 (fax)
Email: radelman@erols.com

**Local Counsel for Lead Plaintiff**

SULLIVAN, WARD, ASHER & PATTON, P.C.
MICHAEL J. ASHER
15800 Northwestern Highway
1000 Maccabees Center
Southfield, MI 48075
Telephone: 248/746-0700
248/746-2760 (fax)

**Additional Counsel for Lead Plaintiff**

Case 1:09-cv-08030-LBS  Document 66  Filed 01/25/12  Page 155 of 262

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 25, 2012, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system.  The electronic case filing system sent a "Notice of

Electronic Filing" to the attorneys of record who have consented in writing to accept this notice as

service of this document by electronic means.

*/s/ Robert J. Robbins*
ROBERT J. ROBBINS

# EXHIBIT "A"

# Documents Referred to in

# Harkin Floor Statement

# Recruiting Tactics

KAPLAN

Job Aid: Outbound with Rubric & OBS references
Based on the Undergraduate Programs Script published on July 08, 2009

| Hello, this is <advisor name> from the Admissions Department at Kaplan University, How are you today? | → | Rubric Attribute -- Proper Opening |
|---|---|---|

| Great. (First name), please be advised that this call may be RECORDED for training and quality purposes. | ----→ | Rubric Attribute - Call Recording Disclosure |
|---|---|---|

| The reason for my call is that I want to be the first to CONGRATULATE you on the decision you made to make a positive CHANGE in your life. CONGRATULATIONS! (*Wait for their response. BE PATIENT!*)<br><br>I would also like to have an informal conversation and discuss how Kaplan University can help you identify and achieve your goals. Okay? | → | Rubric Attribute -- Objective of the Call |
|---|---|---|

1. May I ask why you are looking to make this change in your life right now? CAN YOU ELABORATE?

2. Why this particular direction? When did you first realize this was the path you wanted to take? Can you tell me more about that?

<u>TAKE YOUR TIME HERE. THIS IS THE FOUNDATION OF THE ENTIRE INTERVIEW.</u>

<u>If the prospective student is unsure of a career direction DON'T GIVE THEM THE ANSWER</u>

- It's not uncommon for an individual to be unsure of a specific career direction at this point but you ARE seeking a positive change in your life. Is that correct?

- If you don't make this change, how do you think your future looks? ARTICHOKE – Getting to the PAIN

Once they answer, get them to clarify further. Can you expand on that?

**Affected Rubric Attributes –**

1. Asks probing questions to explore student motivation

2. Empower the student to respond/ Advisor Call Control

3. Active Listening

4. Advisor picks up on buying signals

5. Build/ Maintain Rapport w/Prospect

1

**Reiterating the Objective of the Call:**

As I stated a moment ago, our objective today is to become better acquainted. First, I want to know more about you - your hopes, dreams, goals and perhaps even fears. Does that sound fair?

→ Rubric Attribute – Objective of the call

TRANSITION: The best way for me to assist you today is to find out a bit more about you and your goals, together we'll determine the right next steps.

**UNCOVERING THE PAIN AND THE FEAR** 

•How long has this been a goal of yours? When did you first realize this is the direction you wanted to move in?

•What has stopped you in the past? What has changed from the past? Why will now be different?

•Whose life would this impact, besides you?

•Who will be the most proud at your graduation? (PDL opportunity)

•What do they think? What did they say?

•How will graduating and pursuing this career change things for you and your family?

→ Affected Rubric Attributes –

1. Asks probing questions to explore student motivation
2. Empower the student to respond/ Advisor Call Control
3. Active Listening
4. Advisor picks up on buying signals
5. Build/ Maintain Rapport w/Prospect

•Reality Check! – So why haven't you taken these steps yet? BE SILENT HERE

**IT IS ALL ABOUT UNCOVERING THEIR PAIN AND FEARS. ONCE THEY ARE REMINDED OF HOW BAD THINGS ARE, THIS WILL CREATE A SENSE OF URGENCY TO MAKE THIS CHANGE.**

<u>Transition:</u>
**Do you have any other questions about what we have discussed so far?**

<u>Commitment:</u>
So let me ask you ONE last time.

Why are you ready to make this change? Can you please elaborate?
Make sure the prospect does a thorough job explaining in detail why they are ready to make this change.

Okay, let me make sure I am on the same page. You are ready to make this change because....
RESTATE BACK WORD FOR WORD. THE BETTER YOU RESTATE, THE BRIGHTER THE DREAM, THE GREATER THE COMMITMENT.

---

Excellent! Based on your level of commitment and the fact you are taking the following steps-
Mention at least 3 things  - Sacrificing time to read, support from family, want a better life for your babies, etc...

  this time I would like to inform you (Student Name) that you have done a fantastic job and YOU
  .VE EARNED THE RIGHT TO CONTINUE IN THE ENROLLMENT PROCESS!

---

Attribute-

Give appropriate
recommendation/ Get Buy- In

Advisor makes a
recommendation to the prospect
based on their needs. Advisor
asked positive questions to
encourage prospect buy-in, while
providing the prospect with the
opportunity to ask any questions

they may have.

# Congratulations!

Can you believe you are on the path to a better life as soon as this
evening???? What questions do you have??

KAPLAN

## CREATING URGENCY -
## UNCOVER THEIR PAIN AND FEARS USING OBS

 

·I am not sure if you have done this before but I would like you to take a moment and THINK of DAY ONE of your new career. Describe to me what you envision? Take your time think about it.

Let me make sure I understand, when you start your new career, you imagine your first day going the following way... (RESTATE)

Wow! I am EXTREMELY impressed. I can tell you have pictured this in your mind before!

Since we are looking towards the future, describe to me how you feel on graduation day? Who will be in the audience cheering you on as you receive your degree on stage? (BE SILENT., DO NOT SPEAK)

Now I am assuming some of your friends and family who would be at graduation are also thinking about making a change as well? Well the good news is if you are accepted to Kaplan, we can send them some information to determine if Kaplan would be a good fit for them as well, okay?

So <Student Name>, if you DON'T make a change or move into this new direction, what do you think your future will look like? (BE SILENT- DO NOT SPEAK.) Can you elaborate?

·I am happy to hear that. As long as you don't lose sight of the life you want to live, I promise you I will do everything in my power to help you take the first step and I will be one more person in the audience cheering you on at graduation! Is that a DEAL???

1. Asks probing questions to explore student motivation

2. Empower the student to respond/ Advisor Call Control

3. Active Listening

4. Advisor picks up on buying signals

5. Build/ Maintain Rapport w/Prospect

KEEP DIGGING UNTIL YOU UNCOVER THEIR PAIN, FEARS AND DREAMS. DO NOT ANSWER FOR THEM. LET THEM PAINT THEIR OWN PICTURE. IF YOU GET THE PROSPECT TO THINK ABOUT HOW TOUGH THEIR SITUATION IS RIGHT NOW AND IF THEY DISCUSS THE LIFE THEY CAN'T GIVE THEIR FAMILY BECAUSE THEY DON'T HAVE A DEGREE, YOU WILL DRAMATICALLY INCREASE YOUR CHANCES OF GAINING A COMMITMENT FROM THE STUDENT! .

IF YOU CAN STIR UP THEIR EMOTIONS, YOU WILL CREATE URGENCY!

2

<u>Reiterating the Objective of the Call:</u>

As I stated a moment ago, our objective today is to become better acquainted. First, I want to know more about you - your hopes, dreams, goals and perhaps even fears. Does that sound fair?

Rubric Attribute – Objective of the call

TRANSITION: The best way for me to assist you today is to find out a bit more about you and your goals, together we'll determine the right next steps.

## UNCOVERING THE PAIN AND THE FEAR – CREATING URGENCY

•How long has this been a goal of yours? When did you first realize this is the direction you wanted to move in?

•What has stopped you in the past? What is different today?

•Whose life would this impact, besides you? What would it mean for them to see you finally take this step to a better life? (SLIENCE.. THIS STIRS UP EMOTION)

•Who will be the most of you for making this change? In addition to your biggest supporter, who else would you invite to graduation? (PDL opportunity) I am assuming your friends and family have been thinking about making a positive change as well correct? GREAT! Once we get you started on this path to success, I will reach out to them and see if we can help make a positive change in their life just like you. Sound like a plan? Awesome!

•Lastly, what are something's you would LOVE to provide for your family but unfortunately due to your current situation you are unable to? Tell me more about that. (Keep digging until you get to their REAL DREAM- a house, taking family to Disney World. DO NOT ANSWER FOR THEM. LET THEM PAINT THEIR OWN PICTURE

Affected Rubric Attributes –

1. Asks probing questions to explore student motivation
2. Empower the student to respond/ Advisor Call Control
3. Active Listening
4. Advisor picks up on buying signals
5. Build/ Maintain Rapport w/Prospect

IF YOU CAN HELP THEM UNCOVER THEIR TRUE PAIN AND FEAR. IF YOU GET THE PROSPECT TO THINK ABOUT HOW TOUGH THEIR SITUATION IS RIGHT NOW, IF YOU TALK ABOUT THE LIFE THEY CAN'T GIVE THEIR FAMILY RIGHT NOW BECAUSE THEY DON'T HAVE A DEGREE...YOU DRAMATICALLY INCREASE YOUR CHANCES OF ENROLLING THIS PROSPECTIVE STUDENT. GET TO THEIR EMOTIONS, AND YOU WILL CREATE THE URGENCY!

               

# EXHIBIT "B"

**Submitting Disbursement Records**

An institution must submit Federal Pell Grant, ACG, National SMART Grant, TTEACH Grant and Direct Loan disbursement records no later than 30 days after making a disbursement or becoming aware of the need to adjust a student's disbursement.

An institution's failure to submit disbursement records within the required 30-day timeframe may result in an audit or program review finding. In addition, the Department may initiate an adverse action, such as a fine or other penalty for such failure.

## PROMPT DISBURSEMENT RULES

In general, schools that are not receiving federal cash from the Department through one of the heightened cash monitoring payment methods must make disbursements as soon as administratively feasible but no later than 3 business days after receiving funds from the Department. (For a discussion of payment methods, see *Chapter 2*.) The disbursements may be credited to the student's account or made directly to the student or parent, as discussed earlier. There is a similar requirement for schools receiving FFEL funds.

Note that these timeframes for disbursing to the student's account (or directly to the student/parent) are different than those for paying FSA credit balances to the student or parent. As we discussed earlier, a school generally has 14 days to pay an FSA credit balance to the student or parent, unless it has written permission to hold the credit balance.

**Note:** Excess cash is discussed in Chapter 2.

# EXHIBIT "C"

c)   if the student is enrolled in a payment period that is scheduled to occur in two award years, the entire payment period is considered to occur within one award year, and the school has assigned the payment period to the award year in which the student receives the greater payment for the period.

The most common change that would make a student ineligible for a Stafford or PLUS disbursement is if the student has dropped below half time, so it is important that your office have a system to check the student's enrollment status at the time of disbursement.

If the student has dropped below half time temporarily, you may still make a Stafford or PLUS disbursement after the student resumes at least half time enrollment.

## PROMPT DISBURSEMENT RULES

In general, schools that are not receiving federal cash from the Department through one of the heightened cash monitoring payment methods must make disbursements as soon as administratively feasible but no later than 3 business days after receiving funds from the Department. The disbursements may be credited to the student's account or made directly to the student or parent, as discussed earlier.

Note that these time frames for disbursing to the student's account (or directly to the student/parent) are different than those for paying FSA credit balances to the student or parent. As we discussed earlier, a school generally has 14 days to pay an FSA credit balance to the student or parent, unless it has written permission to hold the credit balance.

Excess cash is discussed in Chapter 2.

**Three-day rule**

In order to comply with the excess cash regulations (described in chapter 2), when requesting funds with which to make FSA disbursements, schools must ensure they do not draw down more cash than they can disburse over the next three days.

**Submitting Disbursement Records**

A school must submit Federal Pell Grant, IAS Grant, ACG, National SMART Grant, TEACH Grant and Direct Loan disbursement records no later than 30 days after making a disbursement or becoming aware of the need to adjust a student's disbursement.

A school's failure to submit disbursement records within the required 30-day time frame may result in an audit or program review finding. In addition, the Department may initiate an adverse action, such as a fine or other penalty for such failure.

# EXHIBIT "D"

If you have questions after reading the *Instructions for Students* on the back of your 1098-T form, feel free to contact us by phone at 770-776-5192 or via e-mail at 1098T@KHEC.com. If you are in need of an account card that shows your activity, please send an e-mail message to 1098T@KHEC.com and one of our Accounts Receivable Representatives will send you a printout of your account card via e-mail.



KAPLAN
HIGHER EDUCATION

☐ CORRECTED

| FILER'S name, street address, city, state, ZIP code, and telephone number | 1 Payments received for qualified tuition and related expenses $ | OMB No. 1545-1574 | |
|---|---|---|---|
| Kaplan Higher Education Corp. 042 Kaplan Univ., Online 3750 Brookside Pkwy., Suite 150 Alpharetta, GA 30022 770-776-5192 1098t@khec.com | 2 Amounts billed for qualified tuition and related expenses $ 17,465 | 2006 Form 1098-T | Tuition Statement |
| FILER'S federal identification no. *REDACTED* | STUDENT'S social security number *REDACTED* | 3 If this box is checked, your educational institution has changed its reporting method for 2006 ☐ | Copy B For Student |
| STUDENT'S name, address, and ZIP code Jorgensen, Karilyn *REDACTED* | 4 Adjustments made for a prior year $ | 5 Scholarships or grants $ | This is important tax information and is being furnished to the Internal Revenue Service. |
| | 6 Adjustments to scholarships or grants for a prior year $ | 7 Checked if the amount in box 1 or 2 includes amounts for an academic period beginning January - March 2007 ▶ ☐ | |
| Service Provider/Acct. No. (see instr.) | 8 Checked if at least half-time student ☐ | 9 Checked if a graduate student ☑ | 10 Ins. contract reimb./refund $ |

Form **1098-T**  ♺ Printed on Recycled Paper  (keep for your records)  Department of the Treasury - Internal Revenue Service

# EXHIBIT "E"

STATE OF FLORIDA

OFFICE OF THE ATTORNEY GENERAL

DEPARTMENT OF LEGAL AFFAIRS


X---------------------------X

 IN THE INVESTIGATION OF:    : CIVIL ACTION

                             : DEPOSITION OF:

 Kaplan, Inc., a/k/a         :

 Kaplan Educational          : ELENA BRIGHT

 Centers Inc., a/k/a         :

 Kaplan University, f/k/a    :  DECEMBER 14,

 Kaplan College              :     2010

                             :   2:00 p.m.

                             :

X---------------------------X

C O M P U T E R I Z E D    T R A N S C R I P T

of the stenographic notes of the proceedings in

the above-entitled matter as taken by and before

MELISSA J. LUMI, a Certified Court Reporter, and

Notary Public of the State of New Jersey, at the

offices of JOSEPH ALBANESE & ASSOCIATES, 250

Washington Street, Toms River, New Jersey  08753,

on December 14, 2010, commencing at 2:00 in the

afternoon.

-------------------------------------------------

JOSEPH ALBANESE & ASSOCIATES

Certified Shorthand Reporters

250 Washington Street

Toms River, New Jersey 08754

Office (732) 244-6100

APPEARANCES:

OFFICE OF THE ATTORNEY GENERAL
FOR THE STATE OF FLORIDA
BY: RENE HARROD, ESQ.
    110 S.E. 6th Street
    Fort Lauderdale, Florida 33301

INDEX
Witness                    Page No.
ELENA BRIGHT
Direct Examination by Ms. Harrod:     4




EXHIBITS
No.        Description        Page No.
           None

         E L E N A    B R I G H T,
    1882 Compass Court, Toms River,
    New Jersey 08753, having been
    first duly sworn, according to law,
    upon her oath, testified as follows:

         EXAMINATION
BY MS. HARROD:
    Q.    Ma'am, as you know, my name is
Renee Harrod. I'm with the Office of the
Attorney General for the State of Florida.
         You are here today voluntarily to
give a sworn statement. Correct?
    **A.    Yes, I am.**
    Q.    And you understand that you're
under oath?
    **A.    Yes, I do.**
    Q.    Thank you. Would you please
state your full name for the record?
    **A.    Elena Bright.**
    Q.    Ma'am, have you ever used any
other name?
    **A.    Years ago, when I was married to
someone else.**
    Q.    Okay. Just for the record, what

name were you using at that point in time, ma'am?
    **A.    Taborn, T-A-B-O-R-N, Elena Taborn.**
    Q.    For what time period was that,
ballpark?
    **A.    1990 to '91, I think.**
    Q.    Okay. Thank you. And ma'am,
are you taking any medication or anything else
that would affect your ability to testify
truthfully here today?
    **A.    No.**
    Q.    Thank you very much. How old are
you?
    **A.    Oh God, 58.**
    Q.    And what's your address, ma'am?
    **A.    1882 Compass Court, Toms River,
New Jersey 08753.**
    Q.    And your phone number, please?
    **A.    727-656-0279.**
    Q.    Great. Thank you. Would you
please sketch out for me your educational
background starting with high school?
    **A.    Graduated high school in 19 --
when did I graduate? 1970 from Toms River High
School. I also have a Bachelor's Degree in mass
communications from the University of South**

1  Florida, and I graduated in '89, 1989.
2      Q.    Any other postgraduate education,
3  ma'am?
4      A.    No.
5      Q.    Okay.  Any licenses,
6  certifications or anything else that you hold
7  currently?
8      A.    No.
9      Q.    Have you ever been a licensed real
10 estate broker, anything like that?
11     A.    Licensed cosmetologist.  Does that
12 count?
13     Q.    Okay.  What state was that in?
14     A.    Both in New Jersey and Florida.
15     Q.    Thank you.  And then, if you'd
16 please, following your graduation from University
17 of South Florida in '89, we don't need to go
18 through every job that you may have held, but
19 generally what career did you begin practicing
20 in?  If you could sketch out for me your work
21 history.
22     A.    As far as education goes, oh Lord,
23 I wish I brought my resume.  I've worked in
24 advertising right after college for a magazine
25 called -- oh my God.  Now we're going back so

1  many years.
2      Q.    It was for a magazine?
3      A.    Yes, two magazines I worked for.
4      Q.    Okay.
5      A.    And I'm sorry, the names -- Tampa
6  Bay Magazine was one, and the other was Auto
7  Trader.  That was it.  Those two magazines I
8  worked for.
9      Q.    Okay.  And that was immediately
10 following your graduation from University of
11 South Florida?
12     A.    Uh-huh.
13     Q.    And then after you completed
14 working for the magazines, what did you do next?
15     A.    Then I went to work for a school.
16 Do you need the names of all these schools I've
17 worked for?
18     Q.    Are there a lot?
19     A.    Yeah.
20     Q.    Why don't you give me a
21 representative sample.
22     A.    Okay.  First school I worked for
23 was Segal, S-E-G-A-L, and they taught court
24 reporting and medical backgrounds, medical
25 billing and coding, things like that, medical

1  assisting.  I worked for them for almost three
2  years as director of admissions.  And then they
3  sold the business and -- oh, wow.
4      Okay.  After Segal, Lord, let me
5  give you the brief -- I don't remember the
6  whole -- geez, you should have warned me you were
7  going to ask these questions.  I've worked for
8  Remington College in Tampa, I've worked for Devry
9  University out of Tampa, I worked for ITT Tech
10 for six years, that was out of Tampa, Florida, of
11 course Kaplan University was my last one.
12     Total of, since '92, I've been in
13 education in various schools, and those were the
14 schools that I worked at.  I can't give you the
15 dates.  I don't remember.
16     Q.    That's okay.  All told, you've
17 worked in the education industry for how long,
18 would you say?
19     A.    Since 1992.  So what is that?
20 Sixteen years?  Yeah.
21     Q.    Eighteen years?
22     A.    Oh my God.  It's 18 years now?
23 Wow.  Okay.
24     Q.    And, ma'am, when you were working
25 at Segal or Devry or ITT, in what capacity were

1  you working?
2      A.    Always in admissions, admissions
3  representative, admissions advisor, same thing as
4  I did at Kaplan.  The only difference is that I
5  did not work in a call center, I worked
6  one-on-one with the people.  In other words, on
7  the campus.
8      Q.    In all of the institutions prior
9  to your work at Kaplan you had worked on campus
10 interacting face-to-face?
11     A.    Yes, I did.
12     Q.    And then, ma'am, for what time
13 periods were you working with Kaplan?
14     A.    I started in July of last year,
15 but I got sick, so I had to restart again in
16 August.  So from August to November.  Let me --
17 August of 2009 to November of 2010.
18     Q.    Okay.  And what positions did you
19 hold during that time period?
20     A.    Admissions advisor.
21     Q.    Did your title ever change?
22     A.    No.
23     Q.    And where were you located?
24     A.    Orlando, Florida.
25     Q.    And you indicated that was a call

1 center, not a physical campus?
2     **A. Correct.**
3     Q. Who did you report to during that
4 timeframe?
5     **A. Scott Beckett.**
6     Q. How do you spell that?
7     **A. Beckett, B-E-C-K-E-T-T. That was**
8 **the last boss. There was several bosses because**
9 **they changed them around quite a bit.**
10     Q. Okay.
11     **A. But that was my last one.**
12     Q. And for what time periods,
13 approximately, did you report to Mr. Beckett?
14     **A. Lord, let me think. I think it**
15 **was from. Oh, good grief. I think it was**
16 **from -- all of this year, from what is it? I**
17 **think it was from January to recent, or -- gosh.**
18     Q. So approximately for the entirety
19 of 2010 that you were at Kaplan?
20     **A. Yes, because before that there was**
21 **a girl who they fired that held his position,**
22 **so -- and he took her place. So I believe it**
23 **was -- yeah, boy, I'm bad on dates. I am really**
24 **bad on dates.**
25     Q. Okay.

1     **A. It was for most of the year, not**
2 **all of this year. I'm sorry. I don't want to**
3 **make a liar out of myself here, but it was for**
4 **quite a while.**
5     Q. To your recollection it was for
6 most of 2010 you reported to Mr. Beckett.
7 Correct?
8     **A. Yes.**
9     Q. Okay. And ma'am, what were your
10 responsibilities? Let's go back a step. What
11 was your title at Kaplan?
12     **A. Admissions advisor.**
13     Q. And what was your responsibilities
14 as admissions advisor?
15     **A. To enroll students in the various**
16 **programs.**
17     Q. And were you enrolling students
18 solely for the on-line school?
19     **A. Yes, solely for the on-line**
20 **school.**
21     Q. Were you working in a particular
22 segment of the Kaplan organization, meaning a
23 particular program or degree?
24     **A. In the beginning, I represented**
25 **all of them. The last, I'd say the last five to**

1 six months, they segmented people and then I
2 started working in the law area only, but for the
3 first six, seven, eight months, it was
4 representing everything that we taught on-line.
5     Q. Being that you could enroll
6 students in any program.
7     **A. Correct.**
8     Q. Ma'am, when you started with
9 Kaplan, how were you trained?
10     **A. Ten days of in-class training and**
11 **then they put us out on the floor and it was sort**
12 **of a sink or swim thing.**
13     **They had other people, other**
14 **representatives like myself out there that were**
15 **supposed to be called mentors that were supposed**
16 **to help us. The first couple of weeks I was**
17 **there, I got absolutely no help. It was a very**
18 **frustrating situation, because the mentors, you**
19 **know, were busy doing their own thing and helping**
20 **the other people that were under them, so it was**
21 **a very disorganized, very disorganized feeling.**
22     Q. Ma'am, given that you started at
23 Kaplan after about 16 years in the education
24 industry, how did you compare your first
25 experiences at Kaplan with your prior 16 years in

1 the industry?
2     **A. Absolutely horrendous. I have**
3 **never seen an organization run that way in that**
4 **knowing what -- from all of the previous schools,**
5 **knowing what we're allowed to say, what we're not**
6 **allowed to say, what the laws are concerning**
7 **privacy issues and all of that, they just kind of**
8 **ran over and did their own thing, and I was**
9 **surprised at that.**
10     **I was also surprised that the**
11 **directors that were over us, one of them, the**
12 **first one I had, he had no educational background**
13 **as far as working in an educational anything.**
14 **So his bottom line was, get as many enrollments**
15 **as you can no matter how you get them.**
16     Q. He said that?
17     **A. Oh, yes, and if I made a stink**
18 **about it and I got upset over it, he'd tell me to**
19 **take a chill pill, go home and take a pill.**
20     Q. When you said you got upset over
21 it, what do you remember having got upset over?
22     **A. Because I do not believe in**
23 **misleading people, I do not believe in lying.**
24 **I've got a great reputation at all of the schools**
25 **I've worked at, because I really stick by the**

1  student comes first, and the very first person I
2  worked for there didn't have that same -- it
3  was -- the problem was those people that were
4  over us as admissions directors received bonuses
5  off of what we enrolled, so of course they just
6  wanted the enrollments, they didn't care how we
7  got them, and that was my big argument with him.
8      Q.    Meaning that you were trying to
9  make sure that you abided by the requirements and
10  restrictions as to what you could or could not
11  say?
12      A.    Right.
13      Q.    And he was only concerned about
14  getting the enrollment?
15      A.    Right, because the pressure came
16  down on him, you have to have so many numbers,
17  and of course he put the pressure on us, you have
18  to have so many numbers, and of course your job
19  was always at stake, pressure, pressure,
20  pressure, and I said, but that's not the way to
21  do this business, we're dealing with people here.
22  These aren't slabs of beef, okay, these are
23  people with lives and you're impacting them and
24  you just can't throw them into a class,
25  regardless of whether it's good or not for them.

1  You have to make sure you're placing them
2  correctly, and that's always been my thing,
3  placing them correctly, that way you don't have
4  drop-outs, they're happy, they get out, they've
5  got a career they're very interested in, not just
6  for the enrollment sake.
7          But Kaplan was -- in the course in
8  training, it was all about ethics and morals and
9  all of that, but when you get out on the floor,
10  it was a totally different thing.
11      Q.    What do you mean in training it
12  was about ethics, but on the floor it was
13  different?  How do you --
14      A.    Well in training, what was it,
15  IKSOR was their motto, integrity, knowledge, wow,
16  something, ethics.  They gave us rules that -- in
17  other words, put Kaplan, which made me feel good
18  at first, thinking Kaplan is a real honest, up
19  front school, they're all about the student,
20  what's best for the student, but when you get out
21  on the floor, it's all about the numbers and do
22  what you can to get the numbers and who cares
23  what you say, and that's wrong.
24      Q.    Ma'am, did you have incidences
25  where you had been trained to say or to not say a

1  particular thing and then on the floor you were
2  instructed the opposite?
3      A.    Let me think about this.  Let me
4  think.  Let me think.  Hold on.  I don't think
5  it was so much going against what we were trained
6  to say or do, but it was more along the lines of
7  pressuring the people for the closing.
8          In other words, pressure,
9  pressure, pressure, and that's not what the
10  training was about.  The training was about
11  quality education, placing people correctly, not
12  pressuring them into something regardless of
13  whether it was good for them or not.
14      Q.    Ma'am, when you say pressure, are
15  you talking about the supervisor's pressure on
16  the advisors or the advisor's pressure on the
17  students or both?
18      A.    Both.  They pressured us for the
19  numbers.  If we didn't have the numbers, you
20  were fired, and in education, you are not allowed
21  to get fired because of the numbers, because in
22  education in admissions, it's not about -- it's
23  illegal, in other words, for a school to say to a
24  representative, an advisor, to say, well, if you
25  don't have X amount of enrollments per month,

1  you're out.
2          They can't do that.  That went
3  out 20-something years ago, because then you're
4  talking commission positioned, and we are not
5  commissioned, we're salaried.
6      Q.    Okay.  Was it ever indicated,
7  too, that you needed to have so many enrollments
8  or you were out?
9      A.    Absolutely.  All the time.
10      Q.    By whom?
11      A.    By the directors over us.  You
12  see, everything was broken down into groups
13  there.  They had maybe 20 people, or 25 people
14  under one admissions director, and there's like
15  1,000 people in that building.  Okay?
16          So you just figure, you know, 400
17  people on a floor, upstairs at least, that they
18  were all broken down into these areas with
19  directors over them, and then under the director
20  of admissions there was the assistant director of
21  admissions, and they're the ones that were
22  constantly on us, what are your numbers, and
23  daily, sometimes two and three times a day, who
24  have you talked to, what point are you at, where
25  are you, can't you close them today, you have to

close them today, we need the numbers today, you
can't wait until tomorrow.

It was push, push, push, push,
push. Even though the people were not in a
position to maybe pay for the admissions fee or
they weren't quite ready to make that decision
yet, we had to call them back and push, push,
push. That's not the way education should be.

Q. So the supervisors would exert
pressure on the admissions visitors by requiring
them to have a certain number of enrollments a
week, a month or a session?

A. It was weekly and monthly, and of
course the sessions could run anywhere from --
anywhere from two to three weeks to four to
five weeks, because they started at least one
session every month.

Q. Okay. Were there any other ways
other than requiring that -- go back a second.
You said that you were required to get, quote,
the numbers. What do you mean by "the numbers"?

A. We were each given quotas. Okay?
We each had so many people we had to enroll per
start. So if we had -- my number was three. I
had to have at least minimum three enrollments

per start, and then, you know, as you get more
and more experience, they would up it, then it
was four enrollments, and then five enrollments.
So the more experienced you got, the more they
expected and they would just keep upping your
numbers.

Q. And so the pressure was put upon
the admissions advisors to get the -- their quota
of enrollments per session or per start?

A. Correct.

Q. And then you indicated that their
jobs were threatened if they weren't able to
obtain the number?

A. Not threatened. People were
walked off the floor for not meeting their
numbers. That was a reality. We saw it all
the time.

Q. And was everyone aware that it was
because they hadn't met their numbers?

A. Absolutely.

Q. How did you learn that?

A. We all talked. We're all
sitting -- we don't sit in separate offices, we
just sit in long lines of desks right next to
each other, cubbies, and so everybody hears what

everybody else is doing and saying.

So we all talk. Everybody knows.
That's the kind of place where it's very open
what's going on. You know, you see someone, a
director walk on the floor, tap someone on the
shoulder and they walk them out, security is
there, they walk them out, they're gone. It's
just how it happened.

Q. Was there some method which the
supervisors of the school kept track of how many
enrollments each advisor had?

A. Yes. All by computer.

Q. And were you able to check that
for everyone or just for yourself or what?

A. Just for yourself, individually.

Q. But you could go in and check and
see that you've gotten two so far, you need to
get one more?

A. Right.

Q. Supervisors kept track of that for
all the people they were supervising?

A. Absolutely.

Q. Ma'am, other than your job being
threatened and being required to make the minimum
number of enrollments for each start, was there

any other form in which the pressure was put upon
the admissions advisors to make the enrollments?

A. There was a lot of favoritism, a
lot of favoritism going on. A lot of behind the
scenes -- how to put this gently -- girlfriend,
boyfriend kind of thing between the directors and
the representatives, a lot of the directors were
fooling around with some of the girls on the
floor, and if they liked you, it didn't matter
what your numbers were, you didn't lose your job.

Q. All right. So that other than
these relationship issues, were the admissions
advisors also either rewarded or penalized
monetarily for its number of enrollments?

A. No, not monetarily, no.

Q. Did the number of enrollments
affect compensation in any way?

A. Yes. When I first started there,
they had a scale and it was called the gem scale
and it went -- gosh, there was many, many steps
to it. I can't remember all the steps, but
there was sapphire and ruby and diamond, and the
more enrollments you made, every time your salary
review came up, you could actually jump up 10,
15, $20,000, depending how many enrollments.

1    There was common knowledge there
2  that you could start out at $30,000, and within
3  three months, after you had your first review,
4  jump up to $50,000 because you enrolled so many
5  people.  That's happened.
6    Q.    Now, my understanding is the gem
7  system is that there was what was called
8  qualitative and what was called quantitative
9  areas of review.  Is that right?
10   A.    Yes.
11   Q.    But that you would only get
12 advanced to the lowest of the two?  So that if
13 you had only a sapphire number of enrollments but
14 on qualitative you were a diamond, you would only
15 be promoted to the sapphire level?
16   A.    Correct.
17   Q.    So is it fare to say then that
18 everyone understood the gem system primarily or
19 solely to be based upon enrollments?
20   A.    Yes, it was.  Now, that changed
21 after the government came down and said, hey,
22 you're not doing things right.  Then all of a
23 sudden they did away with that system, and
24 sometime in November -- of course I was fired in
25 the beginning of November, they said they were

1  going to be changing it.
2    I don't know what they changed it
3  to.  You know, all of the bonuses -- because we
4  got bonuses, when our students were in school for
5  one year we were supposed to receive $150 bonus
6  per student after they stayed in school one year.
7  Of course, I never got my bonus because they
8  conveniently fired me before mid-November when I
9  was supposed to receive it.
10   Q.    But the policy is each admissions
11 advisor was supposed to get a bonus of $150 for
12 each student?
13   A.    Correct.
14   Q.    And were you aware of admissions
15 advisors who actually received that bonus?
16   A.    Yes, many, sure.  They had big --
17 once a quarter when they gave out the checks, the
18 actual CEO would come to Orlando and we'd have
19 the whole floor, you know, it was like 500
20 people, whatever it was, there while he was
21 saying so and so got a thousand dollars bonus
22 check, and they'd give out the checks right there
23 on the floor.
24   Q.    Were those checks just for the one
25 year bonus or were they for something else, too?

1    A.    So that was just for the bonus.
2  Quarterly bonus, because quarterly, you know,
3  depending on when you started working there, as
4  long as you had a student in for 36 credit hours
5  or for one year, that's when you would get your
6  bonus.
7    So when they gave these out
8  quarterly, everybody got different amounts of
9  money depending how long they were there and how
10 many students they enrolled.
11   Q.    Now, were the admissions advisors
12 able to do anything, or were they able to somehow
13 affect the students staying in the program for a
14 year?
15   A.    Yes.  Whenever there were
16 problems, in other words, if there was a student
17 that was unhappy because of a teacher or because
18 of -- whatever problems, it was our job to, you
19 know, check in with them, give them a call, take
20 a temperature, in other words, to make sure, hey,
21 if there are any problems, can I help you, and to
22 try the keep to student in school and enrolled so
23 they don't drop.
24   Q.    Okay.  Now, you indicated before
25 that in your experience in the education

1  industry, a lot of things were done very
2  differently at Kaplan.
3    In terms of admissions advisors'
4  attempts to keep the student enrolled, was there
5  anything in that aspect that you thought was
6  inappropriate or made you uncomfortable?
7    A.    No.  No.  Actually, servicing
8  the student once the student is enrolled and in
9  school is a good thing.  That's not a negative.
10 That's a positive.
11   Q.    Okay.  And then you indicated
12 earlier that when the government said that they
13 weren't doing it right, everything changed.  Can
14 you tell me what you're referring to?
15   A.    Yes, the script disappeared, we
16 got a new script, it went totally generic.  We
17 were not actually allowed to close -- there was
18 no close.
19   In other words, there was no
20 asking for the enrollment, it was just, well, you
21 think about it and I'll give you a call back or
22 you can call me back.
23   It went totally, totally the
24 opposite direction.  We were told, do not push.
25 I mean, it was totally generic.  Therefore,

1   **because it went so bland, the enrollments went**
2   **way down. Okay? And of course the school**
3   **didn't receive as many funds because the**
4   **enrollments were down, so they started firing**
5   **people because numbers were off. Well, it's not**
6   **our fault that numbers are off, because the**
7   **script was just so bland. We weren't allowed to**
8   **say half of what we used to say, and what we did**
9   **say was very bland.**
10      Q. Now, the timeframe when this
11   happened, was this after the GOA report came out
12   in August of 2010?
13      **A. You got it. Exactly.**
14      Q. And the GAO report was what you
15   were referring to when you said the government
16   said that Kaplan wasn't doing it right?
17      **A. Correct. Misleading people, or**
18   **misleading information, things like that.**
19      Q. Now, when the GAO report came out,
20   was that something that the Kaplan's admission
21   advisors were aware of?
22      **A. Oh, yes. Well, it hit the news.**
23   **It was kind of hard to hide it. But yes, they**
24   **definitely put the -- the CEO put an email out to**
25   **all of us and told us what was going on and that**

1   **things had to change and they were going to be**
2   **working with the government, you know, to make**
3   **sure that we did things right, and I said, good,**
4   **finally, I'm glad someone is doing something.**
5      Q. Had you read the GOA report when
6   it came out, ma'am?
7      **A. No.**
8      Q. Did anyone else read it that
9   you're aware of in terms of admissions advisors?
10      **A. I didn't ask, no. I understand**
11   **it's very, very long.**
12      Q. Were the admissions advisors and
13   yourself generally aware of the recommendations
14   or the findings of the GAO report?
15      **A. Some of it. I was told it was**
16   **like 900 pages or something. I don't know.**
17   **Some ridiculous amount. So all we were told is**
18   **follow the new script, do not ask for a close.**
19   **In other words, don't ask, don't push.**
20      **Everything totally went the**
21   **opposite direction. An example comes to mind,**
22   **part of the old script was talking about**
23   **accreditation, explaining accreditation, and**
24   **comparing us to schools like Harvard and Yale,**
25   **that we have the same type of accreditation they**

1   **do, being regionally accredited, and that in**
2   **itself is not a lie, it's true, but they took**
3   **that out, too, because the government said we**
4   **could not say that, so they took that out.**
5      **Okay. Good. Good. That's fine. I**
6   **have no problem with that.**
7      Q. It was misleading to suggest that
8   Kaplan was similar to Harvard or Yale?
9      **A. Well, we didn't say similar, we**
10   **said the accreditation was the same. The whole**
11   **idea behind it, the script, when you read it, was**
12   **that Kaplan's educational quality, because we**
13   **have the same accreditation type, is as good as**
14   **Harvard or Yale.**
15      Q. And did you think that that was
16   accurate or misleading?
17      **A. Misleading. It was implied. It**
18   **was never stated outright, it was implied.**
19      Q. Got it. When the GAO report came
20   out and suggested that Kaplan had been practicing
21   or making statements to students that were
22   misleading or deceptive, did you or any of the
23   other admissions advisors say, well, that's just
24   wrong, that's just false, we weren't -- the
25   government just got it wrong?

1      **A. No.**
2      Q. What was the general reaction
3   amongst the admissions advisors?
4      **A. Well, you have to understand, I**
5   **think -- there was only maybe a handful of us**
6   **there that had any kind of admissions background,**
7   **so the other people were kind of like, oh, okay.**
8   **They came from different backgrounds, they didn't**
9   **know. I know when the government was collecting**
10   **information and we were shopped, I knew the**
11   **people that were shopping me. You know what I'm**
12   **saying? I knew when I was shopped.**
13      Q. Is it fair to say then you were
14   not surprised when the GAO findings came out?
15      **A. Absolutely -- every school, every**
16   **private school is shopped, and that's fine, it**
17   **keeps everybody where they should be, but I knew**
18   **something was going to start happening the moment**
19   **they started heavily shopping Kaplan.**
20      Q. No, I'm sorry, I meant in terms of
21   the substance of the report. Were you surprised
22   that the GAO report was condemning or finding
23   negative conclusions about the way Kaplan had
24   been operating?
25      **A. No, I was not surprised.**

1  Q.    And why was that?
2  A.    **Because I know what should and**
3  **shouldn't have been said, and the things that**
4  **shouldn't have been said I wasn't saying, and if**
5  **they yelled at me for it, I said, well, I'm not**
6  **going to misconstrue things to make a sale.  I**
7  **don't do that.**
8  Q.    Were other admissions advisors
9  making statements that were false or
10 misconstruing things in order to make a sale?
11 A.    **Absolutely.**
12 Q.    Did you hear them doing that?
13 A.    **Yes, but you know what?  I don't**
14 **know, honestly, if they knew what they were**
15 **saying was wrong or not, but --**
16 Q.    They were just doing what they
17 were told?
18 A.    **Most of them were doing what they**
19 **were told.  Some of them were promising things**
20 **that they knew were wrong, but they were being**
21 **pressured that if they didn't make the**
22 **enrollment, they'd get fired.**
23 Q.    Promising things like what?
24 A.    **Jobs.  Oh, yeah, you'll make**
25 **$50,000 a year when you get out of school with**

1  **this and this and this and this degree.  That's a lie.**
2  Q.    And representatives or supervisors
3  were making those statements to students?
4  A.    **Yes, but those are the ones that**
5  **don't have any educational background either.**
6  Q.    You said you were one of the few
7  admissions advisors who had prior experience in
8  the education industry?
9  A.    **Yes.  My boss, my director of**
10 **admissions came from a bank.  He worked for**
11 **Chase Credit Cards.  That was his background.**
12 **Now, he had a college degree, but he had no**
13 **educational college background.**
14 Q.    So based upon your experience in
15 the industry, was it your perception that he was
16 not aware of what the requirements or the rules
17 really were?
18 A.    **I don't know what he was aware of**
19 **or not aware of.  I can't speak for him.**
20 Q.    Okay.
21 A.    **I don't want to --**
22 Q.    No, that's fair.  Ma'am, I wanted
23 to go back to after the GAO report, you indicated
24 that the CEO sent an email to everyone?
25 A.    **Yes.**

1  Q.    Indicating that things needed to
2  change now?
3  A.    **They were going to -- they said**
4  **they were going to work with the Department of**
5  **Education in every way possible to make things**
6  **correct.  I can't remember his exact words.**
7  Q.    Uh-huh.
8  A.    **It was an email.**
9  Q.    And you indicated a couple of
10 things did change after that, and you said that
11 the script disappeared.  What did you mean by
12 that?
13 A.    **We got a new script.  The old**
14 **script, we were told to rip it up and throw it**
15 **away.  I didn't.  I kept it, but unfortunately**
16 **I couldn't go back in to get it to show you, so**
17 **I'm sure it was thrown away by now.**
18 Q.    You said the new script was
19 totally generic?
20 A.    **Uh-huh.  Very bland.**
21 Q.    Could you explain to me more the
22 difference between the old script and the new
23 script after the GAO report?
24 A.    **There's 35 pages.  One of them**
25 **was the comparing of -- we weren't allowed to**

1  **talk about accreditation, only to say that we**
2  **were regionally accredited, and if you wanted to**
3  **check out what it was, I can give them CHEA.org**
4  **website to check it out.  We were not allowed to**
5  **explain what accreditation meant, we weren't**
6  **allowed to compare ourselves with other schools,**
7  **things like that.**
8  **Gosh.  There was so many things**
9  **different.  The end result, the closing**
10 **statement was totally different in that, well, if**
11 **you feel this is right for you, you can give us a**
12 **call back instead of actually asking for the**
13 **enrollment.  That was different, too.**
14 Q.    So they were moved in the hard
15 sell in the closing statement?
16 A.    **Yes, they sure did.**
17 Q.    Now, one of the things that I saw
18 in the script was a statement about making a
19 recommendation of the student for the program?
20 A.    **Yes.**
21 Q.    Do you recall that?
22 A.    **Yes.**
23 Q.    What was that all about?
24 A.    **Well, the whole selling technique**
25 **is interview process, if you pass the interview**

9 (Pages 30 to 33)

1  process, I will recommend you to my supervisors
2  for admissions to be accepted into school, and
3  that's what that's all about.
4      Q.   If you got to that point with a
5  student, then did you put them on hold and go
6  speak with a supervisor to see if you could
7  recommend them for enrollment?
8      A.   No.
9      Q.   But it was just a line, it didn't
10 mean anything?
11     A.   Bingo.
12     Q.   Meaning it didn't mean anything
13 internally, it just meant that the student had
14 the perception that they were somehow qualified
15 if they were accepted for a recommendation?
16     A.   Exactly.  They had to be
17 recommended by the advisor to get accepted into
18 school.
19     Q.   That was the student's perception?
20     A.   Yes.
21     Q.   And in actuality, there was no
22 recommendation, they were automatically accepted
23 if they passed the test and paid the fee?
24     A.   That's right.
25     Q.   Did the recommendation portion of

1  the script change after the GAO report?
2      A.   Yeah.  There was no recommendation
3  at all anymore.  Not that I remember.
4      Q.   And then were also portions
5  of the script which referred to the Washington
6  Post or members of the Board of Directors?
7      A.   Uh-huh.
8      Q.   Can you tell me what the old
9  script said in that report?
10     A.   Oh, Lord.  I remember part of
11 that section talked about we were owned by the
12 Washington Post, talked about how long we had
13 been in business, since 1920s, we had over 70
14 campuses -- 60 or 70 campuses in the United
15 States.  There was something else, too.  What
16 was it?
17     Q.   Were admissions advisors ever told
18 to tell students that Melinda Gates and Warren
19 Buffet were on the board?
20     A.   Okay, I don't know about Warren
21 Buffet, but yes, Melinda Gates all the time.
22 That was part of the spiel, yes, and that because
23 of that, our affiliation with her, that our
24 students were eligible to receive the Windows
25 Office Suite at a severely, you know, big,

1  dramatically reduced rate, and at that point it
2  was like $69 instead of like $500, and then it
3  went up to $99, which was still cheap, but yes,
4  that was one of the things that we told them.
5      Q.   So the admissions advisors would
6  tell the students that not only Ms. Gates was on
7  the board, but because of that affiliation, the
8  student could get a discounted license for the
9  Microsoft Office Suite?
10     A.   Yes.
11     Q.   Did that change after the GAO
12 report?
13     A.   It all disappeared.  All of it.
14     Q.   And then you indicated, too, that
15 after the GAO report and changes in the script,
16 that enrollments went way down?
17     A.   They certainly did.
18     Q.   Can you explain what you mean by
19 that?
20     A.   Well, because the script was so
21 generic, it was not a sales script anymore, it
22 was more like a presentation.  Okay?  There was
23 no real close feature to it, there was
24 closings -- close as in C-L-O-S-E, that kind of
25 close.

1      Q.   Uh-huh.
2      A.   Of course it went down, the amount
3  of enrollments went down because the script went
4  so generic.  Also, the amount of leads that we
5  got went down severely, too, which means to me
6  that their marketing as far as getting new leads,
7  buying new leads off the Internet went way down.
8      Q.   Let's deal with the first part
9  first.  You said there was no real closing, it
10 was more of a presentation than a sales script.
11 Does that mean that the pressure that the
12 admissions advisor had previously been exerting
13 upon the prospect to enroll, did that change?
14     A.   Yes, all of a sudden they said,
15 oh, well, you're no longer required to have X
16 amount of students per start, and we're going to
17 have to come up with a brand new salary prospect.
18 in other words, how we're going to tell you what
19 your salary range is.  I left before I found
20 that out.
21     Q.   Got it.  When you reviewed the
22 new script, your perception, though, is that the
23 hard sell tactics and the pressure upon the
24 students had been removed?
25     A.   Yes, it had been.

```
 1        Q.    Okay.  And now you said that the
 2   number of leads went down, too.  Those would be
 3   the contact information for the prospect of
 4   students?
 5        A.    Right.  And then -- oh, here's
 6   the catch.  Okay?  Normally, you should get
 7   anywhere between five and seven, ten leads, 11
 8   leads a day.  Right?  Per person, per rep.  At
 9   the end there, I was getting two or three leads a
10   day, and when I asked, why are my leads down so
11   dramatically, I mean, how am I going to talk to
12   anyone when I've only got two or three new leads
13   a day, well, you haven't been enrolling, so as
14   soon as you enroll, we'll give you more leads.
15        Q.    How could you enroll if you didn't
16   have leads to enroll?
17        A.    Thank you.  That was my whole
18   argument.
19              So basically what they were doing,
20   honestly, is just taking and targeting the people
21   that they wanted to get rid of by just giving
22   them two or three leads a day so they could find
23   a reason to fire you.
24        Q.    Ma'am, all of the calls with
25   students were taped.  Is that right?
```

```
 1        A.    That's what we were told, yes.
 2        Q.    Have you ever heard the phrase,
 3   tree phone?
 4        A.    Tree phone?
 5        Q.    Tree phone, as in like a tree, a
 6   tree phone?
 7        A.    No.  What is that?
 8        Q.    I don't know.  Were any of the
 9   admissions advisors ever instructed, or did they
10   ever contact students on a telephone line other
11   than the recorded Kaplan line?
12        A.    No.  We were told we were not
13   allowed to.
14        Q.    Were you aware of any of the
15   advisors ever doing that?
16        A.    Nobody that I was friends with did
17   that.  No.
18        Q.    And then if the calls were taped,
19   were you ever reviewed on the content or the
20   quality of the call?
21        A.    Absolutely.  And they were all
22   really great reviews.
23        Q.    How often were you reviewed on the
24   quality of the content of your call?
25        A.    The last several months, I'd say
```

```
 1   once a week, twice a week.
 2        Q.    And were you ever reprimanded or
 3   corrected on the content of the calls?
 4        A.    Not until I got fired.  No.  We
 5   were told if -- in fact, it was funny, because
 6   Wednesday, the week that I got fired, Wednesday
 7   of that week, there was a big group meeting and
 8   we were told, okay, no one else is going to get
 9   fired for saying the wrong thing, because so much
10   was going on, changes were going flying back and
11   forth, nobody knew what we were allowed to say,
12   what we weren't allowed to say, so they said,
13   next time, you know, somebody gets caught saying
14   something wrong, we're just going to pull you off
15   the phones, retrain you and put you back on the
16   phones, you won't be fired.
17              That was Wednesday at the meeting.
18   Thursday I got fired.  Never got a warning,
19   nothing, I just got fired because --
20        Q.    And what did they say you had said
21   wrong on the phone?
22        A.    I spoke to a mom about her son's
23   initial entrance test to get into school, his
24   assessment to get into school and told her that
25   he did wonderful, she should be very proud of
```

```
 1   him, that he scored very high, which he did, and
 2   that was against privacy issues, so I got fired.
 3        Q.    It's against privacy issues to
 4   tell a mom that her son did well?
 5        A.    Yes.  I told you it was bogus.
 6   I know what's illegal and -- I was talking to a
 7   mom about her son who lives with her, he was
 8   under 24, as long as the boy is under 24, the
 9   parent has a right to know because they have to
10   help pay for school.
11              Anyway, so that was the reason I
12   was given by human resources.
13        Q.    Okay.  And who gave you that
14   communication, meaning who told you that that was
15   what was done wrong?
16        A.    The human resources representative
17   right there on the campus in Orlando.  I don't
18   remember her name.  I apologize.  There's only
19   one female there, though.  So you can't miss it.
20        Q.    Okay.  Ma'am, was there anything
21   else in the content of the script itself prior to
22   the GAO report that you thought was particularly
23   misleading or inaccurate?
24        A.    In the original one you're talking
25   about?
```

1    Q.   Yes.

2    A.   Oh, gosh.  I wish I had it in
3 front of me.  I could tell you so much more.
4 Let me think a second here.  I recently found
5 out that Kaplan does not have over 70 campuses.
6 We've only got like five or six from what I
7 understand of career learning centers, and Kaplan
8 has bought other schools out, but doesn't have a
9 Kaplan name.  I just found that out recently and
10 that was really surprising to me.

11    By the way, they did take that
12 part out of the second script, the new script.

13    Q.   But that was part of the old
14 script?

15    A.   Yes, over 70 campuses across the
16 United States, and we don't.  We didn't.

17    Q.   Got it.  Ma'am, during the
18 enrollment process, was there a fee charged to
19 the students?

20    A.   Yes.  That changed too.

21    Q.   When did that take place?

22    A.   The fee was $75, which was not
23 really -- I take it back, it was not a fee, it
24 was part of the tuition, it was a tuition
25 deposit.  There was no actual admissions fee.

1 That $75 was deducted from the tuition cost for
2 their first year in school.

3    Q.   And when were they required to pay
4 that?

5    A.   After they went through financial
6 aid and they signed off on all their paperwork
7 and accepted the financial aid documents.

8    Q.   Okay.  And when did the student
9 get sent to financial aid during the enrollment
10 process?

11    A.   After the whole presentation was
12 done, they said, yes, I want to go forward with
13 this, then I would send them to financial aid
14 where they'd get up front all their information,
15 sign all their documents, then they would send
16 them back to me, I would put them on the computer
17 and get their enrollment agreement done and then
18 the very last thing is collect the $75.

19    Q.   So the student had to commit to
20 the program before they were sent to financial
21 aid?

22    A.   That was what we were supposed to
23 do.  We weren't supposed to send them over there
24 to waste financial aid's time asking questions if
25 they didn't say they wanted to do it.

1    Q.   Okay.

2    A.   That was another argument I had
3 with them.

4    Q.   What was your argument?

5    A.   Well, you know, you're talking
6 about a $60,000 commitment, and some people don't
7 know if they can afford the payment or if they're
8 even going to have payments or get grant money,
9 so to me it's only fair.  Before you buy a car,
10 you want to know what the payments are.  Right?

11    Q.   Uh-huh.

12    A.   So I would send them over there,
13 transfer them to financial aid and a lot of the
14 financial aid people would get upset with me, you
15 really shouldn't send them over because you don't
16 have any paperwork on them or anything, and we
17 were told not to do that because it would be
18 wasting financial aid's time.  But I did it
19 anyway because that's only fair.

20    Now, that changed also.  The new
21 way of doing it was they could go through, ask
22 any questions of financial aid they want, because
23 we were not allowed to talk about financial aid
24 at all.

25    Q.   So after the GAO report, it

1 changed that the students could actually learn
2 more information about the cost and the financial
3 aid before they committed?

4    A.   Correct.

5    Q.   But before the GAO report, the
6 student had to basically commit before you were
7 supposed to send them to financial aid?

8    A.   Correct.

9    Q.   But the admissions advisors were
10 not allowed to tell the students anything about
11 the cost of the financial aid available?

12    A.   No.  Just general information,
13 and really, realistically, you're not allowed to
14 do that as an admissions person.  There is
15 strict federal guidelines.  We cannot talk about
16 money, just tell them that we have it available
17 for them if they qualify.  That's all I would
18 say.  If they had questions, I'd transfer them
19 over.  Even though we weren't allowed to, I would
20 do it anyway, because like I said, they need to
21 know up front.

22    Q.   How did the other admission
23 advisors handle that?

24    A.   Most of them, like I said, didn't
25 understand the whole process, so they would

1  follow Kaplan's rules, well, you can't go to
2  financial aid until you say you want to do this.
3  So they would follow the rules, the ones that
4  didn't have admissions background like me.
5      Q.   Gotcha.  Ma'am, prior to the GAO
6  report, what would admissions advisors tell the
7  students about placement, graduation rates or
8  salary?
9      A.   There was paperwork given out on
10 all that information.  I never used it.  I did
11 hear some people use it.
12         I couldn't tell you what the
13 placement rates are, because I didn't use it.
14 When I was asked about that, I would refer them
15 to the website so they could go read it.  I never
16 used the paperwork because I didn't think it was
17 very accurate, so --
18     Q.   But you were aware that other
19 admissions advisors were using the paperwork?
20     A.   Yes.
21     Q.   And were other admissions advisors
22 quoting student's salary or guaranteeing jobs?
23     A.   Yes, they were.
24     Q.   And do you know if they were
25 written up or fired or reprimanded for doing so?

1      A.   Not that I know of.  No.  Again,
2  if you were liked, things were just glossed over,
3  a little slap on the hand, no, no, can't do that,
4  and nothing else ever happened.
5      Q.   Meaning if you were liked, that --
6  if you had a lot of enrollments?
7      A.   If you had a lot of enrollments or
8  if they took a personal liking to you.  Like I
9  said, there was a lot of favoritism, and
10 sometimes it was never even caught, because
11 remember, up until the federal government came
12 down on the school, they did not -- what's the
13 word, record every conversation.
14         After the government in August
15 came down and said, wrong, wrong, wrong, okay,
16 that's when every conversation got recorded.
17     Q.   Before August, what got recorded?
18     A.   It was sporadic, hit and miss.
19     Q.   And were the admissions advisors
20 aware of that?
21     A.   I was.  I don't know if everyone
22 was.
23     Q.   How were you aware of that?
24     A.   I was aware of it, sure.
25     Q.   How were you aware of that?

1      A.   Again, it's the kind of place that
2  this stuff just goes through the grapevine.
3  People that you know that know somebody that's in
4  admissions, you know, the big wigs, so to say, so
5  you just kind of gather this information from
6  talking to people.
7      Q.   Gotcha.  Ma'am, what did
8  admission advisors tell students about the
9  ability of the Kaplan credits being accepted by
10 other institutions?
11     A.   I don't know what everybody else
12 told them.  I always told them it's always up to
13 the receiving institution.  However, when you
14 were at a regionally accredited school, and this
15 I have heard people say, because we're regionally
16 accredited, your credits will be accepted at all
17 the other schools if you want to transfer.
18     Q.   So you heard admissions advisors
19 tell students that because Kaplan was regionally
20 accredited, that Kaplan credits would be accepted
21 at any other regionally accepted school?
22     A.   At any other school.  Not just
23 regional.
24     Q.   Oh, at any other school, period?
25     A.   Right.  And I know that to be

1  wrong, so --
2      Q.   You know that fact to be wrong?
3      A.   That fact to be wrong.
4      Q.   Meaning that the Kaplan credits
5  would not be accepted by any other school just
6  because Kaplan is regionally accredited?
7      A.   Correct.  Every school, and this
8  is the phrase you have to use, you have to have
9  it memorized in your brain as an admissions rep,
10 it is up to the receiving institution whether
11 they accept or deny your credits, regardless of
12 what school you're transferring from.  Regional
13 or national accreditation, it doesn't matter.
14 It's up to the receiving institution.
15     Q.   Ma'am, were you, while you were at
16 Kaplan, or frankly at any time, aware of schools
17 that did not accept Kaplan credits for credit --
18 for transfer credit?
19     A.   You know, that's funny you should
20 ask that.  I did talk to one student who wanted
21 to transfer from a school out in the midwest and
22 he came to us and they went back and they said
23 they wouldn't take the credits, and I can't
24 remember the name of the school.  So there was
25 one instance, yes, where they wouldn't accept it.

1   I can't remember -- was it Colorado State?  I
2 can't remember.  It was a school out in the
3 midwest, and that's common, though.  That's
4 common that a lot of schools won't accept other
5 schools, 100 percent of their credits, because
6 the classes don't match up exactly, and that's
7 normal in the industry.
8     Q.   Would you say that it's up to the
9 admissions rep to tell them that the Kaplan
10 credits would be accepted at any other
11 institution because Kaplan was regionally
12 accredited, would you say that that was both
13 false and misleading?
14     A.   Oh, absolutely.  It's an untruth.
15 You can't tell someone that credits are going to
16 transfer to another school 100 percent.  You
17 can't say that, but I've heard it said.
18     Q.   Ma'am, while you were at Kaplan,
19 and I apologize for asking these intrusive
20 questions, but what was your salary structure?
21     A.   $37,000.
22     Q.   $37,000?
23     A.   Yes.
24     Q.   And did that go up or down at the
25 time you were there?

1     A.   No, and it was supposed to go up
2 in August, but I never got a review.  They just
3 blew it off.
4     Q.   So you were there between August
5 and November, 2010, and did not receive your
6 annual review?
7     A.   No, I did not.
8     Q.   Ma'am, when we had first started,
9 you indicated that when you came to Kaplan after
10 your 16 years in the education industry, your
11 first reaction to the way things were done at
12 Kaplan was, quote, absolutely horrendous.
13     Is there anything else that
14 surprised you or that you thought was absolutely
15 horrendous about the way Kaplan conducted its
16 admission process that we haven't covered yet?
17     A.   When I first got on the floor for
18 the first, I don't know, four or five months, I
19 remember there's two huge floors with about 400
20 people a piece, on each floor, admissions people,
21 it was conducted so unprofessionally in that when
22 someone got an enrollment, there would be hooping
23 and hollering and singing and screaming and
24 like -- so totally unprofessional, things like,
25 who let the dogs out.  I mean, it was like

1 crazy, noisy, screaming and yelling.
2     Q.   Like a football game?
3     A.   Yes.  It was like, what are you
4 guys -- and you couldn't hear, and if you tried
5 to tell them to be quiet, you got a dirty like.
6 It's like I don't -- I was constantly trying to
7 explain to the person I was talking to, oh, we're
8 just having a birthday party and they're noisy,
9 just trying to make excuses for the total
10 unprofessionalism in the background, the
11 screaming and the yelling and megaphones and
12 playing football on the floor, and these were the
13 bosses doing it.  It was unbelievable.
14     Q.   Wow.  So your perception then was
15 that the treatment of enrolling a student was
16 sort of scoring a goal or singing, who let the
17 dogs out was something that was not only condoned
18 but was done at the direction of supervisors?
19     A.   You got it.  Exactly.  They're
20 the ones that started it.  Sure.
21     Q.   What else struck you as absolutely
22 horrendous or really surprised you when you came
23 to Kaplan that we haven't discussed yet?
24 Anything?
25     A.   I'm thinking.  Hold on one

1 second.  During training, there was a ten-day
2 training period.  Two weeks, they said if you
3 missed any time off from work, the first two
4 weeks of the schooling there, it was automatic
5 termination.
6     I started originally in July of
7 2009, and I moved down from New Jersey back to
8 Florida for this job, and unfortunately about a
9 week and a half, I was only about two or
10 three days out of graduating from that class, I
11 ended up unfortunately in the hospital.  They
12 fired me on the spot, and I had just spent a lot
13 of money and effort to move to Florida for that
14 job, and because I landed in the hospital, about
15 seven or eight days into training, they fired me,
16 and so I called up, and so I called up the person
17 who had fired me and I said, you can't fire me,
18 I've landed in the hospital, I'm ill.
19     Anyway, so they rehired me and
20 started me again in another training class in
21 August.  I was told by Tara, you know, Tara
22 Bull, several months after that that they had a
23 big pool going to see if I actually came back or
24 not, because most people that go out on
25 disability or are sick or go into the hospital

14 (Pages 50 to 53)

1    never come back to Kaplan. That wasn't very
2    nice.
3        Q. They had a pool for people who
4    left Kaplan on disability or on illness to see
5    whether or not they would come back?
6        A. Yes. They all made bets that I
7    wasn't ever going to come back, because no one
8    else did. I was the only person that did.
9        Q. And you're not the first person
10   who had this pool?
11       A. Obviously not. Tara Bull could
12   tell you about that. She's the one that told me
13   about it.
14       Q. Ma'am, one clarifying question.
15   Earlier, you indicated that after the GAO report
16   and the script changed, that enrollments dropped
17   dramatically.
18       A. True.
19       Q. How were you aware of that?
20       A. Well, like I said, we all sit in
21   these long rows, open desks, so we all hear and
22   talk to each other. So nobody is getting
23   enrollments.
24       People like myself that, you know,
25   performed pretty decently were getting no leads,

1    or two or three leads, and not enrolling. So
2    our whole group, every session that started, it
3    was down, it was down, it was down. The
4    enrollment numbers went way down. We were
5    not -- the last two quarters that I was there,
6    two sessions, we never hit our numbers, two or
7    three sessions, never hit our numbers, because
8    every group is given X amount of numbers every
9    session that they have to fill, seats. We
10   haven't hit it yet, and the group I was in was
11   always way up there, but as time went on, they
12   were firing so many people, we had -- I don't
13   know, we went down to less than half in my group
14   alone, and the amount of leads coming in went
15   down, therefore it follows, the amount of
16   enrollments went down.
17       Q. Got it. Ma'am, do you know where
18   the school obtained the leads that you called?
19       A. Off the Internet. They would buy
20   different services.
21       Q. Did you ever speak to a student
22   that you had called based upon a lead and the
23   student said that they had never indicated an
24   interest in Kaplan?
25       A. Yes, but that happens a lot,

1    because they're looking for jobs and they fill
2    in -- if you go on to Career Builder, because
3    it's happening to me now, looking for a job, and
4    many times you go to, okay, you want to fill out
5    an application for X, Y, Z job, and you go to
6    that site to fill it out, somehow that site
7    transmits your information to these services that
8    grab your name and phone number and call you.
9    Okay? Or they'll tell the school, hey, they're
10   looking for a school to go to, and in reality
11   they're not.
12       So yes, I've called many students,
13   just like I'm getting calls now, that said, hey,
14   I'm looking for a job, not to go to school.
15       Q. Gotcha. Ma'am, as you're aware,
16   the Office of the Attorney General is
17   investigating Kaplan based upon allegations and
18   complaints from students regarding potential
19   deceptive or unfair trade practices that the
20   school has in its enrollment, admissions or
21   financial aid processes.
22       Is there anything else, ma'am,
23   that you are familiar with based upon your
24   experience at Kaplan that the Office of Attorney
25   General should be aware of in connection with

1    this investigation? Something that we have not
2    yet discussed today?
3       A. I think the worst part of it was
4    not the educational part, and I've never been a
5    student there, so I don't know, I've heard
6    students complain and things like that, but from
7    the admissions point of view, because it was
8    strictly telephone sales, that's what it was. I
9    think the worst of it was that the student, or
10   the potential candidate to be a student, was
11   looked upon as just money-maker and not really
12   caring about the person on the other side, say
13   what you want, tell them what you want, just get
14   the enrollment was the attitude of everyone I
15   came in contact with as far as people who were in
16   a director's position, because their salaries
17   would go up with more enrollments and that
18   bothered me the worst.
19       Q. Got it.
20       A. The quality, the integrity, you
21   know, a lot of things that Kaplan did was good.
22   Okay? But that part of it, when you got out on
23   the floor, it was pressure, pressure -- we had
24   the -- what do you call it, the emergency
25   ambulance squad there at least two or three or

1 sometimes four times a week because people were
2 falling over. One boy, 27 years old, had a
3 heart attack and died.
4    Q.    Just because of the pressure you
5 were under?
6    A.    Yes. They had to come for me one
7 day. My blood pressure went up to 178 over 120.
8 I was walking around like I was drunk. The
9 pressure was horrendous. You want to keep your
10 job, but you want to do what's right.
11    Q.    And when someone was, as you had
12 said before, walked off the floor, was that sort
13 of a public firing, meaning everyone knew that
14 they were being fired?
15    A.    Yup. Right in front of everybody.
16    Q.    So that was a lot of pressure on
17 the advisors?
18    A.    Oh my God, yes. It's like -- the
19 whole thing was who's going to be next. So
20 you're walking on eggs there.
21    Q.    Well, ma'am, I have no further
22 questions at this point in time, unless there's
23 anything else that you think we should know for
24 the investigation that we haven't covered yet.
25    A.    No, I think that's about it.

1    Q.    Okay. Well, I thank you very
2 much for your time. The court reporter is going
3 to type up the transcript and then you have the
4 option, either to come into the office and read
5 it after she's typed it up or you can waive that
6 right and allow her to type it up and send it in.
7 Would you like to read it, ma'am, or would you
8 like to waive that right?
9    A.    I can waive that right. I think
10 it's going to be accurate.
11    Q.    Okay. I have no further
12 questions and we're going to be off the record.
13 Thank you so much, ma'am.
14        (Whereupon deposition was
15     concluded at 2:55 p.m.)

1            C E R T I F I C A T E
2
3        I, MELISSA LUMI, a Certified
4 Shorthand Reporter and Notary Public of the State
5 of New Jersey certify that the foregoing is a
6 true and accurate Computerized Transcript of the
7 Deposition of Elena Bright, who was first duly
8 sworn by me.
9        I further certify that I am neither
10 attorney, of counsel for, nor related to or
11 employed by any of the parties to the action in
12 which the Depositions are taken, and further that
13 I am not a relative or employee of any attorney
14 or counsel employed in this case, nor am I
15 financially interested in the action.
16
17
18
19
            MELISSA LUMI, C.S.R.
20
21
22
23
24
25

## A

**abided (1)** 14:9
**ability (2)** 5:8 48:9
**able (4)** 19:12 20:13 24:12,12
**aboveentitled (1)** 1:12
**absolutely (12)** 12:17 13:2 17:9 19:20 20:22 29:15 30:11 39:21 50:14 51:12,14 52:21
**accept (4)** 49:11,17 49:25 50:4
**accepted (11)** 34:2 34:15,17,22 43:7 48:9,16,20,21 49:5 50:10
**accreditation (8)** 27:23,23,25 28:10 28:13 33:1,5 49:13
**accredited (7)** 28:1 33:2 48:14,16,20 49:6 50:12
**accurate (4)** 28:16 46:17 59:10 60:6
**action (3)** 1:4 60:11 60:15
**actual (2)** 23:18 42:25
**actuality (1)** 34:21
**address (1)** 5:14
**admission (4)** 26:20 45:22 48:8 51:16
**admissions (49)** 8:2 9:2,2,3,20 11:12 11:14 14:4 16:22 17:14,20,21 18:5 18:10 19:8 21:2,12 23:10,14 24:11 25:3 27:9,12 28:23 29:3,6 30:8 31:7 31:10 34:2 35:17 36:5 37:12 39:9 42:25 45:9,14 46:4 46:6,19,21 47:19 48:4,18 49:9 50:9 51:20 56:20 57:7
**advanced (1)** 22:12
**advertising (1)** 6:24
**advisor (9)** 9:3,20 11:12,14 16:24 20:11 23:11 34:17 37:12
**advisors (28)** 16:16 16:16 19:8 21:2,13 23:15 24:11 25:3 26:21 27:9,12 28:23 29:3 30:8 31:7 35:17 36:5

39:9,15 45:9,23 46:6,19,21 47:19 48:8,18 58:17
**affairs (1)** 1:2
**affect (3)** 5:8 21:17 24:13
**affiliation (2)** 35:23 36:7
**afford (1)** 44:7
**afternoon (1)** 1:18
**ago (2)** 4:23 17:3
**agreement (1)** 43:17
**aid (14)** 43:6,7,9,13 43:21 44:13,14,22 44:23 45:3,7,11 46:2 56:21
**aids (2)** 43:24 44:18
**albanese (2)** 1:15,23
**allegations (1)** 56:17
**allow (1)** 59:6
**allowed (15)** 13:5,6 16:20 25:17 26:7 32:25 33:4,6 39:13 40:11,12 44:23 45:10,13,19
**ambulance (1)** 57:25
**amount (8)** 16:25 27:17 37:2,4,16 55:8,14,15
**amounts (1)** 24:8
**annual (1)** 51:6
**anymore (2)** 35:3 36:21
**anyway (4)** 41:11 44:19 45:20 53:19
**apologize (2)** 41:18 50:19
**application (1)** 56:5
**approximately (2)** 10:13,18
**area (1)** 12:2
**areas (2)** 17:18 22:9
**arent (1)** 14:22
**argument (4)** 14:7 38:18 44:2,4
**asked (2)** 38:10 46:14
**asking (4)** 25:20 33:12 43:24 50:19
**aspect (1)** 25:5
**assessment (1)** 40:24
**assistant (1)** 17:20
**assisting (1)** 8:1
**associates (2)** 1:15 1:23
**attack (1)** 58:3
**attempts (1)** 25:4
**attitude (1)** 57:14
**attorney (7)** 1:1 2:3 4:11 56:16,24

60:10,13
**august (9)** 9:16,16 9:17 26:12 47:14 47:17 51:2,4 53:21
**auto (1)** 7:6
**automatic (1)** 53:4
**automatically (1)** 34:22
**available (2)** 45:11 45:16
**aware (18)** 19:18 23:14 26:21 27:9 27:13 31:16,18,19 39:14 46:18 47:20 47:23,24,25 49:16 54:19 56:15,25

## B

**bachelors (1)** 5:24
**back (19)** 6:25 11:10 18:7,19 25:21,22 31:23 32:16 33:12 40:10,15 42:23 43:16 49:22 53:7 53:23 54:1,5,7
**background (8)** 5:21 13:12 29:6 31:5,11 31:13 46:4 52:10
**backgrounds (2)** 7:24 29:8
**bad (2)** 10:23,24
**ballpark (1)** 5:4
**bank (1)** 31:10
**based (5)** 22:19 31:14 55:22 56:17 56:23
**basically (2)** 38:19 45:6
**bay (1)** 7:6
**beckett (5)** 10:5,7,7 10:13 11:6
**beef (1)** 14:22
**beginning (2)** 11:24 22:25
**believe (3)** 10:22 13:22,23
**best (1)** 15:20
**bets (1)** 54:6
**big (6)** 14:7 23:16 35:25 40:7 48:4 53:23
**billing (1)** 7:25
**bingo (1)** 34:11
**birthday (1)** 52:8
**bit (1)** 10:9
**bland (4)** 26:1,7,9 32:20
**blew (1)** 51:3
**blood (1)** 58:7
**board (3)** 35:6,19

36:7
**bogus (1)** 41:5
**bonus (9)** 23:5,7,11 23:15,21,25 24:1,2 24:6
**bonuses (3)** 14:4 23:3,4
**boss (2)** 10:8 31:9
**bosses (2)** 10:8 52:13
**bothered (1)** 57:18
**bottom (1)** 13:14
**bought (1)** 42:8
**boy (3)** 10:23 41:8 58:2
**boyfriend (1)** 21:6
**brain (1)** 49:9
**brand (1)** 37:17
**brief (1)** 8:5
**bright (4)** 1:6 3:3 4:20 60:7
**broken (3)** 17:12,18
**broker (1)** 6:10
**brought (1)** 6:23
**buffet (2)** 35:19,21
**builder (1)** 56:2
**building (1)** 17:15
**bull (2)** 53:22 54:11
**business (3)** 8:3 14:21 35:13
**busy (1)** 12:19
**buy (2)** 44:9 55:19
**buying (1)** 37:7

## C

**call (9)** 9:5,25 18:7 24:19 25:21,22 33:12 39:20,24 56:8 57:24
**called (10)** 6:25 12:15 21:19 22:7,8 53:16,16 55:18,22 56:12
**calls (4)** 38:24 39:18 40:3 56:13
**campus (4)** 9:7,9 10:1 41:17
**campuses (4)** 35:14 35:14 42:5,15
**candidate (1)** 57:10
**cant (17)** 8:14 14:24 17:2,25 18:2 21:21 31:19 32:6 41:19 46:1 47:3 49:23 50:1,2,15,17 53:17
**capacity (1)** 8:25
**car (1)** 44:9
**cards (1)** 31:11
**care (1)** 14:6
**career (4)** 6:19 15:5 42:7 56:2

**cares (1)** 15:22
**caring (1)** 57:12
**case (1)** 60:14
**catch (1)** 38:6
**caught (2)** 40:13 47:10
**center (2)** 9:5 10:1
**centers (2)** 1:6 42:7
**ceo (3)** 23:18 26:24 31:24
**certain (1)** 18:11
**certainly (1)** 36:17
**certifications (1)** 6:6
**certified (3)** 1:13,23 60:3
**certify (2)** 60:5,9
**change (7)** 9:21 27:1 32:2,10 35:1 36:11 37:13
**changed (8)** 10:9 22:20 23:2 25:13 42:20 44:20 45:1 54:16
**changes (2)** 36:15 40:10
**changing (1)** 23:1
**charged (1)** 42:18
**chase (1)** 31:11
**chea (1)** 33:3
**cheap (1)** 36:3
**check (6)** 20:13,16 23:22 24:19 33:3,4
**checks (3)** 23:17,22 23:24
**chill (1)** 13:19
**civil (1)** 1:4
**clarifying (1)** 54:14
**class (3)** 14:24 53:10 53:20
**classes (1)** 50:6
**close (9)** 17:25 18:1 25:17,18 27:18 36:23,24,24,25
**closing (4)** 16:7 33:9 33:15 37:9
**closings (1)** 36:24
**coding (1)** 7:25
**collect (1)** 43:18
**collecting (1)** 29:9
**college (5)** 1:7 6:24 8:8 31:12,13
**colorado (1)** 50:1
**come (7)** 23:18 37:17 54:1,5,7 58:6 59:4
**comes (2)** 14:1 27:21
**coming (1)** 55:14
**commencing (1)** 1:17
**commission (1)** 17:4
**commissioned (1)**

17:5
**commit (2)** 43:19
45:6
**commitment (1)**
44:6
**committed (1)** 45:3
**common (3)** 22:1
50:3,4
**communication (1)**
41:14
**communications (1)**
5:25
**compare (2)** 12:24
33:6
**comparing (2)** 27:24
32:25
**compass (2)** 4:2 5:15
**compensation (1)**
21:17
**complain (1)** 57:6
**complaints (1)** 56:18
**completed (1)** 7:13
**computer (2)** 20:12
43:16
**computerized (1)**
60:6
**concerned (1)** 14:13
**concerning (1)** 13:6
**concluded (1)** 59:15
**conclusions (1)**
29:23
**condemning (1)**
29:22
**condoned (1)** 52:17
**conducted (2)** 51:15
51:21
**connection (1)** 56:25
**constantly (2)** 17:22
52:6
**contact (3)** 38:3
39:10 57:15
**content (4)** 39:19,24
40:3 41:21
**conveniently (1)**
23:8
**conversation (2)**
47:13,16
**correct (12)** 4:13
10:2 11:7 12:7
19:10 22:16 23:13
26:17 32:6 45:4,8
49:7
**corrected (1)** 40:3
**correctly (3)** 15:2,3
16:11
**cosmetologist (1)**
6:11
**cost (3)** 43:1 45:2,11
**couldnt (3)** 32:16
46:12 52:4

**counsel (2)** 60:10,14
**count (1)** 6:12
**couple (2)** 12:16
32:9
**course (10)** 8:11
14:5,17,18 15:7
18:14 22:24 23:7
26:2 37:2
**court (5)** 1:13 4:2
5:15 7:23 59:2
**covered (2)** 51:16
58:24
**crazy (1)** 52:1
**credit (4)** 24:4 31:11
49:17,18
**credits (10)** 48:9,16
48:20 49:4,11,17
49:23 50:5,10,15
**cubbies (1)** 19:25
**currently (1)** 6:7

———————

**D**
**daily (1)** 17:23
**dates (3)** 8:15 10:23
10:24
**day (6)** 17:23 38:8
38:10,13,22 58:7
**days (3)** 12:10 53:10
53:15
**deal (1)** 37:8
**dealing (1)** 14:21
**december (2)** 1:7,17
**decently (1)** 54:25
**deceptive (2)** 28:22
56:19
**decision (1)** 18:6
**deducted (1)** 43:1
**definitely (1)** 26:24
**degree (4)** 5:24
11:23 31:1,12
**deny (1)** 49:11
**department (2)** 1:2
32:4
**depending (3)** 21:25
24:3,9
**deposit (1)** 42:25
**deposition (3)** 1:5
59:14 60:7
**depositions (1)**
60:12
**description (1)** 3:16
**desks (2)** 19:24
54:21
**devry (2)** 8:8,25
**diamond (2)** 21:22
22:14
**didnt (20)** 14:2,6
16:19 21:9,10 26:3
27:10 28:9 29:8
30:21 32:15 34:9

34:12 38:15 42:16
43:25 45:24 46:4
46:13,16
**died (1)** 58:3
**difference (2)** 9:4
32:22
**different (8)** 15:10
15:13 24:8 29:8
33:9,10,13 55:20
**differently (1)** 25:2
**direct (1)** 3:4
**direction (3)** 25:24
27:21 52:18
**director (6)** 8:2
17:14,19,20 20:5
31:9
**directors (8)** 13:11
14:4 17:11,19 21:6
21:7 35:6 57:16
**dirty (1)** 52:5
**disability (2)** 53:25
54:4
**disappeared (3)**
25:15 32:11 36:13
**discounted (1)** 36:8
**discussed (2)** 52:23
57:2
**disorganized (2)**
12:21,21
**documents (2)** 43:7
43:15
**doesnt (2)** 42:8
49:13
**dogs (2)** 51:25 52:17
**doing (14)** 12:19
20:1 22:22 25:13
26:16 27:4 30:12
30:16,18 38:19
39:15 44:21 46:25
52:13
**dollars (1)** 23:21
**dont (32)** 6:17 7:20
8:5,15 11:2 15:3
16:4,25 19:23 23:2
24:23 27:16,19,19
30:7,13 31:5,18,21
35:20 39:8 41:17
42:16 44:6,15
47:21 48:11 50:6
51:18 52:6 55:12
57:5
**dramatically (3)**
36:1 38:11 54:17
**drop (1)** 24:23
**dropouts (1)** 15:4
**dropped (1)** 54:16
**drunk (1)** 58:8
**duly (2)** 4:4 60:7

———————

**E**

**earlier (2)** 25:12
54:15
**education (13)** 6:2
6:22 8:13,17 12:23
16:11,20,22 18:8
24:25 31:8 32:5
51:10
**educational (8)** 1:6
5:20 13:12,13
28:12 31:5,13 57:4
**effort (1)** 53:13
**eggs (1)** 58:20
**eight (2)** 12:3 53:15
**eighteen (1)** 8:21
**either (3)** 21:13 31:5
59:4
**elena (5)** 1:6 3:3
4:20 5:2 60:7
**eligible (1)** 35:24
**email (3)** 26:24
31:24 32:8
**emergency (1)** 57:24
**employed (2)** 60:11
60:14
**employee (1)** 60:13
**ended (1)** 53:11
**enroll (7)** 11:15 12:5
18:23 37:13 38:14
38:15,16
**enrolled (6)** 14:5
22:4 24:10,22 25:4
25:8
**enrolling (4)** 11:17
38:13 52:15 55:1
**enrollment (13)**
14:14 15:6 25:20
30:22 33:13 34:7
42:18 43:9,17
51:22 55:4 56:20
57:14
**enrollments (28)**
13:14 14:6 16:25
17:7 18:11,25 19:3
19:3,9 20:11,25
21:2,14,16,23,25
22:13,19 26:1,4
36:16 37:3 47:6,7
54:16,23 55:16
57:17
**entirety (1)** 10:18
**entrance (1)** 40:23
**esq (1)** 2:4
**estate (1)** 6:10
**ethics (3)** 15:8,12,16
**everybody (7)** 19:25
20:1,2 24:8 29:17
48:11 58:15
**exact (1)** 32:6
**exactly (4)** 26:13
34:16 50:6 52:19

**examination (2)** 3:4
4:7
**example (1)** 27:21
**excuses (1)** 52:9
**exert (1)** 18:9
**exerting (1)** 37:12
**expected (1)** 19:5
**experience (5)** 19:2
24:25 31:7,14
56:24
**experienced (1)** 19:4
**experiences (1)**
12:25
**explain (4)** 32:21
33:5 36:18 52:7
**explaining (1)** 27:23

———————

**F**
**facetoface (1)** 9:10
**fact (3)** 40:5 49:2,3
**fair (4)** 29:13 31:22
44:9,19
**falling (1)** 58:2
**false (3)** 28:24 30:9
50:13
**familiar (1)** 56:23
**far (5)** 6:22 13:13
20:17 37:6 57:15
**fare (1)** 22:17
**fault (1)** 26:6
**favoritism (3)** 21:3,4
47:9
**feature (1)** 36:23
**federal (2)** 45:15
47:11
**fee (6)** 18:5 34:23
42:18,22,23,25
**feel (2)** 15:17 33:11
**feeling (1)** 12:21
**female (1)** 41:19
**figure (1)** 17:16
**fill (4)** 55:9 56:1,4,6
**finally (1)** 27:4
**financial (16)** 43:5,7
43:9,13,20,24
44:13,14,18,22,23
45:2,7,11 46:2
56:21
**financially (1)** 60:15
**find (1)** 38:22
**finding (1)** 29:22
**findings (2)** 27:14
29:14
**fine (2)** 28:5 29:16
**fire (2)** 38:23 53:17
**fired (18)** 10:21
16:20,21 22:24
23:8 30:22 40:4,6
40:9,16,18,19 41:2
46:25 53:12,15,17

**firing (3)** 26:4 55:12
  58:13
**first (21)** 4:4 7:22
  12:3,16,24 13:12
  14:1,1 15:18 21:18
  22:3 37:8,9 43:2
  51:8,11,17,18 53:3
  54:9 60:7
**five (6)** 11:25 18:16
  19:3 38:7 42:6
  51:18
**floor (16)** 12:11 15:9
  15:12,21 16:1
  17:17 19:15 20:5
  21:9 23:19,23
  51:17,20 52:12
  57:23 58:12
**floors (1)** 51:19
**florida (12)** 1:1 2:4,5
  4:11 6:1,14,17
  7:11 8:10 9:24
  53:8,13
**flying (1)** 40:10
**follow (3)** 27:18 46:1
  46:3
**following (2)** 6:16
  7:10
**follows (2)** 4:5 55:15
**fooling (1)** 21:8
**football (2)** 52:2,12
**foregoing (1)** 60:5
**form (1)** 21:1
**fort (1)** 2:5
**forth (1)** 40:11
**forward (1)** 43:12
**found (3)** 37:19 42:4
  42:9
**four (4)** 18:15 19:3
  51:18 58:1
**frankly (1)** 49:16
**friends (1)** 39:16
**front (5)** 15:19 42:3
  43:14 45:21 58:15
**frustrating (1)** 12:18
**full (1)** 4:19
**funds (1)** 26:3
**funny (2)** 40:5 49:19
**further (4)** 58:21
  59:11 60:9,12

**G**

**game (1)** 52:2
**gao (16)** 26:14,19
  27:14 28:19 29:14
  29:22 31:23 32:23
  35:1 36:11,15
  41:22 44:25 45:5
  46:5 54:15
**gates (3)** 35:18,21
  36:6

**gather (1)** 48:5
**geez (1)** 8:6
**gem (3)** 21:19 22:6
  22:18
**general (7)** 1:1 2:3
  4:11 29:2 45:12
  56:16,25
**generally (2)** 6:19
  27:13
**generic (5)** 25:16,25
  32:19 36:21 37:4
**gently (1)** 21:5
**getting (6)** 14:14
  37:6 38:9 54:22,25
  56:13
**girl (1)** 10:21
**girlfriend (1)** 21:5
**girls (1)** 21:8
**give (10)** 4:13 7:20
  8:5,14 23:22 24:19
  25:21 33:3,11
  38:14
**given (5)** 12:22
  18:22 41:12 46:9
  55:8
**giving (1)** 38:21
**glad (1)** 27:4
**glossed (1)** 47:2
**go (22)** 6:17 11:10
  13:19 18:19 20:16
  31:23 32:16 34:5
  43:12 44:21 46:1
  46:15 50:24 51:1
  53:24,25 56:2,4,5
  56:10,14 57:17
**goa (2)** 26:11 27:5
**goal (1)** 52:16
**god (4)** 5:13 6:25
  8:22 58:18
**goes (2)** 6:22 48:2
**going (27)** 6:25 8:7
  16:5 20:4 21:4
  23:1 26:25 27:1
  29:18 30:6 32:3,4
  37:16,18 38:11
  40:8,10,10,14 44:8
  50:15 53:23 54:7
  58:19 59:2,10,12
**good (9)** 10:15 14:25
  15:17 16:13 25:9
  27:3 28:5,13 57:21
**gosh (4)** 10:17 21:20
  33:8 42:2
**gotcha (3)** 46:5 48:7
  56:15
**gotten (1)** 20:17
**government (9)**
  22:21 25:12 26:15
  27:2 28:3,25 29:9
  47:11,14

**grab (1)** 56:8
**graduate (1)** 5:23
**graduated (2)** 5:22
  6:1
**graduating (1)** 53:10
**graduation (3)** 6:16
  7:10 46:7
**grant (1)** 44:8
**grapevine (1)** 48:2
**great (3)** 5:19 13:24
  39:22
**grief (1)** 10:15
**group (5)** 40:7 55:2
  55:8,10,13
**groups (1)** 17:12
**guaranteeing (1)**
  46:22
**guidelines (1)** 45:15
**guys (1)** 52:4

**H**

**hadnt (1)** 19:19
**half (3)** 26:8 53:9
  55:13
**hand (1)** 47:3
**handful (1)** 29:5
**handle (1)** 45:23
**happened (4)** 20:8
  22:5 26:11 47:4
**happening (2)** 29:18
  56:3
**happens (1)** 55:25
**happy (1)** 15:4
**hard (3)** 26:23 33:14
  37:23
**harrod (4)** 2:4 3:4
  4:8,10
**harvard (3)** 27:24
  28:8,14
**havent (5)** 38:13
  51:16 52:23 55:10
  58:24
**hear (4)** 30:12 46:11
  52:4 54:21
**heard (5)** 39:2 48:15
  48:18 50:17 57:5
**hears (1)** 19:25
**heart (1)** 58:3
**heavily (1)** 29:19
**hed (1)** 13:18
**held (2)** 6:18 10:21
**help (4)** 12:16,17
  24:21 41:10
**helping (1)** 12:19
**heres (1)** 38:5
**hey (4)** 22:21 24:20
  56:9,13
**hide (1)** 26:23
**high (4)** 5:21,22,23
  41:1

**history (1)** 6:21
**hit (5)** 26:22 47:18
  55:6,7,10
**hold (5)** 6:6 9:19
  16:4 34:5 52:25
**hollering (1)** 51:23
**home (1)** 13:19
**honest (1)** 15:18
**honestly (2)** 30:14
  38:20
**hooping (1)** 51:22
**horrendous (5)** 13:2
  51:12,15 52:22
  58:9
**hospital (4)** 53:11,14
  53:18,25
**hours (1)** 24:4
**huge (1)** 51:19
**human (2)** 41:12,16

**I**

**id (3)** 11:25 39:25
  45:18
**idea (1)** 28:11
**iksor (1)** 15:15
**ill (2)** 25:21 53:18
**illegal (2)** 16:23 41:6
**illness (1)** 54:4
**im (13)** 4:10 7:5
  10:23 11:2 27:4
  29:11,20 30:5
  32:17 52:25 53:18
  56:13,14
**immediately (1)** 7:9
**impacting (1)** 14:23
**implied (2)** 28:17,18
**inaccurate (1)** 41:23
**inappropriate (1)**
  25:6
**incidences (1)** 15:24
**inclass (1)** 12:10
**indicated (11)** 9:25
  17:6 19:11 24:24
  25:11 31:23 32:9
  36:14 51:9 54:15
  55:23
**indicating (1)** 32:1
**individually (1)**
  20:15
**industry (8)** 8:17
  12:24 13:1 25:1
  31:8,15 50:7 51:10
**information (9)**
  26:18 29:10 38:3
  43:14 45:2,12
  46:10 48:5 56:7
**initial (1)** 40:23
**instance (1)** 49:25
**institution (4)** 48:13
  49:10,14 50:11

**institutions (2)** 9:8
  48:10
**instructed (2)** 16:2
  39:9
**integrity (2)** 15:15
  57:20
**interacting (1)** 9:10
**interest (1)** 55:24
**interested (2)** 15:5
  60:15
**internally (1)** 34:13
**internet (2)** 37:7
  55:19
**interview (2)** 33:25
  33:25
**intrusive (1)** 50:19
**investigating (1)**
  56:17
**investigation (3)** 1:4
  57:1 58:24
**issues (4)** 13:7 21:12
  41:2,3
**itt (2)** 8:9,25
**ive (13)** 6:23 7:16
  8:7,8,12 13:24,25
  38:12 50:17 53:18
  56:12 57:4,5

**J**

**january (1)** 10:17
**jersey (8)** 1:14,16,24
  4:3 5:16 6:14 53:7
  60:5
**job (11)** 6:18 14:18
  20:23 21:10 24:18
  53:8,14 56:3,5,14
  58:10
**jobs (4)** 19:12 30:24
  46:22 56:1
**joseph (2)** 1:15,23
**july (2)** 9:14 53:6
**jump (2)** 21:24 22:4

**K**

**kaplan (47)** 1:5,6,7,7
  8:11 9:4,9,13
  10:19 11:11,22
  12:9,23,25 15:7,17
  15:18 25:2 26:16
  28:8,20 29:19,23
  39:11 42:5,7,9
  48:9,19,20 49:4,6
  49:16,17 50:9,11
  50:18 51:9,12,15
  52:23 54:1,4 55:24
  56:17,24 57:21
**kaplans (3)** 26:20
  28:12 46:1
**keep (4)** 19:5 24:22
  25:4 58:9

**keeps (1)** 29:17
**kept (3)** 20:10,20
  32:15
**kind (9)** 13:7 20:3
  21:6 26:23 29:6,7
  36:24 48:1,5
**knew (7)** 29:10,12
  29:17 30:14,20
  40:11 58:13
**know (47)** 4:9 12:19
  17:16 19:1 20:4
  23:2,3,19 24:2,19
  27:2,16 29:9,9,11
  30:2,13,14 31:18
  35:20,25 39:8
  40:13 41:6,9 44:5
  44:7,10 45:21
  46:24 47:1,21 48:3
  48:3,4,11,25 49:2
  49:19 51:18 53:21
  54:24 55:13,17
  57:5,21 58:23
**knowing (2)** 13:4,5
**knowledge (2)** 15:15
  22:1
**knows (1)** 20:2

**L**

**landed (2)** 53:14,18
**lauderdale (1)** 2:5
**law (2)** 4:4 12:2
**laws (1)** 13:6
**lead (1)** 55:22
**leads (16)** 37:4,6,7
  38:2,7,8,9,10,12
  38:14,16,22 54:25
  55:1,14,18
**learn (2)** 19:21 45:1
**learning (1)** 42:7
**left (2)** 37:19 54:4
**legal (1)** 1:2
**level (1)** 22:15
**liar (1)** 11:3
**license (1)** 36:8
**licensed (2)** 6:9,11
**licenses (1)** 6:5
**lie (2)** 28:2 31:1
**liked (3)** 21:9 47:2,5
**liking (1)** 47:8
**line (4)** 13:14 34:9
  39:10,11
**lines (2)** 16:6 19:24
**little (1)** 47:3
**lives (2)** 14:23 41:7
**located (1)** 9:23
**long (8)** 8:17 19:24
  24:4,9 27:11 35:12
  41:8 54:21
**longer (1)** 37:15
**looked (1)** 57:11

**looking (4)** 56:1,3,10
  56:14
**lord (4)** 6:22 8:4
  10:14 35:10
**lose (1)** 21:10
**lot (15)** 7:18 21:3,4,4
  21:7 25:1 44:13
  47:6,7,9 50:4
  53:12 55:25 57:21
  58:16
**lowest (1)** 22:12
**lumi (3)** 1:13 60:3,19
**lying (1)** 13:23

**M**

**maam (31)** 4:9,21
  5:1,6,14 6:3 8:24
  9:12 11:9 12:8,21
  15:24 16:14 20:23
  27:6 31:22 38:24
  41:20 42:17 46:5
  48:7 49:15 50:18
  51:8 54:14 55:17
  56:15,22 58:21
  59:7,13
**magazine (3)** 6:24
  7:2,6
**magazines (3)** 7:3,7
  7:14
**making (4)** 28:21
  30:9 31:3 33:18
**marketing (1)** 37:6
**married (1)** 4:23
**mass (1)** 5:24
**match (1)** 50:6
**matter (4)** 1:12
  13:15 21:9 49:13
**mean (10)** 15:11
  18:21 25:25 32:11
  34:10,12 36:18
  37:11 38:11 51:25
**meaning (7)** 11:22
  14:8 34:12 41:14
  47:5 49:4 58:13
**means (1)** 37:5
**meant (3)** 29:20 33:5
  34:13
**medical (3)** 7:24,24
  7:25
**medication (1)** 5:7
**meeting (3)** 19:15
  40:7,17
**megaphones (1)**
  52:11
**melinda (2)** 35:18,21
**melissa (3)** 1:13 60:3
  60:19
**members (1)** 35:6
**memorized (1)** 49:9
**mentors (2)** 12:15,18

**met (1)** 19:19
**method (1)** 20:9
**microsoft (1)** 36:9
**midnovember (1)**
  23:8
**midwest (2)** 49:21
  50:3
**mind (1)** 27:21
**minimum (2)** 18:25
  20:24
**misconstrue (1)** 30:6
**misconstruing (1)**
  30:10
**misleading (9)** 13:23
  26:17,18 28:7,16
  28:17,22 41:23
  50:13
**missed (1)** 53:3
**mom (3)** 40:22 41:4
  41:7
**moment (1)** 29:18
**monetarily (2)** 21:14
  21:15
**money (4)** 24:9 44:8
  45:16 53:13
**moneymaker (1)**
  57:11
**month (3)** 16:25
  18:12,17
**monthly (1)** 18:13
**months (6)** 12:1,3
  22:3 39:25 51:18
  53:22
**morals (1)** 15:8
**motto (1)** 15:15
**move (1)** 53:13
**moved (2)** 33:14
  53:7

**N**

**name (8)** 4:9,19,22
  5:1 41:18 42:9
  49:24 56:8
**names (2)** 7:5,16
**national (1)** 49:13
**need (5)** 6:17 7:16
  18:1 20:17 45:20
**needed (2)** 17:7 32:1
**negative (2)** 25:9
  29:23
**neither (1)** 60:9
**never (13)** 13:3 23:7
  28:18 40:18 46:10
  46:15 47:10 51:2
  54:1 55:6,7,23
  57:4
**new (20)** 1:14,16,24
  4:3 5:16 6:14
  25:16 27:18 32:13
  32:18,22 37:6,7,17

  37:22 38:12 42:12
  44:20 53:7 60:5
**news (1)** 26:22
**nice (1)** 54:2
**noisy (2)** 52:1,8
**normal (1)** 50:7
**normally (1)** 48:6
**notary (2)** 1:14 60:4
**notes (1)** 1:11
**november (5)** 9:16
  9:17 22:24,25 51:5
**number (10)** 5:17
  18:11,24 19:13
  20:25 21:14,16
  22:13 38:2 56:8
**numbers (21)** 14:16
  14:18 15:21,22
  16:19,19,21 17:22
  18:1,21,21 19:6,16
  19:19 21:10 26:5,6
  55:4,6,7,8

**O**

**oath (2)** 4:5,16
**obtain (1)** 19:13
**obtained (1)** 55:18
**obviously (1)** 54:11
**office (9)** 1:1,25 2:3
  4:10 35:25 36:9
  56:16,24 59:4
**offices (2)** 1:15 19:23
**oh (18)** 5:13 6:22,25
  8:3,22 10:15 13:17
  26:22 29:7 30:24
  35:10 37:15 38:5
  42:2 48:24 50:14
  52:7 58:18
**okay (40)** 4:25 5:6
  6:5,13 7:4,9,22 8:4
  8:16,23 9:18 10:10
  10:25 11:9 14:22
  17:6,15 18:18,22
  24:24 25:11 26:2
  28:5 29:7 31:20
  35:20 36:22 38:1,6
  40:8 41:13,20 43:8
  44:1 47:15 56:4,9
  57:22 59:1,11
**old (7)** 5:11 27:22
  32:13,22 35:8
  42:13 58:2
**once (3)** 23:17 25:8
  40:1
**oneonone (1)** 9:6
**ones (4)** 17:21 31:4
  46:3 52:20
**online (3)** 11:18,19
  12:4
**open (2)** 20:3 54:21
**operating (1)** 29:24

**opposite (3)** 16:2
  25:24 27:21
**option (1)** 59:4
**order (1)** 30:10
**org (1)** 33:3
**organization (2)**
  11:22 13:3
**original (1)** 41:24
**originally (1)** 53:6
**orlando (3)** 9:24
  23:18 41:17
**outright (1)** 28:18
**owned (1)** 35:11

**P**

**page (3)** 3:2,16
**pages (2)** 27:16
  32:24
**paid (1)** 34:23
**paperwork (5)** 43:6
  44:16 46:9,16,19
**parent (1)** 41:9
**part (10)** 27:22
  35:10,22 37:8
  42:12,13,24 57:3,4
  57:22
**particular (3)** 11:21
  11:23 16:1
**particularly (1)**
  41:22
**parties (1)** 60:11
**party (1)** 52:8
**pass (1)** 33:25
**passed (1)** 34:23
**pay (3)** 18:5 41:10
  43:3
**payment (1)** 44:7
**payments (2)** 44:8
  44:10
**penalized (1)** 21:13
**people (39)** 9:6 12:1
  12:13,20 13:23
  14:3,21,23 16:7,11
  17:13,13,15,17
  18:4,23 19:14
  20:21 22:5 23:20
  26:5,17 29:7,11
  38:20 44:6,14
  46:11 48:3,6,15
  51:20,20 53:24
  54:3,24 55:12
  57:15 58:1
**percent (2)** 50:5,16
**perception (5)** 31:15
  34:14,19 37:22
  52:14
**performed (1)** 54:25
**period (4)** 5:3 9:19
  48:24 53:2
**periods (2)** 9:13

10:12
**person (8)** 14:1 38:8
  45:14 52:7 53:16
  54:8,9 57:12
**personal (1)** 47:8
**phone (7)** 5:17 39:3
  39:4,5,6 40:21
  56:8
**phones (2)** 40:15,16
**phrase (2)** 39:2 49:8
**physical (1)** 10:1
**piece (1)** 51:20
**pill (2)** 13:19,19
**place (4)** 10:22 20:3
  42:21 48:1
**placement (2)** 46:7
  46:13
**placing (3)** 15:1,3
  16:11
**playing (1)** 52:12
**please (4)** 4:18 5:17
  5:20 6:16
**point (6)** 5:1 17:24
  34:4 36:1 57:7
  58:22
**policy (1)** 23:10
**pool (3)** 53:23 54:3
  54:10
**portion (1)** 34:25
**portions (1)** 35:4
**position (3)** 10:21
  18:5 57:16
**positioned (1)** 17:4
**positions (1)** 9:18
**positive (1)** 25:10
**possible (1)** 32:5
**post (2)** 35:6,12
**postgraduate (1)** 6:2
**potential (2)** 56:18
  57:10
**practices (1)** 56:19
**practicing (2)** 6:19
  28:20
**presentation (3)**
  36:22 37:10 43:11
**pressure (22)** 14:15
  14:17,19,19,20
  16:8,9,9,14,15,16
  18:10 19:7 21:1
  37:11,23 57:23,23
  58:4,7,9,16
**pressured (2)** 16:18
  30:21
**pressuring (2)** 16:7
  16:12
**pretty (1)** 54:25
**previous (1)** 13:4
**previously (1)** 37:12
**primarily (1)** 22:18
**prior (5)** 9:8 12:25

31:7 41:21 46:5
**privacy (3)** 13:7 41:2
  41:3
**private (1)** 29:16
**problem (2)** 14:3
  28:6
**problems (3)** 24:16
  24:18,21
**proceedings (1)** 1:11
**process (6)** 33:25
  34:1 42:18 43:10
  45:25 51:16
**processes (1)** 11:8
**program (5)** 11:23
  12:6 24:13 33:19
  43:20
**programs (1)** 11:16
**promising (2)** 30:19
  30:23
**promoted (1)** 22:15
**prospect (3)** 37:13
  37:17 38:3
**proud (1)** 40:25
**public (3)** 1:14 58:13
  60:4
**pull (1)** 40:14
**push (10)** 18:3,3,3,3
  18:4,7,7,8 25:24
  27:19
**put (11)** 12:11 14:17
  15:17 19:7 21:1,5
  26:24,24 34:5
  40:15 43:16

___

**Q**

**qualified (1)** 34:14
**qualify (1)** 45:17
**qualitative (2)** 22:8
  22:14
**quality (5)** 16:11
  28:12 39:20,24
  57:20
**quantitative (1)** 22:8
**quarter (1)** 23:17
**quarterly (3)** 24:2,2
  24:8
**quarters (1)** 55:5
**question (1)** 54:14
**questions (7)** 8:7
  43:24 44:22 45:18
  50:20 58:22 59:12
**quiet (1)** 52:5
**quite (3)** 10:9 11:4
  18:6
**quota (1)** 19:8
**quotas (1)** 18:22
**quote (2)** 18:20
  51:12
**quoting (1)** 46:22

**R**

**ran (1)** 13:8
**range (1)** 37:19
**rate (1)** 36:1
**rates (2)** 46:7,13
**reaction (2)** 29:2
  51:11
**read (6)** 27:5,8 28:11
  46:15 59:4,7
**ready (1)** 18:6
**real (4)** 6:9 15:18
  36:23 37:9
**realistically (1)**
  45:13
**reality (2)** 19:16
  56:10
**really (10)** 10:23
  13:25 31:17 39:22
  42:10,23 44:15
  45:13 52:22 57:11
**reason (2)** 38:23
  41:11
**recall (1)** 33:21
**receive (5)** 23:5,9
  26:3 35:24 51:5
**received (2)** 14:4
  23:15
**receiving (3)** 48:13
  49:10,14
**recollection (1)** 11:5
**recommend (2)** 34:1
  34:7
**recommendation (5)**
  33:19 34:15,22,25
  35:2
**recommendations ...**
  27:13
**recommended (1)**
  34:17
**record (4)** 4:19,25
  47:13 59:12
**recorded (3)** 39:11
  47:16,17
**reduced (1)** 36:1
**refer (1)** 46:14
**referred (1)** 35:5
**referring (2)** 25:14
  26:15
**regarding (1)** 56:18
**regardless (3)** 14:25
  16:12 49:11
**regional (2)** 48:23
  49:12
**regionally (8)** 28:1
  33:2 48:14,15,19
  48:21 49:6 50:11
**rehired (1)** 53:19
**related (1)** 60:10
**relationship (1)**
  21:12

**relative (1)** 60:13
**remember (13)** 8:5
  8:15 13:21 21:21
  32:6 35:3,10 41:18
  47:11 49:24 50:1,2
  51:19
**remington (1)** 8:8
**removed (1)** 37:24
**rene (1)** 2:4
**renee (1)** 4:10
**rep (3)** 38:8 49:9
  50:9
**report (21)** 10:3,13
  26:11,14,19 27:5
  27:14 28:19 29:21
  29:22 31:23 32:23
  35:1,9 36:12,15
  41:22 44:25 45:5
  46:6 54:15
**reported (1)** 11:6
**reporter (1)** 1:13
  59:2 60:4
**reporters (1)** 1:23
**reporting (1)** 7:24
**representative (4)**
  7:21 9:3 16:24
  41:16
**representatives (3)**
  12:14 21:7 31:2
**represented (1)**
  11:24
**representing (1)**
  12:4
**reprimanded (2)**
  40:2 46:25
**reputation (1)** 13:24
**required (4)** 18:20
  20:24 37:15 43:3
**requirements (2)**
  14:9 31:16
**requiring (2)** 18:10
  18:19
**resources (2)** 41:12
  41:16
**responsibilities (2)**
  11:10,13
**restart (1)** 9:15
**restrictions (1)**
  14:10
**result (1)** 33:9
**resume (1)** 6:23
**retrain (1)** 40:15
**review (5)** 21:24
  22:3,9 51:2,6
**reviewed (3)** 37:21
  39:19,23
**reviews (1)** 39:22
**rewarded (1)** 21:13
**rid (1)** 38:21
**ridiculous (1)** 27:17

**right (26)** 6:24 14:12
  14:15 19:24 20:19
  21:11 22:9,22
  23:22 25:13 26:16
  27:3 33:11 34:24
  38:5,8,25 41:9,17
  44:10 48:25 58:10
  58:15 59:6,8,9
**rip (1)** 32:14
**river (5)** 1:16,24 4:2
  5:15,23
**rows (1)** 54:21
**ruby (1)** 21:22
**rules (4)** 15:16 31:16
  46:1,3
**run (2)** 13:3 18:14

___

**S**

**sake (1)** 15:6
**salaried (1)** 17:5
**salaries (1)** 57:16
**salary (6)** 21:23
  37:17,19 46:8,22
  50:20
**sale (2)** 30:6,10
**sales (3)** 36:21 37:10
  57:8
**sample (1)** 7:21
**sapphire (3)** 21:22
  22:13,15
**saw (2)** 19:16 33:17
**saying (7)** 20:1 23:21
  29:12 30:4,15 40:9
  40:13
**scale (2)** 21:19,19
**scenes (1)** 21:5
**school (41)** 5:21,22
  5:24 7:15,22 11:18
  11:20 15:19 16:23
  20:10 23:4,6 24:22
  25:9 26:2 29:15,16
  30:25 34:2,18
  40:23,24 41:10
  43:2 47:12 48:14
  48:21,22,24 49:5,7
  49:12,21,24 50:2
  50:16 55:18 56:9
  56:10,14,20
**schooling (1)** 53:4
**schools (12)** 7:16
  8:13,14 13:4,24
  27:24 33:6 42:8
  48:17 49:16 50:4,5
**scored (1)** 41:1
**scoring (1)** 52:16
**scott (1)** 10:5
**screaming (3)** 51:23
  52:1,11
**script (27)** 25:15,16
  26:7 27:18,22

28:11 32:11,13,14
32:18,22,23 33:18
35:1,5,9 36:15,20
36:21 37:3,10,22
41:21 42:12,14,14
54:16
**seats (1)** 55:9
**second (4)** 18:19
42:4,12 53:1
**section (1)** 35:11
**security (1)** 20:6
**see (6)** 17:12 20:4,17
34:6 53:23 54:4
**seen (1)** 13:3
**segal (4)** 7:23,23 8:4
8:25
**segment (1)** 11:22
**segmented (1)** 12:1
**sell (2)** 33:15 37:23
**selling (1)** 33:24
**send (7)** 43:13,15,23
44:12,15 45:7 59:6
**sent (3)** 31:24 43:9
43:20
**separate (1)** 19:23
**services (2)** 55:20
56:7
**servicing (1)** 25:7
**session (5)** 18:12,17
19:9 55:2,9
**sessions (3)** 18:14
55:6,7
**seven (3)** 12:3 38:7
53:15
**severely (2)** 35:25
37:5
**shes (2)** 54:12 59:5
**shopped (3)** 29:10
29:12,16
**shopping (2)** 29:11
29:19
**shorthand (2)** 1:23
60:4
**shoulder (1)** 20:6
**shouldnt (3)** 30:3,4
44:15
**show (1)** 32:16
**sick (2)** 9:15 53:25
**side (1)** 57:12
**sign (1)** 43:15
**signed (1)** 43:6
**similar (2)** 28:8,9
**singing (2)** 51:23
52:16
**sink (1)** 12:12
**sit (3)** 19:23,24
54:20
**site (2)** 56:6,6
**sitting (1)** 19:23
**situation (1)** 12:18

**six (4)** 8:10 12:1,3
42:6
**sixteen (1)** 8:20
**sketch (2)** 5:20 6:20
**slabs (1)** 14:22
**slap (1)** 47:3
**sold (1)** 8:13
**solely (3)** 11:18,19
22:19
**somebody (2)** 40:13
48:3
**son (2)** 41:4,7
**sons (1)** 40:22
**soon (1)** 38:14
**sorry (3)** 7:5 11:2
29:20
**sort (3)** 12:11 52:16
58:12
**south (3)** 5:25 6:17
7:11
**speak (3)** 31:19 34:6
55:21
**spell (1)** 10:6
**spent (1)** 53:12
**spiel (1)** 35:22
**spoke (1)** 40:22
**sporadic (1)** 47:18
**spot (1)** 53:12
**squad (1)** 57:25
**stake (1)** 14:19
**start (7)** 18:24 19:1
19:9 20:25 22:2
29:18 37:16
**started (14)** 9:14
12:2,8,22 18:16
21:18 24:3 26:4
29:19 51:8 52:20
53:6,20 55:2
**starting (1)** 5:21
**state (8)** 1:1,14 2:4
4:11,19 6:13 50:1
60:4
**stated (1)** 28:18
**statement (4)** 4:13
33:10,15,18
**statements (3)** 28:21
30:9 31:3
**states (2)** 35:15
42:16
**stayed (1)** 23:6
**staying (1)** 24:13
**stenographic (1)**
1:11
**step (1)** 11:10
**steps (2)** 21:20,21
**stick (1)** 13:25
**stink (1)** 13:17
**street (3)** 1:16,24 2:5
**strict (1)** 45:15
**strictly (1)** 57:8

**struck (1)** 52:21
**structure (1)** 50:20
**student (25)** 14:1
15:19,20 23:6,12
24:4,16,22 25:4,8
25:8 33:19 34:5,13
36:8 43:8,19 45:6
49:20 52:15 55:21
55:23 57:5,9,10
**students (28)** 11:15
11:17 12:6 16:17
23:4 24:10,13
28:21 31:3 34:19
35:18,24 36:6
37:16,24 38:4,25
39:10 42:19 45:1
45:10 46:7,22 48:8
48:19 56:12,18
57:6
**stuff (1)** 48:2
**substance (1)** 29:21
**sudden (2)** 22:23
37:14
**suggest (1)** 28:7
**suggested (1)** 28:20
**suite (2)** 35:25 36:9
**supervising (1)**
20:21
**supervisor (1)** 34:6
**supervisors (7)**
16:15 18:9 20:10
20:20 31:2 34:1
52:18
**supposed (9)** 12:15
12:15 23:5,9,11
43:22,23 45:7 51:1
**sure (9)** 14:9 15:1
23:16 24:20 27:3
32:17 33:16 47:24
52:20
**surprised (7)** 13:9
13:10 29:14,21,25
51:14 52:22
**surprising (1)** 42:10
**swim (1)** 12:12
**sworn (3)** 4:4,13
60:8
**system (3)** 22:7,18
22:23

___

## T

**taborn (3)** 5:2,2,2
**tactics (1)** 37:23
**take (7)** 13:19,19
24:19 42:11,21,23
49:23
**taken (2)** 1:12 60:12
**talk (7)** 20:2 33:1
38:11 44:23 45:15
49:20 54:22

**talked (4)** 17:24
19:22 35:11,12
**talking (8)** 16:15
17:4 27:22 41:6,24
44:5 48:6 52:7
**tampa (4)** 7:5 8:8,9
8:10
**tap (1)** 20:5
**taped (2)** 38:25
39:18
**tara (3)** 53:21,21
54:11
**targeting (1)** 38:20
**taught (2)** 7:23 12:4
**teacher (1)** 24:17
**tech (1)** 8:9
**technique (1)** 33:24
**telephone (2)** 39:10
57:8
**tell (20)** 13:18 25:14
35:8,18 36:6 37:18
41:4 42:3 45:10,16
46:6,12 48:8,19
50:9,15 52:5 54:12
56:9 57:13
**temperature (1)**
24:20
**ten (2)** 12:10 38:7
**tenday (1)** 53:1
**termination (1)** 53:5
**terms (3)** 25:3 27:9
29:20
**test (2)** 34:23 40:23
**testified (1)** 4:5
**testify (1)** 5:8
**thank (8)** 4:18 5:6
5:11,19 6:15 38:17
59:1,13
**thats (31)** 8:16 14:20
15:2,23 16:9 18:8
20:3 22:5 24:5
25:9,10 28:5,23,24
29:16 31:1,22 34:3
34:3,24 39:1 44:19
45:17 47:16 48:3
49:19 50:3,3,6
57:8 58:25
**theres (5)** 17:14
32:24 41:18 51:19
58:22
**theyll (1)** 56:9
**theyre (11)** 15:4,5,19
17:21 20:7 44:7
52:8,19 56:1,9,11
**theyve (1)** 15:4
**thing (12)** 9:3 12:12
12:19 13:8 15:2,10
16:1 21:6 25:9
40:9 43:18 58:19
**things (23)** 7:25

22:22 25:1 26:18
27:1,3 30:3,6,10
30:19,23 32:1,5,10
33:7,8,17 36:4
47:2 51:11,24 57:6
57:21
**think (19)** 5:5 10:14
10:14,15,17 16:3,4
16:4,4 25:21 28:15
29:5 42:4 46:16
57:3,9 58:23,25
59:9
**thinking (2)** 15:18
52:25
**thought (3)** 25:5
41:22 51:14
**thousand (1)** 23:21
**threatened (3)** 19:12
19:14 20:24
**three (13)** 8:1 17:23
18:15,24,25 22:3
38:9,12,22 53:10
55:1,7 57:25
**throw (2)** 14:24
32:14
**thrown (1)** 32:17
**thursday (1)** 40:18
**time (18)** 5:1,3 9:12
9:19 10:12 17:9
19:17 21:23 35:21
40:13 43:24 44:18
49:16 50:25 53:3
55:11 58:22 59:2
**timeframe (2)** 10:4
26:10
**times (3)** 17:23 56:4
58:1
**title (2)** 9:21 11:11
**today (6)** 4:12 5:9
17:25 18:1,1 57:2
**told (22)** 8:16 25:24
26:25 27:15,17
30:17,19 32:14
35:17 36:4 39:1,12
40:5,8,24 41:5,14
44:17 48:12,12
53:21 54:12
**tomorrow (1)** 18:2
**toms (5)** 1:16,24 4:2
5:15,23
**total (2)** 8:12 52:9
**totally (9)** 15:10
25:16,23,23,25
27:20 32:19 33:10
51:24
**track (2)** 20:10,20
**trade (1)** 56:19
**trader (1)** 7:7
**trained (3)** 12:9
15:25 16:5

**training (10)** 12:10 15:8,11,14 16:10 16:10 53:1,2,15,20
**transcript (2)** 59:3 60:6
**transfer (6)** 44:13 45:18 48:17 49:18 49:21 50:16
**transferring (1)** 49:12
**transmits (1)** 56:7
**treatment (1)** 52:15
**tree (5)** 39:3,4,5,5,6
**tried (1)** 52:4
**true (3)** 28:2 54:18 60:6
**truthfully (1)** 5:9
**try (1)** 24:22
**trying (3)** 14:8 52:6 52:9
**tuition (3)** 42:24,24 43:1
**twice (1)** 40:1
**two (18)** 7:3,7 17:23 18:15 20:17 22:12 38:9,12,22 51:19 53:2,3,9 55:1,5,6,6 57:25
**type (4)** 27:25 28:13 59:3,6
**typed (1)** 59:5

---

**U**

**uhhuh (6)** 7:12 32:7 32:20 35:7 37:1 44:11
**unbelievable (1)** 52:13
**uncomfortable (1)** 25:6
**understand (5)** 4:15 27:10 29:4 42:7 45:25
**understanding (1)** 22:6
**understood (1)** 22:18
**unfair (1)** 56:19
**unfortunately (3)** 32:15 53:8,11
**unhappy (1)** 24:17
**united (2)** 35:14 42:16
**university (6)** 1:7 5:25 6:16 7:10 8:9 8:11
**unprofessional (1)** 51:24
**unprofessionalism...** 52:10

**unprofessionally (1)** 51:21
**untruth (1)** 50:14
**upping (1)** 19:5
**upset (4)** 13:18,20 13:21 44:14
**upstairs (1)** 17:17
**use (3)** 46:11,13 49:8

---

**V**

**various (2)** 8:13 11:15
**view (1)** 57:7
**visitors (1)** 18:10
**voluntarily (1)** 4:12

---

**W**

**wait (1)** 18:2
**waive (3)** 59:5,8,9
**walk (3)** 20:5,6,7
**walked (2)** 19:15 58:12
**walking (2)** 58:8,20
**want (12)** 11:2 31:21 43:12 44:10,22 46:2 48:17 56:4 57:13,13 58:9,10
**wanted (6)** 14:6 31:22 33:2 38:21 43:25 49:20
**warned (1)** 8:6
**warning (1)** 40:18
**warren (2)** 35:18,20
**washington (4)** 1:16 1:24 35:5,12
**wasnt (4)** 26:16 30:4 54:1,7
**waste (1)** 43:24
**wasting (1)** 44:18
**way (16)** 13:3 14:20 15:3 18:8 21:17 26:2 29:23 32:5 36:16 37:7 42:11 44:21 51:11,15 55:4,11
**ways (1)** 18:18
**website (2)** 33:4 46:15
**wed (1)** 23:18
**wednesday (3)** 40:6 40:6,17
**week (7)** 18:12 40:1 40:1,6,7 53:9 58:1
**weekly (1)** 18:13
**weeks (5)** 12:16 18:15,16 53:2,4
**went (24)** 7:15 17:2 21:20 25:16,23 26:1,1 27:20 36:3 36:16 37:2,3,3,5,7

**38:2 43:5 49:22 55:4,11,13,14,16 58:7
**weve (1)** 42:6
**whats (5)** 5:14 15:20 20:4 41:6 47:12 58:10
**whos (1)** 58:19
**wigs (1)** 48:4
**windows (1)** 35:24
**wish (2)** 6:23 42:2
**witness (1)** 3:2
**wonderful (1)** 40:25
**wont (2)** 40:16 50:4
**word (1)** 47:13
**words (10)** 9:6 15:17 16:8,23 24:16,20 25:19 27:19 32:6 37:18
**work (6)** 6:20 7:15 9:5,9 32:4 53:3
**worked (16)** 6:23 7:3 7:8,17,22 8:1,7,8,9 8:14,17 9:5,9 13:25 14:2 31:10
**working (9)** 7:14 8:24 9:1,13 11:21 12:2 13:13 24:3 27:2
**worst (3)** 57:3,9,18
**wouldnt (2)** 49:23,25
**wow (4)** 8:3,23 15:15 52:14
**written (1)** 46:25
**wrong (15)** 15:23 28:24,25 30:15,20 40:9,14,21 41:15 47:15,15,15 49:1,2 49:3

---

**X**

**xx (2)** 1:4,9

---

**Y**

**yale (3)** 27:24 28:8 28:14
**yeah (5)** 7:19 8:20 10:23 30:24 35:2
**year (11)** 9:14 10:16 11:1,2 23:5,6,25 24:5,14 30:25 43:2
**years (12)** 4:23 7:1 8:2,10,20,21,22 12:23,25 17:3 51:10 58:2
**yelled (1)** 30:5
**yelling (2)** 52:1,11
**youd (1)** 6:15
**youll (1)** 30:24
**youre (16)** 4:15

**14:23 15:1 17:1,3 22:22 25:14 27:9 37:15 41:24 44:5 45:13 49:12 54:9 56:15 58:20
**youve (2)** 8:16 20:17
**yup (1)** 58:15

---

**Z**

---

**0**

**00 (1)** 1:8,17
**000 (8)** 17:15 21:25 22:2,4 30:25 44:6 50:21,22
**08753 (3)** 1:16 4:3 5:16
**08754 (1)** 1:24

---

**1**

**1 (1)** 17:15
**10 (1)** 21:24
**100 (2)** 50:5,16
**11 (1)** 38:7
**110 (1)** 2:5
**120 (1)** 58:7
**14 (2)** 1:7,17
**15 (1)** 21:25
**150 (2)** 23:5,11
**16 (3)** 12:23,25 51:10
**178 (1)** 58:7
**18 (1)** 8:22
**1882 (2)** 4:2 5:15
**19 (1)** 5:22
**1920s (1)** 35:13
**1970 (1)** 5:23
**1989 (1)** 6:1
**1990 (1)** 5:5
**1992 (1)** 8:19

---

**2**

**2 (3)** 1:8,17 59:15
**20 (2)** 17:13 21:25
**2009 (2)** 9:17 53:7
**2010 (7)** 1:7,17 9:17 10:19 11:6 26:12 51:5
**20something (1)** 17:3
**24 (2)** 41:8,8
**2446100 (1)** 1:25
**25 (1)** 17:13
**250 (2)** 1:15,24
**27 (1)** 58:2

---

**3**

**30 (1)** 22:2
**33301 (1)** 2:5
**35 (1)** 32:24

**36 (1)** 24:4
**37 (2)** 50:21,22

---

**4**

**4 (1)** 3:4
**400 (2)** 17:16 51:19

---

**5**

**50 (2)** 22:4 30:25
**500 (2)** 23:19 36:2
**55 (1)** 59:15
**58 (1)** 5:13

---

**6**

**60 (2)** 35:14 44:6
**69 (1)** 36:2
**6th (1)** 2:5

---

**7**

**70 (4)** 35:13,14 42:5 42:15
**7276560279 (1)** 5:18
**732 (1)** 1:25
**75 (3)** 42:22 43:1,18

---

**8**

**89 (2)** 6:1,17

---

**9**

**900 (1)** 27:16
**91 (1)** 5:5
**92 (1)** 8:12
**99 (1)** 36:3

# EXHIBIT "F"

# COMPRESSED TRANSCRIPT OF:

# Mark Stegall

**Date Taken:**
November 22, 2010

**Case:**

*Affiliated Reporting*
*650 Poydras Street, Suite 2610*
*New Orleans, LA  70130*
*Phone: 504-568-9111*
*1-877-568-9111*
*Fax: 504-568-9110*
*Email: pages@affiliatedreporting.com*
*Internet: www.affiliatedreporting.com*

<u>*CD ENCLOSED*</u>

Page 1

STATE OF FLORIDA
OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LEGAL MATTERS


IN THE INVESTIGATION OF:

a/k/a KAPLAN EDUCATIONAL CENTERS, INC.
a/k/a KAPLAN UNIVERSITY
f/k/a KAPLAN COLLEGE


Deposition of Mark Stegall,

228 20th Street New Orleans, Louisiana 70124,

taken in the residence of, Mark Stegall

on the Monday, November 22, 2010.

Page 2

APPEARANCES BY TELEPHONE:


OFFICE OF THE ATTORNEY GENERAL
BY: RENE D. HARROD, ESQUIRE
Assistant Attorney General
110 S.E. 6th Street
Fort Lauderdale, Florida 33301


REPORTED BY:
TIFFANY WALTON TASSIN
CERTIFIED COURT REPORTER

Page 3

EXAMINATION INDEX

Caption . . . . . . . . . . . . . . . . . . 1
Appearances . . . . . . . . . . . . . . . 2
Stipulation . . . . . . . . . . . . . . . 4
Examination

   By Ms. Harrod. . . . . . . . . . . . . 5

Reporter's Page . . . . . . . . . . . . . 38

Reporter's Certificate. . . . . . . . . . 39

EXHIBIT INDEX

No. 1 . . . . . . . . . . . . . . . . . . N

No. 2 . . . . . . . . . . . . . . . . . . N

Page 4

STIPULATION

It is stipulated and agreed by and between

counsel for the parties hereto that the deposition

of MARK STEGALL, is hereby being taken

under the Louisiana Code of Civil Procedure, Article

1421, et seq., for all purposes, in accordance with

law;

That the formalities of reading and

signing are specifically reserved;

That the formalities of sealing,

certification, and filing are specifically waived;

That all objections, save those as to the

form of the question and the responsiveness of the

answer, are hereby reserved until such time as

this deposition, or any part thereof, may be used

or sought to be used in evidence.

* * * * *

Tiffany Walton Tassin, Certified Court
Reporter, officiated in administering the oath

to the herein witness.

1        Mark Stegall, after being
2    duly sworn to tell the truth, the whole truth,
3    and nothing but the truth, was examined and
4    testified as follows:
5            EXAMINATION
6    BY MS. HARROD:
7       Q.  Good afternoon. As you know, my name
8    is Rene Harrod. I am with the Office of the
9    Attorney General. Thank you in participating
10   in today's statement. You understand you are
11   under oath?
12      A.  Yes.
13      Q.  Would you state your full name for the
14   Record?
15      A.  Mark Stegall.
16      Q.  How do you spell your last name?
17      A.  S-t-e-g-a-l-l.
18      Q.  What is your address, sir?
19      A.  Two twenty-eight 20th Street, New Orleans,
20   Louisiana 70124.
21      Q.  And your phone number, please?
22      A.  Area code (404)529-7756.
23      Q.  Sir, where are you currently employed?
24      A.  Embers Steakhouse.
25      Q.  And what is your position?

1       A.  Bartender.
2       Q.  Can you give me your educational
3    background, if you please, starting with after
4    high school.
5       A.  I have a Bachelor's degree from
6    Illinois State University and a Master's
7    degree from Illinois State University.
8       Q.  When did you obtain your bachelor's
9    degree?
10      A.  In 1994.
11      Q.  And what is your Master's degree in?
12      A.  Communications.
13      Q.  And when did you obtain that?
14      A.  1995.
15      Q.  Sir, during what time period were you
16   employed by Kaplan?
17      A.  I started April 1, 2009 and left
18   December 3, 2009.
19      Q.  Where were you employed?
20      A.  Orlando, Florida.
21      Q.  What was your title with the company?
22      A.  Senior Admissions Advisor.
23      Q.  Your beginning title and your
24   concluding title?
25      A.  Yes.

1       Q.  Who was your supervisor?
2       A.  Gordon King.
3       Q.  K-i-n-g?
4       A.  Yes.
5       Q.  Had you had any prior employment with
6    any educational institutes before Kaplan?
7       A.  I was a teacher one time at a
8    community college, but that was it.
9       Q.  For how long?
10      A.  I think I was there for three
11   semesters.
12      Q.  What did you teach?
13      A.  Public speaking.
14      Q.  What market areas was your employment
15   prior to beginning at Kaplan?
16      A.  I was in sales.
17      Q.  What type of sales?
18      A.  Real Estate?
19      Q.  Anything specific?
20      A.  Time share, general real estate,
21   residential.
22      Q.  Who was your employer prior to
23   beginning with Kaplan?
24      A.  Superior Real Estate.
25      Q.  Out of Orlando?

1       A.  They are in Davenport, Florida,
2    outside of Orlando.
3       Q.  Sir, how did you learn of this
4    position at Kaplan?
5       A.  A friend of mine got hired and he
6    called me and got me an interview.
7       Q.  Did you have to take an application
8    test? What kind of things did you have to do
9    to get the job?
10      A.  I remember a couple of interviews. I
11   think there may have been a test, but I really
12   don't remember.
13      Q.  Okay. Once you obtained the position,
14   what types of training did you receive?
15      A.  We had three weeks of training.
16   Basically, sales training.
17      Q.  What do you mean by that?
18      A.  It was just teaching us how to close
19   deals. Close people and get them to say, yes.
20      Q.  Meaning, to get them to enroll in the
21   school?
22      A.  Correct.
23      Q.  And who provided the training to you?
24      A.  They have a training department. Are
25   you asking for names?

Page 9

1    Q. Do you remember the name of your
2 trainer?
3    A. There was like six of them. To be
4 honest, I don't recall any full names.
5    Q. Okay. So, there were three weeks of
6 initial training. Was there any training
7 after?
8    A. Yes. Occasionally, there would be
9 training courses and classes we would go to
10 for an hour or two once or twice a week.
11    Q. What sort of documentation did they
12 give you during the training? Was there a
13 script or a manual?
14    A. We had a script. There was also a
15 manual on how to run the computer and a script
16 on what to say. Things of that nature. The
17 computer was pretty high-tech. It was kind of
18 tough for me. I am not very computer literate.
19    Q. Let's focus for a second, if we could,
20 on the scripts. What were the scripts on? Were
21 the topically organized or what?
22    A. Yes. It was just a sales strategy.
23 Making conversation and making the student
24 feel comfortable. Making them feel like they
25 were your friends before you went in to

Page 10

1 actually getting them to enroll. Selling them.
2    Q. During the training, were you
3 instructed to stay on script. Meaning,
4 verbatim to script or how did that work?
5    A. Any training class we had they would
6 say stick to the script, absolutely.
7    Q. That instruction, "stick to the
8 script," was that continual instructions
9 throughout your time at Kaplan or were you
10 ever instructed otherwise?
11    A. Well, if we were in a classroom
12 setting, we were always told that, but we were
13 always told otherwise when we were
14 individually speaking to management or
15 directors.
16    Q. What do you mean, told otherwise when
17 you were speaking individually?
18    A. Well, they told us that the script was
19 our guide. That is what they want you to say,
20 but there are other things you also need to
21 add to it when you are speaking to the
22 prospective student in order to get them to
23 enroll.
24    Q. What types of other things did you
25 have to add to the script?

Page 11

1    A. The one that I remember specifically,
2 was the one about our accreditation. The
3 script basically said that we were a
4 nationally accredited school and that is all
5 really that I remember the script saying.
6    We learned early on that after we say
7 that it is a nationally accredited school, we
8 add other statements like national
9 accreditation is better than regional
10 accreditation. National accreditation, we have
11 same accreditation is any school you may be
12 familiar with.
13    If the students was calling from
14 Michigan, we were told we had to say, "We have
15 the same accreditation that the University of
16 Michigan has or Michigan State." If we were
17 calling someone from California, it would be
18 the same as U.S.C. or Stanford. The one that
19 really bothered me the most was, we were
20 always told to say that we have the same
21 accreditation as Harvard or Yale. Which was
22 laughable to me.
23    Q. Who told you to say that you had the
24 same accreditation as Harvard or Yale?
25    A. Any team leader, any management, any

Page 12

1 director or assistant directors. They would
2 also get on the phone and say it themselves to
3 reiterate it.
4    Q. Now, you said that your office was
5 told to say,"National accreditation is better
6 than regional accreditation?"
7    A. Yes.
8    Q. And who told you to say that?
9    A. The same people. Assistant directors,
10 directors, team leaders. Whoever was above
11 you.
12    Q. When you were giving the caller's
13 examples of schools, you mentioned Michigan,
14 would you look up those schools ahead of time
15 to see how they were accredited?
16    A. No, it didn't matter.
17    Q. You were just picking any school?
18    A. You pick a school that you knew was a
19 decent school in their area that they would be
20 familiar with and go from there. It didn't
21 really matter if you were telling the truth or
22 not or if it was correct. It was a sales
23 strategy.
24    Q. And that is how you were instructed by
25 your supervisors?

## Page 13

1    A. Yes.
2    Q. Let's go back for a second, in terms
3  of making the calls with the students, did you
4  make the calls or did they call you?
5    A. We place the phone calls to the
6  students.
7    Q. And how did you get the student's
8  number?
9    A. They would be in the computer system.
10  Where they got the leads -- where they got the
11  people's names and numbers, I'm not real sure.
12  I think they filled out something online
13  saying that they want to come back to school.
14  I am not sure where they got the names.
15    Q. Do you know if these leads were
16  exclusive to Kaplan? Meaning, were you the
17  first people to be calling these people or
18  have they been called by other schools prior?
19    A. They had definitely been called by
20  other schools prior.
21    Q. How do you know that?
22    A. They would tell us. The student would
23  tell us that they had been getting three or
24  four calls a day from four or five different
25  schools.

## Page 14

1    Q. In your experience at Kaplan, you were
2  there nine months --
3    A. Yes.
4    Q. -- what percentage of the leads
5  resulted in an enrolled student?
6    A. Ballpark, somewhere between two or
7  three percent.
8    Q. How many calls would you make a day?
9    A. We were required to make a minimum of
10  80 calls a day.
11    Q. So, you are enrolling about four
12  people a day?
13    A. No. If you had five in a week, that
14  was a good week.
15    Q. Five in a week was a good week, but
16  their minimum required enrollments --
17    A. Yes.
18    Q. -- what was that?
19    A. In any period I think they break it
20  down in three week periods and we had to have
21  at least -- it would depend on how long the
22  period was. Sometimes it was two and a half
23  weeks and sometimes it was four, but you would
24  have to have anywhere between three to six
25  enrolled per cycle.

## Page 15

1    Q. Was that difficult or easy to achieve?
2    A. It was difficult.
3    Q. If you didn't meet the minimum level
4  required, what happened?
5    A. Got fired.
6    Q. Was it an immediate firing or was
7  there a warning system?
8    A. No, you would go through, I don't know
9  if they call it probation, but you would be
10  warned that you didn't make the minimum
11  requirement during the last cycle so you would
12  have to make up for it in the next cycle. You
13  knew if you were in trouble.
14    Q. Was that based solely on the number of
15  enrollments, or was there a factor in there on
16  the quality of a call. If you did a really
17  good job explaining the programs, but they
18  just didn't want to enroll, but would take it
19  into consideration?
20    A. No.
21    Q. Were enrollments tracked by each
22  admission advisor?
23    A. Yes.
24    Q. If you were particularly good at
25  enrolling students for whatever reason, were

## Page 16

1  there different levels of performance that you
2  did?
3    A. Yes, absolutely, and different pay
4  levels, too.
5    Q. Explain to me how that worked. Were
6  there certain goals that you had?
7    A. Yes, they had a tier system. If you
8  were at the bottom of the tier you were making
9  about 30,000 a year. If you were at the top,
10  you could make a 100,000 a year.
11    Q. Wow. What was the difference between
12  the 30,000 and the 100,000 based upon?
13    A. Enrollments.
14    Q. Anything else.
15    A. They will tell you that there are
16  other things involved, but it came down to
17  enrollments.
18    Q. Other than the pure monetary
19  compensation, were there any other bonuses or
20  extensive rewards?
21    A. I believe there was. The biggest thing
22  was if you were enrolling students, then you
23  got the better leads.
24    Q. If you were enrolling students you got
25  the better leads? Instead of the ones getting

1   calls for three years and weren't going to
2   school, and the more enrollments you got, the
3   more leads you got.
4       A. The less you got, the less leads you
5   got.
6       Q. The admissions advisor, do they know
7   how many enrollments each other got?
8       A. Yes, if you talked about with each
9   other. You would know every time somebody got
10  an enrollment, because they would tape a
11  balloon to their desk. So, if you would see
12  somebody at their desk and they had six
13  balloons, then you would know they had six
14  enrollments.
15      Q. Okay. How many admissions advisors
16  were working in your facility?
17      A. Boy, that is hard to say, I think
18  maybe 1,500. I don't know.
19      Q. Were there any physical locations
20  where students were actually attending classes
21  where you are located?
22      A. No, there are no campuses in Orlando,
23  just a telemarketing office.
24      Q. And is the telemarketing office just
25  for admission advisors?

1       A. Yes.
2       Q. How would you describe the efforts of
3   the telemarketing office?
4       A. Hypocritical and disgusting.
5       Q. Hypocritical and disgusting. Why would
6   you say that?
7       A. Well, like I said, in a big group
8   meeting they would all preach integrity and
9   script and everything. And then when you got
10  on the phones, they would ask you to do the
11  complete opposite.
12      Q. And you felt you had to do the
13  complete opposite in order to keep your job
14  and make money?
15      A. Yes.
16      Q. How did you come to that perception?
17      A. Well, like I said, I learned pretty
18  early on that once we got on the phone to the
19  students, that the people that were there
20  already and were doing well, they would tell
21  you, that you have to add this or that. And
22  you would just get guidance from other
23  advisors, from managers, and directors and
24  things of that nature.
25      Q. Is it fair to say that you felt like

1   you were under a lot of pressure to sell
2   enrollments of the school?
3       A. Yes.
4       Q. Would you consider this primarily a
5   sales job?
6       A. Yes, 100 percent.
7       Q. And when you were talking to
8   individual students, did they actually enroll
9   during that phone call?
10      A. It was rare. It usually took a couple
11  of phone calls. But every once in a while
12  someone would have all of the documents they
13  needed ready and were ready to sign up on the
14  first call. You usually had to make a few
15  phone calls before you would actually get them
16  enrolled.
17      Q. So, once you have a student that you
18  have spoken to a couple of times, or enough
19  that they are ready to enroll, what did they
20  have to do? Did they have to fill out an
21  agreement or something else?
22      A. It was all done online. We would get
23  them on a computer and on our website and fill
24  out applications and forms and financial aid
25  documents and things like that. It was all

1   done online.
2       Q. Were you enrolling students solely for
3   the online campus, or also for student campus
4   locations?
5       A. No, we only did online campuses.
6       Q. Was there any area that you were
7   focusing on with your students? Meaning, were
8   they all from Kentucky or from Florida?
9       A. They were all over the country.
10      Q. So, you handled the enrollment process
11  and the financial aid process with the
12  students?
13      A. No, we had a financial aid department.
14  Once we had all of the applications filled out
15  and all of the documents we needed and were
16  pretty sure that they wanted to sign up, then
17  we would send them over to another person. We
18  would transfer the call to someone else and
19  those people would go over all of the
20  financial aid information with them.
21      Q. Did the student have to enroll before
22  getting to financial aid, or would it be
23  tentative?
24      A. It would be tentative, because we
25  wouldn't know whether or not they would

Page 21

1  qualify for financial aid until they talked to
2  a financial aid advisor. They would be already
3  committed to the school. Already filled out
4  the application and it was a matter of whether
5  or not they would qualify to get the money
6  they would need to come to school.
7      Q. When you say, already filled out the
8  application, the enrollment application or the
9  financial aid application?
10     A. They would not have filled out the
11 financial aid application with me. They would
12 have filled out an application enrollment
13 agreement. Things like that. I wouldn't know
14 whether or not they were going to be a student
15 until the financial aid department finished
16 with them.
17     Q. So, the student was committing to
18 enroll if they got financial aid?
19     A. Yes, that is pretty accurate.
20     Q. What if the student didn't get
21 financial aid, then what happens?
22     A. Everybody was disappointed.
23     Q. I guess I don't understand. If a
24 student enrolls, how much do they pay for an
25 average program?

Page 22

1      A. Well, the Bachelor's degree was
2  63,000.
3      Q. So, if a student signs up for a
4  Bachelor's degree to pay 63,000, they filled
5  out the enrollment agreement before they
6  determined how they are going to pay the
7  63,000?
8      A. Actually, I think the way it worked
9  was, we filled an application with them and
10 got them committed to the school and it is
11 just like any other sales job, you got it down
12 to the money, which is what we would say,
13 "either you can afford to do this or you cant.
14 Once you are committed, then I will let you
15 talk to financial aid. Until I know you are
16 committed, we are not even going to discuss
17 money, because it doesn't matter until I know
18 you are ready to come to school."
19     Q. And you would tell the students that?
20     A. Yes.
21     Q. Is that how you were instructed to
22 handle admissions and financial aid?
23     A. Yes.
24     Q. Is that pretty typical for how the
25 other admissions officers handled it, too?

Page 23

1      A. Yes.
2      Q. Now, during the admissions part, did
3  you quote the students a price for the program
4  they were enrolling for?
5      A. Can you repeat that?
6      Q. Sure. During your part of the
7  enrollment process, did you give the students
8  a price or cost of the program that they were
9  enrolling in?
10     A. I don't think we threw the number
11 63,000 out there. I think we said, "Don't
12 worry about that. Hopefully, you will qualify
13 for financial aid and you won't have to worry
14 about the cost."
15     I think we broke it down by credit
16 hours so it looked like a small number.
17     Q. What if the student wanted to know a
18 total of how much it was going to cost?
19     A. I don't remember ever a situation like
20 that occurring.
21     Q. Other than the cost per credit hour,
22 were there going to be other out-of-pocket
23 cost to the student? And were those disclosed
24 to the student?
25     A. I think what they did was say

Page 24

1  everything was included in the cost per credit
2  hour so there would be no other cost other
3  than the amount that we were quoting them.
4      Q. Was it accurate?
5      A. I don't know.
6      Q. Where was the financial aid department
7  based at, Florida?
8      A. Yes. They were in the same building as
9  we were.
10     Q. Once the students finished with the
11 financial aid department, did they come back
12 to you or were they done?
13     A. They had to come back to us to finish
14 more online documents.
15     Q. Do you remember what you did with the
16 student after financial aid was completed?
17     A. What they did afterwards?
18     Q. What you did with the students after,
19 yes, sir?
20     A. If I remember right, they came back to
21 us and there was like three more steps online
22 that we had to walk them through. I don't
23 remember exactly, but maybe signing financial
24 agreements and maybe the actual enrollment
25 packet and then signing them up for there

Page 25

1    classes.
2        Q.  Did you ever give a student any advice
3    in terms of how to apply for financial aid?
4        A.  We were always instructed to let the
5    financial aid people deal with the financial
6    stuff and just blow it off. Our job was to
7    sell them on going back to school and changing
8    their lives. It wasn't about the money.
9        Q.  Did any student ever come back to you
10   after completion of the enrollment process,
11   after they got qualified for financial aid?
12       A.  Can you repeat that?
13       Q.  Did any student ever come to you to
14   complete the enrollment process after
15   financial aid that did not qualify for
16   financial aid?
17       A.  So, they still wanted to come once
18   they realized they had to pay for it
19   out-of-pocket?
20       Q.  Right.
21       A.  Once or twice in eight months. It was
22   very rare.
23       Q.  Okay. Is it fair to say that most of
24   the students that you enrolled were on
25   financial aid?

Page 26

1        A.  Yes.
2        Q.  Were all of the students that you
3    enrolled getting financial aid from Kaplan?
4        A.  More often than not. I would say 98
5    percent of the time.
6        Q.  Once the student had completed the
7    enrollment process with you; is there a
8    cancellation period?
9        A.  I think maybe there was. I don't
10   recall to be honest with you.
11       Q.  Do you know if there was a period of
12   time during which they could discontinue or
13   decide to withdraw their enrollment and not be
14   responsible for the cost or the financial aid?
15       A.  No, I think once they were enrolled,
16   they were on the hook for something.
17       Q.  Did you ever have a student try to
18   cancel the process and you were instructed not
19   to return their phone call?
20       A.  No, I wouldn't say that ever happened.
21       Q.  What were you trained to tell students
22   about graduation from the school?
23       A.  I think -- I think I remember the
24   script saying we had the highest graduation
25   rate of any online school. Then again, there

Page 27

1    were things that we were to add that were not
2    in the script. We would mention other schools
3    and how low the other graduation rate were
4    compared to ours.
5        Q.  Do you remember what other schools you
6    would compare it to?
7        A.  Yes, University of Phoenix was one. I
8    think Strayer University. I don't remember all
9    of them, but those were a couple that just
10   came to mind.
11       Q.  Do you know whether or not the Kaplan
12   graduation rate was actually higher than
13   University of Phoenix or Strayer?
14       A.  I know we were told that. I don't know
15   if it was true.
16       Q.  And you were told that by your
17   supervisors or your team managers?
18       A.  Yes. I think there might be something
19   in the script about our graduation rate; if I
20   recall correctly.
21       Q.  What were you trained to tell the
22   students about the accreditation at the
23   school?
24       A.  We were told we had a national
25   accreditation and that somehow it was

Page 28

1    different than most universities which had a
2    regional accreditation. And that somehow
3    national accreditation was better.
4        Q.  Do you know whether or not that is a
5    true statement?
6        A.  No, I have no idea what it meant.
7        Q.  Were you able to explain it to the
8    students as to what that meant?
9        A.  Yes, it is easy to explain to a
10   student, because they have no idea either.
11       Q.  So, as long as you said it
12   authoritatively, they believed it?
13       A.  Absolutely.
14       Q.  How about the transferability of their
15   credits from Kaplan? What did you tell the
16   students about the transferability of their
17   credits?
18       A.  I think we were told that we couldn't
19   make any guarantees about credits, but we make
20   some statement up like, "of all of the
21   students that enrolled, I have never had a
22   problem with a students transferred credits,
23   they have always transferred in".
24       Q.  So, make a third party story out of
25   it. Always transferring to whatever school

Page 29

1   they went to after Kaplan?
2       A. Yes, or if they already had some and
3   wanted to transfer into Kaplan or if they were
4   planning on going to another school, either
5   way it is like don't worry about it, I will
6   transfer it.
7       Q. When you said you would make a
8   statement like, "I have never had a problem
9   with any of my students getting their credits
10  accepted," did you actually follow any of the
11  students to see if their credits were actually
12  accepted by any other institutions?
13      A. No, never.
14      Q. So, it was just a statement that had
15  no basic facts?
16      A. It was sales.
17      Q. You said something that you were
18  instructed to say, was that by the supervisors
19  and team managers?
20      A. Yes.
21      Q. How about the students salary after
22  the program? What did the admissions officer
23  tell you about your post graduation salary?
24      A. This might even be in the script as
25  well, but I remember it being some outrageous

Page 30

1   number. Something like if they didn't get
2   their education it would be like 20,000 a year
3   and if they did get their education with us
4   they would make like 100,000 a year. And then
5   we would go into stories about what they could
6   do with all of this extra money and about how
7   it would change your life and where would you
8   be living if you had that kind of money
9   instead of what you have now. This was the
10  disgusting part of the job.
11      Q. You meaning trying to get the students
12  to dream the big dream?
13      A. Absolutely.
14      Q. Did you have any statistics or data to
15  back any of this up that the student would
16  make 100,000 salary post graduation?
17      A. No. We know there is no guarantee in
18  life what you are going to make.
19      Q. Is it fair to say that the students
20  would have felt like they were being given
21  some sort of guarantee on salary?
22      A. Yes.
23      Q. You said -- what do you mean by the
24  disgusting part?
25      A. You know, I have sold a lot of things

Page 31

1   in my life and there are some things I don't
2   feel bad about selling, but selling these
3   young kids or even older people who may have
4   this dream of changing their life when you
5   knew it may or may not change.
6           Instead of it will, absolutely change
7   your life if you do this, if you just sign up
8   for all of these classes and sign up for this
9   63,000 loan. You just felt like you were
10  putting these people who were already in a bad
11  situation in life in a worse one.
12      Q. Let me ask you about that for a
13  minute. You said these people were already in
14  a bad situation. Is it fair to say that the
15  typical perspective student that you were
16  speaking with was already in a fairly
17  difficult economic situation?
18      A. Yes. If they were already well off, I
19  may as well end the call, they weren't going
20  to qualify for financial aid and as soon as
21  they saw how much it was going to cost them
22  for an online degree, they would be smart
23  enough not to do it. So, yes, I wouldn't say
24  that we prayed on those people, but that is
25  who we knew we had a better chance with.

Page 32

1       Q. How about internships or practical
2   training? Did you tell students anything about
3   what portion of their education would include
4   internships or training?
5       A. No.
6       Q. How about placement or job assistance
7   after they graduate?
8       A. I think there was something in the
9   script about that, but I don't recall exactly
10  what it was.
11      Q. Were there any other things that you
12  were told to tell students that made you feel
13  uncomfortable?
14      A. Yes, pretty much everything.
15      Q. Anything other than what we have
16  talked about so far?
17      A. Nothing that I can recall. We have
18  pretty much hit the main points of what we
19  were doing.
20      Q. Did you ever have any students contact
21  you after you had enrolled them saying, "you
22  told me 'X' but I am finding out 'Y'?"
23      A. No.
24      Q. Were you ever in touch with students
25  after they enrolled in the program?

Page 33

1      A. Rarely. I remembered once you got a
2  person enrolled you would say the start date
3  is in two weeks so you would call that person
4  the day they were supposed to start class,
5  because you didn't actually get paid until
6  that person started a class. Just getting them
7  enrolled wasn't good enough. If they didn't go
8  online and do their class the first day you
9  didn't get paid.
10       So, you make sure you made the phone
11  call on the start date to anybody you had
12  enrolled that period and walk them through
13  their process of signing up and going online
14  and attending class that first day.
15       After they started class I think they
16  had to attend a certain amount of classes. I
17  think it was three or something and then we
18  knew that is a good start and we are going to
19  get paid. After that we didn't have much
20  contact with them.
21      Q. How often do students start classes?
22  How often were the periods? Two or four or six
23  week periods?
24      A. Yes. I think there were 13 start
25  periods per year. So, I guess it is about

Page 34

1  every three weeks we would be starting a
2  period of enrollment. It was basically, almost
3  a three week period.
4       So, you had three weeks to get as many
5  enrollments as you could and then the start
6  date would come and you would call all of
7  those students that you had enrolled and get
8  them into their class so you could get paid
9  and then a new cycle would start and you would
10  start the process over every three weeks.
11      Q. Was there pressure put upon the
12  students to enroll for the very next starting
13  period?
14      A. Yes, definitely. We couldn't enroll
15  anybody for a period beyond those three weeks.
16      Q. If they wanted to start when the
17  summer started or when their kids went back to
18  school, they couldn't do that? They had to
19  enroll for the very next period?
20      A. That was our job to sell them like,
21  "you have been putting this off for how long
22  and you are going to put it off longer for
23  some reason or another," and we would make
24  them feel bad about whatever situation they
25  were in to get them to start when we wanted

Page 35

1  them to start. Which was immediately.
2      Q. Sir, why did you leave Kaplan?
3      A. I was disgusted with myself.
4      Q. Because of what you had told students,
5  or what you had been told to tell students to
6  get them to enroll?
7      A. Yes.
8      Q. Did you leave voluntarily or
9  involuntarily?
10      A. Involuntarily, but it was on my own
11  terms. I was ready to go. I, basically, just
12  stopped calling people.
13      Q. For enrollment?
14      A. Yes, I just stopped making phone
15  calls.
16      Q. Did that have a negative response?
17      A. Yes. I was dropped from 50,000 to
18  30,000 and that is when I stopped making phone
19  calls.
20      Q. So, is it fair to say that you
21  effectively quit and then were fired or --
22      A. I was terminated, because I wasn't
23  getting any enrollments. But I wasn't getting
24  any enrollments, because I didn't want to.
25      Q. Would you say that your experience

Page 36

1  with Kaplan, when you worked there in 2009 was
2  typical of the other admission advisors?
3      A. Yes.
4      Q. Meaning, the other admissions advisors
5  were given similar instructions on what they
6  should say in addition to the script?
7      A. Yes.
8      Q. And similar pressure was placed upon
9  the other admission advisors to make a minimum
10  number of enrollments one way or the other?
11      A. All of us were under that pressure,
12  yes.
13      Q. Is there anything else during your
14  experience at Kaplan that you think would be
15  informative for the attorney to know in this
16  investigation into the claim of
17  misrepresentation or unfair and effective
18  trade practices, that I should be made aware
19  of?
20      A. Nothing that I can think of at the
21  moment, no.
22      Q. The court reporter is taking down
23  everything you say and you have the option to
24  either review the transcript once it is typed
25  up or you can waive the right to review it.

## Page 37

1    A. I will waive it.

2       MS. HARROD:

3          That is all I have. Thank you.

## Page 38

REPORTER'S PAGE

I, Tiffany Walton Tassin, Certified
Court Reporter, in and for the State of
Louisiana, the officer, as defined in Rule 28
of the Federal Rules of Civil Procedure and/or
Article 1434(b) of the Louisiana Code of Civil
Procedure, before whom this sworn testimony
was taken, do hereby state on the Record:

That due to the interaction in the
spontaneous discourse of this proceeding,
dashes (--) have been used to indicate
pauses, changes in thought, and/or
talk-overs; that same is the proper method
for a Court Reporter's transcription of
proceeding, and that the dashes (--) do not
indicate that words or phrases have been
left out of this transcript;

That any words and/or names which
could not be verified through reference
material have been denoted with the phrase
"(phonetic)."

_____
        Tiffany Walton Tassin
        Certified Court Reporter
        Louisiana License #29029

## Page 39

C E R T I F I C A T E

This certification is valid only for a
transcript accompanied by my original signature and
original blue stamp on this page.

I, Tiffany Walton Tassin, Certified Court
Reporter, in and for the State of Louisiana, as the
officer before whom this testimony was taken, do
hereby certify that Mark Stegall, after having
been first duly sworn by me upon authority of R.S.
37:2554, did testify as hereinbefore set forth in
the foregoing pages;

That this testimony was reported by me in
the Stenographic (voice-writing) method, was
prepared and transcribed by me or under my personal
direction and supervision, and is a true and correct
transcript to the best of my ability and
understanding;

That I am not related to counsel or to the
parties herein; am not otherwise interested in the
outcome of this matter; and am a valid member in good
standing of the Louisiana State Board of Examiners of
Certified Shorthand Reporters.

_____
        Tiffany Walton Tassin
        Certified Court Reporter
        Louisiana License #29029

**A**

ability (1) 39:16
able (1) 28:7
absolutely (5) 10:6
  16:3 28:13 30:13
  31:6
accepted (2) 29:10
  29:12
accompanied (1)
  39:3
accreditation (14)
  11:2,9,10,10,11,15
  11:21,24 12:5,6
  27:22,25 28:2,3
accredited (3) 11:4,7
  12:15
accurate (2) 21:19
  24:4
achieve (1) 15:1
actual (1) 24:24
add (5) 10:21,25
  11:8 18:21 27:1
addition (1) 36:6
address (1) 5:18
administering (1)
  4:22
admission (4) 15:22
  17:25 36:2,9
admissions (8) 6:22
  17:6,15 22:22,25
  23:2 29:22 36:4
advice (1) 25:2
advisor (4) 6:22
  15:22 17:6 21:2
advisors (6) 17:15
  17:25 18:23 36:2,4
  36:9
afford (1) 22:13
afternoon (1) 5:7
agreed (1) 4:2
agreement (3) 19:21
  21:13 22:5
agreements (1)
  24:24
ahead (1) 12:14
aid (27) 19:24 20:11
  20:13,20,22 21:1,2
  21:9,11,15,18,21
  22:15,22 23:13
  24:6,11,16 25:3,5
  25:11,15,16,25
  26:3,14 31:20
amount (2) 24:3
  33:16
answer (1) 4:14
anybody (2) 33:11
  34:15
appearances (2) 2:2

3:4
application (8) 8:7
  21:4,8,8,9,11,12
  22:9
applications (2)
  19:24 20:14
apply (1) 25:3
april (1) 6:17
area (3) 5:22 12:19
  20:6
areas (1) 7:14
article (2) 4:5 38:6
asking (1) 8:25
assistance (1) 32:6
assistant (3) 2:6 12:1
  12:9
attend (1) 33:16
attending (2) 17:20
  33:14
attorney (5) 1:2 2:4
  2:6 5:9 36:15
authoritatively (1)
  28:12
authority (1) 39:9
average (1) 21:25
aware (1) 36:18

**B**

bachelors (4) 6:5,8
  22:1,4
back (9) 13:2,13
  24:11,13,20 25:7,9
  30:15 34:17
background (1) 6:3
bad (4) 31:2,10,14
  34:24
balloon (1) 17:11
balloons (1) 17:13
ballpark (1) 14:6
bartender (1) 6:1
based (3) 15:14
  16:12 24:7
basic (1) 29:15
basically (4) 8:16
  11:3 34:2 35:11
beginning (3) 6:23
  7:15,23
believe (1) 16:21
believed (1) 28:12
best (1) 39:16
better (6) 11:9 12:5
  16:23,25 28:3
  31:25
beyond (1) 34:15
big (2) 18:7 30:12
biggest (1) 16:21
blow (1) 25:6
blue (1) 39:4
board (1) 39:21

bonuses (1) 16:19
bothered (1) 17:19
bottom (1) 16:8
boy (1) 17:17
break (1) 14:19
broke (1) 23:15
building (1) 24:8

**C**

california (1) 11:17
call (11) 13:4 15:9
  15:16 19:9,14
  20:18 26:19 31:19
  33:3,11 34:6
called (3) 8:6 13:18
  13:19
callers (1) 12:12
calling (4) 11:13,17
  13:17 35:12
calls (11) 13:3,4,5,24
  14:8,10 17:1 19:11
  19:15 35:15,19
campus (2) 20:3,3
campuses (2) 17:22
  20:5
cancel (1) 26:18
cancellation (1) 26:8
cant (1) 22:13
caption (1) 3:3
centers (1) 1:8
certain (2) 16:6
  33:16
certificate (1) 3:12
certification (2) 4:11
  39:2
certified (7) 2:22
  4:21 38:2,24 39:5
  39:22,24
certify (1) 39:8
chance (1) 31:25
change (3) 30:7 31:5
  31:6
changes (1) 38:12
changing (2) 25:7
  31:4
civil (3) 4:5 38:5,6
claim (1) 36:16
class (7) 10:5 33:4,6
  33:8,14,15 34:8
classes (6) 9:9 17:20
  25:1 31:8 33:16,21
classroom (1) 10:11
close (2) 8:18,19
code (3) 4:5 5:22
  38:6
college (2) 1:9 7:8
come (10) 13:13
  18:16 21:6 22:18
  24:11,13 25:9,13

25:17 34:6
comfortable (1) 9:24
committed (4) 21:3
  22:10,14,16
committing (1)
  21:17
communications (1)
  6:12
community (1) 7:8
company (1) 6:21
compare (1) 27:6
compared (1) 27:4
compensation (1)
  16:19
complete (3) 18:11
  18:13 25:14
completed (2) 24:16
  26:6
completion (1) 25:10
computer (5) 9:15
  9:17,18 13:9 19:23
concluding (1) 6:24
consider (1) 19:4
consideration (1)
  15:19
contact (2) 32:20
  33:20
continual (1) 10:8
conversation (1)
  9:23
correct (3) 8:22
  12:22 39:15
correctly (1) 27:20
cost (9) 23:8,14,18
  23:21,23 24:1,2
  26:14 31:21
couldnt (3) 28:18
  34:14,18
counsel (2) 4:3 39:18
country (1) 20:9
couple (4) 8:10
  19:10,18 27:9
courses (1) 9:9
court (8) 2:22 4:21
  36:22 38:3,14,24
  39:5,24
credit (3) 23:15,21
  24:1
credits (6) 28:15,17
  28:19,22 29:9,11
currently (1) 5:23
cycle (4) 14:25 15:11
  15:12 34:9

**D**

dashes (2) 38:11,15
data (1) 30:14
date (3) 33:2,11 34:6
davenport (1) 8:1

day (7) 13:24 14:8
  14:10,12 33:4,8,14
deal (1) 25:5
deals (1) 8:19
december (1) 6:18
decent (1) 12:19
decide (1) 26:13
defined (1) 38:4
definitely (2) 13:19
  34:14
degree (7) 6:5,7,9,11
  22:1,4 31:22
denoted (1) 38:20
department (6) 1:3
  8:24 20:13 21:15
  24:6,11
depend (1) 14:21
deposition (3) 1:14
  4:3,15
describe (1) 18:2
desk (2) 17:11,12
determined (1) 22:6
didnt (12) 12:16,20
  15:3,10,18 21:20
  30:1 33:5,7,9,19
  35:24
difference (1) 16:11
different (4) 13:24
  16:1,3 28:1
difficult (3) 15:1,2
  31:17
direction (1) 39:15
director (1) 12:1
directors (5) 10:15
  12:1,9,10 18:23
disappointed (1)
  21:22
disclosed (1) 23:23
discontinue (1)
  26:12
discourse (1) 38:10
discuss (1) 22:16
disgusted (1) 35:3
disgusting (4) 18:4,5
  30:10,24
documentation (1)
  9:11
documents (4) 19:12
  19:25 20:15 24:14
doesnt (1) 22:17
doing (2) 18:20
  32:19
dont (16) 8:12 9:4
  15:8 17:18 21:23
  23:10,11,19 24:5
  24:22 26:9 27:8,14
  29:5 31:1 32:9
dream (3) 30:12,12
  31:4

**dropped (1)** 35:17
**due (1)** 38:9
**duly (2)** 5:2 39:9

———————
**E**
———————
**early (2)** 11:6 18:18
**easy (2)** 15:1 28:9
**economic (1)** 31:17
**education (3)** 30:2,3
  32:3
**educational (3)** 1:8
  6:2 7:6
**effective (1)** 36:17
**effectively (1)** 35:21
**efforts (1)** 18:2
**eight (1)** 25:21
**either (4)** 22:13
  28:10 29:4 36:24
**embers (1)** 5:24
**employed (3)** 5:23
  6:16,19
**employer (1)** 7:22
**employment (2)** 7:5
  7:14
**enroll (12)** 8:20 10:1
  10:23 15:18 19:8
  19:19 20:21 21:18
  34:12,14,19 35:6
**enrolled (13)** 14:5,25
  19:16 25:24 26:3
  26:15 28:21 32:21
  32:25 33:2,7,12
  34:7
**enrolling (7)** 14:11
  15:25 16:22,24
  20:2 23:4,9
**enrollment (13)**
  17:10 20:10 21:8
  21:12 22:5 23:7
  24:24 25:10,14
  26:7,13 34:2 35:13
**enrollments (13)**
  14:16 15:15,21
  16:13,17 17:2,7,14
  19:2 34:5 35:23,24
  36:10
**enrolls (1)** 21:24
**esquire (1)** 2:5
**estate (3)** 7:18,20,24
**et (1)** 4:6
**everybody (1)** 21:22
**evidence (1)** 4:16
**exactly (2)** 24:23
  32:9
**examination (3)** 3:1
  3:6 5:5
**examined (1)** 5:3
**examiners (1)** 39:21
**examples (1)** 12:13

**exclusive (1)** 13:16
**exhibit (1)** 3:17
**experience (3)** 14:1
  35:25 36:14
**explain (3)** 16:5 28:7
  28:9
**explaining (1)** 15:17
**extensive (1)** 16:20
**extra (1)** 30:6

———————
**F**
———————
**facility (1)** 17:16
**factor (1)** 15:15
**facts (1)** 29:15
**fair (5)** 18:25 25:23
  30:19 31:14 35:20
**fairly (1)** 31:16
**familiar (2)** 11:12
  12:20
**far (1)** 32:16
**federal (1)** 38:5
**feel (5)** 9:24,24 31:2
  32:12 34:24
**felt (4)** 18:12,25
  30:20 31:9
**filing (1)** 4:11
**fill (2)** 19:20,23
**filled (8)** 13:12 20:14
  21:3,7,10,12 22:4
  22:9
**financial (29)** 19:24
  20:11,13,20,22
  21:1,2,9,11,15,18
  21:21 22:15,22
  23:13 24:6,11,16
  24:23 25:3,5,5,11
  25:15,16,25 26:3
  26:14 31:20
**finding (1)** 32:22
**finish (1)** 24:13
**finished (2)** 21:15
  24:10
**fired (2)** 15:5 35:21
**firing (1)** 15:6
**first (5)** 13:17 19:14
  33:8,14 39:9
**five (3)** 13:24 14:13
  14:15
**florida (6)** 1:1 2:8
  6:20 8:1 20:8 24:7
**focus (1)** 9:19
**focusing (1)** 20:7
**follow (1)** 29:10
**follows (1)** 5:4
**foregoing (1)** 39:11
**form (1)** 4:13
**formalities (2)** 4:8
  4:10
**forms (1)** 19:24

**fort (1)** 2:8
**forth (1)** 39:10
**four (5)** 13:24,24
  14:11,23 33:22
**friend (1)** 8:5
**friends (1)** 9:25
**full (2)** 5:13 9:4

———————
**G**
———————
**general (5)** 1:2 2:4,6
  5:9 7:20
**getting (9)** 10:1
  13:23 16:25 20:22
  26:3 29:9 33:6
  35:23,23
**give (4)** 6:2 9:12
  23:7 25:2
**given (2)** 30:20 36:5
**giving (1)** 12:12
**go (8)** 9:9 12:20 13:2
  15:8 20:19 30:5
  33:7 35:11
**goals (1)** 16:6
**going (14)** 17:1
  21:14 22:6,16
  23:18,22 25:7 29:4
  30:18 31:19,21
  33:13,18 34:22
**good (8)** 5:7 14:14
  14:15 15:17,24
  33:7,18 39:20
**gordon (1)** 7:2
**graduate (1)** 32:7
**graduation (7)** 26:22
  26:24 27:3,12,19
  29:23 30:16
**group (1)** 18:7
**guarantee (2)** 30:17
  30:21
**guarantees (1)** 28:19
**guess (2)** 21:23
  33:25
**guidance (1)** 18:22
**guide (1)** 10:19

———————
**H**
———————
**half (1)** 14:22
**handle (1)** 22:22
**handled (2)** 20:10
  22:25
**happened (2)** 15:4
  26:20
**happens (1)** 21:21
**hard (1)** 17:17
**harrod (5)** 2:5 3:8
  5:6,8 37:2
**harvard (2)** 11:21,24
**hereinbefore (1)**
  39:10

**hereto (1)** 4:3
**high (1)** 6:4
**higher (1)** 27:12
**highest (1)** 26:24
**hightech (1)** 9:17
**hired (1)** 8:5
**hit (1)** 32:18
**honest (2)** 9:4 26:10
**hook (1)** 26:16
**hopefully (1)** 23:12
**hour (3)** 9:10 23:21
  24:2
**hours (1)** 23:16
**hypocritical (2)** 18:4
  18:5

———————
**I**
———————
**idea (2)** 28:6,10
**illinois (2)** 6:6,7
**im (1)** 13:11
**immediate (1)** 15:6
**immediately (1)**
  35:1
**include (1)** 32:3
**included (1)** 24:1
**index (2)** 3:1,17
**indicate (2)** 38:11,16
**individual (1)** 19:8
**individually (2)**
  10:14,17
**information (1)**
  20:20
**informative (1)**
  36:15
**initial (1)** 9:6
**institutes (1)** 7:6
**institutions (1)**
  29:12
**instructed (7)** 10:3
  10:10 12:24 22:21
  25:4 26:18 29:18
**instruction (1)** 10:7
**instructions (2)** 10:8
  36:5
**integrity (1)** 18:8
**interaction (1)** 38:9
**interested (1)** 39:19
**internships (2)** 32:1
  32:4
**interview (1)** 8:6
**interviews (1)** 8:10
**investigation (2)** 1:6
  36:16
**involuntarily (2)**
  35:9,10
**involved (1)** 16:16

———————
**J**
———————
**job (9)** 8:9 15:17

18:13 19:5 22:11
  25:6 30:10 32:6
  34:20

———————
**K**
———————
**kaplan (19)** 1:8,8,9
  6:16 7:6,15,23 8:4
  10:9 13:16 14:1
  26:3 27:11 28:15
  29:1,3 35:2 36:1
  36:14
**keep (1)** 18:13
**kentucky (1)** 20:8
**kids (2)** 31:3 34:17
**kind (3)** 8:8 9:17
  30:8
**king (2)** 7:2,3
**knew (5)** 12:18
  15:13 31:5,25
  33:18
**know (22)** 5:7 13:15
  13:21 15:8 17:6,9
  17:13,18 20:25
  21:13 22:15,17
  23:17 24:5 26:11
  27:11,14,14 28:4
  30:17,25 36:15

———————
**L**
———————
**lauderdale (1)** 2:8
**laughable (1)** 11:22
**law (1)** 4:7
**leader (1)** 11:25
**leaders (1)** 12:10
**leads (5)** 13:10,15
  14:4 16:23,25 17:3
  17:4
**learn (1)** 8:3
**learned (2)** 11:6
  18:17
**leave (2)** 35:2,8
**left (2)** 6:17 38:17
**legal (1)** 1:3
**level (1)** 15:3
**levels (2)** 16:1,4
**license (2)** 38:25
  39:25
**life (6)** 30:7,18 31:1
  31:4,7,11
**literate (1)** 9:18
**lives (1)** 25:8
**living (1)** 30:8
**loan (1)** 31:9
**located (1)** 17:21
**locations (2)** 17:19
  20:4
**long (4)** 7:9 14:21
  28:11 34:21
**longer (1)** 34:22

look (1) 12:14
looked (1) 23:16
lot (2) 19:1 30:25
louisiana (9) 1:15
  4:5 5:20 38:4,6,25
  39:6,21,25
low (1) 27:3

_____

M

main (1) 32:18
making (7) 9:23,23
  9:24 13:3 16:8
  35:14,18
management (2)
  10:14 11:25
managers (3) 18:23
  27:17 29:19
manual (2) 9:13,15
mark (6) 1:14,16 4:4
  5:1,15 39:8
market (1) 7:14
masters (2) 6:6,11
material (1) 38:20
matter (5) 12:16,21
  21:4 22:17 39:20
matters (1) 1:3
mean (3) 8:17 10:16
  30:23
meaning (6) 8:20
  10:3 13:16 20:7
  30:11 36:4
meant (2) 28:6,8
meet (1) 15:3
meeting (1) 18:8
member (1) 39:20
mention (1) 27:2
mentioned (1) 12:13
method (2) 38:13
  39:13
michigan (4) 11:14
  11:16,16 12:13
mind (1) 27:10
mine (1) 8:5
minimum (5) 14:9
  14:16 15:3,10 36:9
minute (1) 31:13
misrepresentation...
  36:17
moment (1) 36:21
monday (1) 1:17
monetary (1) 16:18
money (7) 18:14
  21:5 22:12,17 25:8
  30:6,8
months (2) 14:2
  25:21

_____

N

name (4) 5:7,13,16

9:1

names (5) 8:25 9:4
  13:11,14 38:18
national (5) 11:8,10
  12:5 27:24 28:3
nationally (2) 11:4,7
nature (2) 9:16
  18:24
need (2) 10:20 21:6
needed (2) 19:13
  20:15
negative (1) 35:16
never (3) 28:21 29:8
  29:13
new (3) 1:15 5:19
  34:9
nine (1) 14:2
november (1) 1:17
number (7) 5:21
  13:8 15:14 23:10
  23:16 30:1 36:10
numbers (1) 13:11

_____

O

oath (2) 4:22 5:11
objections (1) 4:12
obtain (2) 6:8,13
obtained (1) 8:13
occasionally (1) 9:8
occurring (1) 23:20
office (7) 1:2 2:4 5:8
  12:4 17:23,24 18:3
officer (3) 29:22
  38:4 39:7
officers (1) 22:25
officiated (1) 4:22
okay (4) 8:13 9:5
  17:15 25:23
older (1) 31:3
once (14) 8:13 9:10
  18:18 19:11,17
  20:14 22:14 24:10
  25:17,21 26:6,15
  33:1 36:24
ones (1) 16:25
online (11) 13:12
  19:22 20:1,3,5
  24:14,21 26:25
  31:22 33:8,13
opposite (2) 18:11
  18:13
option (1) 36:23
order (2) 10:22
  18:13
organized (1) 9:21
original (2) 39:3,4
orlando (4) 6:20
  7:25 8:2 17:22
orleans (2) 1:15 5:19

outcome (1) 39:20
outofpocket (2)
  23:22 25:19
outrageous (1) 29:25
outside (1) 8:2

_____

P

packet (1) 24:25
page (3) 3:10 38:1
  39:4
pages (1) 39:11
paid (4) 33:5,9,19
  34:8
part (5) 4:15 23:2,6
  30:10,24
participating (1) 5:9
particularly (1)
  15:24
parties (2) 4:3 39:19
party (1) 28:24
pauses (1) 38:12
pay (5) 16:3 21:24
  22:4,6 25:18
people (13) 8:19
  12:9 13:17,17
  14:12 18:19 20:19
  25:5 31:3,10,13,24
  35:12
peoples (1) 13:11
percent (3) 14:7 19:6
  26:5
percentage (1) 14:4
perception (1) 18:16
performance (1)
  16:1
period (11) 6:15
  14:19,22 26:8,11
  33:12 34:2,3,13,15
  34:19
periods (4) 14:20
  33:22,23,25
person (4) 20:17
  33:2,3,6
personal (1) 39:14
perspective (1)
  31:15
phoenix (2) 27:7,13
phone (11) 5:21 12:2
  13:5 18:18 19:9,11
  19:15 26:19 33:10
  35:14,18
phones (1) 18:10
phonetic (1) 38:21
phrase (1) 38:20
phrases (1) 38:16
physical (1) 17:19
pick (1) 12:18
picking (1) 12:17
place (1) 13:5

placed (1) 36:8
placement (1) 32:6
planning (1) 29:4
please (2) 5:21 6:3
points (1) 32:18
portion (1) 32:3
position (3) 5:25 8:4
  8:13
post (2) 29:23 30:16
practical (1) 32:1
practices (1) 36:18
prayed (1) 31:24
preach (1) 18:8
prepared (1) 39:14
pressure (4) 19:1
  34:11 36:8,11
pretty (7) 9:17 18:17
  20:16 21:19 22:24
  32:14,18
price (2) 23:3,8
primarily (1) 19:4
prior (5) 7:5,15,22
  13:18,20
probation (1) 15:9
problem (2) 28:22
  29:8
procedure (3) 4:5
  38:5,7
proceeding (2) 38:10
  38:15
process (9) 20:10,11
  23:7 25:10,14 26:7
  26:18 33:13 34:10
program (5) 21:25
  23:3,8 29:22 32:25
programs (1) 15:17
proper (1) 38:13
prospective (1)
  10:22
provided (1) 8:23
public (1) 7:13
pure (1) 16:18
purposes (1) 4:6
put (2) 34:11,22
putting (2) 31:10
  34:21

_____

Q

qualified (1) 25:11
qualify (5) 21:1,5
  23:12 25:15 31:20
quality (1) 15:16
question (1) 4:13
quit (1) 35:21
quote (1) 23:3
quoting (1) 24:3

_____

R

rare (2) 19:10 25:22

rarely (1) 33:1
rate (4) 26:25 27:3
  27:12,19
reading (1) 4:8
ready (5) 19:13,13
  19:19 22:18 35:11
real (4) 7:18,20,24
  13:11
realized (1) 25:18
really (5) 8:11 11:5
  11:19 12:21 15:16
reason (2) 15:25
  34:23
recall (5) 9:4 26:10
  27:20 32:9,17
receive (1) 8:14
record (2) 5:14 38:8
reference (1) 38:19
regional (3) 11:9
  12:6 28:2
reiterate (1) 12:3
related (1) 39:18
remember (13) 8:10
  8:12 9:1 11:1,5
  23:19 24:15,20,23
  26:23 27:5,8 29:25
remembered (1)
  33:1
rene (2) 2:5 5:8
repeat (2) 23:5 25:12
reported (2) 2:20
  39:12
reporter (7) 2:22
  4:22 36:22 38:3,24
  39:6,24
reporters (5) 3:10,12
  38:1,14 39:22
required (3) 14:9,16
  15:4
requirement (1)
  15:11
reserved (2) 4:9,14
residence (1) 1:16
residential (1) 7:21
response (1) 35:16
responsible (1)
  26:14
responsiveness (1)
  4:13
resulted (1) 14:5
return (1) 26:19
review (2) 36:24,25
rewards (1) 16:20
right (3) 24:20 25:20
  36:25
rule (1) 38:4
rules (1) 38:5
run (1) 9:15

---

**S**

salary (4) 29:21,23
  30:16,21
sales (8) 7:16,17
  8:16 9:22 12:22
  19:5 22:11 29:16
save (1) 4:12
saw (1) 31:21
saying (4) 11:5 13:13
  26:24 32:21
school (22) 6:4 8:21
  11:4,7,11 12:17,18
  12:19 13:13 17:2
  19:2 21:3,6 22:10
  22:18 25:7 26:22
  26:25 27:23 28:25
  29:4 34:18
schools (7) 12:13,14
  13:18,20,25 27:2,5
script (18) 9:13,14
  9:15 10:3,4,6,8,18
  10:25 11:3,5 18:9
  26:24 27:2,19
  29:24 32:9 36:6
scripts (2) 9:20,20
sealing (1) 4:10
second (2) 9:19 13:2
see (3) 12:15 17:11
  29:11
sell (3) 19:1 25:7
  34:20
selling (3) 10:1 31:2
  31:2
semesters (1) 7:11
send (1) 20:17
senior (1) 6:22
seq (1) 4:6
set (1) 39:10
setting (1) 10:12
share (1) 7:20
shorthand (1) 39:22
sign (4) 19:13 20:16
  31:7,8
signature (1) 39:3
signing (4) 4:9 24:23
  24:25 33:13
signs (1) 22:3
similar (2) 36:5,8
sir (6) 5:18,23 6:15
  8:3 24:19 35:2
situation (5) 23:19
  31:11,14,17 34:24
six (5) 9:3 14:24
  17:12,13 33:22
small (1) 23:16
smart (1) 31:22
sold (1) 30:25
solely (2) 15:14 20:2

somebody (2) 17:9
  17:12
soon (1) 31:20
sort (2) 9:11 30:21
sought (1) 4:16
speaking (5) 7:13
  10:14,17,21 31:16
specific (1) 7:19
specifically (3) 4:9
  4:11 11:1
spell (1) 5:16
spoken (1) 19:18
spontaneous (1)
  38:10
stamp (1) 39:4
standing (1) 39:21
stanford (1) 11:18
start (12) 33:2,4,11
  33:18,21,24 34:5,9
  34:10,16,25 35:1
started (4) 6:17 33:6
  33:15 34:17
starting (3) 6:3 34:1
  34:12
state (9) 1:1 5:13 6:6
  6:7 11:16 38:3,8
  39:6,21
statement (5) 5:10
  28:5,20 29:8,14
statements (1) 11:8
statistics (1) 30:14
stay (1) 10:3
steakhouse (1) 5:24
stegall (7) 1:14,16
  4:4 5:1,15,17 39:8
stenographic (1)
  39:13
steps (1) 24:21
stick (2) 10:6,7
stipulated (1) 4:2
stipulation (1) 3:5
stopped (3) 35:12,14
  35:18
stories (1) 30:5
story (1) 28:24
strategy (2) 9:22
  12:23
strayer (2) 27:8,13
street (3) 1:15 2:7
  5:19
student (24) 9:23
  10:22 13:22 14:5
  19:17 20:3,21
  21:14,17,20,24
  22:3 23:17,23,24
  24:16 25:2,9,13
  26:6,17 28:10
  30:15 31:15
students (40) 11:13

13:3,6,7 15:25
  16:22,24 17:20
  18:19 19:8 20:2,7
  20:12 22:19 23:3,7
  24:10,18 25:24
  26:2,21 27:22 28:8
  28:16,21,22 29:9
  29:11,21 30:11,19
  32:2,12,20,24
  33:21 34:7,12 35:4
  35:5
stuff (1) 25:6
summer (1) 34:17
superior (1) 7:24
supervision (1)
  39:15
supervisor (1) 7:1
supervisors (3)
  12:25 27:17 29:18
supposed (1) 33:4
sure (5) 13:11,14
  20:16 23:6 33:10
sworn (3) 5:2 38:7
  39:9
system (3) 13:9 15:7
  16:7

---

**T**

take (2) 8:7 15:18
taken (4) 1:16 4:4
  38:8 39:7
talk (1) 22:15
talked (3) 17:8 21:1
  32:16
talking (1) 19:7
talkovers (1) 38:13
tape (1) 17:10
tassin (6) 2:21 4:21
  38:2,23 39:5,23
teach (1) 7:12
teacher (1) 7:7
teaching (1) 8:18
team (4) 11:25 12:10
  27:17 29:19
telemarketing (3)
  17:23,24 18:3
telephone (1) 2:2
tell (13) 5:2 13:22,23
  16:15 18:20 22:19
  26:21 27:21 28:15
  29:23 32:2,12 35:5
telling (1) 12:21
tentative (2) 20:23
  20:24
terminated (1) 35:22
terms (3) 13:2 25:3
  35:11
test (2) 8:8,11
testified (1) 5:4

testify (1) 39:10
testimony (3) 38:7
  39:7,12
thank (2) 5:9 37:3
thereof (1) 4:15
thing (1) 16:21
things (12) 8:8 9:16
  10:20,24 16:16
  18:24 19:25 21:13
  27:1 30:25 31:1
  32:11
think (23) 7:10 8:11
  13:12 14:19 17:17
  22:8 23:10,11,15
  23:25 26:9,15,23
  26:23 27:8,18
  28:18 32:8 33:15
  33:17,24 36:14,20
third (1) 28:24
thought (1) 38:12
three (15) 7:10 8:15
  9:5 13:23 14:7,20
  14:24 17:1 24:21
  33:17 34:1,3,4,10
  34:15
threw (1) 23:10
tier (2) 16:7,8
tiffany (6) 2:21 4:21
  38:2,23 39:5,23
time (9) 4:14 6:15
  7:7,20 10:9 12:14
  17:9 26:5,12
times (1) 19:18
title (3) 6:21,23,24
todays (1) 5:10
told (17) 10:12,13,16
  10:18 11:14,20,23
  12:5,8 27:14,16,24
  28:18 32:12,22
  35:4,5
top (1) 16:9
topically (1) 9:21
total (1) 23:18
touch (1) 32:24
tough (1) 9:18
tracked (1) 15:21
trade (1) 36:18
trained (2) 26:21
  27:21
trainer (1) 9:2
training (13) 8:14,15
  8:16,23,24 9:6,6,9
  9:12 10:2,5 32:2,4
transcribed (1)
  39:14
transcript (4) 36:24
  38:17 39:3,16
transcription (1)
  38:14

transfer (3) 20:18
  29:3,6
transferability (2)
  28:14,16
transferred (2)
  28:22,23
transferring (1)
  28:25
trouble (1) 15:13
true (3) 27:15 28:5
  39:15
truth (4) 5:2,2,3
  12:21
try (1) 26:17
trying (1) 30:11
twentyeight (1) 5:19
twice (2) 9:10 25:21
two (6) 5:19 9:10
  14:6,22 33:3,22
type (1) 7:17
typed (1) 36:24
types (2) 8:14 10:24
typical (3) 22:24
  31:15 36:2

---

**U**

uncomfortable (1)
  32:13
understand (2) 5:10
  21:23
understanding (1)
  39:17
unfair (1) 36:17
universities (1) 28:1
university (7) 1:8
  6:6,7 11:15 27:7,8
  27:13
usually (2) 19:10,14

---

**V**

valid (2) 39:2,20
verbatim (1) 10:4
verified (1) 38:19
voicewriting (1)
  39:13
voluntarily (1) 35:8

---

**W**

waive (2) 36:25 37:1
waived (1) 4:11
walk (2) 24:22 33:12
walton (6) 2:21 4:21
  38:2,23 39:5,23
want (4) 10:19 13:13
  15:18 35:24
wanted (6) 20:16
  23:17 25:17 29:3
  34:16,25
warned (1) 15:10

warning (1) 15:7
wasnt (4) 25:8 33:7
  35:22,23
way (3) 22:8 29:5
  36:10
website (1) 19:23
week (8) 9:10 14:13
  14:14,15,15,20
  33:23 34:3
weeks (8) 8:15 9:5
  14:23 33:3 34:1,4
  34:10,15
went (3) 9:25 29:1
  34:17
withdraw (1) 26:13
witness (1) 4:24
wont (1) 23:13
words (2) 38:16,18
work (1) 10:4
worked (3) 16:5 22:8
  36:1
working (1) 17:16
worry (3) 23:12,13
  29:5
worse (1) 31:11
wouldnt (4) 20:25
  21:13 26:20 31:23
wow (1) 16:11

_____
**X**
_____

_____
**Y**
_____
yale (2) 11:21,24
year (5) 16:9,10 30:2
  30:4 33:25
years (1) 17:1
young (1) 31:3

_____
**Z**
_____

_____
**0**
_____
000 (14) 16:9,10,12
  16:12 22:2,4,7
  23:11 30:2,4,16
  31:9 35:17,18

_____
**1**
_____
1 (4) 3:3,19 6:17
  17:18
100 (5) 16:10,12
  19:6 30:4,16
110 (1) 2:7
13 (1) 33:24
1421 (1) 4:6
1434 (1) 38:6
1994 (1) 6:10
1995 (1) 6:14

_____
**2**
_____

2 (2) 3:4,21
20 (1) 30:2
2009 (3) 6:17,18
  36:1
2010 (1) 1:17
20th (2) 1:15 5:19
22 (1) 1:17
228 (1) 1:15
2554 (1) 39:10
28 (1) 38:4
29029 (2) 38:25
  39:25

_____
**3**
_____
3 (1) 6:18
30 (3) 16:9,12 35:18
33301 (1) 2:8
37 (1) 39:10
38 (1) 3:10
39 (1) 3:12

_____
**4**
_____
4 (1) 3:5
404 (1) 5:22

_____
**5**
_____
5 (1) 3:8
50 (1) 35:17
500 (1) 17:18
5297756 (1) 5:22

_____
**6**
_____
63 (5) 22:2,4,7 23:11
  31:9
6th (1) 2:7

_____
**7**
_____
70124 (2) 1:15 5:20

_____
**8**
_____
80 (1) 14:10

_____
**9**
_____
98 (1) 26:4

# EXHIBIT "G"

# GAO

Testimony

Before the Committee on Health, Education, Labor, and Pensions, U.S. Senate

For Release on Delivery
Expected at 10:00 a.m. EDT
Wednesday, August 4, 2010

# FOR-PROFIT COLLEGES

# Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Deceptive and Questionable Marketing Practices

Statement of Gregory D. Kutz, Managing Director
Forensics Audits and Special Investigations

On November 30, 2010, GAO reissued this testimony to clarify and add more precise wording on pages 9 and 12 and to some of the examples cited in Table 1 on page 8 and Appendix I, pages 19-27.



Highlights of GAO-10-948T, a testimony before the Committee on Health, Education, Labor, and Pensions, U.S. Senate

# FOR-PROFIT COLLEGES

## Undercover Testing Finds Colleges Encouraged Fraud and Engaged in Deceptive and Questionable Marketing Practices

## Why GAO Did This Study

Enrollment in for-profit colleges has grown from about 365,000 students to almost 1.8 million in the last several years. These colleges offer degrees and certifications in programs ranging from business administration to cosmetology. In 2009, students at for-profit colleges received more than $4 billion in Pell Grants and more than $20 billion in federal loans provided by the Department of Education (Education). GAO was asked to 1) conduct undercover testing to determine if for-profit colleges' representatives engaged in fraudulent, deceptive, or otherwise questionable marketing practices, and 2) compare the tuitions of the for-profit colleges tested with those of other colleges in the same geographic region.

To conduct this investigation, GAO investigators posing as prospective students applied for admissions at 15 for-profit colleges in 6 states and Washington, D.C.. The colleges were selected based on several factors, including those that the Department of Education reported received 89 percent or more of their revenue from federal student aid. GAO also entered information on four fictitious prospective students into education search Web sites to determine what type of follow-up contact resulted from an inquiry. GAO compared tuition for the 15 for-profit colleges tested with tuition for the same programs at other colleges located in the same geographic areas. Results of the undercover tests and tuition comparisons cannot be projected to all for-profit colleges.

View GAO-10-948T or key components. For more information, contact Gregory Kutz at (202) 512-6722 or kutzg@gao.gov.

## What GAO Found

Undercover tests at 15 for-profit colleges found that 4 colleges encouraged fraudulent practices and that all 15 made deceptive or otherwise questionable statements to GAO's undercover applicants. Four undercover applicants were encouraged by college personnel to falsify their financial aid forms to qualify for federal aid—for example, one admissions representative told an applicant to fraudulently remove $250,000 in savings. Other college representatives exaggerated undercover applicants' potential salary after graduation and failed to provide clear information about the college's program duration, costs, or graduation rate despite federal regulations requiring them to do so. For example, staff commonly told GAO's applicants they would attend classes for 12 months a year, but stated the annual cost of attendance for 9 months of classes, misleading applicants about the total cost of tuition. Admissions staff used other deceptive practices, such as pressuring applicants to sign a contract for enrollment before allowing them to speak to a financial advisor about program cost and financing options. However, in some instances, undercover applicants were provided accurate and helpful information by college personnel, such as not to borrow more money than necessary.

**Fraudulent, Deceptive, and Otherwise Questionable Practices**

| Degree/certificate, location | Sales and Marketing Practice |
|---|---|
| Certificate Program – California | Undercover applicant was encouraged by a college representative to change federal aid forms to falsely increase the number of dependents in the household in order to qualify for grants. |
| Associate's Degree – Florida | Undercover applicant was falsely told that the college was accredited by the same organization that accredits Harvard and the University of Florida. |
| Certificate Program – Washington, D.C. | Admissions representative said that barbers can earn up to $150,000 to $250,000 a year, an exceptional figure for the industry. The Bureau of Labor Statistics reports that 90 percent of barbers make less than $43,000 a year. |
| Certificate Program – Florida | Admission representative told an undercover applicant that student loans were not like a car payment and that no one would "come after" the applicant if she did not pay back her loans. |

Source: GAO

In addition, GAO's four fictitious prospective students received numerous, repetitive calls from for-profit colleges attempting to recruit the students when they registered with Web sites designed to link for-profit colleges with prospective students. Once registered, GAO's prospective students began receiving calls within 5 minutes. One fictitious prospective student received more than 180 phone calls in a month. Calls were received at all hours of the day, as late as 11 p.m. To see video clips of undercover applications and to hear voicemail messages from for-profit college recruiters, see http://www.gao.gov/products/GAO-10-948T.

Programs at the for-profit colleges GAO tested cost substantially more for associate's degrees and certificates than comparable degrees and certificates at public colleges nearby. A student interested in a massage therapy certificate costing $14,000 at a for-profit college was told that the program was a good value. However the same certificate from a local community college cost $520. Costs at private nonprofit colleges were more comparable when similar degrees were offered.

United States Government Accountability Office

Mr. Chairman and Members of the Committee:

Thank you for the opportunity to discuss our investigation into fraudulent, deceptive, or otherwise questionable sales and marketing practices in the for-profit college industry.[1] Across the nation, about 2,000 for-profit colleges eligible to receive federal student aid offer certifications and degrees in subjects such as business administration, medical billing, psychology, and cosmetology. Enrollment in such colleges has grown far faster than traditional higher-education institutions. The for-profit colleges range from small, privately owned colleges to colleges owned and operated by publicly traded corporations. Fourteen such corporations, worth more than $26 billion as of July 2010,[2] have a total enrollment of 1.4 million students. With 443,000 students, one for-profit college is one of the largest higher-education systems in the country—enrolling only 20,000 students fewer than the State University of New York.

The Department of Education's Office of Federal Student Aid manages and administers billions of dollars in student financial assistance programs under Title IV of the Higher Education Act of 1965, as amended. These programs include, among others, the William D. Ford Federal Direct Loan Program (Direct Loans), the Federal Pell Grant Program, and campus-based aid programs.[3] Grants do not have to be repaid by students, while loans must be repaid whether or not a student completes a degree program. Students may be eligible for "subsidized" loans or "unsubsidized" loans. For unsubsidized loans, interest begins to accrue on the loan as soon as the loan is taken out by the student (i.e. while attending classes).

---

[1]For-profit colleges are institutions of post-secondary education that are privately-owned or owned by a publicly traded company and whose net earnings can benefit a shareholder or individual. In this report, we use the term "college" to refer to all of those institutions of post-secondary education that are eligible for funds under Title IV of the Higher Education Act of 1965, as amended. This term thus includes public and private nonprofit institutions, proprietary or for-profit institutions, and post-secondary vocational institutions.

[2]$26 billion is the aggregate market capitalization of the 14 publicly traded corporations on July 14, 2010. In addition, there is a 15th company that operates for-profit colleges; however, the parent company is involved in other industries; therefore, we are unable to separate its market capitalization for only the for-profit college line of business, and its value is not included in this calculation.

[3]The Federal Supplemental Educational Opportunity Grant (FSEOG), Federal Work-Study (FWS), and Federal Perkins Loan programs are called campus-based programs and are administered directly by the financial aid office at each participating college. As of July 1, 2010 new federal student loans that are not part of the campus-based programs will come directly from the Department of Education under the Direct Loan program.

For subsidized loans, interest does not accrue while a student is in college. Colleges received $105 billion in Title IV funding for the 2008-2009 school year—of which approximately 23 percent or $24 billion went to for-profit colleges. Because of the billions of dollars in federal grants and loans utilized by students attending for-profit colleges, you asked us to (1) conduct undercover testing to determine if for-profit college representatives engaged in fraudulent, deceptive, or otherwise questionable marketing practices, and (2) compare the cost of attending for-profit colleges tested with the cost of attending nonprofit colleges in the same geographic region.

To determine whether for-profit college representatives engaged in fraudulent, deceptive, or otherwise questionable sales and marketing practices, we investigated a nonrepresentative selection of 15 for-profit colleges located in Arizona, California, Florida, Illinois, Pennsylvania, Texas, and Washington, D.C. We chose colleges based on several factors in order to test for-profit colleges offering a variety of educational services with varying corporate sizes and structures located across the country. Factors included whether a college received 89 percent or more of total revenue from federal student aid according to Department of Education (Education) data or was located in a state that was among the top 10 recipients of Title IV funding. We also chose a mix of privately held or publicly traded for-profit colleges. We reviewed Federal Trade Commission (FTC) statutes and regulations regarding unfair and deceptive marketing practices and Education statutes and regulations regarding what information postsecondary colleges are required to provide to students upon request and what constitutes substantial misrepresentation of services. During our undercover tests we attempted to identify whether colleges met these regulatory requirements, but we were not able to test all regulatory requirements in all tests.

Using fictitious identities, we posed as potential students to meet with the colleges' admissions and financial aid representatives and inquire about certificate programs, associate's degrees, and bachelor's degrees.[4] We inquired about one degree type and one major—such as cosmetology, massage therapy, construction management, or elementary education—at each college. We tested each college twice—once posing as a prospective student with an income low enough to qualify for federal grants and

---

[4]A certificate program allows a student to earn a college level credential in a particular field without earning a degree.

subsidized student loans, and once as a prospective student with higher income and assets to qualify the student only for certain unsubsidized loans.[5] Our undercover applicants were ineligible for other types of federal postsecondary education assistance programs such as benefits available under the Post-9/11 Veterans Educational Assistance Act of 2008 (commonly referred to as "the Post-9/11 G.I. Bill"). We used fabricated documentation, such as tax returns, created with publicly available hardware, software and materials, and the Free Application for Federal Student Aid (FAFSA)—the form used by virtually all 2- and 4-year colleges, universities, and career colleges for awarding federal student aid—during our in-person meetings. In addition, using additional bogus identities, investigators posing as four prospective students filled out forms on two Web sites that ask questions about students' academic interests, match them to colleges with relevant programs, and provide the students' information to colleges or the colleges' outsourced calling center for follow-up about enrollment. Two students expressed interest in a culinary arts degree, and two other students expressed interest in a business administration degree. We filled out information on two Web sites with these fictitious prospective students' contact information and educational interests in order to document the type and frequency of contact the fictitious prospective students would receive. We then monitored the phone calls and voicemails received.

To compare the cost of attending for-profit colleges with that of nonprofit colleges, we used Education information to select public and private nonprofit colleges located in the same geographic areas as the 15 for-profit colleges we visited. We compared tuition rates for the same type of degree or certificate between the for-profit and nonprofit colleges. For the 15 for-profit colleges we visited, we used information obtained from campus representatives to determine tuition at these programs. For the nonprofit colleges, we obtained information from their Web sites or, when not available publicly, from campus representatives. Not all nonprofit colleges offered similar degrees, specifically when comparing associate's degrees and certificate programs. We cannot project the results of our undercover tests or cost comparisons to other for-profit colleges.

---

[5]Regardless of income and assets, all eligible students attending a Title IV college are eligible to receive unsubsidized federal loans. The maximum amount of the unsubsidized loan ranges from $2,000 to $12,000 per year, depending on the student's grade level and on whether the student is considered "dependent" or "independent" from his or her parents or guardians.

We plan to refer cases of school officials encouraging fraud and engaging in deceptive practices to Education's Office of Inspector General, where appropriate. Our investigative work, conducted from May 2010 through July 2010, was performed in accordance with standards prescribed by the Council of the Inspectors General on Integrity and Efficiency.

# Background

In recent years, the scale and scope of for-profit colleges have changed considerably. Traditionally focused on certificate and programs ranging from cosmetology to medical assistance and business administration, for-profit institutions have expanded their offerings to include bachelor's, master's, and doctoral level programs. Both the certificate and degree programs provide students with training for careers in a variety of fields. Proponents of for-profit colleges argue that they offer certain flexibilities that traditional universities cannot, such as, online courses, flexible meeting times, and year-round courses. Moreover, for-profit colleges often have open admissions policies to accept any student who applies.

Currently, according to Education about 2,000 for-profit colleges participate in Title IV programs and in the 2008–2009 school year, for-profit colleges received approximately $24 billion in Title IV funds. Students can only receive Title IV funds when they attend colleges approved by Education to participate in the Title IV program.

## Title IV Program Eligibility Criteria

The Higher Education Act of 1965, as amended, provides that a variety of institutions of higher education are eligible to participate in Title IV programs, including:

- Public institutions—Institutions operated and funded by state or local governments, which include state universities and community colleges.

- Private nonprofit institutions—Institutions owned and operated by nonprofit organizations whose net earnings do not benefit any shareholder or individual. These institutions are eligible for tax-deductible contributions in accordance with the Internal Revenue code (26 U.S.C. § 501(c)(3)).

- For-profit institutions—Institutions that are privately owned or owned by a publicly traded company and whose net earnings can benefit a shareholder or individual.

Colleges must meet certain requirements to receive Title IV funds. While full requirements differ depending on the type of college, most colleges are

required to: be authorized or licensed by the state in which it is located to provide higher education; provide at least one eligible program that provides an associate's degree or higher, or provides training to students for employment in a recognized occupation; and be accredited by an accrediting agency recognized by the Secretary of Education. Moreover, for-profit colleges must enter a "program participation agreement" with Education that requires the school to derive not less than 10 percent of revenues from sources other than Title IV funds and certain other federal programs (known as the "90/10 Rule"). Student eligibility for grants and subsidized student loans is based on student financial need. In addition, in order for a student to be eligible for Title IV funds, the college must ensure that the student meets the following requirements, among others: has a high school diploma, a General Education Development certification, or passes an ability-to-benefit test approved by Education, or completes a secondary school education in a home school setting recognized as such under state law; is working toward a degree or certificate in an eligible program; and is maintaining satisfactory academic progress once in college.[6]

## Defaults on Student Loans

In August 2009, GAO reported that in the repayment period, students who attended for-profit colleges were more likely to default on federal student loans than were students from other colleges.[7] When students do not make payments on their federal loans and the loans are in default, the federal government and taxpayers assume nearly all the risk and are left with the costs. For example, in the Direct Loan program, the federal government and taxpayers pick up 100 percent of the unpaid principal on defaulted loans. In addition, students who default are also at risk of facing a number of personal and financial burdens. For example, defaulted loans will appear on the student's credit record, which may make it more difficult to obtain an auto loan, mortgage, or credit card. Students will also be ineligible for assistance under most federal loan programs and may not receive any additional Title IV federal student aid until the loan is repaid in full. Furthermore, Education can refer defaulted student loan debts to the Department of Treasury to offset any federal or state income tax refunds

---

[6]GAO previously investigated certain schools' use of ability–to-benefit tests. For more information, see GAO, *PROPRIETARY SCHOOLS: Stronger Department of Education Oversight Needed to Help Ensure Only Eligible Students Receive Federal Student Aid*, GAO-09-600 (Washington, D.C.: August 17, 2009).

[7]GAO-09-600.

due to the borrower to repay the defaulted loan. In addition, Education may require employers who employ individuals who have defaulted on a student loan to deduct 15 percent of the borrower's disposable pay toward repayment of the debt. Garnishment may continue until the entire balance of the outstanding loan is paid.

## College Disclosure Requirements

In order to be an educational institution that is eligible to receive Title IV funds, Education statutes and regulations require that each institution make certain information readily available upon request to enrolled and prospective students.[8] Institutions may satisfy their disclosure requirements by posting the information on their Internet Web sites. Information to be provided includes: tuition, fees, and other estimated costs; the institution's refund policy; the requirements and procedures for withdrawing from the institution; a summary of the requirements for the return of Title IV grant or loan assistance funds; the institution's accreditation information; and the institution's completion or graduation rate. If a college substantially misrepresents information to students, a fine of no more than $25,000 may be imposed for each violation or misrepresentation and their Title IV eligibility status may be suspended or terminated.[9] In addition, the FTC prohibits "unfair methods of competition" and "unfair or deceptive acts or practices" that affect interstate commerce.

---

[8]20 U.S.C. § 1092 and 34 C.F.R. §§ 668.41 -.49.

[9]20 U.S.C. § 1094 (c) (3) and 34 C.F.R. §§ 668.71 - .75. Additionally, Education has recently proposed new regulations that would enhance its oversight of Title IV eligible institutions, including provisions related to misrepresentation and aggressive recruiting practices. See 75 Fed. Reg. 34,806 (June 18, 2010).

## For-Profit Colleges Encouraged Fraud and Engaged in Deceptive and Otherwise Questionable Sales and Marketing Practices

Our covert testing at 15 for-profit colleges found that four colleges encouraged fraudulent practices, such as encouraging students to submit false information about their financial status. In addition all 15 colleges made some type of deceptive or otherwise questionable statement to undercover applicants, such as misrepresenting the applicant's likely salary after graduation and not providing clear information about the college's graduation rate. Other times our undercover applicants were provided accurate or helpful information by campus admissions and financial aid representatives. Selected video clips of our undercover tests can be seen at http://www.gao.gov/products/GAO-10-948T.

## Fraudulent Practices Encouraged by For-Profit Colleges

Four of the 15 colleges we visited encouraged our undercover applicants to falsify their FAFSA in order to qualify for financial aid. A financial aid officer at a privately owned college in Texas told our undercover applicant not to report $250,000 in savings, stating that it was not the government's business how much money the undercover applicant had in a bank account. However, Education requires students to report such assets, which along with income, are used to determine how much and what type of financial aid for which a student is eligible. The admissions representative at this same school encouraged the undercover applicant to change the FAFSA to falsely add dependents in order to qualify for grants. The admissions representative attempted to ease the undercover applicant's concerns about committing fraud by stating that information about the reported dependents, such as Social Security numbers, was not required. An admissions representative at another college told our undercover applicant that changing the FAFSA to indicate that he supported three dependents instead of being a single-person household might drop his income enough to qualify for a Pell Grant. In all four situations when college representatives encouraged our undercover applicants to commit fraud, the applicants indicated on their FAFSA, as well as to the for-profit college staff, that they had just come into an inheritance worth approximately $250,000. This inheritance was sufficient to pay for the entire cost of the undercover applicant's tuition. However, in all four cases, campus representatives encouraged the undercover applicants to take out loans and assisted them in becoming eligible either for grants or subsidized loans. It was unclear what incentive these colleges had to encourage our undercover applicants to fraudulently fill out financial aid forms given the applicants' ability to pay for college. The following table provides more details on the four colleges involved in encouraging fraudulent activity.

**Table 1: Fraudulent Actions Encouraged by For-Profit Colleges**

| Location | Certification Sought and Course of Study | Type of College | Fraudulent Behavior Encouraged |
|---|---|---|---|
| CA | Certificate - Computer Aided Drafting | Less than 2-year, privately owned | • Undercover applicant was encouraged by a financial aid representative to change the FAFSA to falsely increase the number of dependents in the household in order to qualify for Pell Grants. |
| | | | • The undercover applicant suggested to the representative that by the time the college would be required by Education to verify any information about the applicant, the applicant would have already graduated from the 7-month program. The representative acknowledged this was true. |
| | | | • This undercover applicant indicated to the financial aid representative that he had $250,000 in the bank, and was therefore capable of paying the program's $15,000 cost. The fraud would have made the applicant eligible for grants and subsidized loans. |
| FL | Associate's Degree - Radiologic Technology | 2-year, privately owned | • Admissions representative suggested to the undercover applicant that he not report $250,000 in savings reported on the FAFSA. The representative told the applicant to come back once the fraudulent financial information changes had been processed. |
| | | | • This change would not have made the applicant eligible for grants because his income would have been too high, but it would have made him eligible for loans subsidized by the government. However, this undercover applicant indicated that he had $250,000 in savings—more than enough to pay for the program's $39,000 costs. |
| PA | Certificate - Web Page Design | Less than 2-year, privately owned | • Financial aid representative told the undercover applicant that he should have answered "zero" when asked about money he had in savings—the applicant had reported a $250,000 inheritance. |
| | | | • The financial aid representative told the undercover applicant that she would "correct" his FAFSA form by reducing the reported assets to zero. She later confirmed by email and voicemail that she had made the change. |
| | | | • This change would not have made the applicant eligible for grants, but it would have made him eligible for loans subsidized by the government. However, this applicant indicated that he had about $250,000 in savings—more than enough to pay for the program's $21,000 costs. |
| TX | Bachelor's Degree - Construction Management | 4-year, privately owned | • Admissions representative encouraged applicant to change the FAFSA to falsely add dependents in order to qualify for Pell Grants. |
| | | | • Admissions representative assured the undercover applicant that he did not have to identify anything about the dependents, such as their Social Security numbers, nor did he have to prove to the college with a tax return that he had previously claimed them as dependents. |
| | | | • Financial aid representative told the undercover applicant that he should not report the $250,000 in cash he had in savings. |
| | | | • This applicant indicated to the financial aid representative that he had $250,000 in the bank, and was therefore capable of paying the program's $68,000 cost. The fraud would have made the undercover applicant eligible for more than $2,000 in grants per year. |

Source: GAO.

## Deceptive or Questionable Statements

Admissions or financial aid representatives at all 15 for-profit colleges provided our undercover applicants with deceptive or otherwise questionable statements. These deceptive and questionable statements included information about the college's accreditation, graduation rates and its student's prospective employment and salary qualifications, duration and cost of the program, or financial aid. Representatives at schools also employed hard-sell sales and marketing techniques to encourage students to enroll.

### Accreditation Information

Admissions representatives at four colleges either misidentified or failed to identify their colleges' accrediting organizations. While all the for-profit colleges we visited were accredited according to information available from Education, federal regulations state that institutions may not provide students with false, erroneous, or misleading statements concerning the particular type, specific source, or the nature and extent of its accreditation. Examples include:

- A representative at a college in Florida owned by a publicly traded company told an undercover applicant that the college was accredited by the same organization that accredits Harvard and the University of Florida when in fact it was not. The representative told the undercover applicant: "It's the top accrediting agency—Harvard, University of Florida—they all use that accrediting agency….All schools are the same; you never read the papers from the schools."

- A representative of a small beauty college in Washington, D.C. told an undercover applicant that the college was accredited by "an agency affiliated with the government," but did not specifically name the accrediting body. Federal and state government agencies do not accredit educational institutions.

- A representative of a college in California owned by a private corporation told an undercover applicant that this college was the only one to receive its accrediting organization's "School of Excellence" award. The accrediting organization's Web site listed 35 colleges as having received that award.

### Graduation Rate, Employment and Expected Salaries

Representatives from 13 colleges gave our applicants deceptive or otherwise questionable information about graduation rates, guaranteed applicants jobs upon graduation, or exaggerated likely earnings. Federal statutes and regulations require that colleges disclose the graduation rate to applicants upon request, although this requirement can be satisfied by posting the information on their Web site. Thirteen colleges did not

provide applicants with accurate or complete information about graduation rates. Of these thirteen, four provided graduation rate information in some form on their Web site, although it required a considerable amount of searching to locate the information. Nine schools did not provide graduation rates either during our in person visit or on their Web sites. For example, when asked for the graduation rate, a representative at a college in Arizona owned by a publicly traded company said that last year 90 students graduated, but did not disclose the actual graduation rate. When our undercover applicant asked about graduation rates at a college in Pennsylvania owned by a publicly traded company, he was told that if all work was completed, then the applicant should successfully complete the program—again the representative failed to disclose the college's graduation rate when asked. However, because graduation rate information was available at both these colleges' Web sites, the colleges were in compliance with Education regulations.

In addition, according to federal regulations, a college may not misrepresent the employability of its graduates, including the college's ability to secure its graduates employment. However, representatives at two colleges told our undercover applicants that they were guaranteed or virtually guaranteed employment upon completion of the program. At five colleges, our undercover applicants were given potentially deceptive information about prospective salaries. Examples of deceptive or otherwise questionable information told to our undercover applicants included:

- A college owned by a publicly traded company told our applicant that, after completing an associate's degree in criminal justice, he could try to go work for the Federal Bureau of Investigation or the Central Intelligence Agency. While other careers within those agencies may be possible, positions as a FBI Special Agent or CIA Clandestine Officer, require a bachelor's degree at a minimum.

- A small beauty college told our applicant that barbers can earn $150,000 to $250,000 a year. While this may be true in exceptional circumstances, the Bureau of Labor Statistics (BLS) reports that 90 percent of barbers make less than $43,000 a year.

- A college owned by a publicly traded company told our applicant that instead of obtaining a criminal justice associate's degree, she should consider a medical assisting certificate and that after only 9 months of college, she could earn up to $68,000 a year. A salary this high would be

extremely unusual; 90 percent of all people working in this field make less than $40,000 a year, according to the BLS.

## Program Duration and Cost

Representatives from nine colleges gave our undercover applicants deceptive or otherwise questionable information about the duration or cost of their colleges' programs. According to federal regulations, a college may not substantially misrepresent the total cost of an academic program. Representatives at these colleges used two different methods to calculate program duration and cost of attendance. Colleges described the duration of the program as if students would attend classes for 12 months per year, but reported the annual cost of attendance for only 9 months of classes per year. This disguises the program's total cost. Examples include:

• A representative at one college said it would take 3.5–4 years to obtain a bachelor's degree by taking classes year round, but quoted the applicant an annual cost for attending classes for 9 months of the year. She did not explain that attending classes for only 9 months out of the year would require an additional year to complete the program. If the applicant did complete the degree in 4 years, the annual cost would be higher than quoted to reflect the extra class time required per year.

• At another college, the representative quoted our undercover applicant an annual cost of around $12,000 per year and said it would take 2 years to graduate without breaks, but when asked about the total cost, the representative told our undercover applicant it would cost $30,000 to complete the program—equivalent to more than two and a half years of the previously quoted amount. If the undercover applicant had not inquired about the total cost of the program, she would have been led to believe that the total cost to obtain the associate's degree would have been $24,000.

## Financial Aid

Eleven colleges denied undercover applicants access to their financial aid eligibility or provided questionable financial advice. According to federal statutes and regulations, colleges must make information on financial assistance programs available to all current and prospective students.

• Six colleges in four states told our undercover applicants that they could not speak with financial aid representatives or find out what grants and loans they were eligible to receive until they completed the college's enrollment forms agreeing to become a student and paid a small application fee to enroll.

- A representative at one college in Florida owned by a publicly traded company advised our undercover applicant not to concern himself with loan repayment because his future salary—he was assured—would be sufficient to repay loans.

- A representative at one college in Florida owned by a private company told our undercover applicant that student loans were not like car loans because "no one will come after you if you don't pay." In reality, students who cannot pay their loans face fees, may damage their credit, have difficulty taking out future loans, and in most cases, bankruptcy law prohibits a student borrower from discharging a student loan.

- A representative at a college owned by a publicly traded corporation told our undercover applicant that she could take out the maximum amount of federal loans, even if she did not need all the money. She told the applicant she could put the extra money in a high-interest savings account. While subsidized loans do not accrue interest while a student is in college, unsubsidized loans do accrue interest. The representative did not disclose this distinction to the applicant when explaining that she could put the money in a savings account.

**Other Sales and Marketing Tactics**

Six colleges engaged in other questionable sales and marketing tactics such as employing hard-sell sales and marketing techniques and requiring enrolled students to pay monthly installments to the college during their education.

- At one Florida college owned by a publicly traded company, a representative told our undercover applicant she needed to answer 18 questions correctly on a 50 question test to be accepted to the college. The test proctor sat with her in the room and coached her during the test.

- At two other colleges, our undercover applicants were allowed 20 minutes to complete a 12-minute test or took the test twice to get a higher score.

- At the same Florida college, multiple representatives used high pressure marketing techniques, becoming argumentative, and scolding our undercover applicants for refusing to enroll before speaking with financial aid.

- A representative at this Florida college encouraged our undercover applicant to sign an enrollment agreement while assuring her that the contract was not legally binding.

- A representative at another college in Florida owned by a publicly traded company said that he personally had taken out over $85,000 in loans to pay for his degree, but he told our undercover applicant that he probably would not pay it back because he had a "tomorrow's never promised" philosophy.

- Three colleges required undercover applicants to make $20–$150 monthly payments once enrolled, despite the fact that students are typically not required to repay loans until after the student finishes or drops out of the program. These colleges gave different reasons for why students were required to make these payments and were sometimes unclear exactly what these payments were for. At one college, the applicant would have been eligible for enough grants and loans to cover the annual cost of tuition, but was told that she needed to make progress payments toward the cost of the degree separate from the money she would receive from loans and grants. A representative from this college told the undercover applicant that the federal government's "90/10 Rule" required the applicant to make these payments. However, the "90/10 Rule" does not place any requirements on students, only on the college.

- At two colleges, our undercover applicants were told that if they recruited other students, they could earn rewards, such as an MP3 player or a gift card to a local store.[10]

## Accurate and Helpful Information Provided

In some instances our undercover applicants were provided accurate or helpful information by campus admissions and financial aid representatives. In line with federal regulations, undercover applicants at several colleges were provided accurate information about the transferability of credits to other postsecondary institutions, for example:

[10]Depending on the value of the gift, such a transaction may be allowed under current law. Federal statute requires that a college's program participation agreement with Education include a provision that the college will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities. However, Education's regulations have identified 12 types of payment and compensation plans that do not violate this statutory prohibition, referred to as "safe harbors". Under one of these exceptions, schools are allowed to provide "token gifts" valued under $100 to a student provided the gift is not in the form of money and no more than one gift is provided annually to an individual. However, on June 18, 2010 the Department of Education issued a notice of proposed rulemaking that would, among other things, eliminate these 12 safe harbors and restore the full prohibition.

- A representative at a college owned by a publicly traded company in Pennsylvania told our applicant that with regard to the transfer of credits, "different schools treat it differently; you have to roll the dice and hope it transfers."

- A representative at a privately owned for-profit college in Washington, D.C. told our undercover applicant that the transfer of credits depends on the college the applicant wanted to transfer to.

Some financial aid counselors cautioned undercover applicants not to take out more loans than necessary or provided accurate information about what the applicant was required to report on his FAFSA, for example:

- One financial aid counselor at a privately owned college in Washington D.C. told an applicant that because the money had to be paid back, the applicant should be cautious about taking out more debt than necessary.

- A financial aid counselor at a college in Arizona owned by a publicly traded company had the undercover applicant call the FAFSA help line to have him ask whether he was required to report his $250,000 inheritance. When the FAFSA help line representative told the undercover applicant that it had to be reported, the college financial aid representative did not encourage the applicant not to report the money.

In addition, some admissions or career placement staff gave undercover applicants reasonable information about prospective salaries and potential for employment, for example:

- Several undercover applicants were provided salary information obtained from the BLS or were encouraged to research salaries in their prospective fields using the BLS Web site.

- A career services representative at a privately owned for-profit college in Pennsylvania told an applicant that as an entry level graphic designer, he could expect to earn $10–$15 per hour. According to the BLS only 25 percent of graphic designers earn less than $15 per hour in Pennsylvania.

## Web Site Inquiries Result in Hundreds of Calls

Some Web sites that claim to match students with colleges are in reality lead generators used by many for-profit colleges to market to prospective students. Though such Web sites may be useful for students searching for schools in some cases, our undercover tests involving four fictitious

prospective students led to a flood of calls—about five a day. Four of our prospective students filled out forms on two Web sites, which ask questions about students' interests, match them to for-profit colleges with relevant programs, and provide the students' information to the appropriate college or the college's outsourced calling center for follow-up about enrollment. Two fictitious prospective students expressed interest in a culinary arts certificate, one on Web site A and one on Web site B. Two other prospective students expressed interest in a bachelor's in business administration degree, one on each Web site.

Within minutes of filling out forms, three prospective students received numerous phone calls from colleges. One fictitious prospective student received a phone call about enrollment within 5 minutes of registering and another 5 phone calls within the hour. Another prospective student received 2 phone calls separated only by seconds within the first 5 minutes of registering and another 3 phone calls within the hour. Within a month of using the Web sites, one student interested in business management received 182 phone calls and another student also interested in business management received 179 phone calls. The two students interested in culinary arts programs received fewer calls—one student received only a handful, while the other received 72. In total, the four students received 436 phone calls in the first 30 days after using the Web sites. Of these, only six calls—all from the same college—came from a public college.[11] The table below provides information about the calls these students received within the first 30 days of registering at the Web site.

---

[11]Of the 436 calls, not all resulted in a voice message in which a representative identified the school he or she was calling from. For those callers who did not leave a message, GAO attempted to trace the destination of the caller. In some cases GAO was not able to identify who placed the call to the student.

**Table 2: Telephone Calls Received as a Result of Web site Inquiries**

| Student | Student's Location | Web Site Student Used | Degree | Number of Calls Received Within 24 Hours of Registering | Most Calls Received in One Day[a] | Total Number of Calls Received in a Month |
|---|---|---|---|---|---|---|
| 1 | GA | A | Business Administration | 21 | 19 | 179 |
| 2 | CA | B | Business Administration | 24 | 18 | 182 |
| 3 | MD | A | Culinary Arts | 5 | 8 | 72 |
| 4 | NV | B | Culinary Arts | 2 | 1 | 3 |

Source: GAO

[a]This number is based on the number of calls received within the first month of registering but does not include the first 24 hours.

## Tuition at For-Profit Colleges Is Sometimes Higher Than Tuition at Nearby Public and Private Nonprofit Colleges

During the course of our undercover applications, some college representatives told our applicants that their programs were a good value. For example, a representative of a privately owned for-profit college in California told our undercover applicant that the $14,495 cost of tuition for a computer-aided drafting certificate was "really low." A representative at a for-profit college in Florida owned by a publicly traded company told our undercover applicant that the cost of their associate's degree in criminal justice was definitely "worth the investment". However, based on information we obtained from for-profit colleges we tested, and public and private nonprofit colleges in the same geographic region, we found that most certificate or associate's degree programs at the for-profit colleges we tested cost more than similar degrees at public or private nonprofit colleges. We found that bachelor's degrees obtained at the for-profit colleges we tested frequently cost more than similar degrees at public colleges in the area; however, bachelor's degrees obtained at private nonprofit colleges nearby are often more expensive than at the for-profit colleges.

We compared the cost of tuition at the 15 for-profit colleges we visited, with public and private non-profit colleges located in the same geographic area as the for-profit college. We found that tuition in 14 out of 15 cases, regardless of degree, was more expensive at the for-profit college than at the closest public colleges. For 6 of the 15 for-profit colleges tested, we could not find a private nonprofit college located within 250 miles that offered a similar degree. For 1 of the 15, representatives from the private nonprofit college were unwilling to disclose their tuition rates when we inquired. At eight of the private nonprofit colleges for which we were able to obtain tuition information on a comparable degree, four of the for-profit colleges were more expensive than the private nonprofit college. In the

other four cases, the private nonprofit college was more expensive than the for-profit college.

We found that tuition for certificates at for-profit colleges were often significantly more expensive than at a nearby public college. For example, our undercover applicant would have paid $13,945 for a certificate in computer aided drafting program—a certification for a 7-month program obtained by those interested in computer-aided drafting, architecture, and engineering—at the for-profit college we visited. To obtain a certificate in computed-aided drafting at a nearby public college would have cost a student $520. However, for two of the five colleges we visited with certificate programs, we could not locate a private nonprofit college within a 250 mile radius and another one of them would not disclose its tuition rate to us. We were able to determine that in Illinois, a student would spend $11,995 on a medical assisting certificate at a for-profit college, $9,307 on the same certificate at the closest private nonprofit college, and $3,990 at the closest public college. We were also able to determine that in Pennsylvania, a student would spend $21,250 on a certificate in Web page design at a for-profit college, $4,750 on the same certificate at the closest private nonprofit college, and $2,037 at the closest public college.

We also found that for the five associate's degrees we were interested in, tuition at a for-profit college was significantly more than tuition at the closest public college. On average, for the five colleges we visited, it cost between 6 and 13 times more to attend the for-profit college to obtain an associate's degree than a public college. For example, in Texas, our undercover applicant was interested in an associate's degree in respiratory therapy which would have cost $38,995 in tuition at the for-profit college and $2,952 at the closest public college. For three of the associate's degrees we were interested in, there was not a private nonprofit college located within 250 miles of the for-profit we visited. We found that in Florida the associate's degree in Criminal Justice that would have cost a student $4,448 at a public college, would have cost the student $26,936 at a for-profit college or $27,600 at a private nonprofit college—roughly the same amount. In Texas, the associate's degree in Business Administration would have cost a student $2,870 at a public college, $32,665 at the for-profit college we visited, and $28,830 at the closest private nonprofit college.

We found that with respect to the bachelor's degrees we were interested in, four out of five times, the degree was more expensive to obtain at the for-profit college than the public college. For example in Washington, D.C.,

the bachelor's degree in Management Information Systems would have cost $53,400 at the for-profit college, and $51,544 at the closest public college. The same bachelor's degree would have cost $144,720 at the closest private nonprofit college. For one bachelor's degree, there was no private nonprofit college offering the degree within a 250 mile radius. Three of the four private nonprofit colleges were more expensive than their for-profit counterparts.

**Table 3: Program Total Tuition Rates**

| Degree | Location | For-Profit College Tuition | Public College Tuition | Private Nonprofit College Tuition |
|---|---|---|---|---|
| Certificate – Computer-aided drafting | CA | $13,945 | $520 | College would not disclose |
| Certificate – Massage Therapy | CA | $14,487 | $520 | No college within 250 miles |
| Certificate – Cosmetology | DC | $11,500 | $9,375 | No college within 250 miles |
| Certificate – Medical Assistant | IL | $11,995 | $3,990 | $9,307 |
| Certificate – Web Page Design | PA | $21,250 | $2,037 | $4,750 |
| Associate's – Paralegal | AZ | $30,048 | $4,544 | No college within 250 miles |
| Associate's – Radiation Therapy | FL | $38,690 | $5,621 | No college within 250 miles |
| Associate's – Criminal Justice | FL | $26,936 | $4,448 | $27,600 |
| Associate's – Business Administration | TX | $32,665 | $2,870 | $28,830 |
| Associate's – Respiratory Therapist | TX | $38,995 | $2,952 | No college within 250 miles |
| Bachelor's – Management Information Systems | DC | $53,400 | $51,544 | $144,720 |
| Bachelor's – Elementary Education | AZ | $46,200 | $31,176 | $28,160 |
| Bachelor's – Psychology | IL | $61,200 | $36,536 | $66,960 |
| Bachelor's – Business Administration | PA | $49,200 | $49,292 | $124,696 |
| Bachelor's – Construction Management | TX | $65,338 | $25,288 | No college within 250 miles |

Source: Information obtained from for-profit colleges admissions employees and nonprofit college web sites or employees.

Note: These costs do not include books or supplies, unless the college gave the undercover applicant a flat rate to attend the for-profit college, which was inclusive of books, in which case we were not able to separate the cost of books and supplies.

Mr. Chairman, this concludes my statement. I would be pleased to answer any questions that you or other members of the committee may have at this time.

# Contacts and Acknowledgments

For additional information about this testimony, please contact Gregory D. Kutz at (202) 512-6722 or kutzg@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this statement.

# Appendix I: Detailed Results of Undercover Tests

The following table provides details on each of the 15 for-profit colleges visited by undercover applicants. We visited each school twice, posing once as an applicant who was eligible to receive both grants and loans (Scenario 1), and once as an applicant with a salary and savings that would qualify the undercover applicant only for unsubsidized loans (Scenario 2).

| College information and degree sought | Students receiving Pell Grants[a] | Students receiving federal loans[a] | Graduation rate[a] | Encouragement of fraud, and engagement in deceptive, or otherwise questionable behavior |
|---|---|---|---|---|
| 1<br><br>AZ - 4-year, owned by publicly traded company<br><br>Bachelor's – Education | 27% | 39% | 15% | Scenario 1<br><br>• Admissions representative compares the college to the University of Arizona and Arizona State University.<br><br>• Admissions representative did not disclose the graduation rate after being directly asked. He provided information on how many students graduated. This information was available on the college's Web site; however, it required significant effort to find the college's graduation rate, and the college did not provide separate graduation rates for its multiple campuses nationwide.<br><br>• Admissions representative says that he does not know the job placement rate because a lot of students moved out of the area.<br><br>• Admissions representative encourages undercover applicant to continue on with a master's degree after finishing with the bachelor's. He stated that some countries pay teachers more than they do doctors and lawyers.<br><br>Scenario 2<br><br>• Admissions representative said the bachelor's degree would take a maximum of 4 years to complete, but she provided a 1-year cost estimate equal to 1/5 of the required credit hours.<br><br>• According to the admissions representative the undercover applicant was qualified for $9,500 in student loans, and the representative indicated that the applicant could take out the full amount even though the applicant indicated that he had $250,000 in savings.<br><br>• Admissions representative told the undercover applicant that the graduation rate is 20 percent. Education reports that it is 15 percent. |

| College information and degree sought | Students receiving Pell Grants[a] | Students receiving federal loans[a] | Graduation rate[a] | Encouragement of fraud, and engagement in deceptive, or otherwise questionable behavior |
|---|---|---|---|---|
| 2<br><br>AZ - 4-year, owned by publicly traded company<br><br>Associate's Degree – Paralegal | 57% | 83% | Not reported | Scenario 2<br><br>• Upon request by applicant, the financial aid representative estimated federal aid eligibility without the undercover applicant's reported $250,000 in savings to see if applicant qualified for more financial aid. The representative informed the applicant he was ineligible for any grants.<br><br>• Admissions representative misrepresented the length of the program by telling the undercover applicant that the 96 credit hour program would take 2 years to complete. However, she only provided the applicant a first year cost estimate for 36 credit hours. At this rate it would take more than 2.5 years to complete. |
| 3<br><br>CA – less than 2-year, privately owned<br><br>Certificate – Computer Aided Drafting | 94% | 96% | 84% | Scenario 1<br><br>• College representative told the undercover applicant that if she failed to pass the college's required assessment test, she can continue to take different tests until she passes.<br><br>• The college representative did not tell the graduation rate when asked directly. The representative replied, "I think, pretty much, if you try and show up and, you know, you do the work, you're going to graduate. You're going to pass guaranteed." The college's Web site also did not provide the graduation rate.<br><br>• Undercover applicant was required to take a 12-minute admittance test but was given over 20 minutes because the test proctor was not monitoring the student.<br><br>Scenario 2<br><br>• Undercover applicant was encouraged by a financial aid representative to change the FAFSA to falsely increase the number of dependents in the household in order to qualify for a Pell Grant.<br><br>• The financial aid representative was aware of the undercover applicant's inheritance and, addressing the applicant's expressed interest in loans, confirmed that he could take out the maximum in student loans.<br><br>• The career representative told the undercover applicant that getting a job is a "piece of cake" and then told the applicant that she has graduates making $120,000 - $130,000 a year. This is likely the exception; according to the BLS 90 percent of architectural and civil drafters make less than $70,000 per year. She also stated that in the current economic environment, the applicant could expect a job with a likely starting salary of $13-$14 per hour or $15 if the applicant was lucky. |

| College information and degree sought | Students receiving Pell Grants[a] | Students receiving federal loans[a] | Graduation rate[a] | Encouragement of fraud, and engagement in deceptive, or otherwise questionable behavior |
|---|---|---|---|---|
| 4<br><br>CA - 2-year, owned by publicly traded company<br><br>Certificate – Massage Therapy | 73% | 83% | 66% | Scenario 1<br>• The financial aid representative would not discuss the undercover applicant's eligibility for grants and loans and required the applicant to return on another day.<br>Scenario 2<br>• While one school representative indicated to the undercover applicant that he could earn up to $30 an hour as a massage therapist, another representative told the applicant that the school's massage instructors and directors can earn $150-$200 an hour. While this may be possible, according to the BLS, 90 percent of all massage therapists in California make less than $34 per hour. |
| 5<br><br>DC - 4-year, privately owned<br><br>Bachelor's Degree – Business Information Systems | 34% | 66% | 71% | Scenario 1<br>• Admissions representative explains to the undercover applicant that although community college might be a less expensive place to get a degree, community colleges make students spend money on classes that they do not need for their career. However, this school also requires students to take at least 36 credit hours of non-business general education courses.<br>• Admissions representative did not disclose the graduation rate after being directly asked. He told the undercover applicant that it is a "good" graduation rate. The college's Web site also did not provide the graduation rate.<br>• Admissions representative encouraged the undercover applicant to enroll by asking her to envision graduation day. He stated, "Let me ask you this, if you could walk across the stage in a black cap and gown. And walk with the rest of the graduating class and take a degree from the president's hand, how would that make you feel?"<br>Scenario 2<br>• Admissions representative said the bachelor's degree would take 3.5 to 4 years to complete. He gave the applicant the cost per 12 hour semester, the amount per credit, the total number of credits required for graduation, and the number of credits for the first year. When asked if the figure he gave multiplied by four would be the cost of the program, the representative said yes, although the actual tuition would have amounted to some $12,000 more.<br>• Admissions representative required the undercover applicant to apply to the college before he could talk to someone in financial aid.<br>• Admissions representative told the undercover applicant that almost all of the graduates get jobs.<br>• Flyer provided to undercover applicant stated that the average income for business management professionals in 2004 was $77,000-$118,000. When asked more directly about likely starting salaries, the admissions representative said that it was between $40,000 and $50,000. |

| College information and degree sought | Students receiving Pell Grants[a] | Students receiving federal loans[a] | Graduation rate[a] | Encouragement of fraud, and engagement in deceptive, or otherwise questionable behavior |
|---|---|---|---|---|
| 6<br><br>DC – less than 2-year, Privately owned<br><br>Certificate – Cosmetology, Barber | 74% | 74% | Not reported | Scenario 1<br>• Admissions representative told the undercover applicant that the college was accredited by "an agency affiliated with the government," but did not specifically name the accrediting body.<br>• Admissions representative suggested to the undercover applicant that all graduates get jobs. Specifically he told the applicant that if he had not found a job by the time he graduated from the school, the owner of the school would personally find the applicant a job himself.<br>Scenario 2<br>• Admissions representative told our undercover applicant that barbers can earn $150,000 to $250,000 a year, though that would be extremely unusual. The BLS reports that 90 percent of barbers make less than $43,000 a year. In Washington, D.C., 90 percent of barbers make less than $17,000 per year. He said, "The money you can make, the potential is astronomical." |

| College information and degree sought | Students receiving Pell Grants[a] | Students receiving federal loans[a] | Graduation rate[a] | Encouragement of fraud, and engagement in deceptive, or otherwise questionable behavior |
|---|---|---|---|---|
| 7<br><br>FL - 2-year, privately owned<br><br>Associate's Degree – Radiologic Therapy | 86% | 92% | 78% | **Scenario 1**<br>• When asked by the undercover applicant for the graduation rate for two programs, the admissions representative did not answer directly. For example the representative stated that "I've seen it's an 80 to 90% graduation rate" for one of the programs but said for that information "I would have to talk to career services." She also said 16 or 17 students graduated from one of the programs, but couldn't say how many students had started the program. The college's Web site also did not provide the graduation rate.<br>• Admissions representative told our prospective undercover applicant that student loans were not like car loans because student loans could be deferred in cases of economic hardship, saying "It's not like a car note where if you don't pay they're going to come after you. If you're in hardship and you're unable to find a job, you can defer it." The representative did not explain the circumstances under which students might qualify for deferment. Borrowers who do not qualify for deferment or forbearance and who cannot pay their loans face fees, may damage their credit or have difficulty taking out future loans. Moreover, in most cases, bankruptcy law prohibits a student borrower from discharging a student loan.<br><br>**Scenario 2**<br>• Admissions representative suggested to the undercover applicant that he not report $250,000 in savings reported on the FAFSA. The representative told the applicant to come back once the fraudulent financial information changes had been processed.<br>• This change would not have made the undercover applicant eligible for grants because his income would have been too high, but it would have made him eligible for loans subsidized by the government. |

| College information and degree sought | Students receiving Pell Grants[a] | Students receiving federal loans[a] | Graduation rate[e] | Encouragement of fraud, and engagement in deceptive, or otherwise questionable behavior |
|---|---|---|---|---|
| 8<br><br>FL - 2-year, owned by publicly traded company<br><br>Associate's Degree – Criminal Justice | Not Reported | Not Reported | Not Reported | Scenario 1<br>• Admissions representative falsely stated that the college was accredited by the same agency that accredits Harvard and the University of Florida.<br>• A test proctor sat in the test taking room with the undercover applicant and coached her during the test.<br>• The undercover applicant was not allowed to speak to a financial aid representative until she enrolled in the college.<br>• Applicant had to sign agreement saying she would pay $50 per month toward her education while enrolled in college.<br>• On paying back loans, the representative said, "You gotta look at it…I owe $85,000 to the University of Florida. Will I pay it back? Probably not…I look at life as tomorrow's never promised….Education is an investment, you're going to get paid back ten-fold, no matter what."<br>• Admissions representative suggested undercover applicant switch from criminal justice to the medical assistant certificate, where she could make up to $68,000 per year. While this may be possible, BLS reports 90% of medical assistants make less than $40,000 per year.<br><br>Scenario 2<br>• When the applicant asked about financial aid, the 2 representatives would not answer but debated with him about his commitment level for the next 30 minutes.<br>• The representative said that student loans would absolutely cover all costs in this 2-year program. The representative did not specify that federal student loans by themselves would not cover the entire cost of the program. While there are private loan programs available, they are normally based on an applicant passing a credit check, and typically carry higher interest rates than federal student loans.<br>• The representative said paying back loans should not be a concern because once he had his new job, repayment would not be an issue.<br>• The representatives used hard-sell marketing techniques; they became argumentative, called applicant afraid, and scolded applicant for not wanting to take out loans. |

| College information and degree sought | Students receiving Pell Grants[a] | Students receiving federal loans[a] | Graduation rate[a] | Encouragement of fraud, and engagement in deceptive, or otherwise questionable behavior |
|---|---|---|---|---|
| 9<br><br>IL - 2-year, privately owned<br><br>Certificate – Medical Assistant | 83% | 80% | 70% | **Scenario 2**<br>• Admissions representative initially provided misleading information to the undercover applicant about the transferability of the credit. First she told the applicant that the credits will transfer. Later, she correctly told the applicant that it depends on the college and what classes have been taken. |
| 10<br><br>IL - 4-year, owned by publicly traded company<br><br>Bachelor's Degree - Psychology | Not reported | Not reported | Not reported | **Scenario 1**<br>• Admissions representative said the bachelor's degree would take 3.5-4 years to complete, but only provided an annual cost estimate for 1/5 of the program.<br>**Scenario 2**<br>• Admissions representative did not provide the graduation rate when directly asked. Instead she indicated that not everyone graduates. |
| 11<br><br>PA - 4-year, owned by publicly traded company<br><br>Bachelor's Degree – Business Administration | 47% | 58% | 9% | **Scenario 1**<br>• Admissions representative told the undercover applicant that she could take out the maximum amount of federal loans, even if she did not need all the money. She told the applicant she could put the extra money in a high-interest savings account. While subsidized loans do not accrue interest while a student is in college, unsubsidized loans do accrue interest. The representative did not disclose this distinction to the applicant when explaining that she could put the money in a savings account.<br>**Scenario 2**<br>• Admissions representative told the undercover applicant that the college is regionally accredited but does not state the name of the accrediting agency. The college's Web site did provide specific information about the college's accreditation, however.<br>• Admissions representative said financial aid may be able to use what they call "professional judgment" to determine that the undercover applicant does not need to report over $250,000 in savings on the FAFSA.<br>• Admissions representative did not disclose the graduation rate after being directly asked. He instead explained that all students that do the work graduate. This information was available on the college's Web site; however, it required significant effort to find the college's graduation rate, and the college did not provide separate graduation rates for its multiple campuses nationwide. |

| College information and degree sought | Students receiving Pell Grants[a] | Students receiving federal loans[a] | Graduation rate[a] | Encouragement of fraud, and engagement in deceptive, or otherwise questionable behavior |
|---|---|---|---|---|
| 12<br><br>PA – less than 2-year, privately owned<br><br>Certificate – Web Page Design | 52% | 69% | 56% | **Scenario 1**<br>• Admissions representative told the undercover applicant that she has never seen a student decline to attend after speaking with financial aid. The admissions representative would not allow the applicant to speak with financial aid until she enroll in the college.<br>• If the undercover applicant was able to get a friend to enroll in the college she could get an MP3 player and a rolling backpack. As noted in the testimony, although this is not illegal, it is a marketing tactic.<br>**Scenario 2**<br>• Financial aid representative told the undercover applicant that he should have answered "zero" when asked about money he had in savings—the applicant had reported a $250,000 inheritance.<br>• The financial aid representative told the undercover applicant that she would change his FAFSA form by reducing the reported assets to zero. She later confirmed by e-mail and voicemail that she had made the change.<br>• This change would not have made the undercover applicant eligible for grants, but it would have made him eligible for loans subsidized by the government. |
| 13<br><br>TX - 4-year, privately owned<br><br>Bachelor's Degree – Construction Management; Visual Communications | 81% | 99% | 54% | **Scenario 1**<br>• Admissions representative said the program would cost between $50,000 and $75,000 instead of providing a specific number. It was not until the admissions representative later brought the student to financial aid that specific costs of attendance were provided.<br>**Scenario 2**<br>• Admissions representative did not disclose the graduation rate after being directly asked. The college's Web site also did not provide the graduation rate.<br>• Admissions representative encouraged undercover applicant to change the FAFSA to falsely add dependents in order to qualify for grants.<br>• This undercover applicant indicated to the financial aid representative that he had $250,000 in the bank, and was therefore capable of paying the program's $68,000 cost. The fraud would have made the applicant eligible for $2,000 in grants per year. |

| College information and degree sought | Students receiving Pell Grants[a] | Students receiving federal loans[a] | Graduation rate[a] | Encouragement of fraud, and engagement in deceptive, or otherwise questionable behavior |
|---|---|---|---|---|
| 14<br><br>TX - 2-year, owned by publicly traded company<br><br>Associate's Degree – Business Administration | 89% | 92% | 34% | Scenario 1<br>• Admissions representative said the program takes 18 to 24 months to complete, but provided a cost estimate that suggests the program takes more than 2.5 years to complete.<br>• The college's Web site did not provide the graduation rate.<br>Scenario 2<br>• Undercover applicant would be required to make a monthly payment to the college towards student loans while enrolled.<br>• Admissions representative guaranteed the undercover applicant that getting a degree would increase his salary. |
| 15<br><br>TX - 2-year, privately owned<br><br>Associate's Degree – Respiratory Therapy | 100% | 100% | 70% | Scenario 1<br>• The undercover applicant was not allowed to speak to a financial aid representative until he enrolled in the college.<br>Scenario 2<br>• Admissions representative misrepresented the length of time it would take to complete the degree. He said the degree would take 2 years to complete but provided a cost worksheet that spanned 3 years.<br>• The undercover applicant was told he was not allowed to speak to a financial aid representative until he enrolled in the college. After refusing to sign an enrollment agreement the applicant was allowed to speak to someone in financial aid.<br>• Admissions representative told undercover applicant that monthly loan repayment would be lower than it actually would. |

Source: GAO undercover visits and Department of Education.

[a]This information was obtained from the Department of Education National Center for Education Statistics.

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

| GAO's Mission | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| Obtaining Copies of GAO Reports and Testimony | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday afternoon, GAO posts on its Web site newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to www.gao.gov and select "E-mail Updates." |
| Order by Phone | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's Web site, http://www.gao.gov/ordering.htm.

Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537.

Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| To Report Fraud, Waste, and Abuse in Federal Programs | Contact:

Web site: www.gao.gov/fraudnet/fraudnet.htm
E-mail: fraudnet@gao.gov
Automated answering system: (800) 424-5454 or (202) 512-7470 |
| Congressional Relations | Ralph Dawn, Managing Director, dawnr@gao.gov, (202) 512-4400
U.S. Government Accountability Office, 441 G Street NW, Room 7125
Washington, DC 20548 |
| Public Affairs | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800
U.S. Government Accountability Office, 441 G Street NW, Room 7149
Washington, DC 20548 |

Please Print on Recycled Paper

# EXHIBIT "H"

*The New York Times*



This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers, please click here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now. »

November 9, 2010

# Scrutiny Takes Toll on For-Profit College Company

By TAMAR LEWIN

Stanley H. Kaplan started his tutoring business in the basement of his parents' Brooklyn home in 1938. As standardized tests became a bigger fixture of American education, his company became a national operation, preparing millions of students for the SAT, LSAT, MCATs and other tests.

Kaplan was still a test-prep company when the Washington Post Company bought it in 1984, after Richard D. Simmons, the president, convinced Katharine Graham of its potential for expansion and profits.

Over the last decade, Kaplan has moved aggressively into for-profit higher education, acquiring 75 small colleges and starting the huge online Kaplan University. Now, Kaplan higher education revenues eclipse not only the test-prep operations, but all the rest of the Washington Post Company's operations. And Kaplan's revenue grew 9 percent during the last quarter to $743.3 million — with higher education revenues more than four times greater than those from test-prep — helping its parent company more than triple its profits.

But over the last few months, Kaplan and other for-profit education companies have come under intense scrutiny from Congress, amid growing concerns that the industry leaves too many students mired in debt, and with credentials that provide little help in finding jobs.

Reports of students who leave such schools with heavy debt, only to work in low-paying jobs, have prompted the Department of Education to propose regulations that would cut off federal financing to programs whose graduates have high debt-to-income ratios and low repayment rates.

Though Kaplan is not the largest in the industry, the Post Company chairman, Donald Graham, has emerged as the highest-profile defender of for-profit education.

Together, Kaplan and the Post Company spent $350,000 on lobbying in the third quarter of this year, more than any other higher-education company. And Mr. Graham has gone to Capitol Hill to argue against the regulations in private visits with lawmakers, the first time he has lobbied directly on a federal issue in a dozen years.

His newspaper, too, has editorialized against the regulations. Though it disclosed its conflict of interest, the newspaper said the regulations would limit students' choices. "The aim of the regulations was to punish bad actors, but the effect is to punish institutions that serve poor students," Mr. Graham said in an interview.

He said the regulations' emphasis on debt would make it harder for Kaplan to serve older working students who must take out loans to attend school.

He added that Kaplan could play an important role in meeting President Obama's goal of a better-educated work force. Kaplan Higher Ed, Mr. Graham said, has also broadened the reach of the Post Company — beyond the middle-income students who typically use its test-prep services — to include lower-income students.

"We purchased colleges that served mostly poor students, and we have embraced that role," Mr. Graham said. "For students with risk factors, older working students with children, Kaplan has dramatically better graduation rates than community colleges."

The company has acknowledged, however, that the new rules could hurt Kaplan. According to 2009 data released this summer by the Department of Education, only 28 percent of Kaplan's students were repaying their student loans. That figure is well below the 45 percent threshold that most programs will need to remain fully eligible for the federal aid on which they rely. By comparison, 44 percent of students at the largest for-profit, the University of Phoenix, were repaying their loans.

Kaplan is facing several legal challenges. The Florida attorney general is investigating eight for-profit colleges, including Kaplan, for alleged misrepresentation of financial aid and deceptive practices regarding recruitment, enrollment, accreditation, placement and graduation rates.

Kaplan is also facing several federal whistle-blower lawsuits whose accusations dovetail with the findings of an undercover federal investigation of the for-profit industry this summer, including video of high-pressure recruiting and unrealistic salary promises.

"The claims they make are absurd and simply not reflective of the kind of company that Kaplan is," said Andrew S. Rosen, Kaplan's chairman. "We're confident that when a court rules, we'll have a clear demonstration that this is not who Kaplan is."

**Troubles and Growth**

The growth of the for-profit education sector — which offers more flexible schedules and online classes than community colleges, at far higher tuition — has been nothing short of explosive.

The University of Phoenix has more than 450,000 students, for example, and the Education Management Corporation, DeVry, Corinthian Colleges, the Career Education Corporation and Kaplan enroll more than 100,000 each.

All these schools get most of their revenue from federal student aid. Kaplan Higher Education, for example, gets 91.5 percent of its revenue from the federal government, through Pell grants, Stafford loans, military and veterans benefits and other aid.

On average, for-profit colleges spend about 30 percent of their revenue on advertising and marketing.

Lawmakers and Department of Education officials have become increasingly concerned that too much of the $26.5 billion in federal student aid that went to for-profit colleges last year enriched shareholders and company executives, rather than helping students.

Such schools enroll about 11 percent of the nation's college students, and get a quarter of all federal student aid. But their students account for 43 percent of those defaulting on student loans.

These statistics have prompted inquiries about the schools' business practices. This summer, Senator Tom Harkin's committee, in oversight hearings on the industry, watched undercover videos about high-pressure recruiting tactics that Kaplan and others used to sign up students.

Using hidden cameras, investigators from the Government Accountability Office found deception or fraud at 15 for-profit colleges, including two Kaplan campuses.

The undercover videos showed Kaplan recruiters in Florida and California making false or questionable statements to prospective students — suggesting for example, that massage therapists earn $100 an hour, and that student loans need not be paid back.

Mr. Rosen and Mr. Graham quickly issued a statement calling the video scenes "sickening," suspended registration at the two campuses, began retraining employees and started their own "mystery shopper" program to check on employee practices.

"We've done our best in the aftermath of the Senate hearings and the G.A.O. report to make sure that everyone at Kaplan is working for the benefit of the students," Mr. Graham said.

But the bad publicity, and growing scrutiny, have taken their toll. Since its recent high last spring, Washington Post Company stock has dropped by more than a quarter. Other for-profit education companies, including Corinthian Colleges, in which the Post owns an 8 percent stake, fell even further.

Terry Hartle, senior vice president at the American Council on Education, an umbrella organization for all institutions of higher education, said that most people formerly assumed that Kaplan and other leaders in the field were above reproach.

"The G.A.O. investigation changed that," Mr. Hartle said. "It's a very different world for the for-profit college than it was even six months ago."

Mr. Graham said the two locations included in the G.A.O. investigation were outliers, and not typical of what occurs at other Kaplan locations.

But dozens of current and former Kaplan employees said the videos painted a representative picture.

"They are not outliers; they are in the middle of the field, the middle of the bell curve," said William Wratten, a former Kaplan admissions adviser in Chicago, who resigned after a year and a half because he disagreed with company practices. "Maybe not the exact same activities, but the mind-set was the same: Do whatever it takes to get the sale, to keep your job."

Mr. Wratten and other admissions representatives said they were trained to "emphasize that Kaplan is owned by The Washington Post, one of the best newspapers in the country, and that Warren Buffett, and Bill Gates's wife, Melinda Gates, were on our board of directors."

Kaplan officials said that was never part of their training. In response to a question about this, they said they scanned two million recruiting calls and found "Buffett" or "Gates" in only 85.

Four whistle-blower suits against Kaplan under the federal False Claims Act have been made public in the last few years, all making accusations that the company used deceptive practices in its quest for profits, including enrolling unqualified students and paying recruiters for each student enrolled, a practice forbidden by federal law.

In addition, the suits allege, Kaplan kept students on the books after they dropped out, inflated students' grades and manipulated placement data to continue receiving financial aid.

Three of the suits, from Pittsburgh, Milwaukee and Miami, have been consolidated for trial in Miami. A fourth, from Las Vegas, is pending there.

Kaplan has moved to dismiss all four lawsuits, saying they are the work of disgruntled former employees making false accusations.

No court has yet heard the whistle-blower cases. Although they were filed years ago, the litigation is still in early stages, so Kaplan has not yet had to answer each specific charge.

**Whistle-Blower Suits**

Kaplan, said Mr. Rosen, its chairman, is a model of higher education for the future, helping working adults — especially low-income and minority students — improve their lives.

"Kaplan is engaged in making the world a better place," he said.

But many current and former Kaplan employees and students — including those, like Mr. Wratten, not involved in the lawsuits — said in interviews that they believed the company was

concerned most with getting students' financial aid, and that Kaplan's fast-growing revenues were based on recruiting students whose chances of succeeding were low.

They cite, for example, a training manual used by recruiters in Pittsburgh whose "profile" of Kaplan students listed markers like low self-esteem, reliance on public assistance, being fired, laid off, incarcerated, or physically or mentally abused.

Melissa Mack, a Kaplan spokeswoman, said the manual had not been used since 2006.

Admissions advisers, past and present, say the pressure to recruit students leads to aggressive, and sometimes misleading, sales tactics.

Carlos Urquilla-Diaz, a former Kaplan instructor and administrator who is one of the Miami whistle-blowers, recalled a PowerPoint presentation showing African-American women who were raising two children by themselves as the company's primary target.

Such women, Mr. Urquilla-Diaz said, were considered most likely to drop out before completing the program, leaving Kaplan with the aid money and no need to provide more services.

"The idea was, we'll take anybody, and I mean anybody," he said.

Victoria Gatsiopoulos, a former instructor and director of career services at a Kaplan College in Pittsburgh, said in her complaint that the school made promises to students of "how their lives will magically change" if they attended Kaplan classes.

One prospective student with financial difficulties, the complaint said, was promised in writing that "in five years she would have a job in a hospital, a big house in Florida, enough money to go to Disney World with her family and a new Lexus."

Ms. Gatsiopoulos said Kaplan representatives routinely misled prospective students about the jobs they could get after graduation.

"One of our biggest programs was criminal justice," she said. "Students who were recruited were led to believe that they could get into the C.I.A. or F.B.I. or Border Patrol or crime-scene investigation when they graduated, and earn $40-$50,000. But those jobs all require advanced training."

In reality, Ms. Gatsioopoulos said, graduates would often get the same $8 to $9-an-hour security guard jobs they could have had without Kaplan training.

Ms. Gatsiopoulos's complaint said that Kaplan also manipulated its reported placement rates so that a graduate employed in sales at Wal-Mart, for example, would be reported as working in accounting management, and that a telemarketer was reported as working in "business administration fashion merchandising."

She also charges that Kaplan would raise instructors' grades for students so they remained eligible for federal aid. Former Kaplan instructors not involved in the litigation made similar claims.

"More than once, when I refused to inflate a student's grade, they went ahead and did it on their own," Ms. Gatsiopoulos said.

Kaplan officials said they had seen no evidence of manipulated grades, inflated placement reports or unrealistic job promises. But dozens of former students said they felt misled.

Nine years after graduating from high school, Rebecca Masci, a single mother with four young children to support, enrolled in a surgical-technology program in 2004 at Kaplan/CCI in Broomall, Pa., to improve her job prospects.

She took out student loans, lined up her parents to baby-sit, and for three terms, excelled in her classes in anatomy, physiology and pharmacology. But to complete the fourth term and graduate, students need a placement to give her hands-on experience in an operating room. She did not get one.

"When I signed up, they sounded all positive, about plenty of placements, plenty of jobs," said Ms. Masci, now 32 and with five children. "But after I finished the classes, they told me to go home and wait and they'd call when they found something. I was in limbo for more than a year."

Eventually, she said, she was given one short placement, not enough to graduate. Now she has $14,000 of debt, but no surgical-technology certification.

"I'm further behind than I was before I started," she said.

**The Future**

David Goodstein, who was the school's director of education for nine months in 2006, said Ms. Masci's experience was not uncommon.

Mr. Goodstein, who has filed a federal whistle-blower suit against Kaplan, said that although the school had not had enough placement opportunities for the surgical-technology program since 2002, it kept enrolling new students, taking their federal student aid, leaving them stranded without a placement and then dropping them from the program, which was phased out in 2007.

Mr. Goodstein's lawsuit, filed four years ago, is under seal. But the Post Company's securities filings disclosed an investigation of the program.

In the Las Vegas case, Charles Jajdelski, an admissions adviser at Kaplan's Heritage College, said that while cleaning up after an October 2003, graduation ceremony, he found five boxes of diplomas sitting off to the side.

When he asked colleagues about the boxes, his complaint said, they told him they were for phantom students, kept on the books even though they never attended class. The more questions he asked, Mr. Jajdelski said, the more he was told to drop it.

"When I called Kaplan's Western regional assistant director, he told me he knew all about it, I shouldn't worry about it, and we didn't ever need to have this conversation again," Mr. Jajdelski said. "I called the human resources guy in Atlanta, and he said, 'Charles, we need you to be a team player here.' That knocked my socks off."

Mr. Jajdelski reported the situation to the Education Department hot line in November 2003, his complaint said. He was fired weeks later. Kaplan officials said the company was unaware of Mr. Jajdelski's accusations until his lawsuit was unsealed in 2008.

The broadest complaint against Kaplan is the one from Florida, in which the former dean of paralegal studies, Ben Wilcox, is one of three plaintiffs.

Kaplan officials say there is reason to distrust all three plaintiffs.

Mr. Wilcox is under indictment on charges of hacking into Kaplan's computer system and sending out harassing e-mails.

"They'll tell you all sorts of terrible things about me," Mr. Wilcox said, adding that Kaplan is intent on discrediting him because of his access to incriminating evidence. "But the bottom line is that Kaplan is a cold-hearted scam to make money by taking student loans from the government, and leaving students with debt that they'll never be able to pay off."

The other two plaintiffs, Mr. Urquilla-Diaz and Jude Gillespie, have both brought unsuccessful discrimination complaints against Kaplan.

Mr. Graham and Mr. Rosen emphasize that Kaplan has made important changes, including its new "Kaplan Commitment," which allows students to enroll, risk free, for several weeks — thereby eliminating any incentive to recruit unqualified students.

During that period, either the student, or Kaplan, could decide that the program was not a good fit, and end the enrollment.

"Allowing students four or five weeks of conditional enrollment is quite a bold step," Mr. Graham said. "Plainly, in the short term, it will lead to a shrinkage of enrollment, but we don't know how much."

Copyright 2011 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Contact Us | Back to Top

# EXHIBIT "I"

# At Kaplan University, 'Guerrilla Registration' Leaves Students Deep In Debt



First Posted: 12/22/10 08:35 AM Updated: 12/23/10 09:21 AM

Inspiring
Greedy
Typical
Scary
Outrageous
Amazing
Innovative
Infuriating

**Read More:** College Loans, College Loans And Debt, For Profit Colleges, For-Profit Colleges, For-Profit Universities, Kaplan, Kaplan University, Student Aid, Student Debt, Student Loan, Student Loans, University, University Of Phoenix, Washington Post, Business News



Arlen Castillo had just begun an online associate's degree program at Kaplan University when a family emergency forced a change of plans. Her mother in Florida learned she needed extensive surgery that entailed months of recuperation. Only two weeks into her first term, Castillo promptly withdrew to lend her mother support.

As Castillo recalls, a Kaplan academic advisor told her she could simply fill out a withdrawal form and incur no additional expenses beyond the registration fees she had already paid. But a year and a half later, in 2006, collections agents began hounding her, she says, demanding that she pay some $10,000 in supposedly overdue tuition charges. Despite having attended only two online sessions, Castillo had remained officially enrolled at Kaplan for nearly a year after her withdrawal.

Far from an aberration, Castillo's experience typifies the results of a practice known informally inside Kaplan as "guerrilla registration": academic advisors have long enrolled students in classes they never

take, without their consent and sometimes even after they have sought to withdraw from the university, in order to maximize the company's revenues, according to interviews with former employees.

Managers at Kaplan--the highly profitable educational arm of the Washington Post Co.-- have for years pressured academic advisors to use this method to boost enrollment numbers, the former employees said, offering accounts consistent with dozens of complaints filed by former students with the Florida Attorney General's Office and reviewed by The Huffington Post.

Guerrilla registration has been part of a concerted effort by the university to keep students enrolled as long as possible in order to harvest more of the federal financial aid dollars that make up nearly all of the company's higher education revenues, according to former Kaplan academic advisor Sheldon Cobbler, who described the practice in detail.

Most advisors had access to a company database that allowed them to view students' e-mail correspondence without their knowledge, said Cobbler, who worked at Kaplan's Fort Lauderdale, Fla., corporate office from 2007 through July of this year. The advisors routinely searched through students' e-mails to look up their user names and passwords for Kaplan's enrollment system, and then they used that information to sign in using multiple student identities, enrolling them in classes they never intended to join, he said.

"The company didn't want students to withdraw," Cobbler said. "They wanted them to stay in class by any means."

Kaplan denied claims that it has engaged in so-called guerrilla registration, branding as "false" and a "complete mischaracterization" allegations that it has signed students up for classes without their knowledge.

"No one in this company has ever been asked, advised or permitted to be an impostor in terms of e-mail messages or student accounts," said Kaplan spokesman Mark Harrad. "That's just not acceptable."

Kaplan declined requests for interviews with senior company executives.

Guerrilla registration would appear to constitute criminal fraud, said a senior official with the Department of Education, who spoke on condition he not be identified in response to The Huffington Post's description of the practice. The official--who did not confirm the use of the method, but merely characterized its legality-- said it could also trigger criminal penalties under the Federal False Claims Act, which bars the submission of improper claims for government funds.

Cobbler said he did not himself engage in guerrilla registration, but was well aware of its prevalence at Kaplan through conversations with colleagues and discussions with middle managers who told advisors to continue registering students for classes even after they attempted to withdraw. He said guerrilla enrollment was an unwritten company practice, but Kaplan management tacitly encouraged academic advisors and admissions recruiters to employ it to increase official enrollment numbers. He said students who remained enrolled often did not even notice that they had been covertly registered for additional classes.

Cobbler was fired from the company last July, he said, after raising concerns about recruiting practices and a lack of academic support services for struggling students. He had already been seeking other job options, he added, because he felt uncomfortable working for an institution that valued profit above all else.

Are you a student at a for-profit college or university who has been misled by deceptive recruiting practices or predatory financial aid? Share your story below!
Are You In Debt To A For-Profit College?

Find a picture, click the participate button, add a title and upload your picture

Cobbler's description of Kaplan's internal operations is consistent with those of other former employees, who described the company as a machine aimed at getting students--and their federal loan dollars--in the door, with little regard for their academic progress or career advancement.

"They called us admissions advisors; we were salesmen," said Mark Meverden, a former Kaplan recruiter who worked in South Florida and was fired in 2008 for not meeting recruitment goals. "Graduation was the farthest thing from their minds. They just wanted us to grab that $10-, $15- or $20,000 obligated to Kaplan University."



Kaplan systematically padded the tuition bills of many soon-to-be graduating students, requiring that they pay their balances in full before they could obtain their diplomas and transcripts, said Jermaine Johnson, a former financial aid officer at Kaplan's Fort Lauderdale office.

Johnson, who worked at Kaplan from the spring of 2008 until two weeks ago, when he was laid off, characterized the practice as an accounting gimmick: By billing students directly, he said, Kaplan conveyed the appearance of satisfying federal requirements that at least 10 percent of tuition be paid through sources other than federal financial aid dollars. And that enabled Kaplan to capture up to 90 percent of its tuition payments directly from federal sources such as grants and subsidized student loans.

*READ MORE below:*

"If you tell a first-year student they owe money, they will just pull out of the school and go somewhere else," Johnson said. "But if you're close to graduation, you just want to take care of it and move on."

The Kaplan spokesman questioned the motives of those who have come forward to criticize the company's operations, while asserting that negative accounts reflect the views of "disaffected former employees" and a handful of aggrieved students.

"The experiences of these students is hardly representative of the more than 375,000 students and graduates served by Kaplan Higher Education schools over the past decade," the company declared in a statement.

A GROWING BUSINESS

Kaplan University is part of a thriving industry known as for-profit higher education, which runs the gamut from traditional campus settings offering specialized degree programs to online courses. Scrutiny of the sector has intensified in recent months, as evidence has mounted that many institutions make extravagant promises about the value of their programs while leaving students with enormous debts that many cannot repay given the low-wage jobs they tend to secure after graduation.

Concern about the practices of for-profit colleges has amplified as their enrollments have swelled-- particularly in recent years, as the Great Recession has produced legions of jobless people seeking to gain an edge through higher education, and as the Obama administration has sharply increased the availability of federal student aid.

Over the past decade, enrollment in the for-profit sector has more than tripled, billowing from under 900,000 students in the 1998-99 academic year to more than 2.8 million students in 2008-09, according to a recent report from The Education Trust, a student advocacy group. Over the same period, enrollment at public and non-profit universities and colleges grew by only about one-fifth.

Average annual profits for publicly traded for-profit education companies grew 81 percent between 2005 and 2009, according to reports released this year by the Senate Health, Education, Labor and Pensions Committee, reaching a collective $2.7 billion.

Most of that money has come courtesy of the taxpayer: The for-profit college sector relies almost entirely on federal student aid, with many institutions receiving between 85 and 90 percent of their revenues from aid dollars. Although for-profit colleges comprise only about 10 percent of college students nationwide, the industry takes in nearly a quarter of the money set aside for federal higher education grants and loans.

But while that revenue stream has proven lucrative for the profit-making conglomerates that run the schools, students and taxpayers have seen more questionable benefits.

Over a period of three years from 2006 through 2009, more than 20 percent of students taking out loans from for-profit colleges have gone into default--double the percentage of students who took out loans from public universities, according to data released by the Department of Education this summer.

Students at Kaplan-owned campuses had among the highest three-year student loan default rates of all the publicly traded colleges in the industry: more than 27 percent, according to an analysis of the Education Department data.

Kaplan and other for-profit colleges acknowledge the higher rates of default but maintain they are an outgrowth of a public service they perform in enrolling higher risk students from lower-income backgrounds, students who have traditionally been been overlooked by other institutions.

"Our segment grew up by targeting students that were not served well by traditional colleges, and still aren't served well by traditional colleges," said Harrad, the Kaplan spokesman. "In today's economy, you don't see community colleges expanding. If anything, they're cutting back, and the need for students to avail themselves of higher education is increasing."

For-profit colleges now face the prospect of <u>new rules being crafted by the Department of Education</u> that would restrict their access to federal aid dollars if too many of their students fail to repay their loans or if graduates wind up with greater debts than they can manage given their resulting wages.

The new rules--which the industry vigorously opposes--have been aimed at curbing the sorts of aggressive recruitment and financial aid practices that the former Kaplan employees portrayed as typical inside their institutions. They described a blistering workplace environment in which recruiters, financial aid officers and student academic advisors have together focused on two goals: enrolling as many students as possible and doing everything to ensure those recruits don't leave.

Similar accounts have emerged from other for-profit education conglomerates, including the Apollo Group, which owns the University of Phoenix, and Career Education Corp. But Kaplan stands out as a special case, given its affiliation with *The Washington Post*, one of the most respected names in American journalism and an institution that presents itself as an agent of public good.

FROM WATERGATE TO GUERRILLA REGISTRATION

A decade ago, Kaplan was best known for its standardized test preparation classes, but its higher education division has since grown more than ten-fold. Last year, Kaplan higher education posted revenues of more than $1.5 billion, far eclipsing those of the test preparation division and *The Washington Post* newspaper itself.

In short, a corporation named for a newspaper that gained acclaim by holding the powerful to account now derives its largest slice of profits from an enterprise that some liken to a predatory lending operation.

"They kind of suck you in with front-end misrepresentations, not only about the quality of the program, but what the actual costs are, on the assumption that once they suck you in, extricating yourself will become very difficult," said Barmak Nassirian, a lobbyist and executive director of external relations for the American Association of Collegiate Registrars and Admissions Officers, which represents mostly traditional colleges and universities. "It's a quagmire. One wrong step, and you're in up to your eyeballs."

According to former Kaplan employees, the company's methods in attracting and retaining students often collide with basic ethics. Students who have enrolled in online classes while posted to military bases have been pressured to continue their studies even after being shipped off to active war zones, they said. Academic advisors often urge students to fail classes instead of withdrawing, they added, so they will then have to retake classes, enabling Kaplan to capture additional tuition.

Though the company's training manuals prescribe ethical conduct, the day-to-day realities inside Kaplan present a stark contrast, the former employees said.

"The first thing I picked up on easily was that what we're saying and doing in training isn't really aligned with what was said and done on the floor," said Tom Corbett, a former director of admissions in Kaplan's Phoenix office, who worked at the company from August 2008 through June 2010 until he ultimately decided to leave because of what he termed "observed unethical business practices" and a "numbers-focused" admissions process.

When Castillo set her sights on a business associate's degree at Kaplan in early 2005, she had one thing on her mind: convenience. The online curriculum suited her full-time work schedule, she said, and the financial aid options outlined by her advisor sounded manageable. A combination of federal Stafford loans would fully cover the tuition costs.

But news of her mother's impending surgery upended her plans. Learning of the long recovery time-- at least six months--Castillo knew that caring for her mother would cut into her free time. So she filled out a release form, withdrew from the course, and assumed that was the end of her association with Kaplan.

But in June 2006, she began receiving calls from collection agents representing the Department of Education regarding a $10,549.69 balance for her student loans: more than $7,000 for tuition, $1,400 in interest and $2,000 in collection costs. She protested, and she called the education department in Washington to report that she had withdrawn from Kaplan long before such charges would have been justified.

The response she eventually received was troubling. According to the Department of Education, paperwork filed by Kaplan on her behalf indicated that she had remained enrolled in her online program for nearly a year.

More importantly, records showed she had completed 60 percent of her coursework--a crucial threshold. Once a student reaches the 60 percent mark, the college can keep all of the federal financial aid, leaving the student on the hook for balance. Given that many Kaplan courses run only 10 weeks, that requirement can be met in as little as six weeks.

"They claimed that I attended 60 percent," said Castillo, still incredulous. "What classes did I take? What was my GPA? I wasn't sent anything. If I didn't get the education, where did the money go? That question was never answered."

Castillo's experience typifies those described in complaints filed with the Better Business Bureau, on Internet consumer forums and at the Florida Attorney General's office, which is now investigating Kaplan and other for-profit schools for alleged misrepresentations regarding financial aid and deceptive recruitment practices.

In November, Kaplan instituted a new program offering new students a chance to enroll in courses on an introductory basis lasting up to five weeks, with the right to withdraw without further financial obligation.

Asked whether that program was a response to allegations that Kaplan has gamed the system--keeping students enrolled until the six-week mark to justify keeping their federal financial aid dollars--the company spokesman said it was instead a way to help prospectives make good decisions.

"It is a way that we can assure them, and we can assure ourselves, that we have the right students in the right classes," Harrad said.

EASY IN; NO WAY OUT

Former employees said they confronted sustained pressure from management to keep students enrolled at the university for at least 60 percent of the length of their courses, no easy feat in an atmosphere where most students have traditionally departed after little more than a year, according to a recent Senate report.

Former admissions officers say they labored under an imperative to enroll as many students as possible, regardless of their qualifications or the likelihood they would succeed. Former academic advisors--who were supposed to be helping students make wise choices--say they felt constant pressure to keep students enrolled, regardless of all other considerations.

Incentives have been tied directly to paychecks: Admissions advisors have been subject to monthly enrollment quotas that continue to escalate the longer they work there, the former employees said. Managers track employees' progress on dry-erase boards visible to the entire office. A missed monthly recruiting target can lead to termination, they said.

"That number posted on that board or those boards, in every report, taped to the manager's desk or computer, that gross enrollment was the highest priority," said Corbett, the former director of admissions in Phoenix. "It wasn't the student, it wasn't the degree program selection, it wasn't the ability to benefit or complete or pay or absorb the loan. The gross enrollment number was always the first and foremost."

The methods used to boost those numbers featured a creative set of pitches that often took liberties with the truth, the former employees said.

"It was 'Say anything, do anything,'" Corbett recalled.

According to former employees, admissions recruiters frequently touted Kaplan as a prestigious and credible institution by noting its pedigree: It was owned by *The Washington Post*.

Meverden, the Florida recruiter, usually worked with military recruits--a particularly desirable population for for-profit institutions because their federal aid does not count toward a cap on how much the colleges can collect via federal student aid.

He says he often overheard other recruiters telling prospectives in the military that Kaplan's program had the de facto seal of approval from the Pentagon and was specially designed with their needs in mind, when neither of these claims was true. He says he also overheard colleagues promising military recruits they could enroll without paying anything--the government would pick up the whole tab-- when in fact they would typically be required to pay as much as one-third of their tuition.

"I would tell the students straight," he said. "My phone calls were always listened in on, I always told the truth, and I always got lambasted for it."

Meverden and another former recruiter, Leonard Stillman, say they were fired for not hitting monthly recruitment targets.

"To me it was just impossible to keep up with the ever-increasing enrollment and the pressure every day," Stillman said. "The pressure was torturous."

Stillman said he felt compelled to enroll students who had little chance of succeeding based on their prior academic experience. Either that, or miss his numbers.

"I felt that about 10 percent of the ones I spoke with really could do well," Stillman said. "The other ones, we were dragging them through the door."

In recent months, Kaplan has sought to blunt such criticisms by changing its compensation policies. The company has never evaluated admissions officers purely on the basis of how many students they recruit, claimed the company spokesman, directly contradicting the accounts of former employees. Three months ago, Kaplan stopped considering recruitment numbers at all in its evaluation of admissions staff, Harrad said. Kaplan now measures their performance based on attendance and their skills in discussing the company's course offerings, he added.

Once students were in the door, the pressure to keep them there became intense, said Cobbler, the former academic advisor in Fort Lauderdale. Toward the end of his time at Kaplan, Cobbler said the academic advising office had essentially transformed into a call center, with advisors hounding students up to six times a day if they weren't attending classes.

"Over the last year I felt less and less like an academic advisor and more and more like a bill collector," Cobbler said, complaining that he never had time to actually assist students with their needs. "They were just asking us to basically generate numbers for some report that somebody else was looking at."

When Jennifer Davis tried to take a leave of absence from an online Kaplan course during her first term there in the summer of 2006, she encountered what she portrayed as extraordinary pressure to remain.

She had been pursuing a bachelor's degree in paralegal studies, and was already more than 60 percent of the way through when she learned that her husband-- who had been in the hospital for severe pneumonia and emphysema-- might have to be induced into a coma. Wishing to be by his side, she attempted to arrange the leave.

She understood that she would be on the hook for the cost of the first term, but she wanted to cease any further expenses. But when she called and e-mailed her academic advisor, Dimitra Jackson, requesting a withdrawal or leave of absence, she was swiftly denied. According to an e-mail she received from her advisor, Davis was not entitled to a leave because she had not been enrolled at Kaplan for at least two consecutive years.

Davis' advisor subsequently sent her an e-mail informing her that Kaplan was going ahead and registering her for classes in the next term.

"They wouldn't let me drop out," Davis said. "They pre-registered me for classes that I didn't even know I was taking."

In numerous calls and e-mails sent to Jackson over the following month, Davis attempted to put a halt to her continuing enrollment, but was repeatedly rebuffed.

In one e-mail in October 2006, Davis wrote: "I have left voice messages and have e-mailed you several different times and unfortunately since Kaplan could not grant me my leave of absence you must withdraw me from all classes and return all funds and at least send me a letter via snail mail or email confirming this request."

A week later, Davis received a an e-mail from her advisor stating that she had to discuss the matter on the phone before anything could be resolved.

According to Davis, during a subsequent telephone conversation, Jackson told her that if she simply stopped attending classes, she would be dropped from the enrollment and face no additional charges.

But a year later, Davis received a bill for more than $3,400 in unpaid tuition - more than twice what she actually owed for the classes she took, she says.

Jackson did not return phone calls and e-mails seeking her comment.

The Huffington Post provided Kaplan with the details of Davis' complaint and those of five other students, but the company declined to discuss any of those cases, citing privacy restrictions. In a generic statement, Kaplan placed the blame for student complaints on the students themselves, asserting that they made errors in filling out forms for federal student aid.

"Each had issues related either to their financial aid eligibility or to the documents the government requires," the statement said.

PRE-GRADUATION HOLDUP

As Priscilla Williams neared her graduation date from an online Kaplan course in the spring of 2009, she was under the impression that all her bills were paid, she says. When she first enrolled in the program, a financial aid packet sent by Kaplan assured her that her entire tuition would be covered by two major forms of federal student aid: Pell grants, which need never be repaid, and Stafford loans, which generally carry low rates of interest and are payable after graduation.

But just before her graduation date in April 2009, Williams says Kaplan's accounting department informed her that she owed more than $5,000. That sum was due immediately, and until she paid, she was ineligible to receive her diploma, Williams recalled. She could not even receive a transcript.

According to Williams, Kaplan also told her that a previously-accepted credit from a community college no longer counted toward her degree requirement, necessitating that she complete additional coursework--at additional expense.

Williams was both confused and dismayed. She had enrolled in the program, seeking a bachelor's in business administration, precisely because she hoped this credential would give her more opportunities to boost her income in Delaware's real estate business. Now, her credential was being denied until she could come up with a sum of money that she lacked.

"I was current on all my expenses," she said. "The award package I was getting was going to cover everything. None of this was ever brought to my attention. But now that I'm trying to leave, all of a sudden they're creating issues."

Williams has submitted formal grievance letters to the university, the Better Business Bureau and the Florida Attorney General's Office. She has requested detailed accounts of why student loans did not cover her costs as promised, she says, complaining she had yet to receive a satisfactory answer from Kaplan.

Shortly after graduation, Williams was laid off from her job at a real estate agency. Without a diploma or a transcript proving that she completed her bachelor's degree, she was forced to apply for lower-

paid work as a leasing agent, eventually accepting a position that pays some $17,000 less a year--nowhere near enough to pay what Kaplan claimed she owed.

Johnson, the former Kaplan financial aid officer, expressed confidence that Williams' experience was no accident. He routinely saw student's financial statements altered by Kaplan's business office in Alpharetta, Ga., with zero balances suddenly turned into four- and five-figure balances without any them registering for additional courses--always right before graduation.

"You've been told you're fine," he said. "You've been given statements, and the next thing you know, when you graduate, it's 'You've made a mistake on your account.' They know you need your transcript. They know you need your degree, so students, for the most part, will try to pay it."

Are you a student at a for-profit college or university who has been misled by deceptive recruiting practices or predatory financial aid? Share your story below!
Are You In Debt To A For-Profit College?


Find a picture, click the participate button, add a title and upload your picture